No. 2024-1520

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

US PATENT NO. 7,679,637 LLC,

*Plaintiff-Appellant,*

*v.*

GOOGLE LLC,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Western District of Washington, No. 2:23-cv-00592-JHC, Judge John H. Chun

### JOINT APPENDIX

DAVID P. BERTEN
dberten@giplg.com
ALISON A. RICHARDS
arichards@giplg.com
GLOBAL IP LAW GROUP, LLC
55 W. Monroe Street, Suite 3400
Chicago, IL 60603
(312) 241-1500

*Attorneys for Plaintiff-Appellant*
*US Patent No. 7,679,637 LLC*

September 27, 2024

I. SASHA MAYERGOYZ
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
(312) 269-1572
smayergoyz@jonesday.com

MICHAEL C. HENDERSHOT
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
(650) 739-3940
mhendershot@jonesday.com

JENNIFER L. SWIZE
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
jswize@jonesday.com

RITA J. YOON

JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
(415) 626-3939
ryoon@jonesday.com

T. KAITLIN CROWDER
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
kcrowder@jonesday.com

JOHN R. BOULÉ III
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
jboule@jonesday.com

DANIELE SAN ROMÁN
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
dsanroman@jonesday.com

*Attorneys for Defendant-Appellee Google LLC*

# TABLE OF CONTENTS

|  | **Page(s)** |
|---|---|
| **DECISIONS APPEALED** | |
| Order granting Defendant's Motion to Dismiss with prejudice, D.I. 30 (January 25, 2024) | Appx1-26 |
| Judgment By Court, D.I. 31 (January 25, 2024) | Appx27 |
| **PATENT-IN-SUIT** | |
| U.S. Patent No. 7,679,637 (D.I. 1- Ex. 1) | Appx28-40 |
| **DISTRICT COURT DOCKET SHEET** | |
| Civil Docket Sheet for *U.S. Patent No. 7,679,637 LLC v. Google, LLC,* No. 2:23-cv-00592-JHC (WDWA) | Appx41-43 |
| **DISTRICT COURT FILINGS** | |
| D.I. 1 - Complaint (April 18, 2023) | Appx44-54 |
| D.I. 25- First Amended Complaint (July 31, 2023) | Appx85-105 |
| D.I. 26- Google, LLC's Rule 12(B)(6) Motion to Dismiss the First Amended Complaint (Aug. 21, 2023) | Appx107-136 |
| D.I. 27- Plaintiff's Opposition to Defendant Google, LLC's Motion to Dismiss the First Amended Complaint (Sep. 11, 2023) | Appx158 |
| D.I. 27-4- Ex. 4- U.S. Patent No. 9,549,152 | Appx207-248 |
| D.I. 27-5- Ex. 5- Declaration of David Berten Pursuant to Fed. R. Civ. P. 56(d) | Appx249-252 |
| D.I. 29- Google, LLC's Reply in Support of its Rule 12(B)(6) Motion to Dismiss the First Amended Complaint (Sep. 15, 2023) | Appx267 |

| | Page(s) |
|---|---|
| D.I. 32 – Plaintiff's Notice of Appeal | Appx285-286 |
| D.I. 29-1 – Ex. 3 to Google's Reply in Support of Its Motion to Dismiss – Letter from R. Yoon to D. Berten (July 13, 2023) | Appx288-289 |
| D.I. 25-1 - Ex. 1- Select Evidence of Infringement | Appx290-315 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

US PATENT NO. 7,679,637 LLC,

              Plaintiff,

    v.

GOOGLE LLC,

              Defendant.

CASE NO. 2:23-cv-00592-JHC

ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS

## I

### INTRODUCTION

This patent matter comes before the Court on Google's Rule 12(b)(6) Motion to Dismiss the First Amended Complaint. Dkt. # 26. Plaintiff claims infringement of its patent. Google seeks dismissal, arguing ineligibility under Section 101 of the Patent Act. Applying the two-step test of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), for the reasons discussed below, the Court finds that (1) the representative claims of the patent are directed to an abstract idea; and (2) such claims do not contain an inventive concept sufficient for patent eligibility. Further, the Court concludes that amendment of the operative pleading would be futile. Accordingly, the Court GRANTS Defendant's motion and DISMISSES this matter with prejudice.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 1

**Appx1**

## II

### BACKGROUND

On March 16, 2010, the United States Patent and Trademark Office issued U.S. Patent No. 7,679,637 ('637 Patent). Dkt. # 25 at 3. Plaintiff U.S Patent No. 7,679,637 LLC owns the '637 Patent. *Id.* Plaintiff filed its complaint on April 18, 2023, Dkt. # 1, and its First Amended Complaint (FAC) on July 31, 2021, Dkt. # 25. Plaintiff claims that Google's YouTube Service directly infringes Claims 2, 3, 4, 5, 7, 8, and 9 of the '637 Patent; and, in the alternative, that Google induces infringement of Claims 2,3, 4, and 5 of the '637 Patent. *Id.* at 3–4.

Defendant moves to dismiss Plaintiff's infringement claim under Rule 12(b)(6), arguing that the '637 Claims are not directed to patent-eligible subject matter required by § 101 of the Patent Act. 35 U.S.C. § 101. Dkt. # 26.[1]

## III

### PROCEDURAL & SUBSTANTIVE STANDARDS

A.    Motion to Dismiss

A defendant may move to dismiss a claim under Rule 12(b)(6) when a pleading "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), courts construe the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Courts must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). But courts are not required "to accept as true allegations that are

---

[1] In the alternative, Defendant argues for dismissal on the ground that the FAC "fails to plausibly allege that Google 'benefits' or 'uses' the entire claimed system." Dkt. # 26 at 30. Because the Court finds the '637 Patent ineligible under § 101, it need not address this argument in the alternative.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 2

**Appx2**

merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

B.      Section 101 Standards

Federal Circuit law applies to "substantive and procedural issues unique to and intimately involved in federal patent law." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 830 F.3d 1335, 1338 (Fed. Cir. 2016).

Patent eligibility may be resolved on a motion to dismiss so long as there "are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022); *see also ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019).

Section 101 of the Patent Act authorizes protection for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof[.]" 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (quotation marks omitted).

In *Alice Corp. Pty. Ltd.*, the Supreme Court outlined a two-step process for courts to use when assessing whether a claimed invention is an unpatentable abstract idea: first, the court asks

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 3

**Appx3**

whether the patent claims are directed to unpatentable subject matter, and second, if so, the court asks whether the patent includes an "inventive concept" implementing the abstract idea. 573 U.S. 208.

When conducting an *Alice* analysis, the court must consider the "representative" claims of a patent. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). "Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Id.*; *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016) (affirming district court's finding of representativeness when patentee did not "present[] any meaningful argument for the distinctive significance of any claim limitations other than those included in" the representative claim). "A claim is not representative simply because it is an independent claim." *Berkheimer*, 881 F.3d at 1365.

As touched on above, *Alice* step one requires the court to determine whether the representative claims are "directed to" one of the patent-ineligible concepts: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd.*, 573 U.S. at 217. If the representative claims are not directed to any of these concepts, the court must find the claims are patent eligible under § 101. When conducting this analysis, courts may "compare [the] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). And the Federal Circuit has approached this inquiry by asking "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (internal quotation marks and citations omitted). The court "must focus on the language of the Asserted

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 4

**Appx4**

Claims themselves . . . considered in light of the specification." *Id.* (internal quotation marks and citation omitted). The court must "look to whether the [representative] claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).

"In cases involving software innovations, this inquiry often turns on whether the [representative] claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *TecSec, Inc.*, 978 F.3d at 1293 (internal quotation marks and citation omitted). "[S]oftware can make patent-eligible improvements to computer technology, and related claims are eligible as long as they are directed to non-abstract improvements to the functionality of a computer or network platform itself." *Id.* (internal quotation marks and citation omitted). The Federal Circuit has held software-related claims patent eligible when (1) "the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014)[,]" and (2) the claim identifies "a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function, *Uniloc [USA, Inc. v. LG Elecs. USA, Inc.]*, 957 F.3d [1303,] 1306, 1308–09 [(Fed. Cir. 2020)]." *Id.*

A claim is patent ineligible when it "applies a well-known idea using generic computers 'to the particular technological environment of the Internet.'" *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) (quoting *DDR Holdings, LLC*, 773 F.3d at 1259); *see also Two-Way Media Ltd.*, 874 F.3d at 1337 ("Claims directed to generalized steps to be performed on a computer using conventional computer activity are not patent eligible."); *see also*

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS - 5

**Appx5**

*Affinity Labs of Texas LLC v. DIRECTV LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016) ("The Supreme Court and [the Federal Circuit] have repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract."). Finally, "a claim that merely describes an effect or result dissociated from any method by which it is accomplished is usually not directed to patent-eligible subject matter." *Int'l Bus. Machs. Corp. v. Zillow Grp. Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (internal quotation marks and citation omitted).

If the court determines the representative claims are directed to one of the patent-ineligible concepts, the court proceeds to *Alice* step two and determines whether the patent claims include an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice Corp. Pty. Ltd.*, 573 U.S. at 217 (internal quotation marks and citation omitted) (alteration in original). To become patent-eligible, a claim directed to a patent-ineligible concept "requires more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *ChargePoint, Inc.*, 920 F.3d at 773. When a claim "amount[s] to nothing significantly more than an instruction to apply [an] abstract idea … using some unspecified, generic computer and in which each step does no more than require a generic computer to perform generic computer functions" the abstract idea does not become patent-eligible "because claiming the improved speed or efficiency inherent with applying the abstract idea on a computer does not provide a sufficient inventive concept." *Intell. Ventures I LLC*, 838 F.3d at 1316 (internal quotation marks and citations omitted).

Finally, a court may conduct a § 101 analysis before formal claim construction if the patentee does not "explain how any proposed construction would change the § 101 analysis."

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 6

**Appx6**

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x 520, 525 (Fed. Cir. 2021) (affirming § 101 determination on a motion to dismiss before claim construction because plaintiff proposed no construction that would have changed the § 101 analysis).  A § 101 analysis may be conducted before formal claim construction "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).  But when a party does not identify any claim construction issues that need to be resolved or any factual disputes that would affect a § 101 analysis, the Federal Circuit has dismissed without conducting claim construction.  *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, No. 2022-1861, 2024 WL 89642, at *6 (Fed. Cir. Jan 9, 2024).

## IV

### DISCUSSION

A.      The '637 Patent

        According to the '637 Patent abstract, it is,

> [a] web conferencing system which, in one aspect has time-shifting capabilities. Session content is recorded so that participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at normal, slower, or faster speeds, while maintaining substantially consistent perceived audio quality.

Dkt. # 27-2 at 2.  The '637 Patent specification[2] describes the system as a "multi-part software program comprised of a server application **110** running on a computer connected through a

---

[2] The specification "'includes both the written description and the claims' of the patent." *Cisco Sys. v. TQ Delta, LLC*, 928 F.3d 1359, 1362 (Fed. Cir. 2019) (quoting *In re Packard*, 751 F.3d 1307, 1320 n.11 (Fed. Cir. 2014)).

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 7

network **118** to multiple client applications **120a-120n**, each running on a computer." *Id.* at 9 (see FIG. 1 below).[3]



FIG. 1

And the specification explains several advantages of the '637 Patent:

A participant can enter a meeting after it has begun and either begin observing the live content or rewind and see the content that they missed

A participant can observe a meeting in real-time and be able to pause the content to deal with an interruption

A participant observing a meeting can easily replay an interesting segment

---

[3] Dkt. # 27-2 at 3.  Figure 1 "is a block diagram which illustrates the general organization and main components of an embodiment of a time-shifted web conferencing system."  Dkt. # 27-2 at 9.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 8

A participant can observe a live meeting at slower than real-time to more easily digest the content

A participant observing on a delay (from joining late, pausing, replaying, etc. . . .) can observe the content faster than real-time[.]

*Id.*

*Language of the Claims allegedly infringed—i.e., Claims 2–5 and 7–9*

Claim 2 of the '637 Patent provides:

A web conference system comprising:

(a) A first client application allowing at least one presenting participant to share computer screen video,

(b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session,

(c) storage means for recording said computer screen video and said data stream, and

(d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live,

(e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream,

(f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream

whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream.

*Id.* at 13.

Claim 3 of the '637 Patent provides:

The system of claim 2 wherein:

(a) said first client application allows said presenting participant to share audio data

(b) said storage means records said audio data, and

(c) said second client application allows said observing participant to sense said audio data.

*Id.* at 13. Claim 3 depends on Claim 2. Dkt. # 25 at 13.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 9

Claim 4 of the '637 Patent provides:

The system of claim 3 wherein:

(a) said web conferencing system includes an audio time-scale modification component,

(b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed,

(c) whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed.

Dkt. # 27-2 at 14.  Claim 4 depends on Claim 3.  Dkt. # 25 at 14.

Claim 5 of the '637 Patent provides:

The system of claim 4 wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking.

Dkt. # 27-2 at 14.  Claim 5 depends on Claim 4.  Dkt. # 25 at 15.

Claim 7 of the '637 Patent provides:

A web conferencing system comprising:

(a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data

(b) a second client application that allows at least one observing participant to sense said data streams

(c) a server application operatively connected to said first client application and to said second client application, said server application arranged to: i. receive said data streams from said first client application and record it in a storage device ii. retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

Dkt. # 27-2 at 14.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 10

**Appx10**

Claim 8 of the '637 Patent provides:

> The system of claim 7 wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session.

*Id.*

Claim 9 of the '637 Patent provides:

> The system of claim 8 wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams.

*Id.* Claim 9 depends on Claim 8. Dkt. # 25 at 19

**B.     The Representative Claims**

Defendant argues that Claims 2–5 are representative "because they recite substantially similar limitations and are drawn to the same abstract idea as [C]laims 7-9 with [C]laims 7-9 reciting a 'server application.'"[4] Dkt. # 26 at 12, 27. The Court agrees.

In sum, Claim 2 focuses on the sharing of computer screen video; data stream information including "chat data, documents, web pages, and white-boarding session"; storing of such data; and a second client application enabling another user to observe such data, both live and previously recorded. Dkt. # 27-2 at 13. Claim 3 focuses on the sharing, storing, and observation of audio data between first and second client applications. *Id.* Claim 4 focuses on the time-scale modification component enabling the second client application to perceive aspects of the audio data at various rates of playback speed. *Id.* at 14. And Claim 5 focuses on the second client application's time-shifting operations of pausing, resuming, and seeking. *Id.*

---

[4] Defendant also contends that because the '637 Patent "acknowledges that 'the server application' performs generis functions, this limitation does not substantially change the character of [C]laims 7–9 under *Alice*." Dkt. # 26 at 27. The Court agrees.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 11

**Appx11**

In sum, Claim 7 focuses on the sharing of computer screen video and audio data; the recording and retrieval of such data from a server application; a time-scale modification component enabling the second client application to perceive audio data at various playback rates; and the selective observation and sensing of data streams, both live and previously recorded. Dkt. #27-2 at 14. Thus, Claim 7 is represented by Claims 2, 3, and 4. *Id.* Claim 8 focuses on data stream information including "chat data, documents, web pages and white-boarding session[s]" and is, therefore, represented by claim 2. *Id.* Finally, Claim 9 focuses on the second client applications time-shifting operations of pausing, resuming, and seeking and is represented by Claim 5. *Id.*

Plaintiff responds that Defendant's argument is "conclusory" and that Google has not addressed the question "whether each claim has distinctive claim limitations (*e.g.*, limitations not common to the other claims)." Dkt. # 27 at 11. But the Federal Circuit has explained that claims are representative when "the *patentee* does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim." *Berkheimer*, 881 F.3d at 1365 (emphasis added). And Plaintiff has not done so here. Dkt. # 27 at 11–12. Thus, the Court finds Claims 2–5 representative for purposes of its § 101 analysis.

C.     Claim Construction

Plaintiff says that it would be premature for the Court to determine patent-eligibility at the motion to dismiss stage, and that the Court must conduct a claim construction hearing beforehand. Dkt. # 27 at 18. To support this assertion, Plaintiff says that two terms may be

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 12

**Appx12**

"functional" under § 112(6):[5] "time-scale modification component" and "storage means." *Id.* But Plaintiff merely contends that *Google* may make certain arguments about the functionality of these terms in a claim construction hearing—Plaintiff neither proposes constructions of these terms nor explain "how any proposed construction would change the § 101 analysis." *Mortg. Application Techs., LLC*, 839 F. App'x at 525. Therefore, the Court may proceed with a § 101 analysis without conducting claim construction.

D.      The Federal Circuit's application of the *Alice* Two-Step Framework

District courts may "compare [the] claims at issue to those claims already found to be directed to an abstract idea in previous cases[]" when considering a motion to dismiss under § 101. *Enfish, LLC*, 822 F.3d at 1335. Below the Court summarizes instructive cases and then compares the representative claims of the '637 Patent in its eligibility analysis.

1.      Cases involving claims directed to ineligible subject matter under § 101

In *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, the Federal Circuit found patent claims "directed to a method of receiving, displaying, converting, storing and transmitting digital video 'using result-based functional language'" to be ineligible under § 101. 60 F.4th 1349, 1357 (Fed. Cir. 2023) (quoting *Two-Way Media Ltd.*, 874 F.3d at 1337). At *Alice* step one, the Federal Circuit agreed with the district court's conclusion that the claims were "directed to the abstract idea of 'storing and displaying video.'" *Id.* at 1356 (internal citations omitted). At *Alice* step 2, the Federal Circuit held that the claims "'read in light of the specification, do not show a technological improvement in video storage and display because the limitations can be

---

[5] Section 112(6) states that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(6).

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 13

implemented using generic computer elements,' and the 'specification and claims do not explain or show how the monitoring and storage is improved, except by using already existing computer and camera technology.'" *Id.* at 1358. And even if the claims attained the patent-holder's purported solution of achieving the "benefit of transmitting the same digital image to different devices for different and perhaps divergent purposes, while using the same bandwith," the Federal Circuit explained the claims use only "generic functional language" to do so and only require "conventional computer and network components operating according to their ordinary functions[.]" *Id.* at 1358 (internal quotation marks omitted) (citing *Two-Way Media*, 874 F.3d at 1339).

In *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, the Federal Circuit found a claim ineligible under § 101. 874 F.3d 1329. The claim recited "a method for routing information using result-based functional language." *Id.* at 1337. The court found that the claim required "the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but [did] not sufficiently describe how to achieve these results in a non-abstract way." *Id.* at 1337 (quoting *Affinity Labs of Tex.*, 838 F.3d at 1258–59). At *Alice* step 2, the Federal Circuit held that "[m]erely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 1338. The court held that the main problem with the claim was that it "—as opposed to something purportedly described in the specification—is missing an inventive concept." *Id.* at 1339. And while the plaintiff said that "the claim solves various technical problems, including excessive loads on a source server, network congestion, unwelcome variations in delivery times, scalability of networks, and lack of precise recordkeeping . . . [the claim] here only uses generic functional language to achieve these purported solutions." *Id.* at

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 14

**Appx14**

1339. The court also saw "no inventive concept in the ordered combination of these limitations." *Id.* at 1339.

In *Interval Licensing LLC v. AOL Inc.*, the Federal Circuit found patent claims directed to "providing information to a person without interfering with the person's primary activity" to be ineligible under § 101. 896 F.3d 1335, 1343 (Fed. Cir. 2018) (internal quotation marks and citation omitted).[6] The court determined that "[s]tanding alone, the act of providing someone an additional set of information without disrupting the ongoing provision of an initial set of information is an abstract idea" and "the collection, organization, and display of two sets of information on a generic display device is abstract[.]" *Id.* at 1344–45. At *Alice* step two, the Federal Circuit began its analysis by stating "[i]t is well-settled that placing an abstract idea in the context of a computer does not 'improve' the computer or convert the idea into a patent-eligible application of that idea." *Id.* at 1346. And the court held that the claims at issue did not include the "kinds of limitations we have held to 'solve a technology-based problem, even with conventional, generic components, combined in an unconventional manner.'" *Id.* at 1347 (quoting *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016), *cert. denied*, ___ U.S. ___, 138 S.Ct. 469, 199 L.Ed.2d 356 (2017)). The Federal Circuit held that "the claims here do not offer a particular solution to a problem that, in [other cases], was unique to the internet." *Id.* at 1347.

---

[6] Plaintiff says that *Interval Licensing LLC* is distinguishable because the parties there "**agreed** that the claims in the patent . . . were directed to an 'attention manager'; and the district court determined that the abstract idea was 'providing information to a person without interfering with that person's primary activity.'" Dkt. # 27 at 17 (citing *Interval Licensing LLC*, 896 F.3d at 1341). But the district court's order highlighted differences between the plaintiff's and the defendants' positions on the claims: "Defendants argue the asserted claims are directed at the abstract idea of providing information to a person without interfering with the person's primary activity[]" and "[Plaintiff] argues that the claims are 'directed to the operation of an attention manager system[.]" *Interval Licensing LLC v. AOL Inc.*, 193 F. Supp. 3d 1184, 1187 (W.D. Wash. 2016). Thus, the Court does not see the case as meaningfully distinct.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 15

Finally, in *International Business Machines Corporation*, the Federal Circuit found two patents ineligible for patent protection under § 101. 2024 WL 89642, at *1. The district court found the claims of the first patent "'possess[ed] the following indicia of abstractness: (1) describing processes that can be performed with a pen and paper; (ii) using claim language that is result-oriented; and (iii) focusing on an intangible, namely information.'" *Id.* at *4 (quoting J.A. [Joint Appendix] 18). The district court concluded that the patent "'merely mimics what humans do to search for information, with the added feature of conducting the entire exercise on a computer.'" *Id.* (quoting J.A. 18). The Federal Circuit agreed and held that the patent claims "do nothing more than improve a user's experience while using a computer application and are precisely the types of claims that we have held are abstract at step one" in previous cases. *Id.* The Federal Circuit held that plaintiff "fails to explain how the claims do anything more than '[i]dentify[], analyz[e], and present[] certain data to a user,' which we explained in [a prior case] is 'not an improvement specific to computing.'" *Id.* (quoting *Int'l Bus. Machs. Corp.*, 50 F.4th at 1378). Because the claims "do not disclose any technical improvement to how computer applications are used[,]" the Federal Circuit agreed that the first patent is directed to an abstract idea. *Id.* As for the second patent, the Federal Circuit agreed with the district court that it was directed to an abstract idea because,

> the claims are directed to improving a user's experience when viewing search results but do not contain any specific mechanism for doing so. For example, representative claim 14 uses results-oriented language, such as "receiving a resource response set of results," "receiving a user context vector," "mapping the user context vector," and "controlling the presentation of the resource response set," without any explanation for how these steps are carried out.

*Id.* at *5. At *Alice* step two, the Federal Circuit agreed with the district court's determination that "IBM's allegations of inventiveness 'do[] not … concern the computer's or graphical user interface's capability or functionality, [but] relate[] merely to the user's experience and

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 16

satisfaction with the search process and results.'" *Id.* at *4 (quoting J.A. 22). When the Federal Circuit recently found inventiveness, it highlighted that "the specification for those patents included a 'specific implementation' of improving search results, rather than a simple conceptual description of an improvement." *Id.* (quoting *Weisner v. Google LLC*, 51 F.4th 1073, 1086 (Fed. Cir. 2022). Thus, the first patent was not patent-eligible. Similarly, the Federal Circuit found the second patent was not inventive because the plaintiff's claims of inventiveness were not "in the specification or the claims." *Id.*

2. Cases involving claims directed to eligible subject matter under § 101

According to Plaintiff, *DDR Holdings, LLC v. Hotels.com, L.P.*, controls the outcome here. 773 F.3d at 1257. There, the Federal Circuit found the patented claims eligible under a § 101 analysis because "the claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* While the Federal Circuit cautioned that "not all claims purporting to address Internet-centric challenges are eligible for patent," it found that the patent's claims at issue did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice" and the claims "specif[ied] how interactions with the internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258.

Plaintiff also cites *Visual Memory LLC v. NVIDIA Corp.*, in which the Federal Circuit found patented claims eligible under a §101 analysis. 867 F.3d 1253 (Fed. Cir. 2017). The Federal Circuit found the patents at issue to be "directed to a technological improvement: an enhanced computer memory system." *Id.* at 1258–59. According to the Federal Circuit, the patent's claims "focus on a 'specific asserted improvement in computer capabilities'—the use of

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 17

programmable operational characteristics that are configurable based on the type of processor—instead of 'on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Id.* at 1260 (quoting *Enfish, LLC*, 822 F.3d at 1336). The Federal Circuit also stated that the patent's specification "discusses the advantages offered by the technological improvement." *Id.* at 1260. Therefore, the court found that "this is not a case where the claims recite . . .generalized steps to be performed on a computer using conventional computer activity.'" *Id.* at 1260 (quoting *Enfish, LLC*, 822 F.3d at 1338).

E.      The Eligibility of the '637 Patent's Representative Claims Under § 101

1.      *Alice* Step One

For three reasons, the Court concludes that the '637 Patent is directed to the abstract idea of playing back recorded content.

First, Plaintiff does not say, and the claim language does not illustrate how, the claims focus "on a solution to a problem specifically arising in the realm of computer networks or computers." *TecSec, Inc.*, 978 F.3d at 1293 (internal quotation marks and citation omitted). Nor do the claims identify "a specific improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function[.]" *Id.* (internal quotation marks and citation omitted).

Plaintiff says that "the patent claims an invention that is specifically addressed to a specific technical problem with web-based video conferencing, itself a highly technical field that requires all manner of technologies just to establish the conference, let alone have in operate in a manner consistent with the claims." Dkt. # 27 at 17. But the Court struggles to discern what is the "specific technical problem with web-based video conferencing," as Plaintiff does not

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 18

**Appx18**

elaborate on this.  Elsewhere, Plaintiff says that the claims address the issue that "current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Dkt. # 27-2 at 8.  If this is the "specific technical problem," it is not an issue unique to the internet or "in the realms of computer networks"—it is an issue in most meetings, whether virtual or in-person.

Plaintiff highlights that "playing back of some recorded media was known in other technical fields prior to the invention, e.g., digital video recorders (DVRs) like TiVo, which the patent correctly explains is in 'a separate field' of 'television viewing[.]'"  Dkt. # 27 at 7.  The '637 Patent states,

> Web conferencing systems, however, presented technical challenges that are different from television viewing, and [Plaintiff's] invention solved some of those technical issues, overcoming technological problems specifically arising in the realm of these web conferencing systems. For example, unlike a self-contained DVR, web conferencing systems of the kind claimed in the invention involved at least two distinct applications: one used by the presenter and separate applications used by other participants. The '637 patent expressly claims the use of two different applications. . . . Second, unlike TV, web conferencing systems of the kind claimed in the invention use more than one data stream. The '637 patent expressly claims the use of distinct data streams.

*Id.* at 8.  But this merely summarizes the content of the claims, not any specific improvements. And while there very well may be different technological issues between web conferencing systems and "a self-contained DVR," the Federal Circuit explained that "merely limiting the field of use of the abstract idea to a particular existing technological environment [i.e., web conferencing systems] does not render the claims any less abstract."  *Affinity Labs of Texas LLC*, 838 F.3d at 1259.

More to the point, Plaintiff says that the invention "solved some of those technical issues" but does not specify how the claims make the alleged improvements.  Nor does the claim

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 19

**Appx19**

language identify the alleged improvements.  Thus, the Court finds that the representative claims do not include a "specific implementation" of improving web-based conferencing.  While "[t]he '637 [Patent] explains that, unlike DVRs/TiVo with televisions, 'current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress[,]'" Dkt. # 27 at 8, this is merely a "simple conceptual description of an improvement." *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at *4.

Second, the representative claims of the '637 Patent "possess the following indicia of abstractness: . . . claim language that is result-oriented[.]" *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at *4.  Plaintiff fails to explain how the claims do anything more than "share"; "store"; enable a user to "observ[e]" and "sense" the data; and enable "time-shifting" capabilities.  Dkt. # 27-2 at 13–14; *see Two-Way Media Ltd.*, 874 F.3d at 1337 ("the claim require[d] the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but [did] not sufficiently describe how to achieve these results in a non-abstract way.").  As the Federal Circuit has explained, "a claim that merely describes an effect or result dissociated from any method by which it is accomplished is usually not directed to patent-eligible subject matter." *Int'l Bus. Machs. Corp*, 50 F.4th at 1378.

Third, the Federal Circuit previously found that "patent claims directed to 'providing information to a person without interfering with the person's primary activity' to be ineligible under § 101." *Interval Licensing LLC*, 896 F.3d at 1343.  As in *Interval Licensing LLC*, the representative '637 Patent claims merely provide the abstract idea of "collect[ing], organiz[ing], and display[ing] . . . two sets of information on a generic display device." *Id.* at 1344–45.  Moreover, the '637 Patent describes its functions as the recording of session content "so that

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 20

**Appx20**

participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed." Dkt. # 27-2 at 2. And unlike in *DDR Holdings*, the claims here do not offer a solution to an issue unique to the internet. 773 F.3d at 1257.

Finally, in *Hawk Technology Systems*, the Federal Circuit found patent claims "directed to a method of receiving, displaying, converting, storing and transmitting digital video 'using result-based functional language[,]'" ineligible under § 101. 60 F.4th at 1357. The representative claims of the '637 Patent are similarly directed. Claim 2 outlines a "web conference system" allowing for an application to "share computer screen video" and other data; enabling "storage means for recording" said video and data; and a "second client application" enabling another participant to sense said live and previously recorded data. Dkt. # 27-2 at 13. Claim 3 builds on Claim 2 and provides for the "shar[ing]," "stor[ing], and "observing" of audio data. *Id.* Claim 4 builds on Claim 3 and allows for "time-scale modification" of shared screen data, audio data, and the data stream. *Id.* at 14. Finally, Claim 5 enables the observing client application to pause, resume, and seek shared data. *Id.*

For these reasons, the Court finds the representative claims of the '637 Patent to be directed to an abstract idea.

2.      *Alice* Step Two

Because the Court finds the representative claims of '637 Patent to be directed to an abstract idea, it must proceed to step two of the *Alice* framework. Defendant argues that the "[i]ndividual [e]lements and [o]rdered [c]ombination" of the representative claims of the '637

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 21

**Appx21**

Patent "[f]unction in a [c]onventional [w]ay and [d]o [n]ot [s]upply an [i]nventive [c]oncept." Dkt. # 26 at 26 (in heading). The Court agrees.[7]

Plaintiff states that "[t]he asserted claims recite inventive concepts sufficient to render them patent-eligible." Dkt. # 27 at 18. But Plaintiff does not explicitly identify these "inventive concepts" and neither the claim language nor the specification outlines these concepts. "Merely alleging inventiveness without tying those allegations to the patent is insufficient to survive a Rule 12 motion." *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at *5.[8]

Assuming the '637 Patent's inventive concept is the enablement of a user to "observe a previously recorded part of the meeting while the meeting is still in progress," Dkt. # 27 at 8, this language does not sufficiently recite an inventive concept. It merely restates the "abstract goals of the invention; [it does] not teach how" a previously recorded part of the meeting can be observed while the meeting is still in progress. *IBM v. Zillow*, 549 F. Supp. 3d 1247, 1268 (W.D. Wash. 2021), aff'd, *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371 (Fed. Cir. 2022); *see also Dropbox Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (finding that the plaintiff's claims that each patent solves "given technological problems, but

---

[7] In the opposition brief, in the section addressing *Alice* step 2, Plaintiff cites a prior Google patent arguing that "Google *itself* makes extensive use of 'functional claiming' on its own patents." Dkt. # 27 at 20–21. This prior patent is immaterial. The focus of the § 101 analysis is on the claim language of the '637 Patent. Therefore, this Court must consider the claims of the '637 Patent for the § 101 analysis. Whether Defendant has prior patents that also employ "functional claiming" does not affect this analysis.

Also, Plaintiff says that Defendant's 12(b)(6) motion has transformed into a motion for summary judgment because Defendant introduced a patent not on the face of Plaintiff's complaint, Dkt. # 27 at 13–14 (citing Dkt. # 26 at 14). But the Court does not rely on that patent in its § 101 analysis and need not address this argument.

[8] Plaintiff says that the *Aatrix* decision precludes dismissal based on Rule 12(b)(6), Dkt. # 27 at 14–15, but the Court disagrees. In *Aatrix*, the patentee pointed to "concrete allegations in the [] complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity [and] [t]here are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer." 882 F.3d at 1128. Plaintiff does not point to concrete allegations of this sort.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 22

**Appx22**

never provide more support than a conclusory statement that 'the inventions described and claimed ... solved these problems,' improved the art, 'represented a significant advance over existing approaches[,] and were not well-known, routine, or conventional in the field' at the time of patenting" were no more than a "series of legal conclusions" and "insufficient to survive a motion to dismiss.").

Moreover, despite Plaintiff's assertion that the '637 Patent provides inventive concepts, the representative claims "only use[] generic functional language to achieve these purported solutions." *Two-Way Media Ltd.*, 874 F.3d at 1339; *see also BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018) ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application."). The representative claims are comprised of "generic computer functions." *Intell. Ventures I LLC*, 838 F.3d at 1318. Claim 2 provides for the "shar[ing] of computer screen video[,]" "storage means for recording[,]" and receiving recorded content. Dkt. # 27-2 at 13. Claim 3 provides for "audio time-scale modification component." *Id.* at 14. Claims 2 and 3 provide for recording computer screen video, data streams, and audio data. *Id.* at 13–14. Claims 2, 3, and 4 provide for sharing and sensing data streams, audio data, and computer screen video data. *Id.* And Claim 5 provides for time-shifting operations including pausing, resuming, and seeking. *Id.* at 14. The Federal Circuit held in *Two-Way Media Ltd.*, that claims requiring the "processing of data streams, [and] transmi[ssion] . . . from an intermediate computer" as well as claims "receiving and transmitting a real-time media stream from an intermediate server, . . . and recording certain information about the steam" require nothing more "than conventional computer and network components

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 23

**Appx23**

operating according to their ordinary functions." 874 F.3d at 1340–41 (internal quotation marks and citation omitted).

Finally, recent Federal Circuit cases determining § 101 patent eligibility are instructive. As in *Hawk Technology Systems*, the representative claims of the '637 Patent, read in light of the specification, "do not show a technological improvement in video storage and display because the limitations can be implemented using generic computer elements[.]" 60 F.4th at 1358. Nor do the claims "explain or show how the monitoring and storage is improved, except by using already existing computer and camera technology." 60 F.4th at 1358. And compared to *Visual Memory LLC*, while the '637 Patent's specification "discusses the advantages offered by" their patent claims, Dkt. # 27-2 at 9, it does not specify the technological improvement. 867 F.3d at 1260.

For these reasons, the Court finds that the representative claims of the '637 Patent do not contain an inventive concept sufficient for patent eligibility under § 101.

F.      Dismissal With Prejudice

Plaintiff requests an opportunity to amend if this Court finds any defect in their FAC. Dkt. # 27 at 27. A district court must grant leave to amend unless one or more of these factors are present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Courts in this district have dismissed without leave to amend when amendment would be futile after determination of ineligibility under §101. *See e.g.*, *PTP OneClick, LLC v. Avalara, Inc.*, 413 F. Supp. 3d 1050, 1065 at n.11 (W.D. Wash., 2019) ("Dismissal without leave to amend is appropriate only when the court is satisfied that the

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 24

deficiencies in the complaint could not possibly be cured by amendment. . . . Here, no amendment can revive the eligibility of the '915 Patent. . . . Accordingly, the court dismisses PTP's patent infringement claim without leave to amend."); *Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176, 1184 (W.D. Wash., 2016) (dismissal of complaint with prejudice where the court found the patents in question cover ineligible subject matter).

Also, based on futility, the Federal Circuit has affirmed district court dismissals without leave to amend under Ninth Circuit law. For example, in *Sanderling Mgmt. v. Snap Inc.,* the Central District of California's dismissal of an infringement suit for lack of patent-eligible subject matter under 35 U.S.C. § 101 and denial of plaintiff's motion for leave to amend complaint was appealed. 65 F.4th 698 (Fed. Cir. 2023). The Federal Circuit held,

> [n]o amendment to a complaint can alter what a patent itself states. In this case, then, our agreement with the district court as to what the patent discloses, and our agreement with the court's application of the *Alice* test, leads inexorably to the conclusion that amendment of the complaint would have been futile. Sanderling's proposed amendment merely sought to add conclusory statements that the claimed steps were not well-known, routine, and conventional.

*Id.* at 706.

The Court finds that granting leave to amend would be futile. The claim language of '637 Patent dictates the result of § 101 ineligibility and amendment cannot rectify that. *See Sanderling Mgmt.*, 65 F.4th at 706 ("[n]o amendment to a complaint can alter what a patent itself states.").

## V

### CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion to Dismiss and DISMISSES the FAC with prejudice.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 25

**Appx25**

Dated this 25th day of January, 2024.

John H. Chun
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 26

**Appx26**

# UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| US PATENT NO 7,679,637 LLC<br><br>              Plaintiff,<br>v.<br><br>GOOGLE LLC<br><br>              Defendant | **JUDGMENT IN A CIVIL CASE**<br><br>CASE NUMBER 2:23-cv-00592-JHC |

☐   **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒   **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT

Defendant's Rule 12(b)(6) Motion to Dismiss the First Amended Complaint, Dkt. # 26, is

GRANTED.  Plaintiff's First Amended Complaint is dismissed with prejudice.

Dated January 25, 2024.

Ravi Subramanian
Clerk of Court

*/s/Ashleigh Drecktrah*
Deputy Clerk

**Appx27**

US007679637B1

## (12) United States Patent
### Kohler

(10) **Patent No.:** **US 7,679,637 B1**
(45) **Date of Patent:** **Mar. 16, 2010**

(54) **TIME-SHIFTED WEB CONFERENCING**

(76) Inventor: **Jeffrey Alan Kohler**, 6880 156th Pl., NE., Redmond, WA (US) 98052

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 82 days.

(21) Appl. No.: **11/973,219**

(22) Filed: **Oct. 5, 2007**

### Related U.S. Application Data

(60) Provisional application No. 60/855,076, filed on Oct. 28, 2006.

(51) **Int. Cl.**
   *H04N 7/14* (2006.01)
(52) **U.S. Cl.** ................................ **348/14.01**; 379/202.01
(58) **Field of Classification Search** ... 348/14.01–14.08; 379/202.01; 341/61; 370/260; 704/503
   See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

6,278,387 B1 * 8/2001 Rayskiy ....................... 370/260

6,298,129 B1 * 10/2001 Culver et al. ........... 379/202.01
6,847,778 B1 * 1/2005 Vallone et al. ................ 386/68
6,906,741 B2 * 6/2005 Canova et al. ........... 348/14.08
6,967,599 B2 * 11/2005 Choi et al. .................... 341/61
7,466,334 B1 * 12/2008 Baba ....................... 348/14.06
2002/0165721 A1 * 11/2002 Chang ........................ 704/503
2006/0146124 A1 * 7/2006 Pepperell et al. ......... 348/14.08
2008/0247730 A1 * 10/2008 Barton et al. ................ 386/83

* cited by examiner

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Maria El-Zoobi

(57) **ABSTRACT**

A web conferencing system which, in one aspect has time-shifting capabilities. Session content is recorded so that participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at normal, slower, or faster speeds, while maintaining substantially consistent perceived audio quality.

**9 Claims, 5 Drawing Sheets**



**Appx28**

Case 2:24-cv-52092-JtoCumDentu21ent 1 Page 33 4/13ied: 09/27/2024 51

# FIG. 1



Case 2:24-cv-02092-JDC Document 21 Page 34/15/23 09/27/2024 51

# FIG. 2



Audio Stream Decompression and Display     130aud

| 210 | 212 |
|---|---|
| Audio Decompression | Audio Time-Scale Modification |

| 214 | 216 |
|---|---|
| Audio Buffer | Audio Output |

**Appx30**

# FIG. 3

```
Variables


m_fPaused           //indicates if playback is paused
                    // (true) or resumed (false)
m_dwTickStart       //indicates system time when current
                    //  playback began
m_dwStartOffset     //indicates presentation time when
                    //  current playback began
m_flRate            //indicates playback rate (1.0 for
                    //  real-time, 2.0 for double...)



Functions


Pause
     Set m_dwStartOffset to the current presentation time
     Set m_fPaused to true

Resume
     Set m_dwTickStart to the current system time
     Set m_fPaused to false

Seek
     Set m_dwTickStart to the current system time
     Set m_dwStartOffset to the desired seek position

Change Playback Rate
     Set m_dwTickStart to the current system time
     Set m_dwStartOffset to the current presentation time
     Set m_flRate to the desired playback rate

Get Current Presentation Time
     if( m_fPaused )
          return m_dwStartOffset
     else
          return ( (current system time - m_dwTickStart)
               * m_flRate ) + m_dwStartOffset
```

**Appx31**

# FIG.4

```
RetrieveFrames( DWORD dwPresentationTimeRequested,
                UINT  nLastFrameNumberReceived,
                bool  fReceiveAllFrames )
{
      if( nLastFrameNumberReceived == -1 )
      // this would indicate no frames previously received
            fReceiveAllFrames = false;

      CAtlArray<SFrameInfo> framesToRetrieve;
      for( size_t i = 0; i < m_receivedFrames.GetCount(); i++ )
      {
            if( m_receivedFrames[i].nFrameNumber > nLastFrameNumberReceived ||
                  nLastFrameNumberReceived == -1 )
            {
                  if( m_receivedFrames[i].dwPresentationTime >
                        dwPresentationTimeRequested )
                  {
                        break;
                  }

                  if( m_receivedFrames[i].fKeyFrame && !fReceiveAllFrames )
                  {
                        framesToRetrieve.RemoveAll();
                  }

                  framesToRetrieve.Add( m_receivedFrames[i] );
            }
      }

      return framesToRetrieve;
}
```

**Appx32**

# FIG. 5



**Appx33**

US 7,679,637 B1

# 1

## TIME-SHIFTED WEB CONFERENCING

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of provisional patent application Ser. No. 60/855,076, filed 2006 Oct. 28 by the present inventor.

### FEDERALLY SPONSORED RESEARCH

Not applicable

### COMPUTER PROGRAM LISTING

A computer program listing appendix is stored on each of two identical compact disks labeled "Copy 1" and "Copy 2" which accompany this specification. Each disk contains computer program listings that illustrate an implementation of the invention. The listings are recorded as IBM-PC MS-Windows compatible files which have the creation dates, sizes (in bytes) and names listed below:

| | | \ |
|---|---|---|
| 10/22/2006 03:58 PM | 2,817 | ReadMe.txt |
| | | \MeetingDemand |
| 07/29/2006 12:19 PM | 1,372 | MeetingDemand.sln |
| | | \MeetingDemand\Common |
| 10/18/2006 09:36 PM | 769 | debughelpers.h |
| | | \MeetingDemand\MDClientApp |
| 10/16/2006 08:39 PM | 9,058 | CameraInput.cpp |
| 10/16/2006 08:39 PM | 1,885 | CameraInput.h |
| 10/16/2006 08:34 PM | 3,211 | ClockCapture.cpp |
| 10/16/2006 08:31 PM | 408 | ClockCapture.h |
| 10/16/2006 08:34 PM | 2,219 | ClockOverlay.cpp |
| 10/16/2006 08:34 PM | 311 | ClockOverlay.h |
| 10/18/2006 10:04 PM | 6,925 | CommunicationMgr.cpp |
| 10/17/2006 10:29 PM | 2,462 | CommunicationMgr.h |
| 10/16/2006 08:50 PM | 1,722 | ConnectDlg.cpp |
| 10/16/2006 08:50 PM | 553 | ConnectDlg.h |
| 10/18/2006 10:08 PM | 13,252 | MDClientApp.cpp |
| 10/18/2006 08:41 PM | 3,021 | MDClientApp.h |
| 10/22/2006 08:24 PM | 7,418 | MDClientApp.rc |
| 10/22/2006 08:25 PM | 8,960 | MDClientApp.vcproj |
| 10/18/2006 10:06 PM | 17,045 | MDClientAppDlg.cpp |
| 10/18/2006 10:06 PM | 2,258 | MDClientAppDlg.h |
| 10/22/2006 08:25 PM | 1,973 | resource.h |
| 10/18/2006 09:33 PM | 3,247 | ScreenCapture.cpp |
| 10/18/2006 09:33 PM | 296 | ScreenCapture.h |
| 10/18/2006 09:58 PM | 1,919 | ScreenDecoder.cpp |
| 10/18/2006 09:58 PM | 1,429 | ScreenDecoder.h |
| 10/18/2006 09:59 PM | 3,136 | ScreenEncoder.cpp |
| 10/18/2006 09:58 PM | 862 | ScreenEncoder.h |
| 10/02/2006 06:10 PM | 211 | stdafx.cpp |
| 10/02/2006 06:10 PM | 3,008 | stdafx.h |
| 10/17/2006 10:33 PM | 4,073 | TSPlaybackMgr.cpp |
| 10/17/2006 10:33 PM | 1,089 | TSPlaybackMgr.h |
| 10/17/2006 08:20 PM | 1,648 | VideoDecoder.cpp |
| 10/16/2006 09:28 PM | 729 | VideoDecoder.h |
| 10/16/2006 09:28 PM | 381 | VideoDecoderBase.h |
| 10/16/2006 09:28 PM | 1,439 | VideoDisplay.cpp |
| 10/16/2006 09:28 PM | 483 | VideoDisplay.h |
| 10/17/2006 10:07 PM | 3,045 | VideoEncoder.cpp |
| 10/16/2006 09:28 PM | 840 | VideoEncoder.h |
| 10/16/2006 09:28 PM | 27 | WebService.h |
| | | \MeetingDemand\MDClientApp\AudioInput |
| 10/16/2006 08:26 PM | 2,272 | sync_simple.h |
| 10/16/2006 08:26 PM | 18,274 | waveIN_simple.cpp |
| 10/16/2006 08:26 PM | 8,004 | waveIN_simple.h |

# 2

-continued

| | | \MeetingDemand\MDClientApp\AudioOutput |
|---|---|---|
| 10/18/2006 08:48 PM | 3,647 | AudioOutput.cpp |
| 10/18/2006 08:48 PM | 1,064 | AudioOutput.h |
| 10/18/2006 08:33 PM | 2,288 | DataBuffer.cpp |
| 10/18/2006 08:40 PM | 634 | DataBuffer.h |
| 10/18/2006 08:34 PM | 3,423 | TempoChangingAudioBuffer.cpp |
| 10/18/2006 08:34 PM | 791 | TempoChangingAudioBuffer.h |
| | | \MeetingDemand\MDClientApp\MDWebService |
| 10/05/2006 02:49 PM | 398 | MDWebService.disco |
| 10/17/2006 10:15 PM | 20,636 | MDWebService.wsdl |
| 10/05/2006 02:49 PM | 614 | results.discomap |
| | | \MeetingDemand\MDClientApp\res |
| 07/29/2006 12:19 PM | 402 | MDClientApp.rc2 |
| | | \MeetingDemand\MDWebService |
| 10/17/2006 10:36 PM | 6,992 | index.cpp |
| 10/17/2006 10:14 PM | 2,691 | Index.h |
| 10/17/2006 10:14 PM | 8,176 | MDWebService.cpp |
| 07/29/2006 12:18 PM | 171 | MDWebService.def |
| 10/05/2006 09:36 AM | 281 | MDWebService.disco |
| 10/17/2006 10:14 PM | 7,204 | MDWebService.h |
| 10/17/2006 08:06 PM | 2,038 | MDWebService.htm |
| 07/29/2006 12:18 PM | 2,577 | MDWebService.rc |
| 09/10/2006 02:11 PM | 6,039 | MDWebService.vcproj |
| 07/29/2006 12:18 PM | 439 | resource.h |
| 07/29/2006 12:18 PM | 299 | StdAfx.cpp |
| 07/29/2006 04:40 PM | 1,146 | StdAfx.h |

### BACKGROUND

1. Field

The field is web conferencing, specifically the application of time-shifting presentation techniques to the field of web conferencing.

2. Prior Art

Web conferencing systems can be used hold meetings and give presentations where participants are in remote locations. Web conferencing systems allow participants to share content with and observe content from other participants. Typical types of content include screen video data, camera video data, audio data (through computers and through telephones), chat data, documents, and the like

The current generation of web conferencing systems is focused primarily on real-time interaction. That is, participants join a virtual meeting at a designated time and are able to present and observe in real time (hereafter synchronously). Secondarily, many web conferencing systems can record the meeting. This allows a participant to observe the content of the meeting after the meeting has concluded.

However current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress. This is undesirable for several reasons. First, if a participant joins a meeting five minutes late, their only choices are to either observe real-time and simply miss the first five minutes, or wait until the entire meeting has concluded to watch the entire recorded content or a selected part of it. Second, if a participant is observing real-time there is no way for them to pause the content to deal with an interruption, or to easily replay a portion of the content to repeat something they missed. Third, if a participant is observing in real-time and the presenter is moving too quickly, there is no way for the participant to slow the presentation.

A key struggle with using existing web conferencing systems is the organization and scheduling required to ensure

**Appx34**

US 7,679,637 B1

**3**

that all participants are available and connected before the presentation begins. This leads to great inefficiencies, because some participants will simply have to wait for the rest of the participants to join, and some participants may miss part of the presentation or have to wait until the presentation has completed to observe it in its entirety.

In a separate field, commercial digital video recording services and associated equipment, such as one sold under the trademark TiVo by TiVo, Inc, Alviso, Calif., have paved the way in providing live time-shifting capabilities for television viewing and have begun to affect consumers' expectations. Prior to digital video recorders (DVRs), consumers had limited control over their viewing experience. Consumers could either watch a television show in real-time, or with devices like video cassette recorders they could watch a recorded version of the show after the whole show had finished.

DVRs have empowered consumers by allowing them to time-shift real-time television content.

In yet another field, algorithms have been devised to time-scale manipulate audio content with high fidelity reproduction. These algorithms allow an audio stream to be played back at a faster or slower rate while maintaining other perceived aspects of the audio, such as timbre, voice quality, and pitch.

Audio time-scale modification techniques have been applied to applications such as voice-mail and dictation tape playback, post synchronization of film and video, and playback of recorded content. These techniques have also been employed in adaptive buffering schemes for streaming audio (to speed up or slow down audio playback to maintain an optimal buffer length).

### ADVANTAGES

Accordingly several advantages of one or more aspects are to enable several advantageous web conferencing scenarios not previously possible:

a participant can enter a meeting after it has begun and either begin observing the live content or rewind and see the content that they missed

a participant can observe a meeting in real-time and be able to pause the content to deal with an interruption

a participant observing a meeting can easily replay an interesting segment

a participant can observe a live meeting at slower than real-time to more easily digest the content

a participant observing on a delay (from joining late, pausing, replaying, etc. . . . ) can observe the content faster than real-time

Another advantage of one or more aspects is the mitigation of scheduling problems. A meeting organizer can begin the presentation whenever they are ready. The participants who are available at the time can begin observing immediately in real-time. Participants who join later can immediately begin observing what they missed.

### SUMMARY

According to one aspect, a web conferencing system includes time-shifting capabilities which enable participants to observe a session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at different playback rates while maintaining substantially consistent perceived aspects of audio quality.

**4**

### DRAWINGS

#### Figures

FIG. **1** is a block diagram which illustrates the general organization and main components of an embodiment of a time-shifted web conferencing system.

FIG. **2** is a block diagram which illustrates the components responsible for time-shifted playback of audio, according to one embodiment. This diagram represents a specific example of stream decompression and display **130***a***-130***n* in FIG. **1**.

FIG. **3** is a pseudo-code listing of a portion of playback logic used by a client application to determine what presentation time to request from a server, according to one embodiment. This corresponds to playback logic **126** in FIG. **1**.

FIG. **4** is a pseudo-code listing of a portion of server logic used to determine what frames to send to a client application based on a presentation time requested, according to one embodiment. This corresponds to server logic **112** in FIG. **1**.

FIG. **5** is a block diagram which illustrates an alternate embodiment of a time-shifted web conferencing system incorporating telephony.

### DRAWINGS

#### Reference Numerals

| | |
|---|---|
| 110 | server |
| 112 | server logic |
| 114 | storage |
| 116 | server-side communication |
| 118 | network |
| 120a-120n | client |
| 122 | capture logic |
| 124 | client-side communication |
| 126 | playback logic |
| 128a-128n | stream capture and compression |
| 130a-130n | stream decompression and display |
| 130aud | audio stream decompression and display |
| 210 | audio decompression |
| 212 | audio time-scale modification |
| 214 | audio buffer |
| 216 | audio output |
| 510 | telephony network |
| 520a-520n | telephone |
| 530a-530n | participant |
| 540 | telephony device |

### DETAILED DESCRIPTION

#### First Embodiment—FIGS. **1** and **2**

Overview

The general organization and main components of the first time-shifted web conferencing system embodiment are illustrated in FIG. **1**. The system is a multi-part software program comprised of a server application **110** running on a computer connected through a network **118** to multiple client applications **120***a***-120***n*, each running on a computer.

Server

Server **110** is responsible for handling and setting up a web conferencing session, receiving and storing streams of data being shared by the client applications **120***a***-120***n*, and sending streams of data to the client applications.

**Appx35**

US 7,679,637 B1

5        6

Network

Network **118** is a communications link that facilitates the transfer of content between, for example, the server and client applications. In the first embodiment, the network includes the Internet. It may also include one or more other types of networks, such as a local-area-network, a wide-area-network, a point-to-point dial-up connection, a cell-phone network, and the like.

Client

Client applications **120a-120n** run on participants' computers. The client application captures the streams that the participant chooses to share (if any). The client application sends these streams to server **110**. The client application also receives the streams from the server that the participant chooses to observe (if any) and displays them. The client application includes a user interface that allows participants to select what streams to share and receive as well as to pause, resume, seek, and adjust the playback rate while observing. In this way a participant can use the client application to share and/or receive.

Streams

In this system, a web conferencing session contains one or more streams. A stream is any type of data that a participant can share or observe. Examples of streams include screen video, camera video, audio (through computers and/or through telephones), documents, collaborative chat, or any other types of data involved in a web conferencing session.

Streams are comprise a series of discrete frames. Frames are time dependent data. Examples of frames include a segment of audio, a single video image, etc. In the first embodiment each frame in a stream is given a sequential number. Frames are given a timestamp that identifies when they occurred in the session. Frames are identified either as key frames, which can be interpreted independently of any other frames, or as delta frames which rely on previous frames.

This key and delta frame scheme is commonly used in the audio visual field, but it can be applied to other types of streams as well. For instance a web page or document shared during a session can be represented as a key frame. Also a white-boarding session (where participants can annotate an image with virtual pens) can be represented as a sequence of frames (where a pen stroke can be a delta frame, etc.).

Sharing Process

The process involved in sharing content in the first embodiment is as follows: Client applications **120a-120n** contain two key components for sharing: a capture logic software module **122** and a collection of stream capture and compression components **128a-128n**. The capture logic contains information relating to each stream that can be shared. There are different types of stream capture and compression components for each type of data that can be shared. For instance, there is a component type for dealing with screen video, for dealing with camera video, for dealing with audio, etc. Thus the stream capture and compression components constitute a means for sharing data.

In the first embodiment when (if) a participant chooses to share a stream, a capture logic module **122** initializes the appropriate stream capture and compression component **128a-128n**. The stream capture and compression component provides stream format information. This information can include the type of stream as well as stream specific format information such as the codec (compression scheme) used, image dimensions, sampling rate, etc. . . . . The client application then needs to notify the server about this new stream. This is accomplished by sending the information to a client-side communication component **124** which passes the information through network **118** to server **110**.

The server receives information through a server-side communication component **116**. A server logic software module **112** acknowledges the new stream and assigns a unique number to identify the stream. This acknowledgement is passed back to the client through the server-side communication component, network, and client-side communication component.

This arrangement of client-side communication, network, and server-side communication is also used to pass other types of data between the server and the client applications.

During the session, if the participant chose to share streams, frames are captured and compressed by a corresponding component **128a-128n**. Capture logic module **122** assigns the frames sequence numbers and time stamps. The frames are then passed to the server.

When the frames reach the server, server logic module **112** puts meta-information about the frame in an index and then records the frame data with storage component **114**. In the first embodiment the server logic maintains an index for each stream, and the storage component maintains a file containing the actual frame data for the stream. The index contains an entry for each frame that was received. Each entry contains the meta-information for the frame: frame number, the timestamp of the frame, whether the frame was marked as a key frame or a delta frame, and an offset into the storage file where the data from the frame was stored.

Observing Process

The process involved in observing content in the first embodiment is as follows: Clients **120a-120n** receive a list of streams that have been shared through server **110**. A participant can then select which of these streams (if any) they would like to observe. When a stream is chosen, an appropriate stream decompression and display component **130a-130n** is initialized with format information received from the server. Similar to the stream capture and compression components **128a-128n**, there are different types of stream decompression and display components for each type of stream that can be observed.

While a session is being observed, information about what to observe is provided by the playback logic module **126**. This information is sent to the server **110**. Based on this information, server logic module **112** determines what frames should be returned. The appropriate frames are retrieved from storage unit **114** and returned to the client. The frames are then provided to the appropriate stream decompression and display components **130a-130n** which handle decompressing and displaying them. Thus the stream decompression and display components constitute a means for observing data streams.

This process of the client sending information to the server, the server responding with frames, and the client displaying those frames occurs repeatedly as the session is observed.

Capture Logic

With a general overview of the process provided, we can begin to explore individual aspects of the process in more depth.

In the first embodiment capture logic component **122** is responsible for providing sequence numbers and timestamps for each frame that is captured and sent to server **110**.

The timestamps given to each frame are relative to the start of the session. For example, a timestamp could indicate that a frame corresponds to a point in time five minutes into the session. Time relative to the start of the session is referred to as presentation time.

**Appx36**

US 7,679,637 B1

**7**

Another important time concept is that of local system time. Each of client applications **120a-120n** is run on a computer. The client application is able to query the computer's operating system to determine the local time on that computer. This local system time is useful in much of the capture and playback logic.

As part of its responsibilities, capture logic module **122** maintains the following information for each stream that is being shared: the local system time when the stream first started to be shared, the presentation time when the stream first started to be shared, and a count of how many frames have been captured.

When a frame is captured, the capture logic gives it a timestamp (current system time−system time when the stream started to be shared+presentation time when the stream started to be shared). The capture logic also numbers the frame based on how many frames have been captured.

Server Logic

When server **110** receives a frame, it simply stores the frame and its accompanying information. In one embodiment an index is kept by server logic module **112** and the frame data is kept in storage component **114**. Thus the server logic module and storage component constitute a means for recording data streams.

The process is slightly more involved when the server receives a request for frames from a client that is requesting to observe streams. When the client requests frames, it sends along the presentation time requested and the streams that it is interested in receiving. Additionally, for each stream requested, the client also sends along the number of the last frame (if any) from that stream that the client received.

Server logic module **112** will determine the appropriate frames to send for each stream. A listing of a program for implementing this logic is illustrated in FIG. **4** in the C++ programming language. If the client indicated that they had not received any previous frames for a stream (either because they just started observing, or because of a discontinuity like a seek operation), the server logic will find the key frame with the latest presentation time whose presentation time is less than or equal to the requested presentation time. The server logic will then return that frame and any subsequently numbered frames whose presentation times are less than or equal to the requested presentation time.

In the simplest embodiment, if a client provided the number of the last received frame, the server logic would return any frames with a higher number and a presentation time less than or equal to the requested presentation time.

However, there are advantages to having the server logic be smarter than this. In some cases, having a client receive every single frame is important. This could be the case for an audio stream to prevent audio distortion, for a video stream to provide smoother playback and prevent the appearance of jitter, etc. However, in cases where receiving every single frame is not as important, the ability to skip frames can lead to significant bandwidth savings. The decision to allow frames to be skipped can be made on a stream-by-stream basis (e.g., to prevent audio skipping) or on a request by request basis (e.g., if bandwidth becomes restrained a client could chose to sacrifice smoother playback).

Therefore a more advanced embodiment would allow the client to select between receiving all frames or just those frames necessary to display the stream correctly. If the client chose not to receive all frames and there were no key frames between the last received frame and the requested presentation time, the result will be the same as with the simplest embodiment. If there were one or more key frames, the server

**8**

would return the key frame with the latest presentation time less than or equal to the requested presentation time and any subsequently numbered frames whose presentation times are less than or equal to the requested presentation time.

Playback Logic

Another point of interest is playback logic module **126**, which in the first embodiment is responsible for determining what presentation time to request from server **110** if a participant chose to observe. The playback logic module supports the ability to have the participant perform time-shifting actions such as pausing, resuming, and seeking backward or forward. The playback logic module also supports changing the rate at which content is displayed; i.e., allow the participant to observe at slower than or faster than real-time.

The playback logic module is connected to the client application's user interface. Thus the playback logic module and the client application's user interface constitute an interface means allowing participants to pause, resume, seek, and to adjust the playback rate of streams.

A pseudo-code listing of a program for implementing the playback logic module is displayed in FIG. **3**.

In addition to what is shown in the figure, the playback logic is also responsible for remembering the last frame number received for each stream. The last received frame numbers are all initialized to indicate that no frame has been received (in the first embodiment the invalid frame number, −1, is used). The last received frame numbers are updated every time frames are received from the server. In the case of a discontinuity such as seeking (jumping to another point in time), the last received frame numbers would be reset to −1.

Stream Decompression and Display

After frames are received by client **120a-120n**, they are sent to one of the stream decompression and display components **130a-130n**. For the most part, the workings of these components resemble those of similar components in existing web conferencing or audio video display applications. One aspect worth mentioning is how these components deal with playback rate.

In its simplest embodiment, if a stream decompression and display component received a collection of frames from the server, it could decompress the frames in order and then simply display the last frame.

However, for an increased level of fidelity an improved embodiment would display each frame with the appropriate amount of time between each frame. For example, if an improved stream decompression and display component received two frames whose presentation times differed by one second, the component could decompress both frames, display the first frame, wait one second and then display the second frame. A more advanced embodiment would have the components coordinate with each other and the playback logic to improve synchronization between the streams.

If a participant manipulated the playback rate, the components would simply need to adjust the time between frames accordingly.

Audio Stream Decompression and Display

Certain stream types need a more sophisticate treatment. For instance, without additional care, if the playback rate of an audio stream was adjusted, the pitch would change and the audio would seem distorted. It would be advantageous to be able to adjust the playback rate of the audio stream while maintaining the perceived aspects such as pitch.

FIG. **2** illustrates an embodiment of an audio stream decompression and display component **130aud** which addresses the above concerns. It contains an audio decom-

**Appx37**

US 7,679,637 B1

9

pression component **210**, an audio buffer **214** that stores the decompressed audio, and an audio output component **216** responsible for playing the audio.

A point of interest is the audio time-scale modification component **212**. This component includes logic for manipulating the time-scale of a stream of audio while maintaining the perceived aspects of audio quality. Example algorithms include the WSOLA algorithm introduced by Verhelst and Roelands, and available at http://ieeexplore.ieee.org/xpl/free-abs_all.jsp?arnumber=319366, or related algorithms. The first embodiment uses Olli Parviainen's open-source Sound-Touch library, available at http://www.surina.net/sound-touch/.

As audio is received it is decompressed and placed into buffer **214**. As audio is played back, a segment of audio of a certain length is retrieved from the buffer and fed into time-scale modification component **212**. This produces a resultant segment of audio of the same or different length which is then consumed by audio output **216**.

The lengths of the audio segments and the behavior of the time-scale modification component are controlled by the playback rate. For example, in the first embodiment, if the audio output required audio segments 250 milliseconds long and the playback rate was 1.0 (real-time) an audio segment of 250 milliseconds would be retrieved from the buffer. This segment would be fed into the time-scale modification component which would leave it unchanged and return an identical 250 millisecond audio buffer to be output.

Similarly, if the playback rate was 2.0 (twice as fast as real-time), an audio segment 500 milliseconds long would be retrieved from the buffer and fed into the time-scale modification component. The time-scale modification component would adjust the audio and return a 250 millisecond segment to be output.

Physical Configuration

In a typical scenario, the participants **530a-530n** who are presenting and observing would be in remote locations. Client applications **120a-120n** with which the participants are interacting would be running on personal computers. In the first embodiment, the participants would each be running copies of the same client software application. The client application would have the ability to share (present) data streams as well as observe (view) data streams. In other embodiments, multiple client software applications could be provided that support differing capabilities (e.g., first client application for presenting and second client application for observing).

Server application **110** would be running on server class computer. This computer could be hosted and maintained by a company running the web conferencing system. Alternatively, it could be hosted by a company or organization that one or more of the participants are affiliated with.

In the first embodiment, the client application and server application are implemented in C++.

Additional Embodiments

Additional embodiments incorporating different designs and providing different functions can be provided.

Server Architecture

FIG. **1** shows a single server. However, it is possible and advantageous to have the duties split among a plurality of physical computers and software components. This division would afford scalability, redundancy, and performance advantages.

10

Multiple servers could be implemented by separating the storage unit **114** from the server logic component **112** and server-side communication component **116** and placing them on separate physical machines. Additionally, multiple physical machines with the same software components could be used. For example, multiple servers could sit behind a load-balancer. As requests came in, the load-balancer could direct the requests to an appropriate server.

Storage

The way that frame data and associated information is stored and retrieved is open to alternatives. In one example the frame meta-information is stored in a relational database. Relational databases can provide performance, scalability, and persistence advantages over storing the meta-information in an in-memory structure or in a file. The frame data could also be stored in a database, on a network attached storage device, or the like.

Client Architecture

In the first embodiment, a single client application is provided for participants to share and/or observe content. In an alternative embodiment, multiple client applications could be provided. Motivations for this could include simplifying or limiting the application used for observation. Also, applications could be provided for different operating systems or platforms. For example, in a Microsoft Windows environment a native application might be required for full capabilities, such as sharing screen data, but an Adobe Flash application might be able to observe and share some types of data.

Communication

In the first embodiment, the client application observes a session by repeatedly making requests to the server for frames. Each request contains the streams requested, and the last frame numbers received for each stream. While this provides an easier implementation, it is not the most high-performing.

A more optimized embodiment could have the server remember the streams that each client is interested in, the playback rate for the client and the last frame numbers sent for each stream to each client. In this embodiment, clients would only need to update the server if something changed; e.g., if different streams are selected, a discontinuity occurred, etc.

Additionally, there are existing advanced audio video broadcasting mechanisms that do not rely on this request/response mechanism. For example, with protocols like the real-time transport protocol (http://tools.ietf.org/html/rfc1889), the server simply continues to send frames to clients and some separate quality of service mechanism informs the server if the frames are reaching their destination. This can lead to performance improvements, including lowered latency. An embodiment could embrace this strategy.

Also, in the first embodiment, the clients all communicate with the server. However, it is conceivable that under certain circumstances it would be advantageous for some of the clients to communicate directly with each other. For example, a client sharing stream data would send the data to the server to be stored. If there was another nearby client attempting to observe this stream data, the second client might be able to receive the data directly from the first client instead of through the server. Other network topologies could be imagined that would have further advantages.

Other Communications Media

In the first embodiment, all stream data is shared and received through a network connection between the client applications and the server. However, there are examples

Appx38

US 7,679,637 B1

## 11

where this could be expanded. For instance, for sharing or receiving audio, a telephone may be a more suitable device than a computer.

FIG. **5** shows an embodiment that allows participants to share or receive audio through a telephone or through their computer. This embodiment features the addition of a telephony device **540**. This device could be a teleconferencing bridge, an Asterisk server (Asterisk is an open source telephony software program capable of interfacing with telephony networks), a computer running a session initiation protocol (SIP) application (SIP is a protocol commonly used to communicate with telephony networks), or the like. The telephony device communicates through network **118** to server **110**. The telephony device sends audio data to the server to be stored and retrieves audio data from the server to be sent to participants. The server and telephony device contain logic for compressing and decompressing the audio data. The telephony device is connected to a telephony network **510**. This telephony network, which could include the public switched telephone network (PSTN), a private telephone network or the like, connects to telephones **520a-520n**. Participants **530a-530n** connect to the session using client applications **120a-120n**. As in the first embodiment, participants can input and output audio through the client application on their computer. In this embodiment participants also have the option to input and output audio data through their telephone.

In order to support variable speed playback of audio through telephones, some of the logical components introduced with the first embodiment would need to be included in the server application. Before sending audio data to the telephony device, the server would need to decompress it with audio decompression **210**, and manipulate it with audio time-scale modification **212**.

### CONCLUSIONS, RAMIFICATIONS, AND SCOPE

Accordingly, the reader will see that one or more embodiments of time-shifted web conferencing provide several advantageous features. Participants are able to observe content live, delayed while the session is still in progress, or after the session has completed. Additionally, participants are able observe at normal, slower or faster speeds while maintaining substantially consistent perceived aspects of audio quality.

Although the description above contains many specificities, these should not be construed as limiting the scope of any aspect but as merely providing illustrations of some of the presently preferred embodiments. Many other variations are possible and should be considered in the scope. For example the client and server components could run on devices other than computers, clients could maintain a separate local storage of session data, different types of stream data or communication networks could be used, the applications could be organized differently, etc.

Accordingly, the scope should be determined not by the embodiments illustrated, but by the appended claims and their legal equivalents.

I claim:

1. A method of presenting audio data in a web conference comprising:

(a) providing an input means which allows at least one presenting participant to share audio data,

(b) providing a storage means which is able to record said audio data and is operatively connected to said input means,

(c) recording said audio data with said storage means,

## 12

(d) providing an output means which is operatively connected to said storage means and allows at least one observing participant to listen to said audio data,

(e) providing an interface means which can receive instructions and which allows said observing participant to:

i. pause, resume, and seek said audio data, and

ii. adjust the playback rate of said audio data,

(f) providing a time-scale modification means which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates,

(g) retrieving said audio data from said storage means in accordance with said instructions given to said interface means,

(h) manipulating said audio data with said time-scale modification means in accordance with said instructions given to said interface means,

(i) providing said audio data to said observing participant with said output means,

whereby said observing participant can provide said instructions to said interface means at the same time that said presenting participant is sharing said audio data, and said audio data from said presenting participant can be simultaneously recorded by and retrieved from said storage means, allowing said observing participant to selectively listen to said audio data live and allowing said observing participant to selectively listen to a previously presented and recorded part of said audio data at a plurality of playback rates at the same time that said presenting participant is sharing said audio data, and said observing participant will perceive substantially consistent audio quality.

2. A web conferencing system comprising:

(a) a first client application allowing at least one presenting participant to share computer screen video,

(b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session,

(c) storage means for recording said computer screen video and said data stream, and

(d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live,

(e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream,

(f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream

whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream.

3. The system of claim **2** wherein:

(a) said first client application allows said presenting participant to share audio data

(b) said storage means records said audio data, and

(c) said second client application allows said observing participant to sense said audio data.

**Appx39**

US 7,679,637 B1

13

**4**. The system of claim **3** wherein:

(a) said web conferencing system includes an audio time-scale modification component,

(b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed,

whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed.

**5**. The system of claim **4** wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking.

**6**. The method of claim **1** wherein said audio data is provided to said observing participant in such a way that said observing participant can also provide said instructions to said interface means and listen to said audio data after said presenting participant has finished sharing said audio data.

**7**. A web conferencing system comprising:

(a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data

(b) a second client application that allows at least one observing participant to sense said data streams

(c) a server application operatively connected to said first client application and to said second client application, said server application arranged to:

14

i. receive said data streams from said first client application and record it in a storage device

ii. retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

**8**. The system of claim **7** wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session.

**9**. The system of claim **8** wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams.

\*   \*   \*   \*   \*

**Appx40**

CLOSED,APPEAL,JURYDEMAND

**U.S. District Court**
**United States District Court for the Western District of Washington (Seattle)**
**CIVIL DOCKET FOR CASE #: 2:23-cv-00592-JHC**

US Patent No 7,679,637 LLC v. Google LLC
Assigned to: Judge John H. Chun
Case in other court:  Federal Circuit, 24-01520
Cause: 35:271 Patent Infringement

Date Filed: 04/18/2023
Date Terminated: 01/25/2024
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**US Patent No 7,679,637 LLC**                    represented by **David Berten**
                                                  GLOBAL IP LAW GROUP LLC
                                                  55 W MONROE
                                                  STE 3400
                                                  CHICAGO, IL 60603
                                                  312-241-1502
                                                  Email: dberten@giplg.com
                                                  *LEAD ATTORNEY*
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **J Chad Mitchell**
                                                  SUMMIT LAW GROUP
                                                  315 5TH AVE S
                                                  STE 1000
                                                  SEATTLE, WA 98104
                                                  206-676-7000
                                                  Email: chadm@summitlaw.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google LLC**                                    represented by **Michael Hendershot**
                                                  JONES DAY (PALO ALTO)
                                                  1755 EMBARCADERO RD
                                                  PALO ALTO, CA 94303
                                                  650-739-3940
                                                  Fax: 650-739-3900
                                                  Email: mhendershot@jonesday.com
                                                  *LEAD ATTORNEY*
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Rita J Yoon**
                                                  JONES DAY (SF)
                                                  555 CALIFORNIA ST
                                                  26TH FL
                                                  SAN FRANCISCO, CA 98104
                                                  415-875-5816
                                                  Fax: 415-875-5700
                                                  Email: ryoon@jonesday.com
                                                  *LEAD ATTORNEY*
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Ryan McBrayer**
                                                  PERKINS COIE (SEA)
                                                  1201 3RD AVE STE 4900
                                                  SEATTLE, WA 98101-3099
                                                  206-359-3073
                                                  Email: RMcBrayer@perkinscoie.com
                                                  *ATTORNEY TO BE NOTICED*

**Appx41**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/18/2023 | 1 | COMPLAINT against defendant(s) Google, LLC with JURY DEMAND (Receipt # AWAWDC-7974711) filed by U.S. Patent No. 7,679,637 LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Report on Patents and Trademarks (AO Form 120))(Mitchell, J.) (Entered: 04/18/2023) |
| 04/19/2023 | | Judge John H. Chun added. (JWC) (Entered: 04/19/2023) |
| 04/19/2023 | 2 | Summons(es) Electronically Issued as to defendant(s) Google LLC (JWC) (Entered: 04/19/2023) |
| 04/19/2023 | 3 | REPORT on the filing or determination of an action. Emailed to the US Patent Office (JWC) (Entered: 04/19/2023) |
| 04/19/2023 | | NOTICE: Pursuant to Fed.R.Civ.P 7.1(a)(1), Plaintiff must file a Corporate Disclosure Statement by 4/26/2023. If applicable, a Diversity Disclosure Statement may be required pursuant to Fed.R.Civ.P 7.1(a)(2). In order to properly notify the Court, use the event **Corporate/Diversity Disclosure Statement** located in CM/ECF under Other Filings, Other Documents.(CDA) (Entered: 04/19/2023) |
| 04/24/2023 | 4 | CORPORATE DISCLOSURE STATEMENT indicating no Corporate Parents and/or Affiliates. Filed pursuant to Fed.R.Civ.P 7.1(a)(1). Filed by US Patent No 7,679,637 LLC. (Mitchell, J) (Entered: 04/24/2023) |
| 05/02/2023 | 5 | AFFIDAVIT of Service of Summons and Complaint on Defendant Google LLC on 4/25/2023, filed by Plaintiff US Patent No 7,679,637 LLC. (Mitchell, J) (Entered: 05/02/2023) |
| 05/10/2023 | 6 | Unopposed MOTION for Extension of Time to File Answer *to Complaint*, filed by Defendant Google LLC. (Attachments: # 1 Proposed Order) Noting Date 5/10/2023, (McBrayer, Ryan) (Entered: 05/10/2023) |
| 05/10/2023 | 7 | CORPORATE DISCLOSURE STATEMENT identifying Corporate Parent XXVI Holdings Inc., Corporate Parent Alphabet Inc. for Google LLC. Filed pursuant to Fed.R.Civ.P 7.1(a)(1). Filed by Google LLC. (McBrayer, Ryan) (Entered: 05/10/2023) |
| 05/10/2023 | 8 | ORDER granting defendant's 6 Unopposed MOTION for Extension of Time to File Answer *to Complaint*; Google LLC answer due 6/16/2023. Signed by Judge John H. Chun.(MJV) (Entered: 05/10/2023) |
| 05/16/2023 | 9 | NOTICE of Appearance by attorney Ryan McBrayer on behalf of Defendant Google LLC. (McBrayer, Ryan) (Entered: 05/16/2023) |
| 05/17/2023 | 10 | APPLICATION OF ATTORNEY Michael C. Hendershot FOR LEAVE TO APPEAR PRO HAC VICE for Defendant Google LLC (Fee Paid) Receipt No. AWAWDC-8012377 (McBrayer, Ryan) (Entered: 05/17/2023) |
| 05/17/2023 | 11 | APPLICATION OF ATTORNEY Rita J. Yoon FOR LEAVE TO APPEAR PRO HAC VICE for Defendant Google LLC (Fee Paid) Receipt No. AWAWDC-8012455 (McBrayer, Ryan) (Entered: 05/17/2023) |
| 05/17/2023 | 12 | NOTICE of Hearing: Telephone Conference set for Thursday, 5/18/2023 at 10:00 AM before Judge John H. Chun. (AD) (Entered: 05/17/2023) |
| 05/17/2023 | 13 | ORDER re 10 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Michael Hendershot for Defendant Google LLC by Clerk Ravi Subramanian. No document associated with this docket entry, text only. <br><br> *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 05/17/2023) |
| 05/17/2023 | 14 | APPLICATION OF ATTORNEY David Berten FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiff US Patent No 7,679,637 LLC (Fee Paid) Receipt No. AWAWDC-8012899 (Mitchell, J) (Entered: 05/17/2023) |
| 05/18/2023 | 15 | MINUTE ENTRY for proceedings held before Judge John H. Chun- Dep Clerk: *Ashleigh Drecktrah*; Pla Counsel: *Chad Mitchell, David Berten*; Def Counsel: *Ryan McBrayer, Michael Hendersot*; CR: *Nancy Bauer*; **Telephone Conference** held on 5/18/2023. The Court and counsel discuss the Court's potential conflict. As neither party objects, the Court will retain this matter. (AD) (Entered: 05/18/2023) |
| 05/22/2023 | 16 | ORDER REGARDING INITIAL DISCLOSURES AND JOINT STATUS REPORT by Judge John H. Chun. Joint Status Report due by 6/26/2023, FRCP 26(f) Conference Deadline is 6/5/2023, Initial Disclosure Deadline is 6/20/2023. (AD) (Entered: 05/22/2023) |
| 05/25/2023 | 17 | ORDER re 14 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney David Berten for Plaintiff US Patent No 7,679,637 LLC by Clerk Ravi Subramanian. No document associated with this docket entry, text only. <br><br> *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 05/25/2023) |
| 06/02/2023 | | Application for Leave to Appear Pro Hac Vice 11 by attorney Rita J. Yoon will not be processed at this time. Attorney must first complete all requirements for PHV admission via PACER. Please contact Admissions Clerk Jesse Curry at 206-370-8439 or jesse_curry@wawd.uscourts.gov with additional questions. (Ad hoc Attorney Rita J. Yoon) (JWC) (Entered: 06/02/2023) |

**Appx42**

| 06/02/2023 | 18 | Unopposed MOTION for Extension of Time to File Answer re 8 Order on Motion for Extension of Time to Answer, Set Deadlines , filed by Defendant Google LLC. (Attachments: # 1 Proposed Order) Noting Date 6/2/2023, (McBrayer, Ryan) (Entered: 06/02/2023) |
|---|---|---|
| 06/05/2023 | 19 | ORDER granting Defendant's 18 Unopposed MOTION for Extension of Time to Answer Complaint. The Defendant's deadline to answer or otherwise respond to the Complaint is extended from 6/16/2023, to 7/17/2023. Signed by Judge John H. Chun. (SB) (Entered: 06/05/2023) |
| 06/05/2023 | 20 | ORDER re 11 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Rita J Yoon for Defendant Google LLC by Clerk Ravi Subramanian. No document associated with this docket entry, text only.<br><br>*NOTE TO COUNSEL: Local counsel agrees to **sign all filings** and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 06/05/2023) |
| 06/15/2023 | 21 | Unopposed MOTION for Extension of Time *to Exchange Initial Disclosures and File Joint Status Report*, filed by Defendant Google LLC. (Attachments: # 1 Proposed Order) Noting Date 6/15/2023, (McBrayer, Ryan) (Entered: 06/15/2023) |
| 06/15/2023 | 22 | ORDER granting Parties' 21 Unopposed Motion for Extension of Time. Initial Disclosures Pursuant to FRCP 26(a)(1) are due by 7/31/2023, Combined Joint Status Report and Discovery Plan as Required by FRCP 26(f) and Local Civil Rule 26(f) due by 7/31/2023. Signed by Judge John H. Chun. (SB) (Entered: 06/15/2023) |
| 07/17/2023 | 23 | Joint MOTION for Extension of Time , filed by Defendant Google LLC. (Attachments: # 1 Proposed Order) Noting Date 7/17/2023, (McBrayer, Ryan) (Entered: 07/17/2023) |
| 07/17/2023 | 24 | ORDER by Judge John H. Chun granting the parties' 23 Stipulated Motion for Extension of Time. Amended complaint due 7/31/2023; Response to complaint due 8/21/2023; Initial Disclosure Deadline is 9/15/2023; Joint Status Report due by 9/15/2023. (AD) (Entered: 07/17/2023) |
| 07/31/2023 | 25 | AMENDED COMPLAINT against defendant(s) Google LLC with JURY DEMAND filed by US Patent No 7,679,637 LLC. (Attachments: # 1 Exhibit 1)(Mitchell, J) (Entered: 07/31/2023) |
| 08/21/2023 | 26 | MOTION to Dismiss *the First Amended Complaint*, filed by Defendant Google LLC. Oral Argument Requested. (Attachments: # 1 Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2) Noting Date 9/15/2023, (McBrayer, Ryan) (Entered: 08/21/2023) |
| 09/11/2023 | 27 | RESPONSE, by Plaintiff US Patent No 7,679,637 LLC, to 26 MOTION to Dismiss *the First Amended Complaint*. Oral Argument Requested. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Proposed Order)(Mitchell, J) (Entered: 09/11/2023) |
| 09/15/2023 | 28 | JOINT STATUS REPORT signed by all parties. Estimated Trial Days: 5. (Mitchell, J) (Entered: 09/15/2023) |
| 09/15/2023 | 29 | REPLY, filed by Defendant Google LLC, TO RESPONSE to 26 MOTION to Dismiss *the First Amended Complaint* (Attachments: # 1 Exhibit 3)(McBrayer, Ryan) (Entered: 09/15/2023) |
| 10/10/2023 | | NOTICE TO THE PARTIES: The Court acknowledges the requirements of FRCP 16(b), but finds good cause to defer entry of a case scheduling order pending its ruling on Defendant's Motion to Dismiss. (AD) (Entered: 10/10/2023) |
| 01/25/2024 | 30 | ORDER granting Defendant's 26 Motion to Dismiss with prejudice. Signed by Judge John H. Chun. (SB) (Entered: 01/25/2024) |
| 01/25/2024 | 31 | JUDGMENT BY COURT. Defendant's Rule 12(b)(6) Motion to Dismiss the First Amended Complaint, Dkt. # 26 , is GRANTED. Plaintiff's First Amended Complaint is dismissed with prejudice. (SB) (Entered: 01/25/2024) |
| 02/22/2024 | 32 | NOTICE OF APPEAL to Federal Circuit (24-1520) re 31 Judgment by Court, 30 Order on Motion to Dismiss, Terminated Case by Plaintiff US Patent No 7,679,637 LLC. $605, receipt number AWAWDC-8362316 (cc: USCA) (Berten, David) Modified on 2/27/2024 to add Federal Circuit case number. (RE) (Entered: 02/22/2024) |
| 02/22/2024 | | APPEAL NOTIFICATION Form sent to the Federal Circuit re 32 Notice of Appeal. (RE) (Entered: 02/22/2024) |
| 02/27/2024 | 33 | TIME SCHEDULE ORDER/FEDERAL CIRCUIT CASE NUMBER (24-1520) as to 32 Notice of Appeal, filed by US Patent No 7,679,637 LLC. (RE) (Entered: 02/27/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/08/2024 12:42:15 | | |
| **PACER Login:** | GIPLGLAW | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-00592-JHC |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

**Appx43**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

U.S. PATENT NO. 7,679,637 LLC

               Plaintiff,

      v.

GOOGLE, LLC,

               Defendant.

CASE NO.

COMPLAINT

JURY DEMAND

Plaintiff U.S. Patent No. 7,679,637 LLC files this Complaint for patent infringement under the patent laws of the United States, Title 35 of the United States Code against Defendant Google, LLC Google and alleges as follows:

**PARTIES**

1.     Plaintiff U.S. Patent No. 7,679,637 LLC is a limited liability company organized under Washington law and with a place of business in Seattle, Washington. The Plaintiff owns all right, title and interest in U.S. Patent No. 7,679,637.

2.     Defendant Google is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

3.     Google does business across the United States, including in the State of Washington and in this District. As Google explains on one of its websites: "In Washington

COMPLAINT - 1
CASE NO.

**Appx44**

(Seattle, Kirkland, Bellevue and Redmond), we bring creative ideas to large-scale projects that affect billions of lives. Google Washington is the second largest global engineering office outside of the Bay Area, representing almost every Google product."
https://careers.google.com/locations/seattle-kirkland-bellevue-redmond/.

4. Google's website lists 410 job openings in the Seattle, Kirkland, Bellevue and Redmond area.

5. For the relevant time periods of this action, Google made, used, offered for sale and sold in the United States a video presentation system under the brand name YouTube.

## JURISDICTION AND VENUE

6. This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*., and more particularly 35 U.S.C. § 271.

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

8. Google is subject to this Court's general personal jurisdiction pursuant to due process and/or the Washington Long Arm Statute, RCW § 4.28.185, due at least to its substantial business conducted in this forum, including (i) having solicited business in the State of Washington, transacted business within the State of Washington and attempted to derive financial benefit from residents of the State of Washington, including benefits directly related to the instant patent infringement causes of action set forth herein; (ii) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Washington and in this District, and (iii) having committed the complained of tortious acts in Washington and in this District. Google, directly and/or through subsidiaries and agents (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and

COMPLAINT - 2
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx45**

advertises (including offering products and services through its website, http://www.youtube.com, as well as other retailers) its products and/or services in the United States, the State of Washington, and this District. Google, directly and/or through its subsidiaries and agents (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in this District.  These infringing products and/or services have been and continue to be purchased and used by consumers in this District. Google has committed acts of patent infringement within the State of Washington and, more particularly, within this District.

9.       Venue is proper in this District under 28 U.S.C. §§ 1391 (b) and (c) and 1400 (b).

## BACKGROUND

10.      The inventor, Jeffrey Kohler, has a B.S. in Computer Science and Engineering from Michigan State University and an M.B.A. from Purdue University, and worked for Microsoft for over 15 years.  He now works at Meta.

## THE PATENT-IN-SUIT AND CLAIMS-IN-SUIT

11.      On March 16, 2010, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,679,637, entitled "Time-Shifted Web Conferencing," and naming Mr. Kohler as the inventor (the "'637 Patent" or "Patent-in-Suit") (attached as Exhibit 1).

12.      U.S. Patent No. 7,679,637 LLC is the owner of the '637 Patent.

13.      U.S. Patent No. 7,679,637 LLC has the exclusive right to enforce and collect damages for infringement of the Patent-in-Suit during all relevant time periods.

14.      U.S. Patent No. 7,679,637 LLC asserts that at least the following claims of the '637 Patent are infringed directly by Google's YouTube service: claims 2, 3, 4, 5, 7 and 9.

COMPLAINT - 3
CASE NO.

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx46**

15. U.S. Patent No. 7,679,637 LLC does not offer a system practicing the claims of the '637 Patent, and there are no licensees to the '637 Patent. Consequently, there are no products to mark with the patent number of the '637 Patent.

**GOOGLE'S INFRINGING PRODUCTS**

16. Google makes sells, uses, promotes, and profits from a service it markets under the service mark "YouTube."

17. YouTube is a platform that permits users to upload videos to servers controlled by Google, and other users can access the videos uploaded there.

18. YouTube also allows "live streaming," which lets users engage with an audience in real time with a video feed, chat, and more.

19. According to its 2021 10-K, Google earned $19.722 billion from YouTube ads in 2020, and $28.845 billion from YouTube ads in 2021. Source: https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm (page 33).

20. In addition to billions in ad-related revenue from YouTube, Google earns other revenue from YouTube, including YouTube Premium and YouTube TV subscriptions. Google included this revenue in a broader category called "other," which had revenues of $21.711 billion in 2020 and $28.032 billion in 2021. Google disclosed that the $6.3 billion increase from 2020 to 2021 "was primarily driven by YouTube non-advertising and hardware, followed by Google Play. Growth for YouTube non-advertising was primarily due to an increase in paid subscribers." Source: https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm (pages 30, 33, and 34).

COMPLAINT - 4
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx47**

21. Google directly infringes the asserted claims of the Patent-in-Suit under 35 U.S.C. § 271(a) by making, using, supplying, offering for sale, and selling YouTube in the U.S. that includes the systems claimed in the Patent-in-Suit.

### COUNT I: Infringement of Claim 2 of the '637 Patent

22. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 21 of this Complaint as though set forth fully here.

23. Claim 2 of the '637 Patent provides:

| | |
|---|---|
| Preamble of Claim 2 | A web conferencing system comprising: |
| Element A | (a) a first client application allowing at least one presenting participant to share computer screen video, |
| Element B | (b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session, |
| Element C | (c) storage means for recording said computer screen video and said data stream, and |
| Element D | (d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live, |
| Element E | (e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream, |
| Element F | (f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream |
| Element G | whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream. |

COMPLAINT - 5
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx48**

24. As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 2 of the '637 Patent. The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

### COUNT II: Infringement of Claim 3 of the '637 Patent

25. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 24 of this Complaint as though set forth fully here.

26. Claim 3 of the '637 Patent provides:

| Claim 3 | The system of claim **2** wherein: |
|---|---|
| | (a) said first client application allows said presenting participant to share audio data |
| | (b) said storage means records said audio data, and |
| | (c) said second client application allows said observing participant to sense said audio data. |

27. As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 3 of the '637 Patent. The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

### COUNT III: Infringement of Claim 4 of the '637 Patent

28. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 27 of this Complaint as though set forth fully here.

COMPLAINT - 6
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx49**

29.    Claim 4 of the '637 Patent provides:

| Claim 4 | The system of claim **3** wherein: |
| --- | --- |
| | (a) said web conferencing system includes an audio time-scale modification component, |
| | (b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed, |
| | whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed. |

30.    As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 4 of the '637 Patent. The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

**COUNT IV: Infringement of Claim 5 of the '637 Patent**

31.    U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 30 of this Complaint as though set forth fully here.

32.    Claim 5 of the '637 Patent provides:

| Claim 5 | The system of claim **4** wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking. |
| --- | --- |

33.    As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 5 of the '637 Patent. The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

COMPLAINT - 7
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx50**

**COUNT V: Infringement of Claim 7 of the '637 Patent**

34.    U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 33 of this Complaint as though set forth fully here.

35.    Claim 7 of the '637 Patent provides:

| Preamble of Claim 7 | A web conferencing system comprising: |
|---|---|
| Element A | (a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data |
| Element B | (b) a second client application that allows at least one observing participant to sense said data streams |
| Element C | (c) a server application operatively connected to said first client application and to said second client application, said server application arranged to: i. receive said data streams from said first client application and record it in a storage device ii. retrieve said data streams from said storage device and send it to said second client application |
| Element D | (d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates |
| Element E | whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality. |

36.    As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 7 of the '637 Patent.  The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

COMPLAINT - 8
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

**Appx51**

## COUNT VI: Infringement of Claim 8 of the '637 Patent

37.     U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 36 of this Complaint as though set forth fully here.

38.     Claim 8 of the '637 Patent provides:

| Claim 8 | The system of claim **7** wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session. |
|---------|---|

39.     As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 8 of the '637 Patent.  The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

## COUNT VII: Infringement of Claim 9 of the '637 Patent

40.     U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 39 of this Complaint as though set forth fully here.

41.     Claim 9 of the '637 Patent provides:

| Claim 9 | The system of claim **8** wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams. |
|---------|---|

42.     As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 9 of the '637 Patent.  The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

## JURY DEMAND

U.S. Patent No. 7,679,637 LLC demands a trial by jury on all issues that may be so tried.

COMPLAINT - 9
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

**Appx52**

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff U.S. Patent No. 7,679,637 LLC requests that this Court enter judgment in its favor and against Defendant Google Corporation as follows:

A.     Adjudging, finding, and declaring that Google has infringed the above-identified claims of the Patent-in-Suit under 35 U.S.C. § 271;

B.     Awarding the past and future damages arising out of Google's infringement of the claims of the Patent-in-Suit to U.S. Patent No. 7,679,637 LLC in an amount no less than a reasonable royalty, together with prejudgment and post-judgment interest, in an amount according to proof;

C.     Adjudging, finding, and declaring that the Patents-in-Suit are valid and enforceable;

D.     Awarding attorney's fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law; and

E.     Granting U.S. Patent No. 7,679,637 LLC such other further relief as is just and proper, or as the Court deems appropriate.

DATED this 18th of April, 2023.

Respectfully submitted,

SUMMIT LAW GROUP, PLLC

By s/ J. Chad Mitchell
      J. Chad Mitchell, WSBA #39689
      315 5th Ave. S., Ste. 1000
      Seattle, WA 98104-2682
      Telephone: (509) 735-5053
      chadm@summitlaw.com

COMPLAINT - 10
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx53**

GLOBAL IP LAW GROUP, LLC

By *s/ David Berten*　　　　　　　　
　David Berten
　(*pro hac vice pending*)
　55 W. Monroe St., Ste. 3400
　Chicago, IL 60603
　Telephone: (312) 241-1502
　*dberten@giplg.com*


*Attorneys for Plaintiff*

COMPLAINT - 11
CASE NO.

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx54**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

U.S. PATENT NO. 7,679,637 LLC

Plaintiff,

v.

GOOGLE, LLC,

Defendant.

CASE NO. 2:23-cv-00592-JHC

FIRST AMENDED COMPLAINT

JURY DEMAND

Plaintiff U.S. Patent No. 7,679,637 LLC files this Amended Complaint for patent infringement under the patent laws of the United States, Title 35 of the United States Code against Defendant Google, LLC ("Google") and alleges as follows:

**PARTIES**

1.      Plaintiff U.S. Patent No. 7,679,637 LLC is a limited liability company organized under Washington law and with a place of business in Bellevue, Washington.  The Plaintiff owns all right, title and interest in U.S. Patent No. 7,679,637.

2.      Defendant Google is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

3.      Google does business across the United States, including in the State of Washington and in this District. As Google explains on one of its websites: "In Washington

FIRST AMENDED COMPLAINT - 1
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx85**

(Seattle, Kirkland, Bellevue and Redmond), we bring creative ideas to large-scale projects that affect billions of lives. Google Washington is the second largest global engineering office outside of the Bay Area, representing almost every Google product."

https://careers.google.com/locations/seattle-kirkland-bellevue-redmond/.

4. Google's website lists 410 job openings in the Seattle, Kirkland, Bellevue and Redmond areas.

5. For the relevant time periods of this action, Google made, used, offered for sale and sold in the United States a video presentation system under the brand name YouTube.

**JURISDICTION AND VENUE**

6. This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, and more particularly 35 U.S.C. § 271.

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

8. Google is subject to this Court's general personal jurisdiction pursuant to due process and/or the Washington Long Arm Statute, RCW § 4.28.185, due at least to its substantial business conducted in this forum, including (i) having solicited business in the State of Washington, transacted business within the State of Washington and attempted to derive financial benefit from residents of the State of Washington, including benefits directly related to the instant patent infringement causes of action set forth herein; (ii) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Washington and in this District, and (iii) having committed the complained of tortious acts in Washington and in this District. Google, directly and/or through subsidiaries and agents (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and

FIRST AMENDED COMPLAINT - 2
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx86

advertises (including offering products and services through its website, http://www.youtube.com, as well as other retailers) its products and/or services in the United States, the State of Washington, and this District. Google, directly and/or through its subsidiaries and agents (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in this District. These infringing products and/or services have been and continue to be purchased and used by consumers in this District. Google has committed acts of patent infringement within the State of Washington and, more particularly, within this District.

9. Venue is proper in this District under 28 U.S.C. §§ 1391 (b) and (c) and 1400 (b).

## BACKGROUND

10. The inventor, Jeffrey Kohler, has a B.S. in Computer Science and Engineering from Michigan State University and an M.B.A. from Purdue University, and worked for Microsoft for over 15 years. He now works at Meta.

## THE PATENT-IN-SUIT AND CLAIMS-IN-SUIT

11. On March 16, 2010, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,679,637, entitled "Time-Shifted Web Conferencing," and naming Mr. Kohler as the inventor (the "'637 Patent" or "Patent-in-Suit").

12. U.S. Patent No. 7,679,637 LLC is the owner of the '637 Patent.

13. U.S. Patent No. 7,679,637 LLC has the exclusive right to enforce and collect damages for infringement of the Patent-in-Suit during all relevant time periods.

14. U.S. Patent No. 7,679,637 LLC asserts that at least the following claims of the '637 Patent are infringed directly by Google's YouTube service: claims 2, 3, 4, 5, 7, 8 and 9, and that,

FIRST AMENDED COMPLAINT - 3
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

in the alternative, Google induces infringement of certain ways the YouTube system works to indirectly infringe claims 2, 3, 4, and 5 of the '637 Patent.

15. U.S. Patent No. 7,679,637 LLC does not offer a system practicing the claims of the '637 Patent, and there are no licensees to the '637 Patent. Consequently, there are no products to mark with the patent number of the '637 Patent.

**GOOGLE'S INFRINGING PRODUCTS**

16. Google is one of the largest technology companies in the world and it develops and distributes a large and growing number of products including software, hardware, operating systems, "over-the-top" video distribution systems, and software applications (also known as "apps").

17. Google maintains a list of its products on a Google-owned webpage: https://about.google/intl/ALL_us/products/. The products include: Android; Android Auto; Android TV; Calendar; Cars with Google built-in; Chrome;  Chrome Enterprise; Chromebook; Chromecast; Contacts; Docs; Drawings; Drive; Earth; Exposure Notifications; Finance; Forms; Gboard; Gmail; Google Alerts; Google Arts   Culture; Google Assistant; Google Authenticator; Google Cast; Google Chat; Google Classroom; Google Cloud Print; Google Expeditions; Google Fi Wireless; Google Fit; Google Flight; Google Fonts; Google Groups; Google Health Studies; Google Home; Google Input Tools; Google Maps; Google Meet; Google One; Google Pay; Google Photos; Google Play; Google Play Books; Google Play Games; Google Shopping; Google Store; Google TV; Google Wallet; Google Workspace; Keep; Lens; Messages; Nest; Nest Wifi; News; Pixel; Pixel Buds; Pixelbook Go; Play Protect; Podcast; Scholar; Search; Sheets; Sites; Slides; Tilt Brush; Translate; Trave; Voice; Waze; Wear OS by Google; YouTube; YouTube Kids; YouTube Music; and YouTube TV.

FIRST AMENDED COMPLAINT - 4
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx88**

18. The myriad number of Google products also results in an almost incalculable number of ways that Google products can be used together or with products made by third parties. For example, Google makes several operating systems, such as Android, which is used as the operating system on many hardware devices Google sells under Google brand names (for example Pixel mobile phones or Chromebook tablets and computers). Google also distributes Android for use as an operating system on devices made by third parties, such as Samsung smartphones.

19. The list of just smartphones running Android is so extensive, the Wikipedia page attempting to list the devices states: "This is a dynamic list and may never be able to satisfy particular standards for completeness." https://en.wikipedia.org/wiki/List_of_Android_smartphones. The page lists well over 1,000 smartphones using Google's Android Operating System, with links to over 1,800 references.

**Yo T e**

20. Google owns a property it generally refers to as "YouTube," which provides users access to stored and live videos and audios.

21. Google put the YouTube system into place, exercises control over it, and benefits from the YouTube system.

22. One way Google allows access to YouTube content is by maintaining a website at the address https://www.youtube.com/ (the "YouTube Website").

23. Another way Google allows access to YouTube content is by developing and distributing an application called "YouTube" that is made available in several formats, including for devices using either the Android or iOS operating systems (the "YouTube App").

FIRST AMENDED COMPLAINT - 5
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx89

24. Google allows and encourages "live streaming" to the YouTube Website or the YouTube App through at least three different technologies: webcams, mobile, and the use of an encoder. This complaint focuses on the last two technologies: mobile and the use of an encoder.

25. For mobile-based live streaming, Google does not require the use of encoding software; Google supports live streaming through YouTube from Android devices or Apple iPhone or iPad devices.

26. For encoder-based live streaming, Google maintains "live streaming" webpages, such as studio.youtube.com, which is one way users initiate a live stream on YouTube. For encoder-based live streaming, Google also instructs users how to add a third-party encoder that can take the form of software encoders, hardware encoders, or mobile encoders.

27. Google controls and/or directs the actions of the third-party encoders, including by, for example, establishing technical specifications that the encoders must meet and how they must function in Google's system, including by requiring the encoders to accept inclusion of a YouTube "stream key" and by verifying the encoders comply with YouTube's extensive "verification prerequisites"

28. YouTube's control over verified encoders includes the following general requirements (each with its's own list of sub-requirements): Correct API Use; Optimal User Experience; Transmission; Error Handling; Measurability and Brand Use. https://support.google.com/youtube/answer/6259859_sjid_567257342420393900-NA.

29. YouTube also requires that encoders comply with YouTube Live encoding standards. https://support.google.com/youtube/answer/2853702_sjid_15578218290160645545-NA

FIRST AMENDED COMPLAINT - 6
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx90

30.      Google expressly instructs how users should setup systems for live streaming using software or hardware encoders, both of which also require the use of a YouTube "stream key" for the live stream to be initiated.





https://support.google.com/youtube/answer/2907883_hl_en__ref_topic_9257984__sjid_722475214 4479992201-NA#zippy_

31.      Google also includes extensive instructions for how streaming software functions on Google's system studio.youtube.com website.  Google instructs users wishing use Google's system to live stream content to "paste the  YouTube  stream key into your software" that is used to stream content to YouTube.

FIRST AMENDED COMPLAINT - 7
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

Appx91

32. Regardless of how a live stream on YouTube is activated (mobile, or an encoder/YouTube stream key), Google has programmed YouTube to allow what it calls a "DVR feature" for live streaming.

33. When the DVR feature is activated, Google's system allows YouTube viewers of live streams to "pause, rewind, and continue during the event."

34. Google exercises control of the YouTube system and benefits from its use.

35. According to its 2021 10-K, Google earned $19.722 billion from YouTube ads in 2020, and $28.845 billion from YouTube ads in 2021. Source: https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm (page 33).

36. In addition to billions in ad-related revenue from YouTube, Google earns other revenue from YouTube, including YouTube Premium and YouTube TV subscriptions. Google included this revenue in a broader category called "other," which had revenues of $21.711 billion in 2020 and $28.032 billion in 2021. Google disclosed that the $6.3 billion increase from 2020 to 2021 "was primarily driven by YouTube non-advertising and hardware, followed by Google Play. Growth for YouTube non-advertising was primarily due to an increase in paid subscribers." Source: https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm (pages 30, 33, and 34).

37. Google directly infringes the asserted claims of the Patent-in-Suit under 35 U.S.C. § 271(a) by making, using, supplying, offering for sale, and selling YouTube in the U.S. that includes the systems claimed in the Patent-in-Suit.

**Google Meet**

FIRST AMENDED COMPLAINT - 8
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx92

38.     Google also owns a property called "Google Meet."

39.     Like YouTube, Google Meet is distributed or accessible many ways, including through a Google-owned website (https://meet.google.com/) and the Google Meet App.

40.     Google Meet is also included as part of Google Workspace, a subscription service Google offers that has several different tiers    Individual (at $9.99 per month), Business Starter (at $6 per user per month); Business Standard (at $12 per user per month); Business Plus (at $18 per user per month); and Enterprise (call for pricing). https://workspace.google.com/pricing.html.

41.     The higher pricing for the Business Standard, Business Plus, and Enterprise plans is directly tied, at least in part, to the number of participants who can attend a Google Meet event, recording those events, and in-domain live streaming.

42.     Google provides the following comparison of the features of Google Meet that it offers in the four business plans.  All plans include "digital whiteboarding:"

FIRST AMENDED COMPLAINT - 9
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

Appx93

| | Business Starter | Business Standard (MOST POPULAR) | Business Plus | Enterprise |
|---|---|---|---|---|
| | Get started | Get started | Get started | Contact sales |
| **Meet** Video and voice conferencing | 100 participants | 150 participants | 500 participants | 1000 participants |
| Meeting length (maximum) | 24 hours | 24 hours | 24 hours | 24 hours |
| US or international dial-in phone numbers | ✓ | ✓ | ✓ | ✓ |
| Digital whiteboarding | ✓ | ✓ | ✓ | ✓ |
| Noise cancellation | — | ✓ | ✓ | ✓ |
| Meeting recordings saved to Google Drive | — | ✓ | ✓ | ✓ |
| Polling and Q&A | — | ✓ | ✓ | ✓ |
| Moderation controls | — | ✓ | ✓ | ✓ |
| Hand raising | — | ✓ | ✓ | ✓ |
| Breakout rooms | — | ✓ | ✓ | ✓ |
| Attendance tracking | — | — | ✓ | ✓ |
| In-domain live streaming | — | — | — | ✓ |

43. The premium version of Google Meet also supports live streaming to YouTube, where features such as YouTube's DVR feature allow stop, rewinding, and forwarding content.

**COUNT I: Infringement of Claim 2 of the '637 Patent**

44. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 43 of this Complaint as though set forth fully here.

45. Claim 2 of the '637 Patent provides:

| Preamble of Claim 2 | A web conferencing system comprising: |
|---|---|
| Element A | (a) a first client application allowing at least one presenting participant to share computer screen video, |

FIRST AMENDED COMPLAINT - 10
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx94

| Element B | (b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session, |
|---|---|
| Element C | (c) storage means for recording said computer screen video and said data stream, and |
| Element D | (d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live, |
| Element E | (e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream, |
| Element F | (f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream |
| Element G | whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream. |

46. As shown on the claim chart attached as Exhibit 1, which is incorporated by reference, Google's YouTube service directly practices each and every element of claim 2 of the '637 Patent. The claim chart on Exhibit 1 shows preliminary analysis and exemplary preliminary evidence based on public information.

47. Google directly infringes each and every element of claim 2 at least in the situation where a user is capturing screen video and livestreaming it though YouTube using a mobile device.

48. Google also directly infringes each and every element of claim 2 at least in the situation where a user is sharing a conference initiated in Google Meet and livestreaming the conference on YouTube at least with the use of Google Meet's Jam Board Feature.

FIRST AMENDED COMPLAINT - 11
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx95**

49. Google also directly infringes every element of 2 where Google provides a user with a Google "live stream key" enabling the user to share computer video data through initiating live streaming through a YouTube live stream website such as studio.youtube.com.

50. To the extent an encoder is necessary, Google controls an/or directs how the third-party encoders must operate such that Google is the party putting the infringing system into use and benefitting from that use and Google directly infringes claim 2 for that reason.

51. In the alternative, if element A of claim 2 is interpreted to require the use of a third-party encoder as "the first client application" (as opposed to a YouTube live streaming website itself being the first client application) and the Court concludes that Google does not control or direct the third-party encoder to comply with the YouTube system, then Google is liable for inducing infringement of claim 2 because Google had knowledge of '637 patent and the way YouTube infringed claim 2 of that patent at least as early as the date the initial complaint was served on Google in this action and Google has continued to expressly promote the use of encoders (software or hardware) to capture computer screen video for livestreaming on YouTube. See paragraphs 26 to 31 above.

**COUNT II: Infringement of Claim 3 of the '637 Patent**

52. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 151 of this Complaint as though set forth fully here.

53. Claim 3 of the '637 Patent provides:

| Claim 3 | The system of claim **2** wherein: |
|---|---|
| Element A | (a) said first client application allows said presenting participant to share audio data |
| Element B | (b) said storage means records said audio data, and |

FIRST AMENDED COMPLAINT - 12
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx96**

| Element C | (c) said second client application allows said observing participant to sense said audio data. |

54.     As shown on the claim chart attached as Exhibit 1, which is incorporated by reference, Google's YouTube service directly practices each and every element of claim 3 of the '637 Patent.  The claim chart on Exhibit 1 shows preliminary analysis and exemplary preliminary evidence based on public information.

55.     Claim 3 depends on claim 2, and Google infringes claim 2 for the reasons set forth in Count I.

56.     Google directly infringes each and every element of claim 3 at least in the situation where a user is capturing audio and sharing it though YouTube using a mobile device.

57.     Google also directly infringes each and every element of claim 3 at least in the situation where a user is sharing a conference initiated in Google Meet and livestreaming the conference on YouTube including sharing audio data.

58.     Google also directly infringes every element of 3 where Google provides a user with a Google "live stream key" enabling the user to share audio data through YouTube.

59.     To the extent an encoder is necessary, Google controls an/or directs how the third-party encoders must operate such that Google is the party putting the infringing system into use and benefitting from that use and Google directly infringes claim 3 for that reason.

60.     In the alternative, if element A of claim 3 is interpreted to require the use of a third-party encoder as "the first client application" (as opposed to YouTube itself being the first client application) and the Court concludes that Google does not control or direct the third party encoder to comply with the YouTube system, then Google is liable for inducing infringement of claim 3

FIRST AMENDED COMPLAINT - 13
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

**Appx97**

because Google had knowledge of '637 patent and the way YouTube infringed claim 3 of that patent at least as early as the date the initial complaint was served on Google in this action and Google has continued to expressly promote the use of encoders (software or hardware) to capture audio data for livestreaming on YouTube. See paragraphs 26 to 31 above.

### COUNT III: Infringement of Claim 4 of the '637 Patent

61.     U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 60 of this Complaint as though set forth fully here.

62.     Claim 4 of the '637 Patent provides:

| Claim **4** | The system of claim **3** wherein: |
|---|---|
| Element A | (a) said web conferencing system includes an audio time-scale modification component, |
| Element B | (b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed, |
| Element C | whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed. |

63.     As shown on the claim chart attached as Exhibit 1, which is incorporated by reference, Google's YouTube service directly practices each and every element of claim 4 of the '637 Patent.  The claim chart on Exhibit 1 shows preliminary analysis and exemplary preliminary evidence based on public information.

64.     Claim 4 depends on claim 3, and Google infringes claim 3 for the reasons set forth in Count II (and claim 2 for the reasons set forth in Count I).

65.     The "time scale modification component" discussed in claim 4 is a function of the settings supported in YouTube for playing livestream content.  Once the basis of Google's

FIRST AMENDED COMPLAINT - 14
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx98**

infringement of claims 2 and 3 is established (direct infringement or indirect infringement or both), Google infringes claim 4 on the same basis.

### COUNT IV: Infringement of Claim 5 of the '637 Patent

66. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 65 of this Complaint as though set forth fully here.

67. Claim 5 of the '637 Patent provides:

| Claim 5 | The system of claim **4** wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking. |
|---------|---|

68. As shown on the claim chart attached as Exhibit 1, which is incorporated by reference, Google's YouTube service directly practices each and every element of claim 5 of the '637 Patent. The claim chart on Exhibit 1 shows preliminary analysis and exemplary preliminary evidence based on public information.

69. Claim 5 depends on claim 4, and Google infringes claim 4 for the reasons set forth in Count III (and claim 3 for the reason set forth in Count II and claim 2 for the reasons set forth in Count I).

70. The "time-shifting operations" discussed in claim 5 are a function of the settings supported in YouTube for playing livestream content. Once the basis of Google's infringement of claims 2, 3, and 4 is established (direct infringement or indirect infringement or both), Google infringes claim 5 on the same basis.

### COUNT V: Infringement of Claim 7 of the '637 Patent

71. U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 43 of this Complaint as though set forth fully here.

FIRST AMENDED COMPLAINT - 15
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx99**

72. Claim 7 of the '637 Patent provides:

| Preamble of Claim 7 | A web conferencing system comprising: |
|---|---|
| Element A | (a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data |
| Element B | (b) a second client application that allows at least one observing participant to sense said data streams |
| Element C | (c) a server application operatively connected to said first client application and to said second client application, said server application arranged to: i. receive said data streams from said first client application and record it in a storage device ii. retrieve said data streams from said storage device and send it to said second client application |
| Element D | (d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates |
| Element E | whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality. |

73. As shown on the claim chart attached as Exhibit 1, which is incorporated by reference, Google's YouTube service directly practices each and every element of claim 7 of the '637 Patent. The claim chart on Exhibit 1 shows preliminary analysis and exemplary preliminary evidence based on public information.

FIRST AMENDED COMPLAINT - 16
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx100**

74. Claim 7 is limited to audio and computer screen data. The YouTube application meant for playback through TVs also has DVR functionality for audio and computer screen data and therefore infringes claim 7 directly.

75. Google directly infringes each and every element of claim 7 at least in the situation where a user is capturing screen video data and audio data and sharing it though YouTube using a mobile device.

76. Google also directly infringes each and every element of claim 7 at least in the situation where a user is sharing a conference initiated in Google Meet and livestreaming the conference on YouTube.

77. Google also directly infringes every element of 7 where Google provides a user with a Google "live stream key" enabling the user to share computer video data and audio data through YouTube.

78. To the extent an encoder is necessary, Google controls an/or directs how the third-party encoders must operate such that Google is the party putting the infringing system into use and benefitting from that use and Google directly infringes claim 7 for that reason.

79. In the alternative, if element A of claim 7 is interpreted to require the use of a third-party encoder as "the first client application" (as opposed to YouTube itself being the first client application) and the Court concludes that Google does not control or direct the third party encoder to comply with the YouTube system, then Google is liable for inducing infringement of claim 7 because Google had knowledge of '637 patent and the way YouTube infringed claim 7 of that patent at least as early as the date the initial complaint was served on Google in this action and Google has continued to expressly promote the use of encoders (software or hardware) to capture computer screen video for livestreaming on YouTube. See paragraphs 26 to 31 above.

FIRST AMENDED COMPLAINT - 17
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx101

**COUNT VI: Infringement of Claim 8 of the '637 Patent**

80.     U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 43 and 71-79 of this Complaint as though set forth fully here.

81.     Claim 8 of the '637 Patent provides:

| Claim 8 | The system of claim **7** wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session. |
|---------|---|

82.     As shown on the claim chart attached as Exhibit 1, which is incorporated by reference, Google's YouTube service directly practices each and every element of claim 8 of the '637 Patent.  The claim chart on Exhibit 1 shows preliminary analysis and exemplary preliminary evidence based on public information.

83.     Google directly infringes each and every element of claim 8 at least in the situation where a user is capturing screen video and livestreaming it though YouTube using a mobile device.

84.     Google also directly infringes each and every element of claim 8 at least in the situation where a user is sharing a conference initiated in Google Meet and livestreaming the conference on YouTube at least with the use of Google Meet's Jam Board Feature.

85.     Google also directly infringes every element of 8 where Google provides a user with a Google "live stream key" enabling the user to share computer video data through initiating live streaming through a YouTube live stream website such as studio.youtube.com.

86.     To the extent an encoder is necessary, Google controls an/or directs how the third-party encoders must operate such that Google is the party putting the infringing system into use and benefitting from that use and Google directly infringes claim 8 for that reason.

FIRST AMENDED COMPLAINT - 18
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

**Appx102**

In the alternative, if element A of claim 8 is interpreted to require the use of a third-party encoder as "the first client application" (as opposed to a YouTube live streaming website itself being the first client application) and the Court concludes that Google does not control or direct the third-party encoder to comply with the YouTube system, then Google is liable for inducing infringement of claim 8 because Google had knowledge of '637 patent and the way YouTube infringed claim 8 of that patent at least as early as the date the initial complaint was served on Google in this action and Google has continued to expressly promote the use of encoders (software or hardware) to capture computer screen video for livestreaming on YouTube. See paragraphs 26 to 31 above.

### COUNT VII: Infringement of Claim 9 of the '637 Patent

87.     U.S. Patent No. 7,679,637 LLC reasserts and realleges paragraphs 1 through 43 and 71-86 of this Complaint as though set forth fully here.

88.     Claim 9 of the '637 Patent provides:

| Claim 9 | The system of claim **8** wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams. |
|---|---|

89.     As shown on the claim chart attached as Exhibit 2, which is incorporated by reference, Google's YouTube service practices each and every element of claim 9 of the '637 Patent.  The claim chart on Exhibit 2 shows preliminary analysis and exemplary preliminary evidence based on public information.

90.     Claim 9 depends on claim 8, and Google infringes claim 9 for the reasons set forth in Count V (and claim 8 for the reason set forth in Count VI.

91.     The "time-shifting operations" discussed in claim 9 are a function of the settings supported in YouTube for playing livestream content.  Once the basis of Google's infringement of

FIRST AMENDED COMPLAINT - 19
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx103**

claims 7, and 8 is established (direct infringement or indirect infringement or both), Google infringes claim 9 on the same basis.

**JURY DEMAND**

U.S. Patent No. 7,679,637 LLC demands a trial by jury on all issues that may be so tried.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff U.S. Patent No. 7,679,637 LLC requests that this Court enter judgment in its favor and against Defendant Google Corporation as follows:

A.     Adjudging, finding, and declaring that Google has infringed the above-identified claims of the Patent-in-Suit under 35 U.S.C. § 271;

B.     Awarding the past and future damages arising out of Google's infringement of the claims of the Patent-in-Suit to U.S. Patent No. 7,679,637 LLC in an amount no less than a reasonable royalty, together with prejudgment and post-judgment interest, in an amount according to proof;

C.     Adjudging, finding, and declaring that the Patents-in-Suit are valid and enforceable;

D.     Awarding attorney's fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law; and

E.     Granting U.S. Patent No. 7,679,637 LLC such other further relief as is just and proper, or as the Court deems appropriate.

DATED this 31st day of July, 2023.

> Respectfully submitted,
>
> SUMMIT LAW GROUP, PLLC
>
>
> By *s/ J. Chad Mitchell*
>     J. Chad Mitchell, WSBA #39689

FIRST AMENDED COMPLAINT - 20
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx104**

315 5th Ave. S., Ste. 1000
Seattle, WA 98104-2682
Telephone: (509) 735-5053
*chadm@summitlaw.com*

GLOBAL IP LAW GROUP, LLC

By *s/ David Berten*
David Berten
(*pro hac vice pending*)
55 W. Monroe St., Ste. 3400
Chicago, IL 60603
Telephone: (312) 241-1502
*dberten@giplg.com*

*Attorneys for Plaintiff*

FIRST AMENDED COMPLAINT - 21
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

Appx105

THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

U.S. PATENT NO. 7,679,637 LLC

        Plaintiff,

  v.

GOOGLE LLC,

        Defendant.

Case No. 2:23-cv-00592-JHC

**GOOGLE'S RULE 12(B)(6) MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**NOTE ON MOTION CALENDAR: September 15, 2023**

**ORAL ARGUMENT REQUESTED**

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx107**

of a stream of audio while maintaining the perceived aspects of audio quality. ***Example algorithms include the WSOLA algorithm introduced by Verhelst and Roelands, and available at http://ieeexplore.ieee.org/xpl/freeabs _all.j sp?arnumber=319366, or related algorithms.***

\* \* \*

The first embodiment uses ***Olli Parviainen's open-source SoundTouch library, available at http://www.surina.net/soundtouch/.***

\* \* \*

For example, with ***protocols like the real-time transport protocol (http:/ /tools.ietf.org/html/rfcl 889)***, the server simply continues to send frames to clients and some separate quality of service mechanism informs the server if the frames are reaching their destination. This can lead to performance improvements, including lowered latency. ***An embodiment could embrace this strategy***.

(*Id.*, 3:26-32; 9:4-13;10:44-52).

### D. The '637 Patent Acknowledges That The Claimed Web Conferencing System Recites Generic Computer Components

Plaintiff asserts claims 2-5 and 7-9 ("asserted claims")—which are all system claims. (ECF 25 ¶¶ 44-91). All asserted claims depend from either independent claim 2 or 7. Claims 2-5 are representative and recite three or more of the following components of the claimed software system. As shown below, the '637 patent acknowledges that all of these components merely perform generic functions of a computer and already existed before the claimed invention:

| Claimed Computer Component | Admitted Generic or Conventional Functionality Existing Before The Claimed Invention |
|---|---|
| "first client application" | "Client applications … run on participants' computers. The client application captures the streams that the participant chooses to share (if any). The client application ***sends these streams*** to server 110. The client application also ***receives the streams*** from the server that the participant chooses to observe (if any) and ***displays them***…. ***In this way a participant can use the client application to share and/or receive.***" ('637 patent, 5:10-20). |
| "second client application" | |

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 6
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Appx118**

| | |
|---|---|
| | "*[A]pplications could be provided for different operating systems or platforms.* For example, in a *Microsoft Windows environment* a native application might be required for full capabilities, such as sharing screen data, but an *Adobe Flash application* might be able to observe and share some types of data/*" (*Id.*, 10:24-29). |
| "server application" | "When server 110 receives a frame, it *simply stores the frame and its accompanying information.*" (*Id.*, 7:20-21). |
| "storage means for recording" | "The way that frame data and associated information is stored and retrieved is *open to alternatives.*" (*Id.*, 10:11-12).<br><br>"The frame data could also be *stored in a database, on a network attached storage device, or the like.*" (*Id.*, 10:16-18). |
| "audio time scale modification component" | Existing "[a]udio time-scale modification techniques have been applied to *applications such as voice-mail and dictation tape playback, post synchronization of film and video, and playback of recorded content*. These techniques have also been employed … for streaming audio (to speed up or slow down audio playback to maintain an optimal buffer length)." (*Id.*, 3:25-33).<br><br>"In yet another field, *algorithms have been devised to timescale manipulate audio content with high fidelity reproduction*. These algorithms allow an audio stream to be played back at a faster or slower rate while maintaining other perceived aspects of the audio, such as timbre, voice quality, and pitch." (*Id.*, 3:19-24).<br><br>Examples of existing "audio time-scale modification" components that "*maintain[] the perceived aspects of audio quality.*" (*Id.*, 9:3-7):<br><br>• "*WSOLA algorithm* introduced by Verhelst and Roelands … available at http://ieeexplore.ieee.org/xpl/freeabs_all.jsp? arnumber =319366, or related algorithms" (*id.*, 9:8-10);<br><br>• "*Olli Parviainen's open-source SoundTouch library*, available at http://www.surina.net/soundtouch/" (*id.*, 9:11-13);<br><br>• "*[R]eal-time transport protocol* (http:/ /tools.ietf.org/html/rfcl 889)" (*id.*, 10:46-48). |

All asserted claims require at least a "first client application" for the presenter to share "computer screen video"/"computer screen video data." ('637 patent, claims 2 and 7). The '637 patent distinguishes sharing of "computer screen video" from other types of video, like "camera video." (*Id.*, 5:25-28; 5:53-55).

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 7
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx119**

of third-party encoders on YouTube's Help Center. (ECF 25 ¶ 30). As discussed in detail below, the FAC expressly links to YouTube's statement that ***"[n]one of these [encoders] are made by YouTube"*** and users must "evaluate the products and decide which option makes the most sense for you or your business." (Ex. 2, FAC's link at ¶ 30, https://support.google.com/youtube/answer/2907883?hl=en&ref_topic=9257984&sjid=7224752 144479992201-NA#zippy=).

## III. LEGAL STANDARD

Rule 12(b)(6) requires dismissal for failing to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). "Where, as here, the factual allegations are actually inconsistent with and contradict infringement, they are likewise insufficient to state a plausible claim." *Bot M8*, 4 F.4th at 1354. On a Rule 12(b)(6) motion, the Ninth Circuit instructs that "a document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994) (dismissing complaint because documents "expressly mentioned in the amended complaint" but "not physically attached to the pleading"); *Warren v. Fox Family* , 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) (dismissing complaint because "documents on which the complaint 'necessarily relies' and whose 'authenticity . . . is not contested'"). Furthermore, "[i]n general, websites and their contents may be judicially noticed." *Threshold Enters. v. Pressed Juicery*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020); *Caldwell v. Caldwell*, 2006 WL 618511, at *4 (N.D. Cal. 2006) (same).

## IV. THE FAC SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THE '637 PATENT CLAIMS INELIGIBLE SUBJECT MATTER UNDER § 101

The '637 patent uses technical jargon like "time-shifting" and "time-scale modification."

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 9
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

But the claim language and specification confirm that this technical jargon and the '637 patent recite nothing more than the abstract idea of playing back recorded content using conventional computer technology. The asserted claims therefore fail both steps of the Supreme Court's *Alice* test and should be dismissed with prejudice.

*Alice*'s Two-Step Test. Section 101 defines subject matter that is eligible for patent protection as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However, patents that claim "laws of nature, natural phenomena, and abstract ideas are not patentable" because they are "the basic tools of scientific and technological work." *Alice Corp. v. CLS Bank*, 573 U.S. 208, 216 (2014). "Eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP v. InvestPic*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).

"Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion." *Id.* Where "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law," it is proper to dismiss claims under § 101 at the pleading stage. *Aatrix Software v. Green Shades Software*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Secured Mail v. Universal Wilde*, 873 F.3d 905, 912 (Fed. Cir. 2017) (holding claims ineligible "based on intrinsic evidence from the specification without need for extraneous fact finding outside the record"). This is such a case.

In *Alice*, the Supreme Court established the two-step test for § 101 patent eligibility. 573 U.S. at 217. Step 1 asks whether the claim is "directed to" an abstract idea. *Id.* Applying *Alice*, the Federal Circuit explains that abstract ideas include "long-prevalent practice[s]" and ideas or concepts "long-practiced in our society." *Intellectual Ventures I v. Symantec*, 838 F. 3d 1307,

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 10
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx122**

1314 (Fed. Cir. 2016); *Capital One*, 792 F.3d at 1366.  ***An "abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet."***  *Id.*

Step 2 asks whether the elements of the claim "both individually and as an ordered combination" supply an "inventive concept" that transforms the abstract idea into a patent-eligible invention.  *Id.*  "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application."  *BSG v. Buyseasons*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).  The '637 patent fails both steps.

**A.      Step 1:  The '637 Patent Claims The Abstract Idea Of Playing Back Recorded Content**

Step 1 examines "what the patent asserts to be the focus of the claimed advance over the prior art." *Hawk Tech. v. Castle Retail*, 60 F.4th 1349, 1356 (Fed. Cir. 2023).  Here, the '637 patent claims "a multi-part software program." '637 patent, 4:58.  For software, Step 1 asks whether the patent claims "a ***specific*** improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function."  *TecSec v. Adobe*, 978 F.3d 1278, 1293 (Fed. Cir. 2020).  This "***specificity [is] required*** to transform a claim from one claiming only a result"— which is an abstract idea—"to one claiming a way of achieving it."  *SAP*, 898 F.3d at 1167.

**1.      The Specification Confirms That The Asserted Claims Merely Recite The Abstract Idea Of Playing Back Recorded Content**

The '637 patent purports to solve a problem where participants joining a meeting late could not "observe a previously recorded part of the meeting while the meeting is still in progress." (*Id.*, 2:50-54).  This is akin to the "nontechnical human activity of passing a note to a person who is in the middle of a meeting or conversation" to bring the person up to speed.  *Interval Licensing v.*

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 11
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*AOL*, 896 F.3d 1335, 1344 (Fed. Cir. 2018). The Federal Circuit finds this same "act of providing someone an additional set of information without disrupting the ongoing provision of an initial set of information is an abstract idea." *Id.*

The '637 patent describes five purported "advantages" of the claimed invention—all of which further confirm the abstract idea of playing back recorded content:

(1)     "a participant can enter a meeting after it has begun and either begin observing the live content or rewind and see the content that they missed";

(2)     "a participant can observe a meeting in real-time and be able to pause the content to deal with an interruption";

(3)     "a participant observing a meeting can easily replay an interesting segment";

(4)     "a participant can observe a live meeting at slower than real-time to more easily digest the content";

(5)     "a participant observing on a delay (from joining late, pausing, replaying, etc .... ) can observe the content faster than real-time."

('637 patent, 3:33-50).

The first three purported advantages are akin to the "nontechnical human activity of passing a note to a person who is in the middle of a meeting or conversation" to bring the person up to speed. *Interval*, 896 F.3d at 1344. These three "advantages" merely automate the manual process of time-shifting by recording and playing back a live broadcast using a traditional VCR. "[M]ere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology" under § 101. *IBM v. Zillow*, 50 F.4th 1371, 1378 (Fed. Cir. 2022).

Courts find similar processes that merely "amount[] to replacing a live broadcast with what is akin to—in archaic terms—inserting a video tape into a VCR and pressing 'play'" to be abstract.

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 12
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx124**

*RaceTech v. Ky. Downs*, 167 F.Supp. 3d 853, 866 (W.D. Ky. 2016) (dismissing claims reciting playback of recorded live horse races as akin to using VCR to record live broadcast); *CG Tech. v. William Hill U.S.*, 404 F. Supp. 3d 842, 850 (D. Del. 2019) ("abstract idea of managing a betting market during a live sporting event" as akin to using VCR to record live broadcast).

That is all the '637 patent claims—merely automating the manual process of time-shifting by replaying recorded content using a VCR in the context of web conferencing. It is well settled that "merely implement[ing] an old practice in a new environment" is patent ineligible. *FairWarning IP v. Iatric*, 839 F.3d 1089, 1094 (Fed. Cir. 2016). "Mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology" but rather an "abstract idea[] that use[s] computers as tools." *Credit Acceptance v. Westlake*, 859 F.3d 1044, 1055 (Fed. Cir. 2017).

For the fourth and fifth purported advantages of playing back content at "slower" or "faster" speeds, the '637 patent acknowledges that this "time-scale modification" technology was already well-known before the claimed invention. ('637 patent, 3:19-33; *supra* Section II.B). The patent describes conventional "[a]udio time-scale modification techniques" that "have been applied to *applications such as voice-mail and dictation tape playback, post synchronization of film and video, and playback of recorded content*." (*Id.*, 3:25-33). The patent also describes existing "commercial digital video recording" ("DVR") technology "such as one sold under the trademark TiVo" that "paved the way in providing live time-shifting capabilities for television viewing." (*Id.*, 3:7-19). Such "DVRs have empowered consumers by allowing them to time-shift real-time television content." (*Id.*).

All purported advantages described in the '637 patent are nontechnical human or

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 13
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Appx125**

conventional activities, like recording and playing back content using VCRs or DVRs (which itself is a digital form of VCRs). The claim language read in light of the specification therefore confirms that the asserted claims are merely directed to the abstract idea of playing back recorded content applied to the Internet and therefore fail Step 1.

### 2. The Asserted Claims Use Functional Language That Recites The Abstract Idea Of Playing Back Recorded Content

As shown below, representative claims 2-5 merely recite a desired result or function rather than a specific, innovative way to achieve the result or function:

| Claim 2 | Results-Based Functional Claiming Without A Specific Way To Achieve The Result |
|---|---|
| 2. A web conferencing system comprising: | • Merely limits abstract idea to web.<br>• *"[M]erely limiting the field of use of the abstract idea to a particular existing technological environment [i.e., web conferencing] does not render the claims any less abstract."* Affinity Labs v. DirecTV, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016). |
| (a) a *first client application* allowing at least one presenting participant *to share computer screen video*, | • Does not recite how to achieve result of "shar[ing] computer screen video," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of transmitting content*. |
| (b) said first client application also being arranged to allow said presenting participant *to share at least one data stream selected from* the group consisting of chat data, documents, web pages and white-boarding session, | • Does not recite how to achieve result of "shar[ing] at least one data stream" of "chat data, documents, web pages and white-boarding session," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of transmitting particular content*.<br>• Limiting information "to particular content…does not change its character as information … as within the realm of abstract ideas." Elec. Power v. Alstom, 830 F.3d 1350, 1353 (Fed. Cir. 2016). |

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 14
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx126**

| | |
|---|---|
| **(c) storage means for recording** said computer screen video and said data stream, and | • Does not recite how to achieve result of "stor[ing]" or "recording," much less recite a technological improvement to or innovative way of doing so.<br>• Instead, merely recites *generic computer functions of storage and recording.* |
| **(d)** a **second client application allowing** at least one observing participant **to sense said computer screen video and said data stream live**, | • Does not recite how to achieve result of "sens[ing] said computer screen video and said data stream live," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of receiving live content*.<br>• The Federal Circuit found similar claim language *"receiving … [a] real-time media stream"* to be directed to an abstract idea. *Two-Way Media v. Comcast Cable*, 874 F.3d 1329, 1340 (Fed. Cir. 2017). |
| **(e)** said second client application also being arranged to allow said observing participant to **selectively sense a previously presented and recorded part** of said computer screen video and said data stream **while said presenting participant is sharing** a current part of said computer screen video and said data stream, | • Does not recite how to achieve result of "selectively sens[ing] a previously presented and recorded part … while said presenting participant is sharing…," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of receiving recorded content during live presentation*.<br>• The Federal Circuit found similar language *"receiving and transmitting [a] real-time media stream … and recording certain information about the stream"* to be abstract. *Id*. |
| **(f)** said second client application also being arranged *to* allow said observing participant to **selectively sense a previously presented and recorded part** of said computer screen video and said data stream **after said presenting participant has finished sharing** a said computer screen video and, said data stream | • Does not recite how to achieve result of "selectively sens[ing] a previously presented and recorded part … after…finished sharing…," much less recite a technological improvement to or innovative way of doing so.<br>• Instead, merely recites *generic computer function of receiving recorded content after a live presentation*.<br>• The Federal Circuit found similar functional language of *"receiving and transmitting [a] real-time media stream … and recording certain information about the stream"* to be abstract. *Id.* at 1340. |

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 15
(2:23-cv-00592-JHC)

**Appx127**

| whereby said web conferencing system is able to **simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts** of said computer screen video and said data stream. | • Does not recite how to achieve result of "simultaneously record[ing]…and…sens[ing] current and previously presented parts," much less recite a technological improvement or innovative way of doing so. <br> • Instead, merely recites **generic computer functions of recording and transmitting live and recorded content**. <br> • The Federal Circuit found similar functional language, **"receiving and transmitting [a] real-time media stream … and recording certain information about the stream,"** to be abstract. *Id.* at 1340. |
|---|---|

As shown above, no limitation actually recites a specific technological improvement in how the "computer screen video" is shared, recorded, stored, or received during or after a live presentation. Instead, the claim recites a generic function or result "that itself is the abstract idea." *Two-Way*, 874 F.3d at 1337. The Federal Circuit finds similar language of **"receiving and transmitting [a] real-time media stream … and recording certain information about the [real-time] stream"** to be functional and therefore abstract. *Id.* at 1340-41. The fact that these recited functions occur during a live broadcast does not change the generic and abstract nature of the claim. "[N]othing in these claims requires anything other than conventional computer and network components operating according to their ordinary functions." *Id.* at 1341; *Elec. Power*, 830 F.3d at 1351 (finding collecting, recording, and displaying data in "real-time" held abstract).

In *Skillz Platform*, the court found similar claims directed to a "video replay engine" for recording a user's screen during live gameplay and allowing replay were drawn to the "abstract idea of storing, communicating, and displaying data." 2022 WL 783338, *21 (N.D. Cal. 2022). The same result is warranted here. "Because the claims are directed to broad functions— 'generating,' 'recording,' 'capturing,' and 'broadcasting'—without any technological improvement for performing those functions, they are not directed to a specific technological

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 16
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

improvement." *Id.*

Representative claim 3 likewise lacks specificity and uses pure functional claiming:

| Claim 3 | Results-Based Functional Claiming Without A Specific Way To Achieve The Result |
|---|---|
| 3.  The system of claim 2 wherein: | |
| (a) said *first client application* allows said presenting participant to *share audio data* | • Does not recite how to "share audio data," much less recite a technological improvement or innovative way of doing so. <br> • Instead, merely recites *generic computer function of transmitting content*. |
| *(b) said storage means records said audio data, and* | • Does not recite how to "store" or "record[] said audio data," much less recite a technological improvement or innovative way of doing so. <br> • Instead, merely recites *generic computer functions of recording and storage*. |
| (c) said second client application allows said observing participant to *sense said audio data*. | • Does not recite how to "sense said audio data," much less recite a technological improvement or innovative way of doing so. <br> • Instead, merely recites *generic computer function of receiving content*. |

Nowhere does claim 3 recite a specific technological improvement or innovative way  to share, record, store, or receive audio data.  Indeed, the functions of claim 3 can be performed using a conventional tape recorder that records and plays back audio or a radio station recording a broadcast.  Such software claims with brick-and-mortar analogs are abstract and fail Step 1. *Symantec*, 838 F.3d at 1317 (claimed software with "brick and mortar" analog to post office held abstract).

Stripped of their technical jargon, representative claims 4-5 are likewise functional and abstract:

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 17
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Appx129**

| Claim 4 | Results-Based Functional Claiming Without A Specific Way To Achieve The Result |
|---|---|
| 4. The system of claim 3 wherein: | |
| (a) said web conferencing system *includes an audio time-scale modification component*, | • '637 patent acknowledges that recited "audio time-scale modification component" is conventional technology. (*Supra* Section II.B).<br>• Does not recite how to achieve "audio time-scale modification," much less a technological improvement to or innovative way of doing so. |
| (b) said second client application also *allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed*, | • Merely recites generic time-shifting technology as admitted in specification (*i.e.*, generic function of playing back in slow motion or by fast forward, as provided by conventional time-shifting technologies like VCRs and DVRs). (*Id.*).<br>• Does not recite how to achieve an "adjustable rate of speed," much less a technological improvement or innovative way of doing so. |
| whereby said audio time-scale modification component *maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed*. | • Merely recites generic audio time-scale modification technology as admitted in specification (*i.e.*, generic function of playing back audio at different rates of speed with consistent quality, as provided by conventional voicemail or audio dictation services). (*Id.*).<br>• Does not recite how to "maintain[] substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed," much less a technological improvement or innovative way of doing so. |
| Claim 5 | Results-Based Functional Claiming Without A Specific Way To Achieve The Result |
| 5. The system of claim 4 wherein said second client application also allows said observing participant to *perform time-shifting operations comprising pausing, resuming and seeking*. | • Merely recites generic time-shifting technology as admitted in the specification (*i.e.*, generic functions of "pausing, resuming and seeking" provided by conventional VCRs and DVRs). (*Id.*).<br>• Does not recite how to achieve "pausing, resuming and seeking," much less recite a technological improvement or innovative way of doing so. |

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 18
(2:23-cv-00592-JHC)

**Appx130**

Claims 4 and 5 claim nothing more than the generic functions of time-shifting itself (pause, resume, seeking forward and backward) and audio time-scale modification itself (playback at different rates with consistent quality). The '637 patent admits these functions are generic time-shifting and audio time-scale modification technologies present in conventional VCRs, DVRs, voicemail, and open source software. (*Id.*, 3:7-18, conventional time-shifting using VCRs and DVRs; 3:26-32, 9:4-13, 10:44-52, conventional audio time-scale modification using voicemail, dictation, and open source).

Like the other claims, claims 4 and 5 do not recite a specific or innovative way to achieve the claimed results of time-shifting and audio time-scale modification. Nowhere do they recite how the goals of "adjustable rate of speed," "substantially consistent perceived aspects of audio quality," or "pause, resume and seek" are achieved. The claims do not recite any parameters for audio time-scale modification or how the audio data should be manipulated. These claims lack "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *SAP*, 898 F.3d at 1167.

Nor can Plaintiff point to source code in the specification to avoid the functional and abstract nature of the claim language itself. The Federal Circuit instructs that "[e]ven a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims." *ChargePoint v. SemaConnect*, 920 F.3d 759, 769 (Fed. Cir. 2019). "[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on *the specification must always yield to the claim language* in identifying that focus." *Id.* at 766.

"Stripped of the technical jargon that broadly describes non-inventive elements," claims

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 19
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

2-5 only cover the abstract idea of recording and playing back recorded content. *Smart Sys. v. Chi. Transit*, 873 F.3d 1364, 1371 (Fed. Cir. 2017). The asserted claims therefore fail Step 1.

### B. Step 2: The Individual Elements And Ordered Combination Function In A Conventional Way And Do Not Supply An Inventive Concept

#### 1. The '637 Patent Acknowledges That Each And Every Claimed Component Is Conventional

The Step 2 inquiry shifts from the overall focus of the claim to "the elements of each claim both individually and as an ordered combination." The claimed elements must recite an "inventive concept" that transforms the abstract idea into "a patent-eligible application." *Alice*, 573 U.S. at 217. This transformation requires more than "well-understood, routine, conventional activit[ies]." *Id.* at 225. That is all the '637 patent recites.

As the specification admits, none of the recited components in the asserted claims is new. The '637 patent acknowledges that "[f]or the most part, the workings of these components resemble those of similar components in ***existing web conferencing or audio video display applications***," including traditional telephone networks, VCRs, and DVR technology offered by companies such as TiVo and others. (*Id.*, 8:35-37; 3:7-16; Fig. 5). The patent specifically acknowledges that each of these components was already well-understood, routine, or conventional:

| Claimed Computer Component | Admitted Generic or Conventional Functionality Existing Before The Claimed Invention |
|---|---|
| "first client application" | "Client applications … run on participants' computers. The client application captures the streams that the participant chooses to share (if any). The client application ***sends these streams*** to server 110. The client application also ***receives the streams*** from the server that the participant chooses to observe (if any) and ***displays them***…. ***In this way a participant can use the client application to share and/or receive.***" (*Id.*, 5:10-20). |
| "second client application" | |

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 20
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx132**

| | |
|---|---|
| | "*[A]pplications could be provided for different operating systems or platforms.* For example, in a *Microsoft Windows environment* a native application might be required for full capabilities, such as sharing screen data, but an *Adobe Flash application* might be able to observe and share some types of data" (*id.*, 10:20-29). |
| "server application"[5] | "When server 110 receives a frame, it *simply stores the frame and its accompanying information*" (*id.*, 7:20-21). |
| "storage means for recording" | "The way that frame data and associated information is stored and retrieved is *open to alternatives*" (*id.,* 10:11-12). "The frame data could also be *stored in a database, on a network attached storage device, or the like*" (*id.,* 10:16-18). |
| "audio time scale modification component" | Existing "[a]udio time-scale modification techniques have been applied to *applications such as voice-mail and dictation tape playback, post synchronization of film and video, and playback of recorded content*. These techniques have also been employed … for streaming audio (to speed up or slow down audio playback to maintain an optimal buffer length)" (*id.*, 3:25-33). "In yet another field, *algorithms have been devised to timescale manipulate audio content with high fidelity reproduction*. These algorithms allow an audio stream to be played back at a faster or slower rate while maintaining other perceived aspects of the audio, such as timbre, voice quality, and pitch" (*id.*, 3:19-24). The '637 patent describes existing "audio time-scale modification" components that "*maintain[] the perceived aspects of audio quality,*" including examples of open source software that were already available (*id.*, 9:3-13; 10:44-53). |

Nothing in the claims, in view of the specification, requires anything other than off-the-shelf, conventional computer technology for recording, storing, and playing back content. That is so even for the claimed "audio time-scale modification"—which the '637 patent acknowledges already existed with conventional, open source software. *(Id.*, 9:4-10 (open source software

---

[5] Claims 2-5 are representative because they recite substantially similar limitations and are drawn to the same abstract idea as claims 7-9 with claims 7-9 reciting a "server application." As discussed above, the '637 patent acknowledges that the "server application" performs generic functions and therefore this limitation does not substantially change the character of claims 7-9 under *Alice*.

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 21
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

available at "http://ieeexplore.ieee.org/xpl/freeabs_all.jsp? arnumber =319366, or related algorithms"); 9:11-13 ("Olli Parviainen's open-source SoundTouch library" available at http://www.surina.net/soundtouch/"); 10:44-52 ("real-time transport protocol available at http://tools.ietf.org/html/rfcl 889").

Nor can Plaintiff rely on source code from the specification to supply an inventive concept. As discussed above, none of the asserted claims recite any code. Such unclaimed features are irrelevant to the *Alice* analysis. The Federal Circuit is clear under § 101, "the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint*, 920 F.3d at 76. Because the asserted claims only use admittedly well-understood and conventional computer hardware and software to carry out the abstract idea of playing back recorded content, the claims do not recite an inventive concept.

### 2. The Asserted Claims Recite A Conventional Ordering Of Steps

Nor does the ordered combination of claim limitations transform them into substantially more than the abstract idea itself. They use a conventional ordering of steps—first sharing content, then recording and storing it, and then playing it back. The claims use this conventional ordering of steps with admitted conventional technology, including the "first" and "second client applications," "storage means," "application server," and "audio time-scale component." The Federal Circuit instructs that "merely reciting an abstract idea performed on a set of generic computer components" does "not contain an inventive concept." *Two-Way*, 874 F.3d at 1339. The asserted claims therefore fail to transform the abstract idea into a patent eligible invention.

That the claims are addressed to web conferencing technology does not transform them either. The specification acknowledges that known web conferencing systems "allow participants

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 22
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx134**

to share content with and observe content … screen video data, camera video data, audio data (through computers and through telephones), chat data, documents, and the like" and that "many web conferencing systems can record the meeting." ('637 patent, 2:39-43; 2:48-49). The very idea to which the '637 patent is directed—time-shifting a live presentation—and the purported problems it addressed were already understood over a decade before with pre-web technology.

For example, the '213 patent "provide[d] for a portion of a live multimedia presentation to be recorded and played back at an accelerated speed until the user catches up to the real-time presentation" using "speech compression algorithms that retain the pitch of the audio" that themselves dated back to the 1980s. (Ex. 1, 2:44-50; 1:56-58; 7:2-13). This patent's solution was addressed to the same "advantages" as the '637 patent. (*Id.*, 1:36-43) ("a person … viewing the meeting from the beginning and wants to go back to review something while the meeting is in progress"; "a person wants to join a meeting in progress and needs to be brought up-to-date with what has already transpired").

Moreover, as discussed above, the asserted claims are entirely functional. These are the very claims directed to "generalized steps to be performed on a computer using conventional computer activity" that repeatedly fail under Step 2. *Two-Way*, 874 F.3d at 1337, 1339 (finding functional claims fail Step 2 as "a conventional ordering of steps—first processing the data, then routing it, controlling it, and monitoring its reception—with conventional technology to achieve its desired result"); *Elec. Power*, 830 F.3d at 1355 (finding functional claims fail Step 2 because "claims' invocation of computers, networks, and displays does not transform the claimed subject matter into patent-eligible applications" nor recite "any requirements for how the desired result is achieved"); *Clarilogic v. FormFree Holdings*, 681 F. App'x 950, 954-55 (Fed. Cir. 2017) (same).

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 23
(2:23-cv-00592-JHC)

Such claims that use "already available computers, with their already available basic functions" risk a monopoly on a concept and not a technological innovation. *SAP*, 898 F.3d at 1169-1170. This is the very class of claims § 101 was meant to exclude as claiming monopolies on concepts, not innovations. For these reasons, the asserted claims of the '637 patent fail Step 2 and should be dismissed.

## V. THE FAC SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THE FAC FAILS TO PLAUSIBLY ALLEGE THAT GOOGLE "BENEFITS" OR "USES" THE ENTIRE CLAIMED SYSTEM

The Federal Circuit has squarely addressed what constitutes directly infringing "use" of a system claim under § 271(a): "Direct infringement by 'use' of a claimed system requires use of each and every element of the system." *Synchronoss Techs. v. Dropbox*, 987 F.3d 1358, 1369 (Fed. Cir. 2021). This means "a person must ***control (even if indirectly) and benefit from each claimed component.***" *Intellectual Ventures I v. Motorola Mobility*, 870 F.3d 1320, 1329 (Fed. Cir. 2017). Plaintiff has not pleaded either here.

### A. The FAC Is Devoid Of Allegations That Google Benefits From Each Claimed Component

In *Grecia v. McDonald's*, the Federal Circuit affirmed the dismissal of Grecia's complaint because "Grecia failed to allege that McDonald's obtained a ***benefit from each and every claim element.***" 724 Fed. Appx. 942, 947 (Fed. Cir. 2018). There, the complaint "only identified a ***vague benefit*** to McDonald's in that it could use a token stored in metadata associated with a customer's primary account number with Visa." *Id.* The Federal Circuit found that "Grecia's recitation of general benefits to be equivalent to stating that McDonald's benefits from the claimed system as a whole—the argument we rejected in *Intellectual Ventures*." *Id.* "We therefore hold

GOOGLE'S RULE 12(b)(6) MOTION TO DISMISS – 24
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Appx136**

THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

U.S. PATENT NO. 7,679,637 LLC

Plaintiff,

v.

GOOGLE, LLC,

Defendant.

CASE NO. 2:23-cv-00592-JHC

PLAINTIFF'S OPPOSITION TO
DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

JURY DEMAND

NOTED ON MOTION CALENDAR:
September 15, 2023

ORAL ARGUMENT RE   UESTED

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT
CASE NO.  2:23-cv-00592-JHC

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx158

As explained below, Google's subject-matter eligibility motion should be denied outright because the patent claims are not "directed to" any abstract idea and thus are subject-matter eligible under step one of the *Alice* framework. If the Court disagrees and reaches *Alice* step two, Google's motion should be denied at least because it is premature. Step two requires claim construction, fact finding, and credibility determinations, all issues that are inappropriate to resolve in this case on a purported motion to dismiss. *See* Ex. 5, Rule 56(d) Declaration of David Berten. Google's motion attaches documents outside the complaint, including Exhibit 1, a purported third-party prior art patent extending ten pages. This raises myriad factual issues and converts Google's motion to summary judgment under FRCP 12(d). Tellingly, Google's motion does not even mention, let alone explain, how deciding eligibility on a motion to dismiss in this case comports with the controlling *Berkheimer* decision. Google's motion should be denied in its entirety.

Google's second argument about *Centillion* also fails. Google omits that there are times when Google has made, offered for sale, and sold the entire infringing system: 100 end-to-end developed and produced by Google. This occurs, for example, when the YouTube app initiates a YouTube Live Stream and Google's YouTube platform streams it to users' computers. *E.g.*, FAC 25, 47, Ex. 1 to FAC.[1] And as alleged in the FAC, Google also screens and supports the use of third-party encoders when a Live Stream is initiated directly within the YouTube web-based platform (as opposed to the YouTube smartphone app). *E.g.*, FAC 26-31, 49-51, Ex. 1 to FAC. Google puts all of this varied technology in place, exercises control over it, and benefits from its

[1] Exhibit 1 to the FAC is a detailed claim chart explaining the various ways different combinations of Google's products work together in an infringing system. It is included here as Exhibit 1 as well for convenience.

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 2
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx163**

Ex. 2 at 3:7-16 (emphasis added). Web conferencing systems, however, presented technical challenges that are different from television viewing, and Mr. Kohler's invention solved some of those technical issues, overcoming technological problems specifically arising in the realm of these web conferencing systems.

For example, unlike a self-contained DVR, web conferencing systems of the kind claimed in the invention involve at least two distinct applications: one used by the presenter and separate applications used by other participants. The '637 patent expressly claims the use of two different applications. *See e.g.,* Ex. 2, 12:33-44. Second, unlike TV, web conferencing systems of the kind claimed in the invention use more than one data stream. The '637 patent expressly claims the use of distinct data streams. *See e.g.,* Ex. 2, 12:35-38. These are only two examples of the way that web-based conferencing systems operate differently than DVRs, but they are sufficient to demonstrate that the existence of a device like a TiVo for televised content does not mean that that a TiVo could be used to record and playback web-based conferences.

The '637 explains that, unlike DVRs/TiVo with televisions, "current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Ex. 2 at 2:51-54. The patent also explains how web conferencing systems make use of different streams of data and how a technique used in a different field can be applied to data streams in a web conference:

> In this system, a web conferencing session contains one or more streams. A stream is any type of data that a participant can share or observe. Examples of streams include screen video, camera video, audio (through computers and/or through telephones), documents, collaborative chat, or any other types of data involved in a web conferencing session.
>
> Streams are comprise d of a series of discrete frames. Frames are time dependent data. Examples of frames include a segment of audio, a single video image, etc. In the first embodiment each frame in a stream is given a sequential number. Frames

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 4
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

ii. retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

8. The system of claim 7 wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session.

9. The system of claim 8 wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams.

**C  Google Doe  Not Addre  All A  erted Claim  and It  Con l  or  Arg ment that There Are 3 Re  re entati e Claim  Fail**

Plaintiff asserts claims 2-5 and 7-9.  Plaintiff disagrees that any of these claims are

representative of the other claims. Subject-matter eligibility must be addressed for each claim.

Google's motion acknowledges that there is no one representative claim, instead arguing

that "Claims 2-5 are representative." Dkt. #26, 6. Google then purports to identify four computer

components and asserts that each of claims 2-5 "recite three or more of the following components

of the claimed software system." Dkt. #26, 6. But this is not how representativeness is determined;

the question is whether each claim has distinctive claim limitations (*e.g.*, limitations not common

to the other claims).  Google's motion wholly failed to address that question or establish that there

are representative claims.  Because it does not address each claim, and instead erroneously relies

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 7
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx168

on purported representative claims (and does not even address claims 2, 3, 4 and 5), Google's motion must fail.

**D**     **Google' O  n Patent**

Google has repeatedly sought, been awarded, and maintains numerous patents that include "playing back recorded content" or cover video conferencing systems.  A search on Google's own "Google Patents" website suggests that Google has applied for, been granted, or has obtained assignments for over 500 patents with a priority date after 2014 that mention "video conferencing." Google must believe its own patents, all applied for *after Alice* are subject matter eligible.  One of these patents, U.S. 9,549,152 entitled "Application Content Delivery to Multiple Computing Environments Using Existing Video Conferencing Solution" is attached as Exhibit 4 and serves as an example of the hundreds of patents Google has received in the same technical area as the invention. As explained in more detail below, the claims of Google's own subject matter eligible patents are similar in nature to the claims of the '637 patent at least to the extent they relate to "playing back recorded content," include what Google calls "functional claiming," and generally relate to use of computer technology to facilitate the playback.

**III**     **Legal Standard  Rele  ant to Patent Eligi  ilit**

In the Ninth Circuit, courts evaluating motions to dismiss must accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *See e.g., K-Tech Telecommunications, Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013). Courts must presume patent claims to be valid and put the burden on the challenger to establish § 101 invalidity by clear and convincing evidence. 35 U.S.C. § 282(a); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019); *Berkheimer*, 881 F.3d at 1368.

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 8
CASE NO.  2:23-cv-00592-JHC

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

Appx169

## IV    Argument

### A    Google's Motion Must be Treated as a Motion for Summary Judgment

Google's motion relies on material outside the complaint and other than the '637 Patent, including reliance on a third-party patent. Google's motion attempts to rely on its Exhibit 1, U.S. Patent No. 5,692,213, to establish that time shifting during a presentation (albeit not in the context of the web or web conferencing) was already known. *See* Mot. 8:1-15.

In its motion, Google cites *Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994) for the proposition that a document is not "'outside' the complaint if the complaint specifically refers to the document and its authenticity is not questioned." Mot. 9:12-14. Google makes no allegation that its Exhibit 1 was in the complaint, and it was not. Following Rule 12(d), *Branch* makes clear that introducing this exhibit necessarily converts Google's motion to a motion for summary judgment as opposed to a motion to dismiss:

> "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). When "matters outside the pleading are presented to and not excluded by the court," a Rule 12(b)(6) motion is to "be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). "However, material which is properly submitted as part of the complaint may be considered" on a motion to dismiss. *Hal Roach Studios*, 896 F.2d at 1555 n. 19 (emphasis added).

*Branch v. Tunnell*, 14 F.3d 449, *453* (9th Cir. 1994).

To avoid this result, in footnote 4, Google purports to rely on *IBM v. Zillow Grp., Inc.*, No. C20-1130 TSZ, 2022 WL 704137, at 2 (W.D. Wash. Mar. 9, 2022), asking the Court to take judicial notice of the patent. Doing so would not resolve any of the issues. *IBM v. Zillow* does not suggest that material outside the pleading can or should be considered at the motion to dismiss stage; instead, it states the opposite:

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 9
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

> For purposes of assessing (at *Alice* Step Two) whether the "representative" claims set forth an "inventive concept," the Court must consider any prior art or other extrinsic evidence proffered by the parties regarding what was "well-understood, routine, or conventional" at the time of the invention. *See id.* at 5. Any material factual questions on this subject will preclude a dispositive § 101 ruling.

Google's substantive reliance on the '213 patent and unresolved disputes issues of fact must convert the motion to one for summary judgment.

**B.** ***Berkheimer*** **and** ***Aatrix*** **Require Denial of this Section 101 Motion to Dismiss**

It is well-recognized that "whether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer*, 881 F.3d at 1368. The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). *Berkheimer* re-affirmed that any fact that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence. *Id.* (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)). In *Berkheimer*, the Federal Circuit concluded that "the district court erred in concluding there are no underlying factual questions to the § 101 inquiry." The Federal Circuit has also held that patent eligibility can be determined at the Rule 12(b)(6) stage "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix*, 882 F.3d at 1125.

Google has not and cannot prove by clear and convincing evidence that the claim elements, both individually and collectively, were well-understood, routine, and conventional to a skilled artisan at the time of the invention. Google's first attempt is its section dedicated to arguing that "The '637 Patent Discloses Conventional 'Time-Shifting' And 'Audio Time-Scale Modification' Technologies That Existed Before The Claimed Invention." Dkt. #26, 4. The fact that individual elements existed before the claim invention is not enough. *Berkheimer v. HP Inc.*, 881 F.3d 1360,

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 10
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx171**

1369 (Fed. Cir. 2018) ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

Google's next argument is similarly flawed: "The '637 Patent Acknowledges That The Claimed Web Conferencing System Recites Generic Computer Components." Dkt. #26, 6. Google cherry-picks specific parts of claim elements from claims 2-5 and classifies them as "admitted generic or conventional functionality existing before the claimed invention." *Id.* Mere existence before the invention date is not enough to show that there is no issue of fact about whether the claims were well-understood, routine, and conventional. And the analysis must apply to the entire claim, not just the particular words that Defendant finds most generic.

The fact that Google had to split its "conventional" argument into two sections, one that addresses time-shifting and one that addresses web-conferencing, undermines its point and reinforces the fact that the claimed technology was not routine, conventional, or well-understood. Google did not even attempt to argue that the application of "time-shifting" or "audio time-scale modification" to web-conferencing systems was known, let alone routine and conventional. Without any evidence, Google's motion must fail.

**C.** ***Alice* Step One: The '637 Patent Claims Are Directed To Eligible Subject Matter**

In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court acknowledged that, at least at the highest level of generality, all inventions rely on abstract ideas: "An invention is not rendered ineligible for patent simply because it *involves* an abstract concept." 573 U.S. 208, 217 (2014). The Supreme Court explained:

> . . . we tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept.

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 11
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx172

> Applications of such concepts to a new and useful end, we have said, remain eligible for patent protection. Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention. The former would risk disproportionately tying up the use of the underlying ideas and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws.

*Id*. (internal citations and quotations omitted).

To avoid absurd results, in the first step of the *Alice* inquiry, the Court must "determine whether **the claims at issue** are directed to one of those patent-ineligible concepts." *Id*. at 217. The Federal Circuit's *Berkheimer* decision re-emphasized that the district court must focus its review on the claims. The court is required to consider the patent eligibility of the specific claims, defining the specific inventions.  Defendant's Motion suffers from the same problems discussed in *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017) (reversing decision of patent ineligibility where district court had concluded that the claims were directed to the "abstract idea of categorical data storage" but the Federal Circuit's review of claims themselves "demonstrate d  that they are directed to an improved computer memory system, not to the abstract idea of categorical data storage.").

Defendant's proposed re-characterization of the claims now at an extremely high level of generality ignores the claims themselves, including the preambles and all of the claim limitations defining systems claimed.  The asserted claims do not claim the " buildin g  block s '" of human ingenuity and the claims certainly do not claim all uses and applications of the idea of "playing back recorded content."  In addition, the invention is not readily analogizable to a mental process, human activity, or the brick-and-mortar world.  The claims do not recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 12
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx173

the Internet.  Instead, the patent claims an invention that is specifically addressed to a specific technical problem with web-based video conferencing, itself a highly technical field that requires all manner of technologies just to establish the conference, let alone have in operate in a manner consistent with the claims.

Google relies on *Interval Licensing v. AOL*, 896 F.3d 1335 (Fed. Cir. 2018), but that case undermines Google's argument rather than supporting it. First, the parties in *Interval Licensing* **agreed** that the claims in the patent in that case were directed to an "attention manager"; and the district court determined that the abstract idea was "providing information to a person without interfering with that person's primary activity." *Interval Licensing* at 1341 (quoting the opinion of the district court).  The claims in *Interval Licensing* **were** analogous to a human activity    passing a note without interpreting someone's attention    and thus are fundamentally different than the specific claims in this case.

This case is instead dictated by the outcome in *DDR*. The '637 claims are rooted in computer technology and recite specific steps that "that resulted in a departure from the routine and conventional sequence of events after the click of a hyperlink advertisement." 792 F.3d at 1371. Just like in *DDR*, "the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result    a result that overrides the routine and conventional sequence of events ordinarily triggered." In *DDR*, the invention changed the routine or conventional outcome of clicking on an online advertisement. In this case, the '637 claims change the routine or conventional process of the way otherwise live video conferences can be observed by participants, allowing participants to control different aspects of an otherwise live event. Claim 2 claims how web-based conferences that use two different applications (one to stream the

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 13
CASE NO.  2:23-cv-00592-JHC

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx174

conference and the other to view it) and at least two different data streams that are both streaming live and being recorded such that a participant can time-shift the conference.

**D.** *Alice Step Two: Google's Argument as to that Functional Claiming Contravenes 35 U.S.C. 112(6) which Allows Functional Claiming and Requires Claim Construction and Disputed Factual Issue*

The asserted claims recite inventive concepts sufficient to render them patent-eligible. Google argues that claims are not subject-matter eligible because they make use of what Google calls "functional claiming." Dkt. #26, 14-20. Certainly, functional claiming does not render a patent claim invalid of ineligible; indeed, the U.S. patent statute, 35 U.S.C. § 112(6), (pre-AIA) specifically allows functional claiming:

> An element in a claim for a combination may be expressed as a means or step for performing **a specified function** without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Here, the asserted patent claims recite several terms that Google can be expected to argue are expressed functionally, including for example, in claim 7:

> *a time-scale modification component* operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

Another example is in claim 2:

> (c) *storage means* for recording said computer screen video and said data stream . . .

Certainly, Google can be expected to argue during claim construction that each of these is limited to specific structures, materials, or acts described in the specification (and equivalents thereof). By contrast, Google's argument here asks the Court to find that these functional elements — and all the others — include all generic computer means. Determining now that the claims are

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 14
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx175

patent-ineligible because of their functional claiming    without conducting claim construction would be legally erroneous.

Google's motion mixes together several different concepts during its discussion of "functional claiming." In *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, the Supreme Court held certain claims ineligible because they did "no more than    implement the abstract idea of intermediated settlement on a generic computer." In Step Two, what the patent owner characterized as specific hardware did not save the claim because the claim recited only a "data processing system" with a "communications controller" and "data storage unit," which the Court held were "purely functional and generic."

Google's motion relies on *Elec. Power v. Alstom*, 830 F.3d 1350, 1353 (Fed. Cir. 2016), where the patent claimed monitoring of an electric power grid (another longstanding conventional activity) using computer components. That case re-emphasized the distinction between improvements to computer-functionality and, "claims so result-focused, so functional, as to effectively cover any solution to an identified problem." *Id*. at 1356.  Google does not argue, much less prove by clear and convincing evidence, that Plaintiff's claims effectively cover all solutions to the identified problems.[2]

Here, as discussed above, Google has not shown in Step One that each claim (or any claim) recites an abstract idea.  The claims are inherently technological.  In Step Two, Google has

---

[2] Google also relies on *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1256 (Fed. Cir. 2016) in which the claims took a longstanding conventional practice of broadcasting and applied it to a generic, electronic device, in this case    a wireless cellular telephone. Google also cited *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). The district court found that claims were directed to the abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information.

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 15
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx176**

not shown that the claim elements together as a whole are conventional or routine. Further in Step Two, the specific claim limitations, including the means structures, are not functional claims and do not include all possible generic computer components, as claim construction will likely show.

Further, Google *itself* makes extensive use of "functional claiming" on its own patents. Consider, for example, claim 1 of Google's '152 patent, which can be described in exactly the same manner as the '637 patent.

| Google' 52 Patent Claim | Re lt -Ba ed F n tional Claiming itho t a S e ifi a io A hie e the Re lt A l ing Google' Arg ment to It Patent |
|---|---|
| An apparatus comprising at least one processor and at least one memory including computer instructions, when executed by the at least one processor, cause the apparatus to: | |
| *establish*, by an application delivery system in response to an identification of an application from a client device, *a video conferencing session* between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device; | • Does not recite how to "establish" "a video conferencing system," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of establishing a video conference*. |
| *select*, by the application delivery system, *a video capture module* as a video input device for the first video conferencing endpoint; | • Does not recite how to "select" "a video capture module," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of selecting a video capture module*. |
| *receive*, by the video capture module provided on the application delivery system, *display data* output by the application; | • Does not recite how to "receive" "display data" much less recite a technological improvement or innovative way of doing so. |

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 16
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx177

| Google's '52 Patent Claim | Result-Based Functional Claiming without a Specific Ratio to Achieve the Result Applying Google's Argument to Its Patent |
|---|---|
|  | - Instead, merely recites *generic computer function of receiving display data*. |
| *convert*, by the video capture module, *the display data to a plurality of video frames*; | - Does not recite how to "convert" "the display data to a plurality of video frames," much less recite a technological improvement or innovative way of doing so.<br>- Instead, merely recites *generic computer function of converting the display data to a plurality of video frames*. |
| *stream the plurality of video frames* received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and | - Does not recite how to "stream the plurality of video frames" much less recite a technological improvement or innovative way of doing so.<br>- Instead, merely recites *generic computer function of streaming the plurality of video frames.* |
| *receive*, by the application delivery system from the client device, *a user input signal* for the application. | - Does not recite how to "receive" "a user input signal" much less recite a technological improvement or innovative way of doing so.<br>- Instead, merely recites *generic computer function of receiving a user input signal*. |

Thus, the supposed shortcomings of the '637 patent are used by Google in its own patents. The claims use "functional claiming"; they do not explain *how* the claimed function is accomplished. Because Google necessarily believes its own '152 patent is subject matter eligible, however, it should explain what is different about the subject-matter-eligible claims of Google '152 patent and the subject-matter-ineligible claims of the '637 patent. At a minimum, Plaintiff should be afforded an opportunity to take discovery from Google to determine the basis on which Google contends its own patents are subject matter eligible. Whatever those reasons are likely applies with equal force to the '637 patent.

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 17
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**Appx178**

Google's final argument is that the FAC should be dismissed because it does not allege how Google put each individual claim element into use and benefits from it.[3]  As a factual matter, this argument is incorrect in several respects.  It ignores those situations where Google controls the entire system, end-to-end; it ignores the claim chart showing how Google uses each element even when third-party encoders are used; and it ignores completely the allegations that it is Google that benefits from the infringing system.  Ex. Dkt. #26, 21, 34-36 (*e.g.*, Google earned $28.845 billion from YouTube adds in 2021).

**V    Con l   ion**

For the foregoing reasons, Plaintiff respectfully request denial of Google's motion to dismiss.  In the alternative, to the extent the Court finds any defects in the FAC, Plaintiff request an opportunity to amend the complaint to address any such defects.

DATED this 11th day of September, 2023.

Respectfully submitted,

SUMMIT LAW GROUP, PLLC

I CERTIFY THAT THIS OPPOSITION CONTAINS 7,040 WORDS, IN COMPLIANCE WITH THE LOCAL CIVIL RULES.

By *s/ J. Chad Mitchell*
J. Chad Mitchell, WSBA #39689

---

[3] Putting its other cases aside, Google's reliance on *Grecia v. McDonalds*, for a supposed proposition that a patent infringement complaint must allege that the infringer "benefits from each claimed component" should be ignored. *Grecia* is nonprecedential, a fact Google fails to inform the court. The face of the opinion itself expressly states "NOTE: This disposition is nonprecedential."  While it is not improper *per se* for Google to cite the case, it is at least unfortunate that Google did not acknowledge the nonprecedential status of *Grecia.* Under Federal Circuit rules, the Federal Circuit "will not give one of its own nonprecedential dispositions the effect of binding precedent." Fed. Cir. Rule 32.1(d).

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S
RULE 12(B)(6) MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT - 23
CASE NO.  2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Appx184

# (12) United States Patent
## Nayyar et al.

(10) **Patent No.:** **US 9,549,152 B1**
(45) **Date of Patent:** **Jan. 17, 2017**

(54) **APPLICATION CONTENT DELIVERY TO MULTIPLE COMPUTING ENVIRONMENTS USING EXISTING VIDEO CONFERENCING SOLUTIONS**

(71) Applicant: **GOOGLE INC.**, Mountain View, CA (US)

(72) Inventors: **Harsh Nayyar**, Mountain View, CA (US); **Rohan Relan**, Atherton, CA (US); **Chuo-Ling Chang**, Mountain View, CA (US); **Peter Kai Hua Tan**, Campbell, CA (US)

(73) Assignee: **Google Inc.**, Mountain View, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/734,646**

(22) Filed: **Jun. 9, 2015**

### Related U.S. Application Data

(60) Provisional application No. 62/009,715, filed on Jun. 9, 2014.

(51) **Int. Cl.**
*H04N 7/14* (2006.01)
*H04N 7/15* (2006.01)
*H04L 29/06* (2006.01)

(52) **U.S. Cl.**
CPC .............. *H04N 7/15* (2013.01); *H04L 65/403* (2013.01)

(58) **Field of Classification Search**
USPC ........................................... 348/14.014–14.09
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2005/0149988 A1* | 7/2005 | Grannan ................ | H04N 7/088 348/E7.031 |
| 2007/0186002 A1* | 8/2007 | Campbell .............. | H04N 7/142 709/231 |
| 2008/0086700 A1* | 4/2008 | Rodriguez ............ | G06F 9/4443 715/804 |

(Continued)

### OTHER PUBLICATIONS

Cisco, "Sharing a Screen, Documents or Whiteboard in Cisco Unified MeetingPlace", Application and Desktop Sharing Considerations for Large Meetings, Release 7, Dec. 9, 2009, 20 pages.

(Continued)

*Primary Examiner* — Maria El-Zoobi
(74) *Attorney, Agent, or Firm* — Brake Hughes Bellermann LLP

(57) **ABSTRACT**

Example implementations are related to establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device, selecting a video capture module as a video input device for the first video conferencing endpoint, receiving, by the video capture module provided on the application delivery system, display data output by the application, converting, by the video capture module, the display data to a plurality of video frames, streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and receiving, by the application delivery system from the client device, a user input signal for the application.

**25 Claims, 13 Drawing Sheets**



Appx207

**US 9,549,152 B1**

Page 2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2010/0273553 A1* | 10/2010 | Zalewski | A63F 13/12 463/31 |
| 2011/0052144 A1* | 3/2011 | Abbas | G11B 27/034 386/240 |
| 2011/0196928 A1* | 8/2011 | Pryhuber | H04N 7/15 709/204 |
| 2012/0042060 A1* | 2/2012 | Jackowski | H04L 47/2475 709/224 |
| 2014/0195675 A1* | 7/2014 | Silver | H04L 65/1083 709/224 |
| 2014/0208235 A1* | 7/2014 | Robinson | G06F 3/0481 715/753 |
| 2015/0128014 A1* | 5/2015 | Monroe | G06F 3/0482 715/202 |
| 2015/0281107 A1* | 10/2015 | Dorcey | H04L 47/35 370/235 |

OTHER PUBLICATIONS

Sullivan, et al., "Active Collaboration Room, Transforming Business Models by Accelerating Distributed Team Performance", Cisco White Paper, May 2010, 18 pages.
Weinstein, "Real World Options for Multipoint Videoconferencing", Wainhouse Research Whitepaper, Apr. 2012, 11 pages.

* cited by examiner



## FIG. 1



FIG. 2



FIG. 3A



FIG. 3B



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9A



FIG. 9B



FIG. 10



FIG. 11

US 9,549,152 B1

## 1

### APPLICATION CONTENT DELIVERY TO MULTIPLE COMPUTING ENVIRONMENTS USING EXISTING VIDEO CONFERENCING SOLUTIONS

### RELATED APPLICATION

This application claims priority to U.S. Provisional application Ser. No. 62/009,715, filed on Jun. 9, 2014, and entitled "System and Method For Providing Interactive Application Delivery of Apps Across A Multiplicity of Mobile and Non-Mobile Computing Environments Using Existing Video Conferencing Solutions", incorporated herein by reference.

### TECHNICAL FIELD

The various example implementations relate generally to providing a software system and method by which software applications built for one native application environment can be interactively delivered to and experienced on a multiplicity of application environments either native or non-native and specifically to that system and method that delivers the content of those applications through existing video conferencing solutions, negating the requirement for a special purpose player on the client-side.

### BACKGROUND

Existing approaches for delivering interactive applications rely on special purpose players. Such special purpose players exist either as standalone players (an application solely for the purpose of handling an interactive application stream), or as a System Development Kit (SDK), which provides the interactive application streaming capabilities that is integrated into a larger application.

Example implementations described herein may negate the need of having any special purpose player applications on a client device. As such example implementations may remove all the user friction associated with finding an application on an app store, selecting it for download, entering usernames and passwords and downloading and installing the application itself. Also, the example implementations may negate the need to download special purpose players, by its ability to leverage existing video conferencing solutions to deliver interactive applications to a multiplicity of application environments using video conferencing clients, which are widely deployed to end-users. Examples of existing video conferencing solutions include Skype and such browsers as Chrome, Firefox, Opera and others that support WebRTC. Currently there are no other approaches that leverage these widely available and installed video conferencing solutions to deliver interactive application content. Current uses of video conferencing solutions are typically only for supporting video conferencing not for delivering interactive applications.

### SUMMARY

According to an example implementation, a computer program product may include a non-transitory computer-readable storage medium and storing executable code that, when executed by at least one data processing apparatus, is configured to cause the at least one data processing apparatus to perform a method including: establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing

## 2

session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device; selecting a video capture module as a video input device for the first video conferencing endpoint; receiving, by the video capture module provided on the application delivery system, display data output by the application; converting, by the video capture module, the display data to a plurality of video frames; streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and receiving, by the application delivery system from the client device, a user input signal for the application.

According to another example implementation, a computer-implemented method is provided for executing instructions stored on a non-transitory computer-readable storage medium, the method including: establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device; selecting a video capture module as a video input device for the first video conferencing endpoint; receiving, by the video capture module provided on the application delivery system, display data output by the application; converting, by the video capture module, the display data to a plurality of video frames; streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and receiving, by the application delivery system from the client device, a user input signal for the application.

According to another example implementation, an apparatus is provided that includes at least one processor and at least one memory including computer instructions, when executed by the at least one processor, cause the apparatus to: establish, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device; select a video capture module as a video input device for the first video conferencing endpoint; receive, by the video capture module provided on the application delivery system, display data output by the application; convert, by the video capture module, the display data to a plurality of video frames; stream the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and receive, by the application delivery system from the client device, a user input signal for the application.

Various other example implementations may be directed to a software system and method by which software applications built for one native application environment can be interactively delivered to and experienced on a multiplicity of application environments either native or non-native and specifically to a system and method that delivers the content of those applications through existing video conferencing solutions, negating the requirement for a special purpose video-audio player on the client-side.

In one example implementation of a generic video conferencing solution, there are two video conferencing endpoints each communicating two streams of information over a network with each other (1) audio and (2) video. A third

US 9,549,152 B1

3

channel for control is also used, either through a side channel if available in a specific embodiment of a video conferencing solution or implicitly through server processing of voice/gestures from the client's audio/video feed. Locally connected to each video conferencing endpoint there is an audio-visual display for presenting the other endpoints audio and video. There is also a webcam and microphone for capturing the video and audio of the participants at its endpoint of the videoconference and streaming it in real-time to the other endpoint over a network.

In another example implementation, a virtual video device (virtual webcam) and virtual audio device (virtual microphone) are presented or input to one endpoint of the video conferencing solution. This endpoint resides on a mobile Application delivery server. The source of the virtual video device is the display output of the interactive application. The source of the virtual audio device is the audio output of the interactive application. The control is transmitted either through a side channel available in the video conferencing solution (if available), or implicitly through gesture and/or voice recognition by processing the client's audio/video feed. At the other endpoint of the video conferencing solution the present invention works by interfacing a JavaScript-based player controller module via a browser exposed API to the video conferencing solution framework.

In one example implementation, Web Real-Time Communication (WebRTC) is used as the video conferencing solution. WebRTC is an API definition drafted by the World Wide Web Consortium (W3C) that supports browser-to-browser applications for voice calling, video chat and P2P file sharing without plugins (Wikipedia). WebRTC is an open protocol designed for low latency real time communication between web browser endpoints. WebRTC is currently implemented on the following web browsers: Google Chrome, Mozilla Firefox, and Opera.

At a high level, WebRTC exposes RTCPeerConnection. This is an abstraction of the connection established between endpoints communicating over the WebRTC protocol. The architecture allows browser makers or others to override the audio capture and video capture modules. Some example implementations may include overriding these modules on the server-side to integrate with the Application Environment audio and video output respectively on the server side.

In an example implementation that uses WebRTC as the video conferencing solution the video capture and audio capture modules are overwritten on the server-side by modules of the present invention on the mobile app delivery server. The source of the video capture module is the display output of the interactive application. The source of the audio capture is the audio output of the interactive application.

At the other endpoint of the video conferencing solution, the client-side browser, the present invention works by interfacing a JavaScript-based player controller module via a browser-exposed Web API to the WebRTC framework. The player controller module receives streamed video and audio from the WebRTC framework via the Web API and displays and plays the content for the user. The player controller module is also responsible for collecting user input and sends it to the server over the control channel.

In one example implementation, application streaming technology may be used to deliver interactive application content, including streaming of audio and video content between server and client using a WebRTC video conferencing solution.

The provisioner is modified to provide an additional parameter in its response, the WebRTC Signaling port.

4

The control server is modified to provide an additional interface (WebSocket) on which it listens for client connections. Previously, it only listened for connections on a raw TCP socket. The protocol remains identical. In this embodiment, we establish a side channel for control using a WebSocket. Alternatively, this side channel could be established using an RTCDataChannel.

Together, the video capture, audio capture, and WebRTC streamer modules may perform the same or similar function as the "video capture and streamer" and "audio capture and streamer" modules. In the WebRTC system architecture, example implementations may override the audio capture and video capture modules to inject the application audio/video output for streaming. The transport module of the WebRTC stack handles the audio and video streaming. Overriding may generally include replacing one input device with another input device. In an example implementation, overriding may include selecting a video capture module (e.g., virtual webcam) and an audio capture module (e.g., virtual microphone) by a video conferencing endpoint to allow video and audio content from the application to be streamed over a video conferencing session, instead of selecting audio and video content from a microphone and webcam for streaming. Thus, overriding may include the selection of audio capture module and video capture modules that receive content from the application, rather than selection of an audio microphone and video webcam.

WebRTC uses the ICE framework for finding candidates (a process to determine potential network interfaces and ports through which to establish a connection) and uses SDP (session description protocol) for describing media (audio/video) configuration information. However, WebRTC does not define a signaling mechanism for communicating this information between peers. A new module is designed to handle signaling WebRTC signaling server establishes a WebSocket and relays ICE candidates and SDP data between the WebRTC streamer and the client.

On the mobile device, the client may be a JavaScript component executed within a WebRTC capable browser (e.g., Chrome on Android). The WebRTC Web API is exposed by the browser for use by WebRTC applications.

In one example implementation, the functionality of the downloaded client components is provided instead by the browser resident WebRTC endpoint (and its subcomponents) and one JavaScript-based component named the player controller. The browser present, WebRTC endpoint provides sub components for the video decoder, the audio decoder and the player components that subsume the functionality provided by downloaded components with similar names in the original patent application. The JavaScript-based player controller component of the present invention is responsible for establishing a new session and attaching video and audio streams provided by the WebRTC endpoint using the WebRTC API for display and playback using an HTML5 video element. In this embodiment, the JavaScript player controller connects to the control server using a WebSocket rather than a raw TCP socket. The player controller also establishes a connection to the WebRTC Signaling Server through a WebSocket. The player controller uses the WebRTC signaling channel to exchange ICE Candidates and SDP messages between the WebRTC implementation on the browser with that on the mobile app delivery server.

In an example implementation, the WebRTC implementation itself, e.g., WebRTC endpoint in the browser handles both audio/video decoding and playback/rendering. The player controller establishes a WebRTC session using the WebRTC Web API. In order to establish the session, the

**Appx223**

US 9,549,152 B1

5

player controller also gets and or sets the signaling information in order to establish the video conferencing/WebRTC session. The player controller also handles input (touch/keyboard) events and transmits them (using the control channel protocol) to the control server. Finally, the player controller controls the presentation of the stream (e.g., rendered size, orientation).

An example flow for delivering interactive content in this embodiment is as follows:

1. The player controller makes an HTTP GET request to retrieve the JSON configuration file.
2. The player controller makes an HTTPS POST request to the load balancer in order to start an instance of the selected application.
3. The load balancer proxies the request to the provisioner on an available mobile app delivery server, which responds with the following:
   Credentials (username/password)
   IP of the selected mobile app delivery server
   Port that the WebRTC signaling server is listening on
4. The player controller establishes a WebSocket connection to the control channel and follows the control channel protocol to authenticate, sends session parameters (e.g., resolution, bit-rate, fps, etc), and makes a session launch request.
5. The control server responds with a launch response indicating successful session launch.
6. The player controller establishes a connection to the WebRTC signaling server and exchanges ICE candidates and Session Description (offer/response) to establish the WebRTC session.
7. Audio and Video start streaming to the client.
8. The player controller is notified through a WebRTC Web API callback when the audio/video stream is ready to be presented, and the Player attaches the stream to an HTML5 video element.
9. The player controller handles user input and relays the input to the control server.
10. Either the control server informs the player controller that the session has concluded, or the player controller initiates a disconnect.

Example implementations may allow for a highly interactive and application delivery with advantages/benefits, such as, for example, one or more of the following benefits:

(1) content from software applications built for one native application environment can be interactively delivered to and experienced on a multiplicity of application environments either native or non-native;

(2) removes the need to download special purpose client programs to process video and audio stream decoding and display and playback;

(3) leverages widely available client-side browser video conferencing endpoint solutions, including but not limited to WebRTC endpoint solutions, to receive video and audio streams from the server, decode them and display and playback the video and audio streams.

These and other features, aspects and advantages will be more fully understood when considered with respect to the following detailed description, appended claims, and accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overview block diagram of a system to deliver applications to non-native client platforms according to an example implementation.

6

FIG. 2 is a more detailed block diagram of various modules hosted by various computing device of FIG. 1 according to an example implementation.

FIGS. 3A-3B are flow diagrams of a process for providing interactive content generated by an application configured to run in one application environment, to a client device providing a different application environment, according to an example implementation.

FIG. 4 is a flow diagram of a quality of service adaptation algorithm according to an example implementation.

FIG. 5 is an overview block diagram of a generic video conferencing solution according to an example implementation.

FIG. 6 is an overview block diagram of a system to deliver applications to non-native client platforms using a generic video conferencing solution according to an example implementation.

FIG. 7 is an overview block diagram of a WebRTC video conferencing endpoint within a browser within a mobile device according to according to an example implementation.

FIG. 8 is an overview block diagram of a system to deliver applications to non-native platforms using a WebRTC video conferencing solution according to according to an example implementation.

FIGS. 9A-9B are flow diagrams of a process for providing interactive content generated by an application configured to run in one application environment, to a client device providing a different application environment, using a WebRTC video conferencing solution to encode, stream and decode video and audio streams between server and client according to an example implementation.

FIG. 10 is a flow chart illustrating a process for delivery of application content over a video conferencing session to a client device according to an example implementation.

FIG. 11 shows an example of a generic computer device 1100 and a generic mobile computer device 1150, which may be used with the techniques described here.

## DETAILED DESCRIPTION

### I. System and Method for Providing Interactive Content

Embodiments of the present invention provide a system and method for delivering interactive content generated by software applications configured to run on a native application environment, to clients providing non-native application environments, over a data communications network. Such applications may be, for example, gaming applications, and the clients may be mobile phones. The non-native application environments provided by the client devices do not provide the same APIs for running software applications that are provided by the native application environments in which the software applications are intended to run. Although embodiments of the present invention are directed to providing the interactive content to non-native application environments over the data communications network, a person of skill in the art should recognize that the interactive content may also be provided to native platforms.

In general terms, when the client is a mobile device, the method for delivering the interactive content includes:

1. Selecting on the mobile device a server-resident application to be presented on the mobile device.
2. Customization of how the application will appear on the mobile device.

US 9,549,152 B1

7

3. Initialization of control, video and audio channels to be used to deliver application content to the mobile device.

4. Selection of a server to run the application.

5. Startup of the application on the selected server.

6. Server-side screen capture and audio capture of the output of the selected application.

7. Server-side encoding and streaming of the captured video and audio to the client device during a streaming session.

8. Client-side decoding and display of the streamed video on the mobile device.

9. Client-side decoding and playing of the streamed audio on the client device.

10. Client-side input acceptance and encoding on the client device.

11. Client-side forwarding of input to the server-side non-native application.

12. Converting the input to a corresponding input catered to the particular application.

13. Continuous monitoring of the condition of the data communications network during the streaming session and dynamically adjusting the video streams for achieving a highly responsive and interactive experience for the user of the non-native application on the mobile device.

FIG. 1 is an overview block diagram of a system for efficiently delivering interactive content to non-native client devices and platforms according to one embodiment of the present invention. The system in FIG. 1 includes a mobile application delivery system environment 110, a mobile device environment 118, and a data communications network 116 interconnecting the two environments. The data communications network 116 may be a local area network, private wide area network, or the public Internet, accessible via any wired or wireless technology conventional in the art. In one embodiment of the invention, the mobile application delivery system environment 110 is a cloud computing web server environment.

According to one embodiment of the invention, the mobile application delivery system environment 110 includes a set of delivery servers (also referred to as host devices) 112 and a monitoring server 114. According to one embodiment, each of the delivery servers host a software application on a native application environment. The native application environment provides, at a minimum, the same APIs as the APIs available on the original application environment for which the software application was specifically developed to run.

The monitoring server 114 takes requests to start a new application and selects a specific server from a pool of delivery servers 112 that host the application. According to one embodiment, the delivery servers 112 and/or monitoring server 114 are deployed and run in different geographic locations spread out from one another. In order to give the users a highly responsive interactive experience, the software components that reside in the client devices 124 send ICMP echo requests to a load balancer in a monitoring server 114 in a different geographic location, measure the roundtrip time, and choose the delivery server with lowest latency.

According to one embodiment of the invention, the mobile device environment 118 includes standard carrier 3G/4G networks 120, wireless routers 122, and various client devices 124-130 (collectively referenced as 124). The client devices may be mobile phones, electronic tablets, laptops, TV set top boxes, and the like. Although the

8

environment 118 is described as a mobile environment, a person of skill in the art should recognize that the environment may include other environments, as such, for example, wired environments that include wired devices.

Each of the delivery servers 112, monitoring server 114, and client devices 124 includes a central processing unit (CPU) for executing software instructions and interacting with other system components for performing the functions described herein. The servers and client devices further include a mass storage device such as, for example, a hard disk drive or drive array, for storing various applications and data used for implementing the system. The server and client devices further include an addressable memory for storing software instructions to be executed by the CPU.

The server and client devices further include various input and output units conventional in the art. For example, each device may have an input unit such as, for example, a keyboard, keypad, joystick, microphone, and/or display screens with pressure sensitive (touch screen) technology. Each device may also have an output unit such as, for example, speakers, display screens, and the like. The server and client devices may further include wired or wireless data communication links for accessing the data communications network 116.

FIG. 2 is an overview block diagram of various modules hosted by the monitoring servers 114, delivery servers 112, and mobile devices 124 according to an example implementation. The various modules are implemented via computer program instructions which are stored in memory for executing by the CPU of the corresponding server. A person of skill in the art should recognize, however, that all or a portion of the various modules may be implemented via firmware, hardware, or a combination of software, firmware, and/or hardware.

According to one embodiment of the invention, the modules that reside in the monitoring servers 114 include, but are not limited to, a load balancer 216, a configurator 214 module, an autoscaler 212 module, and an analytics 210 module.

The load balancer 216 is configured to find a delivery server 112 that can support an incoming connection request to start an application. The load balancer is configured to select a machine and process instance for each new application request. Once the load balancer selects a machine instance, it also selects the instance of a control server, provisioner, and application environment modules that will be used for a particular instance of the application.

The load balancer 216 is configured to maximize the number of users on each delivery server 112. This allows more delivery servers 112 to become idle, i.e. without any active connections, so the autoscaler 212 can shut them down, potentially saving on cost.

According to one embodiment of the invention the load balancer 216 uses a connection monitor 238 on each delivery server 112 to find an available server. The connection monitor 238 may be implemented as a Ruby process that polls every second for a number of active connections on its delivery server 112. This includes polling for the number of active application environment processes, such as Firefox processes, Wine processes, or custom processes. The connection monitor 238 sends the collected data to an operations database 240. In one embodiment of the present invention, the operations database 240 is high performance database such as, for example, a Mongodb database, configured to handle a high amount of inserts/updates per second as well as quickly respond to queries. According to one embodiment, the connection monitor 238 sends its

Appx225

US 9,549,152 B1

9

hostname, the number of open connections, and the number of available connections (the maximum available connections minus the open connections on a machine).

When a request comes in to the load balancer 216, it queries the operations database 240 to find a delivery server 112 that has connections available. Since there is a lag between when a client has been allocated to a particular delivery server 112, and when the client connects and the connections monitor 238 records the connection, the load balancer 216 cannot entirely trust the data coming from the operations database 240. For example, if a delivery server 112 is near capacity but has one connection available, and the load balancer 216 receives several requests in a short time frame, it may forward all requests to the same delivery server 112 before any client connects and increases the connection count.

In one example implementation, to mitigate the risk of this happening, two strategies are implemented. First, the load balancer 216 is configured to randomly select from a pool of candidate delivery servers 112 so requests do not always go to the same delivery server 112. Second, the load balancer 216 is configured to keep track of the last time it sent a request to a particular delivery server 112 so as to not send the same server multiple requests in a short time period. If there are no delivery servers 112 with available connections, the load balancer 216 is configured to try a preset number of times (e.g. three times) to find one before simply allocating the connection to a random server. This helps ensure that every user always receives a connection, even though his or her experience may be slightly degraded by the excess load on the server.

In one example implementation, the load balancer 216 is further configured to automatically remove problematic delivery servers 112 by checking the responses from the servers. If the response is an error, the server is queued for deletion. Similarly, if the response takes longer than a threshold time period or the delivery server 112 is unreachable, it is queued for deletion.

According to one example implementation, the autoscaler 212 is a module configured to manage the delivery servers 112 in order to accomplish various tasks. For example, the autoscaler may be configured to make sure enough delivery servers 112 are available to serve current users as well as users that may be connecting in the near future. The autoscaler may also be configured to delete unneeded delivery servers 112 so that there is not excess capacity, thus potentially reducing costs, such as, for example, in an embodiment that uses cloud servers.

In this regard, the autoscaler 212 regularly polls the operations database 240 and checks the number of available connections. If the number of available connections is too low, the autoscaler 212 starts enough delivery servers 112 to a configuration specified target number. If the number of available connections is too high, the autoscaler 212 queues the oldest delivery servers 112 for deletion until the number of available connections is equal to the required buffer size. Queuing the oldest servers for deletion helps reduce the number of errors in the system, as typically the oldest servers are prone to errors. A delivery server 112 that is queued for deletion is not immediately deleted as it may have users currently active. However, a server queued for deletion does not receive new connections. The autoscaler 212 regularly checks if any deleted delivery servers 112 are idle and deletes them when they are.

In one example implementation, the autoscaler 212 is implemented as a set of Ruby processes. The autoscaler 212

10

may also interact with the cloud providers, such as Blue Box Group and Amazon Web Services, for creating and deleting servers.

According to one embodiment of the invention, the analytics module 210 keeps statistics on system operations. Analytic data is stored in the analytics database 242. The analytics database 242 may be implemented as a high performance database such as, for example, a Mongodb database. The load balancer 216 stores information about user requests in the analytics database 242. The control server 220 updates records in the analytics database 242 when a user of a client device logs out so that total session time can be calculated. The analytics module 210 is designed to take analytic data offline for further processing. In addition, statistics pertaining to application requests and session distribution are available to be queried from the monitoring server 114.

According to one example implementation, the configurator 214 is a module configured to select and return a configuration file when a user selects a software application or game (collectively referred to as an application) on the client. The configuration files allow customization on the client on a per application basis for elements like mapping user gestures or taps to the original inputs of the application (e.g. mouse down, mouse click events, and the like). The configuration file also supports customization of "player skins" in order to customize the look and feel of the display on the client device.

According to one embodiment, configuration files store information on how the player 236 on the client device 124 should interact with the system, request video frame rate parameters, load content, and the like. There are two types of configuration files: player configuration files and application or game specific configuration files. The player 236 on the client device 124 consumes player configuration files. These files primarily have the URLs of services for retrieval by the player 236. For example a list of apps/games to show on the player 236; user ratings of apps/games, update purchase state in the case of a purchase or trial expiration, and the like. Some parameters may be used to distinguish between different client devices, such as, for example, between an electronic tablet and a mobile phone.

Application or game specific configuration files are used when a particular application or game is being started. This configuration file has all application or game specific information, like the URL to load, the product ID for payment, the screen dimensions it will run at, and parameters to distinguish between the various client devices (e.g. between iPad and an iPhone).

In one embodiment of the invention, configuration files are stored as JSON files. The configuration files allow the player 236 to be as general as possible, and thus allows changes to content or behavior on the fly via changes of the configuration files from the delivery server 112.

According to one example implementation, the provisioner 218 is a module on the delivery servers 112 which sets up a user's account on a particular delivery server. In one embodiment of the present invention, each unique user and its corresponding connection runs in its own Linux user account on the delivery server 112. This allows the sandboxing of users from each other. It also allows the creation of a secure system, as the user accounts have stripped permissions and are only allowed access to files and processes that are required for the selected application. The provisioner 218 creates the user account and adds the user to the required group.

US 9,549,152 B1

11

In one example implementation, the user account set up by the provisioner **218** is determined based on the requested application. The skeleton directory has the files required for the particular application that is selected, for example the correct Mozilla file for a Flash application or the correct executable for a Wine application. The provisioner **218** also creates files in the user's directory to set parameters for the user. Such parameters may include, for example, the audio port to be used, Facebook credentials needed, and the like. The provisioner **218** is configured to set up some of the services the user may require. For instance, in one embodiment of the present invention, the provisioner **218** creates a pulseaudio sink for the user needed to stream audio to the client device.

According to one example implementation, the application environment **222** is a computer environment in which an application executes. The application environment **222** is specific to the type of application selected by the client device, and a computing platform (or virtualized computing platform based on a different underlying platform) of the delivery servers **112**. According to one embodiment, an application environment includes, but is not limited to frameworks, libraries, APIs, and services for the runtime execution of programs developed for a particular computing platform. The application environment may also provide a virtualization layer to provide a different or isolated computing platform. For example, when the particular operating system provided by the computing platform of the delivery servers **112** is Linux, and the selected application is a browser-based application or a Flash-based application, the application environment **222** may be a Firefox browser or other similar browser configured to execute the Flash-based application. If the selected application is a Microsoft Windows application, the application environment **222** is Wine or other similar environment which allows computer programs written for Microsoft Windows to run on Unix-like operating systems. If the selected application requires a graphics processing unit (GPU), such as, for example, for high quality Windows games, the application environment **222** is vglrun. Vglrun executes the application with VirtualGL, which provides OpenGL to Xvnc. When native Unix or Java applications are selected, they are simply run as native applications and the application environment **222** is Unix or Linux.

When the application environment **222** is the Firefox browser, certain Firefox extensions are also used to provide additional functionality and interactivity for a user. For example, a Greasemonkey extension and scripts, and a custom extension, are configured to be used to achieve actions like scrolling, toggling the visibility of the keyboard, URL logging, and the like. The Greasemonkey extension is used to add or edit an HTML DOM that is loaded. The extension associates a script, written in JavaScript, to a URL, and the extension is triggered only for the associated URL. The URLs are filtered through regular expressions. The Greasemonkey scripts trigger after the associated HTML page has been loaded, which serves as an indication that the desired content is loaded, and signals the control server **220** to send a message to the client device **124** to remove the loading screen. The Greasemonkey scripts also attach event handlers to input elements on the HTML page that instruct the control server **220** to show or hide the keyboard. The Greasemonkey scripts are also used to weed out unwanted elements like advertisements and therefore only have the desired content appear on a virtual screen **224** for being streamed to the client devices **124-130**.

12

According to one embodiment of the invention, the Greasemonkey scripts are served up for use remotely through a web service. There is one script present in the Greasemonkey extension that is triggered for an URL that is loaded. The Greasemonkey script then queries a web service passing in the current URL and the content type as parameters. The web service looks up a configuration file that in one embodiment of the present invention is encoded in JSON. The web server then serves the corresponding script back to the Greasemonkey script for it to execute. The configuration file has information of the URLs against which a particular script is to be triggered. The configuration file also has information of a list of excluded URLs and content types for which scripts are not to be triggered. All the URLs are filtered through regular expressions.

According to an example implementation, when the application environment **222** is the Firefox browser, a customized Redirector extension is also used. When the Firefox browser is launched and the customized extension is initialized, the Redirector extension creates a socket to hardcoded port on the control server **220**. The customized extension performs actions such as page scrolling, page refreshing, stopping page loads, blocking URLs, and the like.

According to one example implementation, the customized extension is used to perform page commands forwarded from the client device **124**. For example, when the player **236** on the client device **124**, in response to a user action sends commands such as scroll page, refresh page, stop page, load URL, and the like, to the control server **220** on the delivery server **112**, the control server **220** relays these commands to the customized extension. The customized extension in turn parses the commands and performs the appropriate action as a script on the Firefox browser. According to one embodiment, the customized extension can also be used to block URLs. The Firefox browser asks the customized extension if it should load a URL, and depending on the category of the URL, the request is served or cancelled. The list of blocked URLs comes from the configuration file of the content that has been currently loaded. The URL request is filtered through regular expressions. There are five categories of URLs:

1. White listed URLs: when such a URL is requested, the extension serves the }} request.
2. Black listed URLs: when such a URL is requested, the extension cancels the request.
3. Pop UP listed URLs: when such a URL is requested to load, the extension cancels the request and signals the client device **124**, via the control server **220** and the player **236** on the client device, to show a message to the user informing them that the pop up was blocked.
4. Browser listed URLs: when such a URL is requested to load, the extension cancels the request and signals the client device **124**, via the control server **220** and the player **236** on the client device, to show a message to the user to load the URL natively.
5. Ad URLs: when a URL does not match any of the above URLs, the extension cancels the request and signals the client device **124**, via the control server **220** and the player **236** on the client device, to show the URL loaded in a web view inside of the player.

The customized extension for the Firefox browser application environment can also signal the client appropriately with a message to purchase an application after a trial period is over. When the customized extension is initialized, it queries a service for the payment information of the user for the content loaded. If the content is paid for, the user is given an uninterrupted browsing session. If the user has not yet

US 9,549,152 B1

13

paid for the content, he/she is considered a trial user. When the trial is over, the extension signals the client device **124**, via the control server **220** and the player **236** on the mobile device, to display a message that the trial period is over and provide an option to buy the content. Any further requests are cancelled until the user purchases the content. Using a similar mechanism during the trial period, the user is presented, at periodic intervals, with messages in pop-up windows to make a purchase. In one embodiment of the invention, this payment setup is used for subscription payment systems.

In yet another example, if the native environment for the application that is hosted is Android, the application environment **222** module is a virtualization/emulation software and Android OS. The virtualization/emulation software provides an environment for the Android OS to run. To instrument the application, a custom launcher is used to control the launching of applications. A launcher is a main view of the OS and is responsible for starting other applications. The default launcher of Android is a home screen that a user usually sees. The custom launcher enables launching into the application directly when a client connects, and also prevents the application from exiting when user presses the back button. To achieve a seamless user experience, the data specific to mobile devices **124** are also captured in the mobile device and sent through the control channel to the control server **220**. This data may include the device orientation, GPS location, gyro/accelerometer data, and the like.

According to one embodiment of the invention, the control server **220** is a module that authenticates a client based on input username and password. The control server **220** is also configured to receive input commands from the user via the player **236** on the mobile device **124** and forward these commands to the application environment **222** for the current application. The control server **220** is further configured to forward commands and messages from the application environment **222** to the player **236** on the client device **124** to control the look of the screen on the client device, such as for example, to display notifications that an application has launched, that a pop-up should be displayed, and the like.

In one embodiment of the present invention, authentication is done using PAM authentication. According to one embodiment, the provisioner **218** creates the usernames and passwords for each user. Once the control server **220** has authenticated the user, it knows what username to use for subsequent operations.

According to embodiment of the invention, once the control server **220** has authenticated the mobile client, it executes two processes. The first process is executed by the virtual screen **224** module. According to one embodiment, the virtual screen **224** module is an Xvnc session which provides a X11 display for the application the user wants to run. Xvnc is the Unix VNC (Virtual Network Computing) server, which is based on a standard X server. According to this embodiment, applications can display themselves on Xvnc as if it were a normal X display, but the applications are configured to actually appear on any connected VNC viewers rather than on a physical screen.

The control server **220** may also execute a bash script that sets any preferences needed for the application selected, such as Firefox preferences. The script starts the audio and video streamers, the window manager, and the application the user requested.

The second process or environment the control server **220** starts is the application environment **222** for the selected application. According to one embodiment of the invention,

14

the control server **220** maintains a description of which specific application environments are used based on the type of application selected and the environment of the delivery server **112**.

According to one example implementation, the video capture and streamer **226** module is a module that captures video frames output by the virtual screen **224** module. After the frames are captured, the video capture and streamer **226** module subsequently encodes and streams the video to the mobile device **124**.

In one example implementation, the video capture and streamer **226** encodes in near real-time without a large buffer of frames and streams the encoded frames to the mobile device **124**, where the video decoder **230** on the mobile device **124** decodes in near real-time, also without a large buffer of frames, thus achieving a highly responsive video display.

In one embodiment of the present invention, at start-up, the video streamer and capture **226** module connects to the control server **220**. The control server **220** sends the video capture and streamer **226** module the parameters it should use, including frame rate, bit rate, and a video port to stream the video to the mobile device **124**. The connection between the control server **220** and the video capture and streamer **226** is maintained throughout the lifetime of the connection from the client device **124**, and can be used for quality of service adjustments of the video stream.

According to one example implementation, video capturing and encoding parameters are selected in a way that the system fully utilizes the network bandwidth designated to the video stream to produce high-quality video while keeping the encoding complexity sufficiently low to minimize the encoding time required for each frame, as part of the low-latency design. To further achieve minimal latency in the system so that applications are highly responsive to user input, the server encodes each video frame right after being captured, and the output from the encoder is immediately fed into the socket without excessive buffering or delay. On the client, the video decoder continuously parses the incoming video data from the socket. As soon as it collects all the data required to decode a video frame, the frame is decoded, resized if needed, converted to an appropriate color space, and displayed. Again, video data are decoded and displayed as soon as they are available and there is no excessive buffering to ensure minimal latency.

According to one example implementation, the video capture and streamer **226** module may include of a set of scripts (e.g., Python scripts) for capturing, encoding, and streaming video to the mobile device **124**. According to one example implementation, the script launches one or more video processing programs (e.g. programs implemented using video processing libraries provided in FFMPEG) for the capturing, encoding, and streaming.

According to one example implementation, the video capture and streamer **226** module captures the display output by the virtual screen **224** module. For example, if using FFMPEG, the x11 grab function is invoked to capture the display from the Xvnc display. The video capture and streamer **226** then encodes (e.g. using FFMPEG together with x264) the video according to preset parameters. According to one embodiment, the various parameters are configured to provide low-latency operations to achieve real-time responsiveness to inputs provided by a user. The video capture and streamer **226** module captures the encoded output and streams the video to the mobile device **124**. The video stream connection to the mobile device **124** is maintained for the lifetime of the mobile device **124** client

Appx228

US 9,549,152 B1

15

connection. The mobile device 124 decodes the video using the video decoder 124 module, which in one embodiment of the invention, uses the H.264 decoder from the avcodec library in FFMPEG. The resulting frames are displayed by the player 236 module on the client device 124. The screen display may be done using a low-level API such as, for example, OpenGL ES (e.g. on iOS-based mobile devices), Surfaces (e.g., for Android-based mobile devices), and the like.

In one embodiment of the present invention, the video is encoded by the video capture and streamer 226 module on the delivery server 112 into a byte stream (e.g. an H.264 Annex B byte-stream using FFMPEG and ×264), and streamed to the client device 124 through a TCP socket. The video capturing and encoding is based on a video frame rate (in frames/sec or fps) and maximum video bit rate (in bits/sec or bps). The two parameters together determine a maximum frame size which identifies a maximum number of bits that the encoder can spend to encode a frame. The resulting visual quality of the frame is affected based on the maximum frame size that is selected.

On the client device, the video decoder 230 module parses the byte-stream into data units each corresponding to an encoded video frame and feeds them sequentially a decoder (e.g. H.264 decoder). However, because of how H.264 Annex B byte-streams are defined, the video decoder 230 module is able to recognize the completion of an encoded frame once the start of the next frame is observed. Therefore, a video frame cannot be correctly parsed and decoded until the next frame is received, resulting in an extra latency of the duration of one frame in the display of video content, significant for an interactive system. According to one embodiment, in order to address this latency, the video capture and streamer 226 module is configured to prefix a 4-byte field for each encoded video frame in the byte-stream, indicating the number of bytes included in the encoded frame. With this prefix, the video decoder 230 on the client device 124 can extract an encoded frame from the byte-stream as soon as it arrives and pass it to the decoder without having to wait for the next frame.

According to another example implementation, the video capture and streamer 226 module is configured to append a tag for marking the end of a video frame. For example, an AUD (Access unit Delimiter) defined in H.264 may be appended to the end of each encoded frame. Although AUD in H.264 is designed for marking the beginning of a video frame, it is inserted into the stream right after an encoded frame instead, without having to wait for the next frame to be captured or encoded. The decoder on the client detects the AUD immediately after receiving an encoded frame and starts decoding the frame without having to wait for the next frame.

In one example implementation, the video capture, encoding, and/or streaming parameters can be adjusted in real-time to allow for quality, latency, and/or bandwidth trade-offs, depending on the particular application or game. For example, in one embodiment of the invention, the lowest latency settings are used for Flash-based applications to provide better responsiveness at the expense of video quality. However, for certain Window's games, higher latency settings are used to avoid screen pixilation. These parameters are initially set in the configuration file for a particular application or game, and are configured to be modified in real-time. For example, parameters such as the video frame rate and/or maximum video bit rate may be adjusted in real-time while streaming a particular application or game, based on a monitored condition of the network.

16

More specifically, embodiments of the present invention provide two solutions to stream video from the delivery servers 112 to the client devices 124 with low latency so that applications provide real-time response to user input, while maintaining good visual quality: a first solution based on TCP (Transmission Control Protocol); and a second solution based on UDP (User Datagram Protocol). In both solutions, the virtual screen display on the server is periodically captured into video frames based on the frame rate specified in the system. The video frames are encoded and delivered from the video capture and streamer 226 on the server to the video decoder 230 on the client, via either a TCP or an UDP socket. Video capturing and encoding parameters are selected in a way that the system fully utilizes the network bandwidth designated to the video stream to produce high-quality video while keeping the encoding complexity sufficiently low to minimize the encoding time required for each frame, as part of the low-latency design. To further achieve minimal latency in the system, on the server each video frame is encoded right after being captured, and the output from the encoder is immediately fed into the socket without excessive buffering or delay. On the client, the video decoder continuously parses the incoming video data from the socket. As soon as it collects all the data required to decode a video frame, the frame is decoded, resized if needed and converted to an appropriate color space, and displayed. Again, video data are decoded and displayed as soon as they are available and there is no excessive buffering to ensure minimal latency.

TCP-Based Solution

According to one example implementation, the TCP-based solution uses a TCP socket to provide a reliable channel for video delivery. Potential transmission errors that may occur due to, for example, temporary glitches in the network or insufficient network bandwidth are all taken care of by the built-in error-detection and retransmission mechanism in TCP. Typical video streaming systems insert I-frames periodically in the video stream to enable random access and error recovery capability in the video decoder. However, for high-quality videos the I-frames are usually difficult to compress and therefore can take more time to transmit, resulting in a surge in latency. In the TCP-based solution, since error recovery is no longer needed at the decoder level and random access capability is not required in the interactive streaming application, except for the first frame in the video stream, I-frames are not used to avoid such a latency surge.

When transmission errors occur in the network, the TCP socket on the server side automatically slows down outgoing transmission, and the video traffic coming into the socket from the video streamer can be congested and buffered in the socket, increasing the video latency experienced on the client. To relieve such congestion, the amount of video traffic sent into the socket is quickly decreased so that the latency can be reduced back to a minimal level. In this regard, a QoS (Quality of Service) adaptation algorithm may dynamically adjust the video capturing and encoding parameters based on the network condition. According to one embodiment, the QoS adaptation algorithm not only downgrades video QoS, hence decreasing the amount of video traffic during bad network conditions to reduce latency, but also upgrades video QoS when additional network bandwidth is available to further improve the video quality. The QoS adaptation algorithm determines two QoS parameters used in video capturing and encoding: video: (1) frame rate (in frames/sec or fps); and (2) maximum video bitrate (in bits/sec or bps), denoted by fr and mbr respectively. The two

Appx229

US 9,549,152 B1

17

parameters, fr and mbr, together determine the maximum frame size (mbr/fr), the max. number of bits that the video encoder can spend to encode a frame, which helps provide a good indication of the resulting visual quality of the frame. The operational range of the QoS parameters is defined by four system constants MIN_FR, MAX_FR, MIN_MBR and MAX_MBR such that MIN_FR<=fr<=MAX_FR and MIN_MBR<=mbr<=MAX_MBR. Another constant MBR_STEP (in bits/sec or bps) is specified in the algorithm to map the QoS parameters into a discrete set of QoS levels, together with two time intervals DOWNGRADE_INTERVAL and UPGRADE_INTERVAL that define how much time the algorithm has to wait before making a QoS adjustment. Table 1 is a pseudo code of the QoS algorithm for the TCP-based solution.

TABLE 1

```
===============================================
define MAX_LEVEL as floor(MAX_MBR/MBR_STEP)
define MIN_LEVEL as ceil(MIN_MBR/MBR_STEP)
last_downgrade_time = 0
last_upgrade_time = 0
last_congestion_time = 0
for each level that MIN_LEVEL <= level <= MAX_LEVEL
    congestion_counter[level] = 0
end
current_level = min(max(MAX_FR, MIN_LEVEL), MAX_LEVEL)
for each video frame
    previous_level = current_level
    current_time = current system time
    if (socket is congested in the previous transmission)
        last_congestion_time = current_time
        congestion_counter[current_level] =
        congestion_counter[current_level] + 1
        if (current_level > MIN_LEVEL)
            if (current_time - last_downgrade_time >
            DOWNGRADE_INTERVAL)
                if (current_level > MIN_FR)
                    current_level = max(MIN_FR, MIN_LEVEL)
                else
                    current_level = MIN_LEVEL
                end
            end
        end
    else
        if (current_level < MAX_LEVEL)
            multiplier = pow(2, congestion_counter[current_level + 1])
            if (current_time - max(last_upgrade_time,
            last_congestion_time) >
                multiplier * UPGRADE_INTERVAL)
                current_level = current_level + 1
            end
        end
    end
    if (current_level < previous_level)
        last_downgrade_time = current_time
    else if (current_level > previous_level)
        last_upgrade_time = current_time
        for each level that MIN_LEVEL <= level <= previous_level
            congestion_counter[level] = 0
        end
    end
    mbr = current_level * MBR_STEP
    fr = min(max(current_level, MIN_FR), MAX_FR)
end
===============================================
```

According to one example implementation, a congestion in the TCP socket is detected by testing if new data can be written into the socket within a certain timeout time (e.g., 20 msec), using, for example, a linux poll command. Upon congestion in the socket, the video capture and streamer 226 drops the video frame rate to a minimum value and correspondingly reduces the maximum video bit rate. In addition, when congestion occurs at a certain QoS level, the conges-

18

tion count for that level is increased to record the congestion. If no congestion has occurred for a preset time since the last congestion or last QoS upgrade, indicating a good network condition, the algorithm gradually upgrades the QoS parameters. This interval increases, exponentially for example, with the congestion count at the destination QoS level, making it more difficult to upgrade to a level already shown to be congestion-prone. If the algorithm stays at a certain QoS level without a congestion long enough that it upgrades to the next level, the original level proves to be well supported by the network and the congestion counts of the level and all levels below it are reset to zero. According to one embodiment, when the value of the QoS level becomes smaller than MIN_FR, the video framerate fr stays at MIN_FR but the visual quality of each frame further degrades as indicated by the decrease in the max. frame size mbr/fr. Similarly, when the QoS level becomes larger than MAX_FR, fr stays at MAX_FR but quality of each frame is further improved.

In general, a video encoder does not always produce video traffic at the specified maximum bit rate. The video traffic generated can be far below mbr when the video content is rather static, and only approaches mbr during fast-moving scenes. This leads to an issue that congestion may never occur in a static scene, and the QoS adaptation algorithm keeps upgrading the QoS level multiple times although the upgraded mbr is already well above the bandwidth supported by the network. Significant congestion, hence high latency, can then be set off by a sudden scene change in the video content that generates traffic approaching the highly overvalued mbr. According to one embodiment, to resolve this issue, during a certain time interval right after a QoS upgrade, the video encoder is modified to append dummy data that is ignored in the decoder at the end of each encoded frame so that the frame size reaches the maximum frame size mbr/fr. This modification helps ensure that the video traffic temporarily reaches the specified mbr right after each QoS upgrade. If this bitrate is already more than the network can support, a minor congestion with less impact on latency is triggered followed by a timely QoS downgrade.

UDP-Based Solution

According to one embodiment, a retransmission mechanism in the TCP-based solution helps guarantee that all the data fed into the socket by the video streamer eventually arrive at the video decoder. However, during a bad network condition, the additional time required for retransmission and the potential congestion in the socket can have an adverse impact on the video latency. Although the QoS adaptation algorithm is configured to quickly relieve the congestion, the transient latency increase usually manifests in the form of a momentary pause in the video, which is undesirable in some applications. The UDP-based solution tackles the problem differently. The UDP-based solution does not attempt any retransmission. Data is not buffered in the socket and does not get discarded if not delivered in time. Therefore, video latency is less influenced by the network condition and stays rather constant, at the expense of potential transmission errors at the decoder level. In terms of user experience, the UDP-based solution differs from the TCP-based solution in that instead of potentially introducing momentary video pauses, occasional decoding errors may become noticeable.

The UDP-based solution uses RTP (Real-time Transport Protocol) to deliver the video stream from the server to the client over a UDP socket. RTP handles reordering of the UDP packets and detects if any packet gets lost in the transmission. Without retransmission, a lost packet can lead

US 9,549,152 B1

19

to decoding errors visible in the decoded frame that cannot be fully removed by error concealment techniques in the decoder. These visible decoding errors can also propagate across multiple frames because of the inter-frame dependency in the video stream. To stop such propagation, whenever a lost packet is detected a request for an intra-refresh cycle is sent from the client to the server through the control channel. Instead of using I-frames that can create a surge in latency, intra refresh is a technique in video coding that evenly distributes intra blocks that can be decoded independently from previous frames over multiple frames to stop error propagation while minimizing the increase in video traffic.

In a typical network setup, UDP packets get lost occasionally even when the available network bandwidth is sufficient for the video traffic. However, when packet losses occur frequently, an assumption is made that the current network bandwidth can no longer support the video traffic, and the video QoS level is downgraded. In this regard, a QoS adaptation algorithm similar to the one for the TCP-based solution is used for UDP with two main differences. First, the algorithm for UDP runs on the client instead of on the server. The QoS level determined on the client is then signaled to the server through the control channel to adjust the parameters in video capturing and encoding. Second, the algorithm detects if the frequency of UDP packet losses exceeds a threshold, rather than testing for congestion in the TCP socket, to decide if a QoS downgrade is needed or if an upgrade can be performed.

According to one example implementation, the audio capture and streamer 228 module is a module that captures audio produced by the application. After the audio is captured the audio capture and streamer 228 module subsequently encodes and streams audio to the client device 124.

In one example implementation, audio is captured by the audio capture and streamer 228 module using pulseaudio. Each application has a pulse sink created for it by the provisioner 218. When the application is launched, the pulse sink for the application is set to the one created by the provisioner 218. This ensures that all audio from the application goes to the pulse sink for the user requesting the application. For non pulse-aware applications, a wrapper script, such as padsp, is used to provide an OSS to pulseaudio bridge.

In one example implementation, to capture the audio, parec is used with the source set to be the sink's monitor. The output from parec is passed into an audio encoder.

In one example implementation, the audio encoder can be either CELT, MP3 or the audio can be sent uncompressed. The setting used is determined by what the client supports.

In one example implementation, the output from the audio encoder is passed to the UDP audio streamer. Upon receiving the audio stream, the client device 124, using the audio decoder 232 module decodes the audio. In one embodiment of the invention the audio decoder 232 uses the CELT library. In another example implementation, the audio decoder 232 uses the native iPhone MP3 decoding. The audio decoder 232 in the client device 124 uses a ring buffer to ensure too much audio data doesn't buffer up and create latency. It also uses Audio Queue Service for low latency operation.

In one example implementation, the audio capture and streamer 228, uses Python scripts to monitor all audio processes on the delivery server 112. If any process dies, all the audio processes are restarted and the user only experiences a brief and sometimes unnoticeable audio interruption.

20

According to one example implementation, the player 236 is a module that plays on the client device 124, the application that was selected by the user and which is executed on the delivery servers 112. According to one embodiment, the player allows a user of the client device to play content provided by a software application that is not originally intended to run in the application environment provided by the client device. For example, the client device does not provide the necessary APIs provided by the native application environment of the software application. The client device can thus be described as providing a non-native application environment with respect to the software application. In this regard, the software application is run on the delivery server 112, and the player 236 displays video and plays audio output of the application that is streamed from the delivery server to the client device 124. The player 236 also accepts input from the user, maps the input to a predefined command, encodes the command using a binary protocol, and sends the encoded command over the control channel to the delivery server 112. The mapping of the user input to predefined commands is based on a configuration file and/or modified based on the content currently displayed.

The player 236 communicates with the server side modules using a control channel. According to one example implementation, all communication between the client and server, which the exception of streamed video and audio, occurs over the control channel. Separate video and audio ports on the server are used to stream the video and audio.

According to one example implementation, the video decoder 230 decodes video streamed from the server. In one embodiment of the invention, the video decoder 230 uses the H.264 decoder from the avcodec library in FFMPEG.

According to one example implementation, the video decoder 230 decodes the incoming video stream into video frames in a YUV420 format. To playback the video frames with a desired color representation and dimension, the video decoder converts the video frames back to a RGB color space and resizes the video frames before being displayed on the screen. According to one embodiment, the color-space conversion and resizing is performed using programming shaders running on a graphics processing unit (GPU) through graphics APIs (e.g., OpenGL) that are generally available on clients such as iOS or Android devices. Color-space conversion and resizing using GPUs rather than CPUs significantly reduces the processing time due generally to the parallel processing architecture of GPUs especially suitable for such tasks, resulting in a reduced latency in the system as well as a higher frame rate that can be supported on the client.

According to one example implementation, the player 236 is independent of and not specific to any particular application content that it will present on the client device 124. Only one version of the player 236 is needed for a particular client device 124, regardless of how many different applications or application types it presents on the client device.

According to one example implementation, all communications between the player 236 on the client device 124 and the control server 220 on the delivery server 112 happens over the control channel. The player 236 takes input in the form of touches or on-screen keyboard selections. The input may also be provided via other input devices such as, for example, physical keypads, joysticks, and the like. The input is mapped to preset command and sent from the player 236 over the control channel to the control server 220. The control server 220 converts the received command into a command applicable for the application (e.g. mouse-down

US 9,549,152 B1

21

command, mouse-up command, or keyboard command) using a simulation tool such as, for example, libxdotool. Thus, the control server is configured to translate an input provided using a particular input device, to a second input that is generally provided using a different input device.

According to one example implementation, the player 236 may also send commands in response to user gestures. For example, a swipe down gesture is mapped to a scroll down command for a browser session. The mapping of the gesture to a particular command is based on the configuration file provided to the player for the particular application or game that is being played. The scroll down command is sent by the player 236 as a scroll down command over the control channel to the control server 220. The control server 220 forwards the scroll down command over a socket connection to the application environment 222. The application environment may run specific scripts to execute the particular command. For example, for Flash applications, a Grease-monkey script in the application environment 222 executes an input command using Javascript.

According to one example implementation, the player 236 and the control server 220, using custom commands communicated over the control channel, can coordinate the velocity of the user's scrolling on the client device 124 and the resulting scrolling of the video screen. For example, in one embodiment of the invention, the player 236 interprets the velocity of the user's finger movement into a scroll command of x pixels. The player 236 sends a custom command for a scroll of x pixels via the control channel to the control server 220, which in turn provides the command to the application environment 222. The application scrolls its screen by x pixels and outputs the updated screen for capture and streaming to the client device 124. The video decoder 230 decodes the updated video frames and the player 236 displays a screen where its contents have moved x pixels in response to the user's scrolling gesture. The rapid fine-grain scrolling on the client device and other user input which are communicated to the server causes the returned video and audio streams to reflect the user's scrolling and other action as if playing the application on its native device. This coordination of user input gestures on the client device 124, with reaction of the application on the delivery server 112, provides a highly interactive and responsive experience for the user.

According to one example implementation, the control channel on the client exposes many different types of actions which map to the different types of content. These are encoded using a binary protocol and sent to the server. The server executes these actions differently based on the type of content currently active. Below are a few examples:

1) Control channel exposes: sendMouseDown(button, x-position, y-position)
   Encoding: 2 byte integer indicating the message size (5 bytes), 1 byte indicating the button, 2 bytes for x position, 2 bytes for position
   Executed: via a library that talks to the X11 protocol called xdotool
2) Control channel exposes: sendOrientationChanged(orientation)
   Encoding: 2 byte integer indicating the message size (1 byte), 1 byte indicating the 4 possible orientation
   Executed: via a TCP socket connected to the simulator that tells it to change orientation
3) Control channel exposes: sendTouches(action, active_touch_id, number_touches, touch_id1, x-position1, y-position1, . . . )

22

   Encoding: 2 byte integer indicating the message size (3+5*number_touches bytes), 1 byte indicating the type of action (touch down/move/up), 1 byte indicating the active touch ID that triggered this event, 1 byte the number of touches, followed by the information of each individual touch [touch_id (1 byte), x-position (2 byte), y-position (2 byte)].
   Executed: via a TCP socket connected to the simulator that tells it the current touch event and all the touch data

On the client, each of these commands can be executed by different types of input. For example, sendMouseDown can be called when the "tap" gesture is recognized if the current server-side content is flash. However, if the current server-side content is an Android game, the sendTouches command can be executed in response to the "tap" gesture as this makes more sense.

According to one example implementation, instead of mapping a user input to a specific command catered for the application at the client side, the raw input data is provided to the client and the server converts the raw input data to an input that is appropriate based on the application environment and/or context of the application. For example, if the server-side application environment is Firefox and the content inside is a web page, a touch down immediately followed by a series of touch moves and touch up (a swipe/drag action) on the client mobile device implies the user wants to scroll the page. However, if the control server is not aware that the content is a web page, the server sends a mouse down followed by mouse moves and a mouse up, which is a selection action in Firefox. In order to interpret a swipe/drag action (touch down→move→up) as a scroll command on the server side, embodiments of the present invention use a Firefox extension to capture all the mouse events and interpret them as certain gestures appropriately.

According to one example implementation, the audio decoder 232 module decodes the audio streamed from the server. In one embodiment of the invention the audio decoder 232 will use the native audio decoder of the mobile platform. In another embodiment of the invention the audio decoder 232 will use the CELT decoder library. The CELT codec is a low latency compression-decompression algorithm for audio.

In one example implementation, the player 236 and the other modules the player 236 uses on the client device 124, including the video decoder 230 and audio decoder 232, are packaged as a native application for a particular client device. For example, there is a player application written specifically for iOS devices, such as iPhone 126 or iPad 128 mobile devices, and another player application written specifically for Android 130 mobile devices.

FIGS. 3A-3B are flow diagrams of a process for providing interactive content generated by an application configured to run in one application environment, to a client device providing a different application environment, according to one example implementation.

The process starts, and the monitoring server 114 receives from the client device 124 identification of the particular software application to be invoked. In this regard, the monitoring server 114 receives a user selection of the particular application in step 310.

In step 312, the player 236 on the client device 124 sends a request for the selected application to the configurator 214 on the monitoring server 114.

In step 314 the configurator 214 returns the appropriate configuration file for the selected application back to the player 236, and the player 236 configures itself based on the

US 9,549,152 B1

23

parameters of the returned configuration file. For example, the player sets its display resolution, maximum bit rate, maximum frame rate, audio and video codec used, and the like.

In step 316, the player 236 sends a request to the load balancer 216 on the monitoring server 114 to start an instance of the selected application.

In step 318, the load balancer identifies and selects a specific delivery server 112 and an instance of the provisioner 218 on the same delivery server. According to one embodiment, the load balancer may select a delivery server which is geographically close to the client device.

In step 320 the provisioner 218 responds to the load balancer 216, who responds to the player 236, with parameters that include credentials for accessing the created instance of the delivery server 112, an IP address of the delivery server, and an audio port on the delivery server, to which the player should connect.

In step 322, the player 236 uses the parameters returned in step 320 to connect on the control channel to the instance of the control server 220 selected for the instance of the application.

In step 324 the control server 220 and the player 236 exchange over the control channel, parameters (e.g. username and password) for the instance of the application, frame rate, bit rate, supported video and audio codec, and the like.

In step 326 the control server 220 responds to the player 236 over the control channel with the video port on the delivery server 112 in which the player should connect.

In step 328 the player 236 connects to the video port specified by the control server 220 and the audio port specified by the provisioner 218.

In step 330 the control server 220 invokes the application in the application environment provided by the delivery server 112 and notifies the player 236 that the selected application has finished launching.

In step 332 the selected application generates screen display outputs and provides the outputs on the virtual screen 224 on the delivery server 112.

In step 410 the video capture and streamer 226 receives video parameters, such as, for example, frame rate, bandwidth, bit rate, and video port, from the control server 220.

In step 412 the video capture and streamer 226 captures and encodes a screen display output by the virtual screen 224 into various video frames according to the received frame rate. According to one embodiment, in order to achieve minimal latency in the system, each video frame is encoded after being captured, and the output from the encoder is fed to the video port without excessive buffering or delay. According to one embodiment, the maximum frame size of each video frame is based on the specified frame rate and the maximum bit rate.

In step 414 the audio capture and streamer captures audio from the audio sink of the selected application and then encodes and streams the audio to the client device 124 over the audio port.

In step 416 the video decoder 230 and audio decoder on the client device 124 respectively decodes the received video stream and audio stream, which the player 236 then displays or plays respectively on the client device. In this regard, the video decoder continuously parses the incoming video data from the socket. As soon as it collects all the data required to decode a video frame, the frame is decoded, resized if needed, converted to an appropriate color space, and displayed. Again, video data are decoded and displayed as soon as they are available and there is no excessive

24

buffering to ensure minimal latency. According to one embodiment, the video decoder starts the decoding as soon as it identifies a tag (e.g. an AUD tag) which is inserted at the end of a particular video frame.

In step 418, the user enters input to the selected application via the player 236 using touches, gestures, keyboard entry, or any other form of input. According to one embodiment, the player 236 maps the user input (e.g. downward swipe, shaking of the device, changing orientation of the device, tapping on the screen, and the like) to a particular command defined in the configuration file for the application provided to the client device. For example, changing the orientation of the device may be mapped to a "sendOrientationChanged" command which receives, as a parameter, the orientation of the device. The change of orientation of the device and other inputs to the device are interpreted according to conventional mechanisms that will be understood by a person of skill in the art.

In step 420, the player 236 sends the mapped command(s) over the control channel to the control server 220.

In step 422 the control server converts the commands received from the player 236 to a corresponding input catered to the particular application (e.g. mouse or keyboard command understood by the application), and forwards the converted input commands to the application in the application environment 222.

In step 424, the selected application reacts to the user input or internal events, and changes its screen and sound output appropriately. In step 426 the changes to the screen are reflected onto the virtual screen 224 and the changes to the sound to the audio sink. The sequence then goes to step 412, and the streaming of video and audio to the client device continues.

In one example implementation, instead of mapping the user input to predefined high-level gestures or commands, such as sending a scroll down command when the user swipes down on the screen, the simplest mapping of the input or even the raw touch/input data from the client device is sent to the delivery server 112 over the control channel. For example, a mouse down event is sent when a user touches down on the screen. This mapping of input to the simplest command expected by the application environment on the server side avoids mapping to more complicated actions, such as high-level gestures or commands. The raw user inputs are then interpreted differently based on the content inside the application environment 222 and/or the context of the application. For example, a Firefox application provides a different context, which is browser based, than an Android application, which is touch-based. Thus, a mouse-down event may be transmitted to a Firefox application when a same action by a user would create the transmitting of a touch down event for an Android application. With respect to the transmitting of input based on content, instead of interpreting what the user wants to do (via, for example, gesture recognizers) on the client device, and sending it to the application on the server side, according to one embodiment of the invention, such gestures and/or user intentions are interpreted on the server side. For example, a touch down immediately followed by a series of touch moves and a touch up (i.e. a swipe/drag action) on the mobile device would imply that the user wants to scroll the page. If the control server makes a minimal interpretation based on the context of the application and transmits a mouse down input followed by mouse moves and mouse up inputs to, for example, a Firefox application, the application may interpret the input as a selection action instead of a scroll. Thus, for certain applications, the server is configured

Appx233

US 9,549,152 B1

25

to capture all the mouse events and interpret them as a gesture prior to transmitting the input to the application. For a Firefox application environment, for example, whether interpreting a touch down event followed by a series of touch move events and a touch up event, as a scroll command, depends on the move direction. In the embodiment of the invention for Flash apps, such interpretation as a scroll command is disabled when the mouse down happens inside the Flash object, where the Flash object itself would interpret these mouse down/move/up events. Thus, for a Flash object, the inputs are not changed, and the minimally interpreted input (e.g. mouse down→move→up) is sent to the Flash object for interpreting the command on its own.

Interpreting the touch events on the delivery server **112** has the advantage of achieving content-aware gesture mapping. The application environment **222** knows exactly where the user touches and thus where the gesture starts and ends. Therefore the gesture can be better mapped creating a better user experience. In addition, sending the raw touch data improves responsiveness of the application because the raw input data is provided as the inputs are being entered instead of waiting for the entire input to complete. For example, there is no need for a swipe down event to complete before transmitting such an event to the application.

In one example implementation, the control channel is configured to transmit multiple touch inputs for application environments **222** that accept and expect such events (e.g. an Android application running in the delivery server **112**). In this case, a touch tracker in the player **236** tracks the multiple touches. Each touch at the client side is assigned with a touch ID. According to one embodiment, each finger is represented with a touchID having associated coordinates (x, y). Each time the user starts or ends a touch event (e.g. putting one more finger down or lifting one finger up), the touch tracker in the player **236** groups all the touches along with the action (down/move/up) and the active touch ID that corresponds to the finger that initiated the event. This data is then sent through the control channel and to the control server **220**. The control server **220** organizes the touch data into the format accepted by the application environment **222**, and sends the formatted data to the application environment **222**.

FIG. **4** is a flow diagram of a process for dynamically adjusting the quality of streamed video frames during a streamed video session based on network congestion over a TCP socket, according to one example implementation. The process implements the QoS algorithm of table I. According to one embodiment, the process is implemented by the video capture and streamer module **226** on the mobile app delivery server **112**.

In one example implementation, video quality may be either dynamically downgraded or upgraded based on the concurrent congestion status of a TCP socket. In this regard, the process adjusts video quality by varying two aspects of video quality: video frame rate and video bit rate. For example, the video frame rate can range from 10 to 24 frames per second (fps), and the video bit rate can range from 320K to 2048K bits per second (bps). Video frame rate affects primarily the smoothness or choppiness of a video. For a given video frame rate, the video bit rate affects primarily the visual quality of individual frames.

In one example implementation, as congestion over a TCP socket occurs, both the video frame rate and video bit rate are downgraded together until the video bit rate hits a predefined floor value MIN_FR, after which the video frame rate is held constant but the video bit rate continues to be downgraded.

26

According to one example implementation, the process of FIG. **4** may be invoked before the encoding of each and every frame of video to be transmitted to the client device. However at the initialization of the video streaming session, certain constant values are set that control the range and frequency of the adjustment of video quality. In one embodiment of the invention, the following constants are used:

MIN_LEVEL=minimum QoS level (e.g 5);
MAX_LEVEL=maximum QoS level (e.g. 32);
MIN_FR=minimum frame rate (e.g. 10);
MAX_FR=for maximum frame rate (e.g. 24);
MIN_MBR=for minimum bit rate (e.g. 320K);
MAX_MBR=maximum bit rate (e.g. 2048K);
MBR_STEP=bit rate increment (e.g. 64K);
DOWNGRADE_INTERVAL=downgrade interval time (e.g. 1000 milliseconds); and
UPGRADE_INTERVAL=upgrade interval time (e.g. 1000 milliseconds).

The outcome of the process is the setting of the video frame rate (fr) and the video bit rate (mbr) parameters which are subsequently used by the video encoder to encode the next video frame.

The process in FIG. **4** starts, and in step **460**, the video capture and streamer module **226** before the encoding of each frame first sets a previous quality level to the value of a current quality level, and further sets a current time to the current system time.

In step **462**, the video capture and streamer module **226** determines whether the TCP socket was congested after the transmission of the last video frame. If the TCP socket was congested, the process goes to step **464** where the process attempts to downgrade the quality level by adjusting the value of the current quality level. In this regard, the process sets the value of a last congestion time to the value of the current time, and increments a congestion counter for the current quality level.

In step **466**, the process determines whether the current quality level is greater than a preset minimum quality level. If the answer is NO, the process proceeds to step **474** because the process does not downgrade the level below the preset minimum quality level.

If the current quality level is greater than the preset minimum quality level, the process determines whether the difference between the current time and the last downgrade time exceeds a preset downgrade interval. If it does not, the processor proceeds to step **474**. According to one embodiment, using a downgrade interval to control how frequently the level is downgraded insures a smoother downgrade process without wild down swings. If the downgrade interval time has been exceeded, the process proceeds to step **468**.

In step **468**, the video capture and streamer module **226** downgrades the current quality level to the preset minimum quality level if the current quality level is less than or equal to a preset minimum frame rate. If the current quality level is greater than the preset minimum frame rate, the process downgrades the current quality level to either the preset minimum frame rate or the preset minimum QoS level, whichever is a greater value. In either case, after the downgrade has been done, the process proceeds to step **474**.

Referring again to step **462**, if a determination is made that the TCP socket was not congested, the video capture and streamer module **226** proceeds to step **470** to check if an upgrade of the video quality level is possible. In this regard, the process determines if the current quality level is less than a preset maximum QoS level. If the answer is NO, meaning

US 9,549,152 B1

27

that the current quality level is already at the maximum level, the process proceeds to step **474**.

If the current quality level is less than the preset maximum QoS level, the process proceeds to step **472** to attempt to upgrade the level by a preset amount, such as, for example, by one. In this regard, the process uses a congestion counter for the current quality level to compute a multiplier. According to one embodiment, if the congestion counter is zero, the multiplier is one; if the congestion counter is one, the multiplier is two; if the congestion counter is two, the multiplier is four, and so on. According to one embodiment, the multiplier acts as an exponential dampener. The multiplier is multiplied by a preset upgrade interval time to compute an upgrade delay time. The current time is then subtracted from the greater of either the last upgrade time or the last congestion time, and if the difference has exceeded the computed upgrade delay time, an upgrade take place. If an upgrade is allowed, the current quality level is incremented by one. In either case, the algorithm then proceeds to step **474**.

In step **474**, the video capture and streamer module **226** checks if either a downgrade or an upgrade of the current quality level has just occurred. If not, the process proceeds to step **482**. If an upgrade or downgrade has just occurred, the process determines, in step **476**, whether a downgrade has occurred. If the answer is YES, the process proceeds to step **478** where the last downgrade time is set to the current time and the process proceeds to step **482**.

If instead in step **476** it is determined that an upgrade has just occurred, the process proceeds to step **480** for setting the congestion counters to zero for all quality levels less than or equal to the current level. That is, because of the upgrade, the process allowed to have confidence in the lack of congestion in all levels less than or equal to the current level to which it has been upgraded. The algorithm then proceeds to step **482**.

Step **482** is the culmination of the process where the video frame rate and video bit rate are set based on the results of the algorithm. According to one embodiment, the video bit rate is set to the current quality level multiplied by a preset bit rate increment. In computing the video frame rate, the maximum value of either the current quality level or the preset minimum frame rate is selected. The result is then compared against the preset maximum frame rate. The minimum of the two values is then set as the video frame rate. The process ends, and the video encoder and streamer module **226** uses the set video frame rate and video bit rate to encode the next video frame to be streamed to the client device.

The processes of FIGS. **3-4** may be described in terms of a software routine executed by the corresponding CPU based on instructions stored in memory. A person of skill in the art should recognize, however, that the processes may be executed via hardware, firmware (e.g. via an ASIC), or in any combination of software, firmware, and/or hardware. Furthermore, the sequence of steps of the processes are not fixed, but can be altered into any desired sequence as recognized by a person of skill in the art.

The various example implementations may allow the efficient delivery of interactive applications built for one environment to various mobile devices (and other clients) for which they were not originally written. The various example implementations allow the applications to function on the new platforms with little or no redevelopment of the applications. Application developers will be able to quickly re-purpose their existing application assets to run on the new environments without the need to learn the technical details

28

of the new platforms. The example implementations may also help eliminate the need to download the applications to the new platforms, or purchase separate applications for the new platforms.

According to the above example implementation, the applications are configured to appear to function on the new platform in the same way as they would on the native platform. The example implementation may also allow the applications to be highly responsive to the user's control. The high responsiveness is aided by reducing the latency of upstream inputs from the client to the server running the application, and latency of downstream audio and video from the server to the client.

### II. Interactive Application Content Delivery Using Video Conferencing Solutions

Example implementations provide a software system and method by which content (e.g., audio data and display data) from software applications built for one native application environment can be interactively delivered to and experienced on a multiplicity of application environments either native or non-native and specifically to that system and method that delivers the content of those applications through existing video conferencing solutions, negating the requirement for a special purpose player on the client-side. Although examples are described with regard to mobile devices, those skilled in the art will recognize that it could be to any client device.

As an overview, the following shows an example flow, in one embodiment of the present invention using a WebRTC video conferencing solution, when the client is a mobile device, a method for delivering interactive applications built for one platform to a multiplicity of application environments using an existing WebRTC video conferencing solutions includes but is not limited to the following steps:

1. On a mobile device, the end user selects an interactive application (e.g. by clicking on a link within a browser).
2. The player controller on the mobile device makes an HTTP GET request to what component to retrieve a JavaScript Object Notation (JSON) configuration file.
3. The player controller makes an HTTP POST request to the load balancer on the mobile application (app) monitoring server in order to start an instance of the selected application.
4. The load balancer proxies the request to the provisioner on an available mobile application delivery server which responds with the following (1) credentials (username/password), (2) IP address of the selected mobile application delivery server and (3) port that the WebRTC signaling server is listening on.
5. The player controller establishes a WebSocket connection to the control server on the mobile application delivery server and follows the control server protocol to authenticate, send session parameters (e.g. resolution, bit-rate, fps, etc.) and makes a session launch request.
6. The control server responds to the player controller on the mobile device with a launch response indication a successful session launch.
7. The player controller establishes a connection to the WebRTC signaling server on the mobile application delivery server and exchanges ICE candidates and session description (offer/response) to establish the WebRTC session.

Appx235

US 9,549,152 B1

29

8. The audio and video of the selected application running in the application environment are captured respectively by the audio capture and video capture components on the mobile app delivery server and then are streamed to the client by the WebRTC streamer. For example, the video capture module/component may receive display data (e.g., a plurality of display frames) output from the application and then convert (e.g., encode) the display data (or display frames) to a plurality of video frames for streaming via a video conferencing (e.g., WebRTC) endpoint to a peer video conferencing endpoint at the client device (e.g., mobile device) via the video conferencing (e.g., WebRTC) session.

9. The player controller on the mobile device is notified through the WebRTC Web API callback when the audio/video stream is ready to be presented, and the player controller attaches the stream to an HTML5 video element.

10. The player controller handles user input and relays the input to the control server.

11. To disconnect either the control server informs the player controller that the session has concluded, or the player controller initiates a disconnect.

FIG. 5 is an overview block diagram of a generic video conferencing solution according to example implementation.

According to one example implementation, a generic video conferencing solution may be used, which may include but is not limited to at least two generic video conferencing solution environments (or video conferencing systems) 510 and 526 which contain the video conferencing components required for a video conference between them.

According to one example implementation, the generic video conferencing solution environments 510 and 526 include but are not limited to identical components at each endpoint which include but are not limited to the video conferencing endpoints 518 and 528, the display components, 512 and 530, the webcam components 514 and 532, and the microphone components 516 and 534. The webcam components 514 and 532 and the microphone components 516 and 534 respectively capture the video and audio of participants at their endpoint and using the services of their respective video conferencing endpoints 518 and 528 encode and stream audio 520, video 522 and optional control streams 524 between endpoints where they are decoded and processed by the video conferencing endpoints 518 and 528 for display/playback on their respective display devices 512 and 530.

FIG. 6 is an overview block diagram of a system to deliver applications to non-native client platforms using a generic video conferencing solution according to one example implementation.

According to one example implementation, the system includes a mobile application delivery system 610 with video conferencing environment (including a video conferencing endpoint 518), which may be similar to the mobile application delivery system environment 110 described above with respect to FIG. 2. The system also includes an application (app) environment 612, which may be similar to the application environment 222 described above with respect to FIG. 2. The system also includes a control server 220a, which may be similar to the control server 220 described above with respect to FIG. 2.

According to an example implementation, the system also includes a virtual microphone 614, which captures the audio output of an application from the application environment

30

612. The system also includes a virtual webcam 616, which captures the video output of an application from the application environment 612. In particular, the virtual webcam 616 may receive display data (e.g., display frames) from the application, and may then convert the display data (or display frames) to video frames for streaming. The system 610 also includes a video conferencing endpoint 518. The video conferencing endpoint 518 is capable of encoding and streaming audio and video outputs from the virtual microphone 614 and virtual webcam 616 respectively and encoding and streaming audio 520, video 522 and control 524 over a network 116 to generic video conferencing solution environment 526 (including a video conferencing endpoint 528 provided within a client device), which may be similar to the generic video conferencing solution environment 526 described above with respect to FIG. 5. The video conferencing endpoint 518 also is capable of receiving over a network 116 audio 520, video 522 and control 524 streams from another generic video conferencing solution environment 526 (and from video conferencing endpoint 528) at a client device. In this manner, for example, audio/video content of an application running on application delivery system 610 may be captured by virtual microphone 614 and virtual webcam 616 and streamed via video conferencing endpoint 518 to a video conferencing endpoint 528 at a client device to allow the application audio/video content to be output/displayed by the client device without the application being present (including without the application being installed or running) on the client device.

Also, user input signals may be streamed or transmitted from the client device to the application delivery system 610 where the user input signals may control operation of the application running on the application delivery system 610. Thus, in this manner, the user input signals or control signals from the client device may cause the display data and/or audio data output by the application to be changed, adjusted or modified based on the user input signals/control signals from the client device. According to an example implementation, control processing 620 within the application delivery system 610 may receive, from a client device, user input signals (or interaction data) with respect to an application or in response to the display/output of content from the application that is being output by the client device, e.g. without the application being present (including without the application being installed or running) on the client device.

Application delivery system 610 may receive the user input signals (or control signals), for example, via an audio channel, a video channel or a control channel of a video conferencing (e.g., WebRTC) session, or may receive control signals or user input signals via a separate or side control channel. User input signals may be, for example, user input signals provided via one or more input devices of the client device, e.g., key presses, gestures on a touch screen of the client device, joystick inputs, etc., where such user input signals may be transmitted via a control channel, for example. Alternatively, user input signals may be provided as an audible input (e.g., a voice/speech command spoken by the user to control the application) that may be received via a microphone 534 of the client device, recorded as audio data, and, for example, sent by video conferencing endpoint 528 of client device via an audio channel (or a control channel) of the video conferencing session to the video conferencing endpoint 518 of application delivery system.

Alternatively, user input signals may be provided as a visual gesture (e.g., an arm or hand motion by the user to control the application) by a user that may be received or detected via a webcam 532 of the client device, recorded as

US 9,549,152 B1

31

video data, and, for example, sent by video conferencing endpoint **528** of client device via a video (or a control) channel of the video conferencing session to the video conferencing endpoint **518** of application delivery system. In an example implementation, the user input signals by a user (including the audible inputs or visual gestures) may be converted, by the client device based on a configuration file associated with the application, or by control processing **620** or control server **220***a* of the application delivery system **610**, to a control signal or a command to be input to the application. The user input signal from the client device may be converted to a control signal or command that is input or provided to the application, or the user input signal may be directly input to the application.

The application, running on the application delivery system **610**, may be controlled based on (or in response to) the user input signal/control signal/command provided to the application, e.g., the application may change, adjust or update the audio/video (or display) signals output by the application based on the one or more received user input signals/control signals/commands from the client device, e.g., without the application being present (e.g., including without the application being installed or running) on the client device. This process may be repeated, e.g., the updated/changed audio/video signals (that were updated/changed by the application based upon or in response to signals from the user of the client device) may be streamed by video conferencing endpoint **518** of the application delivery system **610** via a video conferencing session to the video conferencing endpoint **528** of the client device, where such updated/changed audio/video content from the application may be output/displayed via the client device to the user, even though the application is not present on the client device.

In an example implementation, a user of a client/mobile device may generate audible inputs (e.g., voice/spoken audible commands by a user, such as "stop", "turn left", etc., to provide feedback or control to the application), which may be received/captured by microphone **534**, transmitted via an audio (or control) channel of the WebRTC session to the application delivery system **610**, and then converted by control processing **620**, or by control server **220***a* (FIG. **8**), to control (or text) commands via speech-to-text functions, or other command conversion functions.

In another example, a user of a client/mobile device may generate a visual gesture (e.g., a user moving a hand or arm to indicate a specific command with respect to the application), which may be captured by a webcam **532**, transmitted (e.g., within one or more video frames) via a video channel (or a control channel) of the WebRTC session to the application delivery system **610**, and then converted to control (or text) commands by command conversion functions (e.g., image processing logic to detect specific visual gestures by a user on a received video) within control processing **620** or by control server **220***a* (FIG. **8**). These converted audible inputs or visual gestures from a user of the client/mobile device (user input signals) may then be provided to the application running in the application environment.

These user input signals, as examples, may be provided or input to the application, where such user input signals may cause the application to change or adjust the display data and audio data output by the application, which may result in a change or update to the display data and/or audio data output by the application, which in turn, may result in an update or change to the video frames output by the virtual webcam **616** and/or the audio data output by the virtual microphone **614**

32

for streaming back to the client/mobile device via the video conference (e.g., WebRTC) session.

FIG. **7** is an overview block diagram of a WebRTC video conferencing endpoint within a browser within a mobile device according to an example implementation.

According to one example implementation, a WebRTC video conferencing solution is used on both the server and client side. On the server side it may be integrated with the mobile application delivery system **610** as described above with reference to FIG. **6**. On the mobile device client side, in one example implementation, it may be contained within commonly used browsers on mobile devices. On the client side the interface for client side web applications **710**, **712**, **714**, etc. is exposed through the WebAPI component **718**.

According to one example implementation, a WebRTC video conferencing solution may be used by and is not limited to the WebRTC **720** environment, the WebRTC C++ API **722**, the session management **724** component, the voice engine **726**, the video engine **730**, the transport component **736**.

The system also includes several components that can be overridden, such as an audio capture/render component **728**, a video capture component **730**, and a network I/O component **734**. On the server side (e.g., FIG. **6**) the virtual microphone **614** described above with respect to FIG. **6** overrides the microphone **516** (FIG. **5**), which captures audio from a participant. On the server side the virtual webcam **616** described above with respect to FIG. **6** overrides the webcam **514** (FIG. **5**), which captures video from a participant. On the client side within a browser **716** the audio capture/render component **728**, the video capture component **732**, and the network I/O component **734** are all overridden by the browser maker.

With respect to the audio signal on the server side, the term override means, for example, that the virtual microphone **614** may be selected to provide audio input to a video conferencing endpoint **518** (FIG. **6**) from an application within the application delivery system **610**, instead of providing an audio input to the video conferencing endpoint **610** from the microphone **516**, which captures audio of a participant. In this manner, the audio signal output from the application (via the virtual microphone **614**) may be selected as an input to the video conferencing endpoint **610**, rather than selecting the audio signal from the participant (via the microphone **516**). With respect to the video signal, overriding means, for example, that the virtual webcam **616** may be selected to provide video input to the provide video input to a video conferencing endpoint **518** (FIG. **6**) from an application within the application delivery system **610**, instead of providing an video input to the video conferencing endpoint **610** from the webcam **514**, which captures video of a participant. In this manner, the video signal (or display data) output from the application (via the virtual microphone **614**) may be selected as an input to the video conferencing endpoint **610**, rather than selecting the video signal from the participant (via the webcam **514**). In an example implementation, the virtual webcam **616** may receive display data (e.g., one or more display frames) output from the application, convert the display data to a plurality of video frames which may be output to the video conferencing endpoint **518** for streaming to the other video conferencing endpoint **528** provided on the mobile/client device.

FIG. **8** is an overview block diagram of a system to deliver applications to non-native platforms using a WebRTC video conferencing solution according to one example implementation. According to one example implementation, the system may include a mobile application delivery system with

US 9,549,152 B1

33

video conferencing solution environment **610**, which may be similar to the mobile application delivery system environment **110** described above with respect to FIG. **2**.

FIG. **8** is an overview block diagram of various modules hosted by the monitoring servers **114**, delivery servers **112**, and mobile devices **124** according to one example implementation. The various modules are implemented via computer program instructions, which are stored in memory for executing by the CPU of the corresponding server. A person of skill in the art should recognize, however, that all or a portion of the various modules may be implemented via firmware, hardware, or a combination of software, firmware, and/or hardware.

Except where noted the components in FIG. **8** are similar in kind, description, function and operation to identically named and numbered components described above in FIG. **2** according to one example implementation. Referring to FIG. **8**, according to one example implementation, the components resident in the mobile application delivery servers **112** modified or added from the system described above for FIG. **2** are the following: the provisioner **218a**, the control server **220a**, the video capture (virtual webcam) **226a**, the audio capture (virtual microphone) **228a**, the WebRTC streamer **227**, and the WebRTC signaling server **229** components. These modified or added components will be described below.

According to one example implementation, the provisioner **218a** is modified from the original description for FIG. **2** above to provide an additional parameter in its response, the WebRTC signaling port to be used.

According to one example implementation, the control server **220a** is modified from the original description for FIG. **2** above to provide an additional interface, WebSocket, on which it listens for client connections. Previously the control server **220** described above for FIG. **2** only listened for client connections on a raw TCP socket. The protocol employed over either a TCP socket or a WebSocket remains unchanged. According to one example implementation, a side channel for control is established by the control server **220a** using a WebSocket. In another example implementation, a side channel for control could be established using an RTCDataChannel.

According to one example implementation together the video capture **226a**, audio capture **228a** and WebRTC Streamer **227** components of FIG. **8** perform the same functions as the video capture and streamer **226** and audio capture and streamer **228** of the original patent application described above for FIG. **2**. Referring to the WebRTC system architecture depicted in FIG. **7** the audio capture/render **728** of FIG. **7** is overridden by the audio capture **228a** component of FIG. **8** and the video capture **732** of FIG. **7** is overridden by the video capture **226a** component of FIG. **8**. Referring again to the WebRTC system architecture depicted in FIG. **7**, the transport model **736** handles the audio and video streaming, in FIG. **8** the WebRTC streamer **227** represents this component in the block diagram.

According to one example implementation, the WebRTC signaling server **229** of FIG. **8** establishes a WebSocket and proxies ICE candidates and SDP data between the WebRTC streamer **227** and the client device. The WebRTC framework depicted in FIG. **7** uses the ICE framework for finding candidates (a process to determine potential network interfaces and ports to establish a connection) and it uses SDP (session description protocol) for describing media (audio/video) configuration information. However WebRTC does not define a signaling mechanism for communicating this information between peers. Therefore the WebRTC signal-

34

ing server **229** of FIG. **8** in the mobile app delivery server **112** is the component that establishes a WebSocket and proxies ICE candidates and SDP configuration data between the WebRTC streamer component **227** and the client.

Still referring to FIG. **8**, according to one example implementation, on the client side within the mobile device environment **118**, several components described above in FIG. **2** for the original patent application are added, modified or subsumed by the WebRTC endpoint environment **239** within the mobile device browser **124a**. These modified, added or subsumed components include but are not limited to, the video decoder **230a**, the audio decoder **232a**, the quality of service **234a**, the player **236a** and the WebRTC Web API **237** components. In addition a player controller **250**, outside of the WebRTC endpoint environment **239**, and implemented entirely in JavaScript is added according to one embodiment of the present invention. These modified, added or subsumed components will be described below.

According to an example implementation, the ubiquitous presence of WebRTC endpoint environments in many browsers is leveraged to provide streaming of audio/video streams between server and clients and to eliminate the need to download and install software in mobile devices to accomplish these functions. Because of that purpose built components described for FIG. **2** of the original patent application are no longer needed and are subsumed by the capabilities of the ubiquitously present WebRTC endpoint solutions within mobile device browsers. These components from FIG. **2** described above that are subsumed by capabilities of the WebRTC endpoint solutions include but are not limited to, the video decoder **230**, the audio decoder **232**, the quality of service **234** and the player **236** components.

Still referring to FIG. **8** according to one embodiment of the present invention, inside the mobile device environment **118**, there is a mobile device browser **124a** that contains a WebRTC endpoint **239** environment. Examples of mobile device browsers that include WebRTC endpoints **239** includes but is not limited to Google Chrome, Mozilla Firefox, and Opera.

Still referring to FIG. **8** according to an example implementation, within the WebRTC endpoint **239** environment, the video decoder **230a** component performs the video decoding function performed by the video decoder **230** component described above for FIG. **2**. Also within the WebRTC endpoint **239**, the audio decoder **232a** component performs the audio decoding function performed by the audio decoder **232** component described above for FIG. **2**. Also within the WebRTC endpoint **239**, the quality of service **234a** component performs the quality of service functionality performed by the quality of service **234** component described above for FIG. **2**.

Still referring to FIG. **8** according to an example implementation, within the WebRTC endpoint **239** environment, the WebRTC Web API **237** exposes an API interface accessible e.g. via JavaScript that allows a Web App running in the mobile device browser **124a** to control the functionality of the WebRTC endpoint **239**.

Still referring to FIG. **8** according to an example implementation, within the mobile device browser **124a** there is a JavaScript client component named the player controller **250**. The player controller **250** is analogous, with exceptions noted below, to the player **236** component described above for FIG. **2**. The player controller **250** unlike the player component **236** of the original patent application does not handle decoding or playback/display of the audio and video

US 9,549,152 B1

35

streams. Those functions are provided in an example implementation by the WebRTC endpoint 239 and its subcomponents.

In an example implementation, the player controller 250 connects to the control server 220a using a WebSocket rather than a raw TCP socket. The player controller 250 also establishes a connection to the WebRTC signaling server 229 through a WebSocket. The player controller 250 uses the "WebRTC signaling channel" to exchange ICE candidates and SDP messages between the WebRTC endpoint 239 in the mobile device browser 124a with the WebRTC signaling server 229 on the mobile app delivery servers 112.

In contrast to FIG. 2, in an example implementation, the WebRTC endpoint 239 using the video decoder 230a and audio decoder 232a components handles both audio and video decoding and playback and rendering. The player controller 250 establishes a WebRTC session using the WebRTC Web API 237. In order to establish the session, the player controller 250 also gets and or sets the signaling information in order to establish the WebRTC session. The player controller 250 also handles input (touch/keyboard) events from the end user and transmits them using the control channel protocol to the control server 220a on the mobile app delivery servers 112. The player controller 250 also controls the presentation of the stream (e.g. rendered size, orientation etc.) for presentation to the end user within the mobile device browser 124a.

FIGS. 9A-9B are modified flow diagrams from FIGS. 3A and 3B, of a process for providing interactive content generated by an application configured to run in one application environment, to a client device providing a different application environment, using a video conferencing solution to stream and decode audio and video content from server to client according to an example implementation.

The process starts, and the monitoring server 114 receives from the client device 124a identification of the particular software application to be invoked. In one embodiment of the present invention, the user selects an application through a URL on the client-side browser. In this regard, the mobile application monitoring server 114 receives the user selection of the particular application in step 910 of FIG. 9a. The mobile application monitoring server 114 serves web pages, which contain the player controller 250 as included JavaScript. In another embodiment of the present invention, it can be served from a CDN (e.g. Amazon S3).

Still referring to FIG. 9a of the present invention, in step 912, the player controller 250 on the client device 124a sends a request for the selected application to the configurator 214 on the monitoring server 114.

In step 914 the configurator 214 returns the appropriate configuration file for the selected application back to the player controller 250, and the player controller 250 configures itself based on the parameters of the returned configuration file. For example, the player sets its display resolution, maximum bit rate, maximum frame rate, audio and video codec used, and the like.

In step 916, the player controller 250 sends a request to the load balancer 216 on the monitoring server 114 to start an instance of the selected application.

In step 918, the load balancer identifies and selects a specific delivery server 112 and an instance of the provisioner 218a on the same delivery server. According to one embodiment, the load balancer may select a delivery server, which is geographically close to the client device.

In step 920 the provisioner 218a responds to the load balancer 216, who responds to the player controller 250, with parameters that include credentials for accessing the

36

created instance of the delivery server 112, an IP address of the delivery server, and an audio port and a WebRTC signaling port on the delivery server, to which the player should connect.

In step 922, the player controller 250 uses the parameters returned in step 920 to connect on the control channel through the WebSocket interface to the instance of the control server 220a selected for the instance of the application.

In step 924 the control server 220a and the player controller 250 exchange over the control channel, parameters (e.g. username and password) for the instance of the application, frame rate, bit rate, supported video and audio codec, and the like.

In step 926 the control server 220a responds to the player controller 250 over the control channel with the video port on the delivery server 112 in which the player should connect. This step still occurs for compatibility reasons but is irrelevant in this embodiment of the invention.

In step 928 the player controller 250 connects to the WebRTC signaling server 229 of FIG. 8, on the signaling port specified by the specified by the provisioner 218a, and exchanges SDP and ICE candidate messages to establish the WebRTC session.

In step 930 the control server 220a invokes the application in the application environment provided by the delivery server 112 and notifies the player controller 250 that the selected application has finished launching.

In step 932 the WebRTC API 237 on the client notifies the player controller 250 that the session has been established and the remote stream has been received and the player controller 250 attaches the stream to an HTML5 video element to begin display and playback. The selected application generates screen display outputs and provides the outputs on the virtual screen 224 on the delivery server 112.

Now referring to FIG. 9b in step 940 the WebRTC streamer 227 of FIG. 8 obtains video parameters, such as, for example, frame rate, bandwidth, bit rate, and video port, from the control server 220a.

In step 942 the WebRTC video capture component 226a, the overridden video capture module described above with reference to FIG. 8, captures the selected app's video running in the app environment 222 from the virtual screen 224 and passes it to the WebRTC streamer 227 which encodes and streams the video to a mobile device.

In step 944 the WebRTC audio capture component 228a, the overridden audio capture module described above with reference to FIG. 8, captures the selected app's audio running in the app environment 222 from the audio sink and passes it to the WebRTC streamer 227 which encodes and streams the audio to a mobile device.

In step 916, on the client, the video decoder 230 and the audio decoder 232a of the WebRTC endpoint 239 are responsible for decoding the video and audio streams respectively and notifying the player controller 250 via the WebRTC Web API 237, when the streams are ready for display and playback. The player controller 250 attaches the streams to an HTML5 video element for display/playback.

In step 948, the user enters input to the selected application via the player controller 250 using touches, gestures, keyboard entry, or any other form of input. According to one embodiment, the player controller 250 maps the user input (e.g. downward swipe, shaking of the device, changing orientation of the device, tapping on the screen, and the like) to a particular command defined in the configuration file for the application provided to the client device. For example, changing the orientation of the device may be mapped to a

**Appx239**

US 9,549,152 B1

37

"sendOrientationChanged" command which receives, as a parameter, the orientation of the device. The change of orientation of the device and other inputs to the device are interpreted according to conventional mechanisms that will be understood by a person of skill in the art.

In step 950, the player controller 250 sends the mapped command(s) over the control channel (established through a secure WebSocket as opposed to a TCP socket of the original patent application) to the control server 220a.

In step 952 the control server 220a converts the commands received from the player controller 250 to a corresponding input catered to the particular application (e.g. mouse or keyboard command understood by the application), and forwards the converted input commands to the application in the application environment 222.

In step 954, the selected application reacts to the user input or internal events, and changes its screen and sound output appropriately.

In step 956 the changes to the screen are reflected onto the virtual screen 224 and the changes to the sound to the audio sink. The sequence then goes to step 942, and the streaming of video and audio to the client device continues.

According to an example implementation, a system is provided including a plurality of host devices, a client device, and a server coupled to the plurality of host devices and the client device over a data communications network, each host device hosting a software application configured to run on an application environment provided by the host device, and the client device receiving interactive content generated by a particular software application configured to run on an application environment different than an application environment provided by the client device. The server may include: a processor; and a memory coupled to the processor and storing program instructions therein, the processor being configured to execute the program instructions, the program instructions including: receiving from the client device identification of the particular software application; identifying one of the plurality of host devices hosting the particular software application; invoking the particular software application on the application environment provided by the identified host device; periodically capturing and encoding a screen display output generated by the particular software application into a plurality of video frames in such a way that overrides the virtual webcam component of a video conferencing endpoint; streaming the plurality of video frames over the data communications network during a streaming session using a video conferencing endpoint; receiving from the server at the client device the plurality of video frames over the data communications network during a streaming session using a video conferencing endpoint; receiving interaction data from the client device in response to the streamed video frames; converting the interaction data to a corresponding input catered to the particular software application; and providing the input to the particular software application, wherein the software application is configured to generate a second screen output in response.

According to an example implementation, the program instructions further include: identifying a configuration file associated with the particular software application; transmitting the configuration file to the client device, wherein the client device is configured to map a user input to a particular command based on the configuration file; and receiving the particular command from the client device as the interaction data. In an example implementation, the client device may be a mobile phone or electronic tablet. In an example implementation, the second screen may be output in real-time with the providing of the interaction data

38

by a user of the client device. In an example implementation, the video conferencing endpoint used is a WebRTC video conferencing endpoint.

One or more example implementations may relate generally to providing a software system and method by which software applications built for one native application environment can be interactively delivered to and experienced on a multiplicity of application environments either native or non-native and specifically to that system and method that delivers the content of those applications through existing video conferencing solutions, negating the requirement for a special purpose player on the client-side.

According to an example implementation, an apparatus may include at least one processor and at least one memory including computer instructions, when executed by the at least one processor, cause the apparatus to:

1) establish, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device. For example, in response to an identification of an application from a client device, an application delivery system 610 may establish a video conferencing session (e.g., WebRTC session) between video conferencing endpoint 518 provided on the application delivery system 610 and a video conferencing endpoint 528 (e.g., FIG. 6) provided on a client device.

2) select a video capture module as a video input device for the first video conferencing endpoint. For example, video conferencing endpoint 518 may select a video capture module/virtual webcam 616 to provide video input to video conferencing endpoint 518 (FIG. 6) from an application within the application delivery system 610, instead of providing an video input to the video conferencing endpoint 610 from the webcam 514, which captures video of a participant. In this manner, the video signal (or display data) output from the application (via the virtual microphone 614) may be selected as an input to the video conferencing endpoint 610, rather than selecting the video signal from the participant (via the webcam 514).

3) receive, by the video capture module provided on the application delivery system, display data output by the application; For example, the video capture module/virtual webcam 616 (e.g., FIG. 6) may receive display data (e.g., one or more display frames) output from the application, and

4) convert, by the video capture module, the display data to a plurality of video frames. For example, the video capture module/virtual webcam 616 (e.g., FIG. 6) may convert the display data (e.g., display frames output by the application) to a plurality of video frames which may be output to the video conferencing endpoint 518 for streaming to the other video conferencing endpoint 528 provided on the mobile/client device.

5) stream the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session. For example, video conferencing (e.g., WebRTC) endpoint 518 may stream the plurality of video frames (received from the video capture module/virtual webcam 616) to the video conferencing (e.g., WebRTC) endpoint 528 provided on the client device via the video conferencing (e.g., WebRTC) session. And,

Appx240

US 9,549,152 B1

39

6) receive, by the application delivery system from the client device, a user input signal for the application. For example, application delivery system **610** may receive a user input signal from a user of the client/mobile device, e.g., via a control channel, an audio channel or a video channel of the video conferencing session, or via a separate/side control channel.

According to an example implementation, the video capture module may include a virtual webcam that is configured to interface between the application and the first video conferencing endpoint and to output a plurality of video display frames in a format that is compatible with the first video conferencing endpoint. For example, video capture module/virtual webcam **616** may convert the display data/ display frames having a first format (e.g., having a first screen resolution, frame rate, maximum bit rate, or other format parameters) to a plurality of video frames having a second format (e.g., having a second screen resolution, frame rate, maximum bit rate or other format parameters) that is compatible with the video conferencing endpoints **518** and **528**.

According to an example implementation, the computer instructions that cause the apparatus to receive may include computer instructions that cause the apparatus to: receive, by the video capture module (e.g., video capture module/ virtual webcam **616**, FIG. **6**), one or more display frames output by the application; and buffer, by the video capture module, each of the one or more display frames.

According to an example implementation, the computer instructions that cause the apparatus to convert may include computer instructions that further cause the apparatus to: convert, by the video capture module (e.g., video capture module/virtual webcam **616**), the display data from a first frame format (e.g., having a first screen resolution, frame rate, maximum bit rate, or other format parameters) to a plurality of video frames having a second frame format (e.g., having a second screen resolution, frame rate, maximum bit rate, or other format parameters).

According to an example implementation, the apparatus may further include computer instructions that cause the apparatus to:

1) select an audio capture module as an audio input device for the first video conferencing endpoint. For example, video conferencing endpoint **518** may select audio capture module/virtual microphone **614** as an audio input device for the video conferencing endpoint **518**, e.g., to receive the audio data/signals from the application.

2) receive, by the audio capture module provided on the application delivery system, audio data output by the application. For example, audio capture module/virtual microphone **614** may receive the audio data/signals from the application.

3) stream the audio data received via the audio capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session. For example, video conferencing endpoint **518** may stream the audio data/signal received via the audio capture module/virtual microphone **614** to video conferencing endpoint **528** via the video conferencing session.

According to an example implementation, the audio capture module may include a virtual microphone (e.g., an audio capture module/virtual microphone **614**) that is configured to interface between the application and the first

40

video conferencing endpoint and to output audio data in a format that is compatible with at least the first video conferencing endpoint.

According to an example implementation, the computer instructions that cause the apparatus to receive, by the audio capture module, may include computer instructions that cause the apparatus to: receive, by the audio capture module (e.g., audio capture module/virtual microphone **614**), audio data output by the application in a first audio format (e.g., a first audio format having sampling rate, word length or other format parameters) associated with the application; convert, by the audio capture module, the audio data output by the application from the first audio format to a second audio format (e.g., a second audio format having sampling rate, word length or other format parameters) that is associated with (e.g., compatible with) at least the first video conferencing endpoint; and output the audio data in the second audio format to the first video conferencing endpoint.

According to an example implementation, the apparatus may further include computer instructions that cause the apparatus to: establish a control channel between the application delivery system and the client device; and receive, by the application delivery system from the client device via the control channel, the user input signal for the application. The user input signal may be a variety of user input signals such as a user's gesture or input on an input device (e.g., keyboard, mouse, trackpad, touchscreen), an audible input or a visual gesture by the user, or other user input signal or control signal.

According to an example implementation of the apparatus, the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal may include instructions that cause the apparatus to: receive, by the application delivery system from the client device via the video conferencing session, a user input signal from a user of the client device, the user input signal provided as at least one of: a first signal indicating a visual gesture by the user that is streamed by the second video conferencing endpoint to the first video conferencing endpoint via a video channel of the video conferencing session; and a second signal indicating an audible input by the user that is streamed by the second video conferencing endpoint to the first video conferencing endpoint via an audio channel of the video conferencing session.

For example, a user of a client/mobile device may generate audible inputs (e.g., voice/spoken audible commands by a user, such as "stop", "turn left", etc. to provide feedback or control to the application), which may received/captured by microphone **534**, transmitted via an audio (or control) channel of the WebRTC session to the application delivery system **610**, and then converted by control processing **620** to control (or text) commands via speech-to-text functions, or other command conversion functions. In another example, a user of a client/mobile device may generate a visual gesture (e.g., a user moving a hand or arm to indicate a specific command with respect to the application), which may be captured by a webcam **532**, transmitted via a video channel (or a control channel) of the WebRTC session to the application delivery system **610**, and then converted to control (or text) commands by command conversion functions (e.g., image processing logic to detect specific visual gestures by a user on a received video) within control processing **620**. These converted audible inputs or visual gestures from a user of the client/mobile device (user input signals) may then be provided to the application running in the application environment.

**Appx241**

US 9,549,152 B1

41

The apparatus of claim **1**, wherein the video conferencing session comprises at least a first video channel and a first audio channel for streaming of video data and audio data, respectively, from the first video conferencing endpoint (e.g., **518**) to the second video conferencing endpoint (e.g., **528**), and a second video channel and a second audio channel for streaming of video data and audio data, respectively, from the second video conferencing endpoint to the first video conferencing endpoint. In an example implementation, the apparatus may further include computer instructions that cause the apparatus to: receive, by the application delivery system from the client device via at least one of the second video channel and the second audio channel of the video conferencing session, a user input signal. A variety of user input signals may be transmitted and/or received over an audio channel and/or a video channel of the video conferencing sessions, such as an audible input from a user of the client device, a visual gesture by the user, or other user input signal from the user.

According to another example implementation, the apparatus may further include computer instructions that cause the apparatus to: provide the user input signal to the application; and receive, by the video capture module provided on the application delivery system, changed or updated display data output by the application in response to the user input signal. According to an example implementation, the user input signals may be provided or input to the application at the application delivery system **610**, where such user input signals may cause the application to change or adjust the display data and audio data output by the application, which may result in a change or update to the display data and/or audio data output by the application, which in turn, may result in an update or change to the video frames output by the virtual webcam **616** and/or the audio data output by the virtual microphone **614** for streaming back to the client/mobile device via the video conference (e.g., WebRTC) session.

According to another example implementation, the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal may include instructions that cause the apparatus to: receive, by the first video conferencing endpoint from the second video conferencing endpoint via the video conferencing session, a user input signal indicating an audible input or a visual gesture by a user of the client device; and convert the user input signal indicating the audible input or the visual gesture to a control signal for the application; provide the control signal to the application; and receive, by the video capture module provided on the application delivery system, changed or updated display data output by the application in response to the control signal. For example, a user of a client/mobile device may generate audible inputs that may received/captured by microphone **534**, transmitted via an audio (or control) channel of the WebRTC session to the application delivery system **610**, and then converted by control processing **620** to control (or text) commands via speech-to-text functions, or other command conversion functions. In another example, a user of a client/mobile device may generate a visual gesture that may be captured by a webcam **532**, transmitted via a video channel (or a control channel) of the WebRTC session to the application delivery system **610**, and then converted to control (or text) commands by command conversion functions within control processing **620**. These converted audible inputs or visual gestures from a user of the client/ mobile device (user input signals) may then be provided to the application running in the application environment (e.g.,

42

see FIG. **6**). These user input signals may cause the application to change or adjust the display data and audio data output by the application, which may result in a change or update to the display data and/or audio data output by the application, which in turn, may result in an update or change to the video frames output by the virtual webcam **616** and/or the audio data output by the virtual microphone **614** for streaming back to the client/mobile device via the video conference (e.g., WebRTC) session.

According to an example implementation, the computer instructions that cause the apparatus to stream may include computer instructions that cause the apparatus to stream the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session without downloading the application to the client device.

According to an example implementation, the computer instructions that cause the apparatus to establish may include computer instructions that cause the apparatus to: perform the following in response to a request from a client device to use without purchasing or downloading the application: invoke the application; and establish, by an application delivery system, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device.

According to an example implementation, the application is not present on the client device, and wherein the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal may include instructions that cause the apparatus to: receive, by the first video conferencing endpoint from the second video conferencing endpoint via a video channel of the video conferencing session, a user input signal; and changing, by the application, the display data output by the application based on the user input signal. In an example implementation, the user input signal may include a visual gesture from a user of the client device, e.g., which may be received by a client device webcam **532**, wherein the visual gesture may be recorded or indicated on one or more video frames transmitted or streamed by video conferencing endpoint **528** over the video channel of the video conferencing session to the video conferencing endpoint **518** of application delivery system **610**, where the application may change or update its audio data or display data output by the application based on the visual gesture. In some example implementations, the visual gesture may be converted by application delivery system **610** to a control signal that is provided or input to the application, e.g., to control the application, such as to cause the application to change or update its audio data or display data output by the application based on or in response to the control signal.

According to another example implementation, the application is not present on the client device, and wherein the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal may include instructions that cause the apparatus to: receive, by the first video conferencing endpoint from the second video conferencing endpoint via an audio channel of the video conferencing session, a user input signal; and changing, by the application, at least one of the display data or audio data output by the application based on the user input signal. In an example implementation, the user input signal may include an audible input from a user of the client device, e.g., which may be received by a client device microphone **534**, wherein the audible input may be recorded

US 9,549,152 B1

43 44

or indicated on audio data transmitted or streamed by video conferencing endpoint **528** over the audio channel of the video conferencing session to the video conferencing endpoint **518** of application delivery system **610**, where the application may change or update its audio data or display data output by the application based on the audible input. In some example implementations, the audible input may be converted by application delivery system **610** to a control signal that is provided or input to the application, e.g., to control the application, such as to cause the application to change or update its audio data or display data output by the application based on or in response to the control signal.

According to an example implementation, the application may be configured to run on an application environment different than an application environment provided by the client device. For example, the application (e.g., running on the application delivery system **610**) may be configured to run on a non-mobile application environment, while the client may be a mobile device. As another example, the application may be configured to run on a first mobile operating system environment (e.g., iOS), while the mobile device that receives the audio/video content from the application via the video conferencing session may be a mobile device that runs a second mobile operating system (e.g., Android). The use of a video conferencing technology may allow content from an application configured to run in a first application environment to be streamed to a client device for display or output on the client device that is configured to operate applications in second application environment that is incompatible with the first application environment.

Similarly, the use of this video conferencing technology to stream application content may allow a user of a client device to send a request to use (e.g., view, receive or interact with) the application without purchasing or downloading the application, e.g., try-before-purchase, of the application. For example, a user of a mobile/client device may select a URL for an application (e.g., a video game, a weather application or other application), and the user may select an option to temporarily use without purchasing or downloading the application, e.g., try-before-buy, of the application (e.g., without the application being present on the client device). The application delivery system **610** may then invoke the application, establish the video conferencing session, select the virtual webcam **616** and virtual microphone **614** as inputs to the video conferencing endpoint **518** so as to stream the audio/display (video) content of the application to the mobile device. In this manner, the user may be able to receive the content of the application without having the visit the App store, and download/purchase the application, according to an illustrative example implementation.

FIG. **10** is a flow chart illustrating a process for delivery of application content over a video conferencing session to a client device according to an example implementation. Operation **1010** includes establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device. Operation **1020** includes selecting a video capture module as a video input device for the first video conferencing endpoint. Operation **1030** includes receiving, by the video capture module provided on the application delivery system, display data output by the application. Operation **1040** includes converting, by the video capture module, the display data to a plurality of video frames. Operation **1050** includes streaming the plurality of video frames received via the video capture module

from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session. And, operation **1060** includes receiving, by the application delivery system from the client device, a user input signal for the application.

According to an example implementation, the method may further include selecting an audio capture module as an audio input device for the first video conferencing endpoint; receiving, by the audio capture module provided on the application delivery system, audio data output by the application; and, streaming the audio data received via the audio capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session.

According to an example implementation, the receiving, by the audio capture module, may include: receiving, by the audio capture module, audio data output by the application in a first audio format associated with the application; converting, by the audio capture module, the audio data output by the application from the first audio format to a second audio format that is associated with at least the first video conferencing endpoint; and outputting the audio data in the second audio format to the first video conferencing endpoint.

According to an example implementation, the receiving, by the application delivery system from the client device, a user input signal for the application may include: establishing a control channel between the application delivery system and the client device; and receiving, by the application delivery system from the client device via the control channel, the user input signal for the application.

According to an example implementation, the receiving, by the application delivery system from the client device, a user input signal for the application may include: receiving, by the application delivery system from the client device via the video conferencing session, a user input signal from a user of the client device, the user input signal provided as at least one of: a first signal indicating a visual gesture by the user that is streamed by the second video conferencing endpoint to the first video conferencing endpoint via a video channel of the video conferencing session; and a second signal indicating an audible input by the user that is streamed by the second video conferencing endpoint to the first video conferencing endpoint via an audio channel of the video conferencing session.

According to an example implementation, the receiving, by the application delivery system from the client device, a user input signal for the application may include: receiving, by the application delivery system from the client device via at least one of a video channel and an audio channel of the video conferencing session, a user input signal.

According to an example implementation, the method may further include providing the user input signal to the application; and receiving, by the video capture module provided on the application delivery system, changed or updated display data output by the application in response to the user input signal.

According to an example implementation, the receiving, by the application delivery system from the client device, a user input signal for the application may include: receiving, by the first video conferencing endpoint from the second video conferencing endpoint via the video conferencing session, a user input signal indicating an audible input or a visual gesture by a user of the client device; converting the user input signal indicating the audible input or the visual gesture to a control signal for the application; providing the control signal to the application; and receiving, by the video

US 9,549,152 B1

45

capture module provided on the application delivery system, changed or updated display data output by the application in response to the control signal.

According to an example implementation, the streaming may include: streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session without downloading the application to the client device.

According to an example implementation, the establishing may include performing the following in response to a request from a client device to use without purchasing or downloading the application: invoking the application; and establishing, by an application delivery system, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device.

According to an example implementation, the application may be configured to run on an application environment different than an application environment provided by the client device.

According to an example implementation, a computer program product may include a non-transitory computer-readable storage medium and storing executable code that, when executed by at least one data processing apparatus, is configured to cause the at least one data processing apparatus to perform a method including: establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on a client device; selecting a video capture module as a video input device for the first video conferencing endpoint; receiving, by the video capture module provided on the application delivery system, display data output by the application; converting, by the video capture module, the display data to a plurality of video frames; streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and receiving, by the application delivery system from the client device, a user input signal for the application.

According to an example implementation of the computer program product, the receiving, by the application delivery system from the client device, a user input signal for the application may include: establishing a control channel between the application delivery system and the client device; and receiving, by the application delivery system from the client device via the control channel, the user input signal for the application.

According to an example implementation of the computer program product, the receiving, by the application delivery system from the client device, a user input signal for the application may include: receiving, by the application delivery system from the client device via at least one of a video channel and an audio channel of the video conferencing session, a user input signal.

FIG. 11 shows an example of a generic computer device 1100 and a generic mobile computer device 1150, which may be used with the techniques described here. Computing device 1100 is intended to represent various forms of digital computers, such as laptops, desktops, workstations, personal digital assistants, servers, blade servers, mainframes, and other appropriate computers. Computing device 1150 is intended to represent various forms of mobile devices, such

46

as personal digital assistants, cellular telephones, smart phones, and other similar computing devices. The components shown here, their connections and relationships, and their functions, are meant to be exemplary only, and are not meant to limit implementations of the inventions described and/or claimed in this document.

Computing device 1100 includes a processor 1102, memory 1104, a storage device 1106, a high-speed interface 1108 connecting to memory 1104 and high-speed expansion ports 1110, and a low speed interface 1112 connecting to low speed bus 1114 and storage device 1106. Each of the components 1102, 1104, 1106, 1108, 1110, and 1112, are interconnected using various busses, and may be mounted on a common motherboard or in other manners as appropriate. The processor 1102 can process instructions for execution within the computing device 1100, including instructions stored in the memory 1104 or on the storage device 1106 to display graphical information for a GUI on an external input/output device, such as display 1116 coupled to high speed interface 1108. In other implementations, multiple processors and/or multiple buses may be used, as appropriate, along with multiple memories and types of memory. Also, multiple computing devices 1100 may be connected, with each device providing portions of the necessary operations (e.g., as a server bank, a group of blade servers, or a multi-processor system).

The memory 1104 stores information within the computing device 1100. In one implementation, the memory 1104 is a volatile memory unit or units. In another implementation, the memory 1104 is a non-volatile memory unit or units. The memory 1104 may also be another form of computer-readable medium, such as a magnetic or optical disk.

The storage device 1106 is capable of providing mass storage for the computing device 1100. In one implementation, the storage device 1106 may be or contain a computer-readable medium, such as a floppy disk device, a hard disk device, an optical disk device, or a tape device, a flash memory or other similar solid state memory device, or an array of devices, including devices in a storage area network or other configurations. A computer program product can be tangibly embodied in an information carrier. The computer program product may also contain instructions that, when executed, perform one or more methods, such as those described above. The information carrier is a computer- or machine-readable medium, such as the memory 1104, the storage device 1106, or memory on processor 1102.

The high speed controller 1108 manages bandwidth-intensive operations for the computing device 1100, while the low speed controller 1112 manages lower bandwidth-intensive operations. Such allocation of functions is exemplary only. In one implementation, the high-speed controller 1108 is coupled to memory 1104, display 1116 (e.g., through a graphics processor or accelerator), and to high-speed expansion ports 1110, which may accept various expansion cards (not shown). In the implementation, low-speed controller 1112 is coupled to storage device 1106 and low-speed expansion port 1114. The low-speed expansion port, which may include various communication ports (e.g., USB, Bluetooth, Ethernet, wireless Ethernet) may be coupled to one or more input/output devices, such as a keyboard, a pointing device, a scanner, or a networking device such as a switch or router, e.g., through a network adapter.

The computing device 1100 may be implemented in a number of different forms, as shown in the figure. For example, it may be implemented as a standard server 1120, or multiple times in a group of such servers. It may also be

US 9,549,152 B1

47

implemented as part of a rack server system 1124. In addition, it may be implemented in a personal computer such as a laptop computer 1122. Alternatively, components from computing device 1100 may be combined with other components in a mobile device (not shown), such as device 1150. Each of such devices may contain one or more of computing device 1100, 1150, and an entire system may be made up of multiple computing devices 1100, 1150 communicating with each other.

Computing device 1150 includes a processor 1152, memory 1164, an input/output device such as a display 1154, a communication interface 1166, and a transceiver 1168, among other components. The device 1150 may also be provided with a storage device, such as a microdrive or other device, to provide additional storage. Each of the components 1150, 1152, 1164, 1154, 1166, and 1168, are interconnected using various buses, and several of the components may be mounted on a common motherboard or in other manners as appropriate.

The processor 1152 can execute instructions within the computing device 1150, including instructions stored in the memory 1164. The processor may be implemented as a chipset of chips that include separate and multiple analog and digital processors. The processor may provide, for example, for coordination of the other components of the device 1150, such as control of user interfaces, applications run by device 1150, and wireless communication by device 1150.

Processor 1152 may communicate with a user through control interface 1158 and display interface 1156 coupled to a display 1154. The display 1154 may be, for example, a TFT LCD (Thin-Film-Transistor Liquid Crystal Display) or an OLED (Organic Light Emitting Diode) display, or other appropriate display technology. The display interface 1156 may comprise appropriate circuitry for driving the display 1154 to present graphical and other information to a user. The control interface 1158 may receive commands from a user and convert them for submission to the processor 1152. In addition, an external interface 1162 may be provided in communication with processor 1152, so as to enable near area communication of device 1150 with other devices. External interface 1162 may provide, for example, for wired communication in some implementations, or for wireless communication in other implementations, and multiple interfaces may also be used.

The memory 1164 stores information within the computing device 1150. The memory 1164 can be implemented as one or more of a computer-readable medium or media, a volatile memory unit or units, or a non-volatile memory unit or units. Expansion memory 1174 may also be provided and connected to device 1150 through expansion interface 1172, which may include, for example, a SIMM (Single In Line Memory Module) card interface. Such expansion memory 1174 may provide extra storage space for device 1150, or may also store applications or other information for device 1150. Specifically, expansion memory 1174 may include instructions to carry out or supplement the processes described above, and may include secure information also. Thus, for example, expansion memory 1174 may be provide as a security module for device 1150, and may be programmed with instructions that permit secure use of device 1150. In addition, secure applications may be provided via the SIMM cards, along with additional information, such as placing identifying information on the SIMM card in a non-hackable manner.

The memory may include, for example, flash memory and/or NVRAM memory, as discussed below. In one imple-

48

mentation, a computer program product is tangibly embodied in an information carrier. The computer program product contains instructions that, when executed, perform one or more methods, such as those described above. The information carrier is a computer- or machine-readable medium, such as the memory 1164, expansion memory 1174, or memory on processor 1152, that may be received, for example, over transceiver 1168 or external interface 1162.

Device 1150 may communicate wirelessly through communication interface 966, which may include digital signal processing circuitry where necessary. Communication interface 1166 may provide for communications under various modes or protocols, such as GSM voice calls, SMS, EMS, or MMS messaging, CDMA, TDMA, PDC, WCDMA, CDMA2000, or GPRS, among others. Such communication may occur, for example, through radio-frequency transceiver 1168. In addition, short-range communication may occur, such as using a Bluetooth, Wi-Fi, or other such transceiver (not shown). In addition, GPS (Global Positioning System) receiver module 1170 may provide additional navigation- and location-related wireless data to device 1150, which may be used as appropriate by applications running on device 1150.

Device 1150 may also communicate audibly using audio codec 1160, which may receive spoken information from a user and convert it to usable digital information. Audio codec 1160 may likewise generate audible sound for a user, such as through a speaker, e.g., in a handset of device 1150. Such sound may include sound from voice telephone calls, may include recorded sound (e.g., voice messages, music files, etc.) and may also include sound generated by applications operating on device 1150.

The computing device 1150 may be implemented in a number of different forms, as shown in the figure. For example, it may be implemented as a cellular telephone 1180. It may also be implemented as part of a smart phone 1182, personal digital assistant, or other similar mobile device.

Various implementations of the systems and techniques described here can be realized in digital electronic circuitry, integrated circuitry, specially designed ASICs (application specific integrated circuits), computer hardware, firmware, software, and/or combinations thereof. These various implementations can include implementation in one or more computer programs that are executable and/or interpretable on a programmable system including at least one programmable processor, which may be special or general purpose, coupled to receive data and instructions from, and to transmit data and instructions to, a storage system, at least one input device, and at least one output device.

These computer programs (also known as programs, software, software applications or code) include machine instructions for a programmable processor, and can be implemented in a high-level procedural and/or object-oriented programming language, and/or in assembly/machine language. As used herein, the terms "machine-readable medium" "computer-readable medium" refers to any computer program product, apparatus and/or device (e.g., magnetic discs, optical disks, memory, Programmable Logic Devices (PLDs)) used to provide machine instructions and/or data to a programmable processor, including a machine-readable medium that receives machine instructions as a machine-readable signal. The term "machine-readable signal" refers to any signal used to provide machine instructions and/or data to a programmable processor.

To provide for interaction with a user, the systems and techniques described here can be implemented on a com-

Appx245

US 9,549,152 B1

49
50

puter having a display device (e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor) for displaying information to the user and a keyboard and a pointing device (e.g., a mouse or a trackball) by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback (e.g., visual feedback, auditory feedback, or tactile feedback); and input from the user can be received in any form, including acoustic, speech, or tactile input.

The systems and techniques described here can be implemented in a computing system that includes a back end component (e.g., as a data server), or that includes a middleware component (e.g., an application server), or that includes a front end component (e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the systems and techniques described here), or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication (e.g., a communication network). Examples of communication networks include a local area network ("LAN"), a wide area network ("WAN"), and the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

A number of embodiments have been described. Nevertheless, it will be understood that various modifications may be made without departing from the spirit and scope of the invention.

In addition, the logic flows depicted in the figures do not require the particular order shown, or sequential order, to achieve desirable results. In addition, other steps may be provided, or steps may be eliminated, from the described flows, and other components may be added to, or removed from, the described systems. Accordingly, other embodiments are within the scope of the following claims.

What is claimed is:

1. An apparatus comprising at least one processor and at least one memory including computer instructions, when executed by the at least one processor, cause the apparatus to:

establish, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device;

select, by the application delivery system, a video capture module as a video input device for the first video conferencing endpoint;

receive, by the video capture module provided on the application delivery system, display data output by the application;

convert, by the video capture module, the display data to a plurality of video frames;

stream the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and

receive, by the application delivery system from the client device, a user input signal for the application.

2. The apparatus of claim 1, wherein the video capture module comprises a virtual webcam that is configured to interface between the application and the first video conferencing endpoint and to output a plurality of video display frames in a format that is compatible with the first video conferencing endpoint.

3. The apparatus of claim 1, wherein the computer instructions that cause the apparatus to receive the display data comprises computer instructions that cause the apparatus to:

receive, by the video capture module, one or more display frames output by the application; and

buffer, by the video capture module, each of the one or more display frames.

4. The apparatus of claim 1, wherein the computer instructions that cause the apparatus to convert the display data comprises computer instructions that further cause the apparatus to:

convert, by the video capture module, the display data from a first frame format to a plurality of video frames having a second frame format.

5. The apparatus of claim 1 and further comprising instructions that cause the apparatus to:

select an audio capture module as an audio input device for the first video conferencing endpoint;

receive, by the audio capture module provided on the application delivery system, audio data output by the application; and

stream the audio data received via the audio capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session.

6. The apparatus of claim 5, wherein the audio capture module comprises a virtual microphone that is configured to interface between the application and the first video conferencing endpoint and to output audio data in a format that is compatible with at least the first video conferencing endpoint.

7. The apparatus of claim 5, wherein the computer instructions that cause the apparatus to receive, by the audio capture module, comprises computer instructions that cause the apparatus to:

receive, by the audio capture module, audio data output by the application in a first audio format associated with the application;

convert, by the audio capture module, the audio data output by the application from the first audio format to a second audio format that is associated with at least the first video conferencing endpoint; and

output the audio data in the second audio format to the first video conferencing endpoint.

8. The apparatus of claim 1 and further comprising computer instructions that cause the apparatus to:

establish a control channel between the application delivery system and the client device; and

receive, by the application delivery system from the client device via the control channel, the user input signal for the application.

9. The apparatus of claim 1, wherein the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, the user input signal comprise instructions that cause the apparatus to:

receive, by the application delivery system from the client device via the video conferencing session, a user input signal from a user of the client device, the user input signal provided as at least one of:

a first signal indicating a visual gesture by the user that is streamed by the second video conferencing endpoint to

**Appx246**

US 9,549,152 B1

## 51

the first video conferencing endpoint via a video channel of the video conferencing session; and

a second signal indicating an audible input by the user that is streamed by the second video conferencing endpoint to the first video conferencing endpoint via an audio channel of the video conferencing session.

10. The apparatus of claim 1, wherein the video conferencing session comprises at least a first video channel and a first audio channel for streaming of video data and audio data, respectively, from the first video conferencing endpoint to the second video conferencing endpoint, and a second video channel and a second audio channel for streaming of video data and audio data, respectively, from the second video conferencing endpoint to the first video conferencing endpoint, the apparatus further comprising computer instructions that cause the apparatus to:

receive the user input signal via at least one of the second video channel and the second audio channel of the video conferencing session.

11. The apparatus of claim 1 and further comprising computer instructions that cause the apparatus to:

provide the user input signal to the application; and

receive, by the video capture module provided on the application delivery system, changed or updated display data output by the application in response to the user input signal.

12. The apparatus of claim 1, wherein the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal comprise instructions that cause the apparatus to:

receive, by the first video conferencing endpoint from the second video conferencing endpoint via the video conferencing session, a user input signal indicating an audible input or a visual gesture by a user of the client device; and

convert the user input signal indicating the audible input or the visual gesture to a control signal for the application; and

provide the control signal to the application to control the application; and

receive, by the video capture module provided on the application delivery system, changed or updated display data output by the application in response to the control signal.

13. The apparatus of claim 1, wherein the application is not present on the client device, and wherein the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal comprise instructions that cause the apparatus to:

receive, by the first video conferencing endpoint from the second video conferencing endpoint via a video channel of the video conferencing session, a user input signal; and

changing, by the application, the display data output by the application based on the user input signal.

14. The apparatus of claim 13 wherein the user input signal comprises a visual gesture from a user of the client device.

15. The apparatus of claim 5, wherein the application is not present on the client device, and wherein the computer instructions that cause the apparatus to receive, by the application delivery system from the client device, a user input signal comprise instructions that cause the apparatus to:

## 52

receive, by the first video conferencing endpoint from the second video conferencing endpoint via an audio channel of the video conferencing session, a user input signal; and

changing, by the application, at least one of the display data or audio data output by the application based on the user input signal.

16. The apparatus of claim 15 wherein the user input signal comprises an audible input from a user of the client device.

17. The apparatus of claim 1 wherein the first video conferencing endpoint comprises a first Web Real-Time Communications (WebRTC) endpoint provided on the application delivery system, and the second video conferencing endpoint comprises a second WebRTC endpoint provided on the client device.

18. The apparatus of claim 1 wherein the computer instructions that cause the apparatus to stream comprises computer instructions that cause the apparatus to:

stream the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session without downloading the application to the client device, and without the application being present on the client device.

19. The apparatus of claim 1 wherein the computer instructions that cause the apparatus to establish the video conferencing session comprises computer instructions that cause the apparatus to:

perform the following in response to a request from a client device to use without purchasing or downloading the application:

invoke the application; and

establish, by an application delivery system, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device.

20. The apparatus of claim 1 wherein the application is configured to run on an application environment different than an application environment provided by the client device.

21. A computer-implemented method for executing instructions stored on a non-transitory computer-readable storage medium, the method comprising:

establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device;

selecting, by the application delivery system, a video capture module as a video input device for the first video conferencing endpoint;

receiving, by the video capture module provided on the application delivery system, display data output by the application;

converting, by the video capture module, the display data to a plurality of video frames;

streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and

receiving, by the application delivery system from the client device, a user input signal for the application.

53

22. The method of claim 21 and further comprising:

selecting an audio capture module as an audio input device for the first video conferencing endpoint;

receiving, by the audio capture module provided on the application delivery system, audio data output by the application; and

streaming the audio data received via the audio capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session.

23. A computer program product, the computer program product comprising a non-transitory computer-readable storage medium and storing executable code that, when executed by at least one data processing apparatus, is configured to cause the at least one data processing apparatus to perform a method comprising: establishing, by an application delivery system in response to an identification of an application from a client device, a video conferencing session between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device;

Selecting, by the application delivery system, a video capture module as a video input device for the first video conferencing endpoint;

receiving, by the video capture module provided on the application delivery system, display data output by the application;

54

converting, by the video capture module, the display data to a plurality of video frames;

streaming the plurality of video frames received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and

receiving, by the application delivery system from the client device, a user input signal for the application.

24. The computer program product of claim 23 wherein the receiving, by the application delivery system from the client device, a user input signal for the application comprises:

establishing a control channel between the application delivery system and the client device; and

receiving, by the application delivery system from the client device via the control channel, the user input signal for the application.

25. The computer program product of claim 23 wherein receiving, by the application delivery system from the client device, the user input signal for the application comprises:

receiving the user input signal via at least one of a video channel and an audio channel of the video conferencing session.

* * * * *

THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| U.S. PATENT NO. 7,679,637 LLC | CASE NO. 2:23-cv-00592-JHC |
|---|---|
| Plaintiff, | DECLARATION OF DAVID BERTEN PURSUANT TO FED. R. CIV. P. 56(d) |
| v. | |
| GOOGLE, LLC, | JURY DEMAND |
| Defendant. | |

**Appx249**

I, David Berten, submit this Declaration and declare as follows:

1. I am a Partner at the law firm of Global IP Law Group LLC, which is Counsel for Plaintiff in the above-captioned action.

2. I submit this Declaration based upon my personal knowledge of the facts set forth herein.

3. I provide this declaration pursuant to Federal Rule of Civil Procedure 56(d) "When Facts Are Unavailable to the Nonmovant," which provides: If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

4. Fact discovery has not yet begun in this case. The full factual record is not available to Plaintiff without fact discovery. Many of the alleged facts about § 101 subject-matter eligibility are likely in Google's possession and control and/or the possession and control of third parties. Although the full scope of the needed fact discovery about § 101 cannot now be known to Plaintiff, examples of that discovery are included below.

5. For example, fact discovery, including expert reports, documents, and/or depositions (and likely **M r** proceedings) will be needed to determine if the asserted claims are well-understood, routine, and conventional, as Google contends. Dkt. 26 at 20.

6. Plaintiff should also be allowed to develop the evidence the '637 patent claims an improvement in computer functionality over the state of the art existing at the time.

7. Fact discovery is also needed to determine the facts, if any, supporting or refuting at least the following Google arguments:

> "The patent specifically acknowledges that each of these components was already well-understood, routine, or conventional"

**Appx250** [1]

"Nothing in the claims, in view of the specification, requires anything other than off-the-shelf, conventional computer technology for recording, storing, and playing back content."

"Because the asserted claims only use admittedly well-understood and conventional computer hardware and software    "

"The claims use this conventional ordering of steps with admitted conventional technology, including the   first' and   second client applications,'   storage means,'   application server,' and   audio time-scale component.'"

"First, the asserted patent claims are directed to a long-established abstract idea, adding only conventional computing components in functional terms."

"The patent admits the solution is nothing more than playing back recorded content during and after the live meeting."

"But the idea of recording a live broadcast and replaying parts of it during the broadcast has been around since at least the 1960s (    , instant replay during live sports broadcasts)."

"the '637 patent acknowledges that all of these components merely perform generic functions of a computer and already existed before the claimed invention."

The claims recite "functions  that  are generic time-shifting and audio time-scale modification technologies present in conventional VCRs, DVRs, voicemail, and open source software."

"The very idea to which the '637 patent is directed    time-shifting a live presentation    and the purported problems it addressed were already understood over a decade before with pre-web technology."

8.      The facts above are disputed and resolution of these fact disputes related to § 101 patent-eligibility cannot be reached without allowing Plaintiff an opportunity to obtain fact discovery (and likely expert discovery) regarding the above factual contentions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 11, 2023

Respectfully submitted,

David Berten

THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

U.S. PATENT NO. 7,679,637 LLC

        Plaintiff,

  v.

GOOGLE LLC,

        Defendant.

Case No. 2:23-cv-00592-JHC

**GOOGLE'S REPLY IN SUPPORT OF ITS RULE 12(B)(6) MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**NOTE ON MOTION CALENDAR: September 15, 2023**

**ORAL ARGUMENT REQUESTED**

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**Appx267**

The claims of the '637 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101, and Plaintiff's allegations of direct (and by extension indirect) infringement fail to state a claim. Plaintiff's response invokes general arguments but provides none of the required specifics to support them. Regarding § 101, Plaintiff does little to defend what its patent actually claims—the controlling inquiry—beyond arguing the invention applies the idea of playing back recorded content to the field of web-conferencing. But the Federal Circuit and Supreme Court have repeatedly held limiting an abstract idea to a field of technology does not salvage a claim. Nor does Plaintiff dispute the claimed elements are conventional components. Regarding infringement, Plaintiff's FAC suffers from the same fundamental defect as its original, and Plaintiff fails to address much of the authority in Google's motion. The Court should dismiss Plaintiff's claims with prejudice.

## I. The '637 Patent Claims Patent-Ineligible Subject Matter.

### A. Rule 12(b) Is A Proper Mechanism For Resolving Patent Ineligibility

Rather than defend the '637 patent claims on the merits, Plaintiff devotes much of its brief to urging the Court not to resolve this question. But whether a patent is directed to eligible matter is a threshold legal question (*see Bilski v. Kappos*, 130 S.Ct. 3218, 3225 (2010)), and "[t]here is no question that a court may examine at the pleading stage whether a patent is directed to eligible subject matter…." *Shortridge v. Foundation Construction Payroll Service, LLC*, No. 14-cv-04850-JCS, 2015 WL 1739256, at *6 (N.D. Cal. Apr. 14, 2015); *see also Int'l Business Mach. Corp. v. Zillow Grp., Inc.*, 549 F. Supp. 3d 1247, 1256 (W.D. Wash. 2021). This threshold legal issue of patent eligibility has the "'hallmarks of a jurisdictional inquiry.'" *Shortridge*, 2015 WL 1739256, at *6 (N.D. Cal.)[1] (quoting Judge Mayer's concurrence in *Ultramercial, Inc. v. Hulu, Inc.*, 772 F.3d 709 (Fed. Cir. 2014) that "extolled the virtues of 'addressing section 101 at the outset of litigation,' noting both doctrinal…and practical benefits").

---

[1] Because of the similarity between the Local Patent Rules, the reasoning of courts in the Northern District of California has been found instructive on procedural issues. *E.g. Genuine Enabling Tech. LLC v. Nintendo Co. Ltd.*, No. C19-00351-RSM, 2019 WL 3779867, at *4 (W.D. Wash. Aug. 12, 2019).

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS – 1
(2:23-cv-00592-JHC)

**Appx272**

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Federal Circuit routinely affirms such dismissals. This issue is appropriate for resolution by the Court now.

> **B.** **Plaintiff Fails To Identify Any Facts Or Evidence In Support Of Patent Eligibility**

Plaintiff spends much time on broad generalizations and little time on what the '637 patent actually claims. For example, Plaintiff broadly asserts that the '637 patent is "very much technological in nature and that its claims have numerous specific limitations that Google's summary ignores." (Opp. at 1; *see also* Opp. at 12-13.) But Plaintiff identifies no limitation purportedly ignored by Google that transforms the abstract idea of playing back recorded content into an invention. Nor does Plaintiff offer any explanation of the purportedly inventive combination of claim elements (other than use of the idea in web conferencing, which is insufficient to establish patent eligibility).

In contrast, Google established that the claim elements, both individually and collectively, were well-understood, routine, and conventional at the time of the invention. The specification[5] admits that the claimed elements, such as "time-shifting" and "audio time-scale modification" technologies, were conventional (*see* Mot. at 3-6), and Plaintiff does not dispute that (Opp. at 10-11). The specification likewise admits that the computer components, like "client applications," "server application," and "storage means for recording" were conventional. (*See* Mot. at 6-7.) Plaintiff does not appear to dispute that the ***claim elements*** individually consist of conventional computer components. (Opp. at 11.) What Plaintiff does dispute is whether the ***claims*** were well-understood, routine, and conventional. (Opp. at 11.) But whether it is novel to implement the idea in the field of web conferencing is a separate question under the Patent Act, *see Bilski*, 130 S. Ct.

---

[5] Plaintiff cites *Berkheimer* for the proposition that disclosure in the prior art does not necessarily render a component well-understood, routine, or conventional. (Opp. at 10-11.) Nevertheless, the '213 patent's disclosures more than a decade earlier ae highly probative of the conclusion that the '637 patent's components are conventional (Mot. at 8); however, the Court need not even look beyond the specification to draw this conclusion.

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS – 4
(2:23-cv-00592-JHC)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

at 3225, and not the issue here.  Plaintiff has not identified *any* genuine dispute of fact as to whether the **claim elements** were well-understood, routine, and conventional.

This case is a far cry from the *Aatrix* and *Berkheimer* cases Plaintiff cites.  (Opp. at 10.) The patent-owner in *Aatrix* pointed to multiple "concrete allegations . . . that individual elements and the claimed combination are not well-understood, routine, or conventional activity" and regarding "the claimed combination's improvement to the functioning of the computer." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  Plaintiff points to no such concrete allegations here and cannot, as the FAC contains none.  *Berkheimer* does not compel a different result.  In fact, the court found certain claims patent ineligible and reinforced that "[p]atent eligibility has in many cases been resolved on motions to dismiss," making clear that "nothing in this decision should be viewed as casting doubt on the propriety of those cases." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

To the extent Plaintiff recites any other "facts," they do not establish a genuine dispute. Plaintiff asserts that the '637 patent was more than a "thought exercise" because the inventor "built a working prototype" and identified "software subroutines."  (Opp. at 3.)  Such facts are red herrings; to rely on them to find eligibility would be error.  Neither building a prototype nor identifying software in the patent's specification transforms the **claims** into an invention.  The specification "'must always yield to the claim language,' which defines the breadth of the monopoly asserted by the patentee." *Int'l Business Mach.*, 549 F. Supp. 3d at 1257 (quoting *ChargePoint v. SemaConnect*, 920 F.3d 759, 766 (Fed. Cir. 2019)).  Plaintiff cannot simply point to an "illustrat[ion] [of] an implementation" (Opp. at 3) that falls within the breadth of a claim to demonstrate that the whole of the claim is directed to eligible subject matter. *ChargePoint*, 920 F.3d at 769 ("The § 101 inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details from the specification if those details are not claimed." (quotation omitted)).  "Even a specification full of technical details about a physical

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS – 5
(2:23-cv-00592-JHC)

**Appx276**

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims." *Id.*  Whatever embodiments the specification may disclose, it is the claim language to which the Court must look.

Plaintiff asserts that playing back recorded content was previously known only in a "separate field" and that it solved "technological problems specifically arising in the realm of [] web conferencing systems."  (Opp. at 3-4.)  But this contention standing alone does not pass muster, even under the Federal Circuit precedent Plaintiff cites.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014) ("We caution, however, that not all claims purporting to address Internet-centric challenges are eligible for patent.").

Plaintiff contends that "web-based conferencing systems operate differently than DVRs" and that a TiVo could not itself be "used to record and playback web-based conferences."  (Opp. at 4.)  But the inability to simply cut and paste TiVo components into a web conferencing system does not render the idea of playing back recorded content eligible for patent.  *See Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1365-66 (Fed. Cir. 2021) (finding that "working around the existing constraints" of the technology to implement an abstract idea using "conventional components and functions generic to [that] technology" was patent-ineligible).

Nor does limiting the '637 patent to web conferencing systems that use "two different applications" and "more than one data stream" lessen the abstractness of the idea.  (Opp. at 4.)  "At best, that narrowing is an 'attempt[ ] to limit the use' of the abstract…idea 'to a particular technological environment,' which has long been held insufficient to save a claim in this context." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (collecting Supreme Court cases); *see also Affinity Labs v. DirecTV*, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016).  Importantly, even these limitations Plaintiff identifies merely claim the idea of using "two different applications" and "more than one data stream."  The claims are not directed to a specific improvement, change, or implementation of those concepts as required to be patent-eligible.

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS – 6
(2:23-cv-00592-JHC)

**Appx277**

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Plaintiff cannot survive the issue of patent-eligibility merely by disagreeing with the legal conclusion. On a motion to dismiss, "courts must take all the factual allegations in the complaint as true—but are not bound to accept as true a legal conclusion couched as a factual allegation." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (quotation omitted). Allegations that "restate the claim elements and append a conclusory statement" that the inventions "were not well-known, routine, or conventional in the field…provide no more than a series of legal conclusion[s] about the § 101 analysis." *Id.* (finding "the unsupported factual allegations constituted merely attorney arguments attempting to manufacture a factual question" (quotation omitted)). The intrinsic record demonstrates that the claims of the '637 patent are directed to the application of an abstract idea with generic components. Plaintiff needed to identify specific factual allegations that, when taken as true, establish a material dispute. It did not, and it cannot.

### C.    Claims 2-5 Are Representative Of Claims 7-9

As explained in Google's Motion, claims 2-5 are representative of claims 7-9. (Mot. at 21 n.5.) "[C]laims may be treated as 'representative' if a patentee makes no 'meaningful argument for the distinctive significance of any claim limitations not found in the representative claim….'" *Int'l Business Mach.*, 549 F. Supp. 3d at 1256 (quoting *Berkheimer*, 881 F.3d at 1365). Plaintiff states that it "disagrees," but it does not identify *any* difference, much less a meaningful one, between claims 2-5 and 7-9 that it claims would impact the § 101 analysis.

### D.    *Alice* Step 1: The Claims Of The '637 Patent Are "Results-Oriented" and Plaintiff Proposes No Claim Construction That Could Change That

Faced with clearly results-oriented claims, Plaintiff turns to red herrings. Plaintiff points to the permissibility of so-called means-plus-function claiming under 35 U.S.C. § 112(6) and identifies two terms that may or may not be "functional" terms under § 112(6): "time-scale

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS – 7
(2:23-cv-00592-JHC)

**Appx278**

**E.** *Alice* **Step 2: The Elements Of The Asserted Claims Of The '637 Patent Are Generic, Routine, and Conventional**

As explained in Google's Motion, the claim elements consist of routine functions carried out by generic and conventional components.[7] (Mot. at 20-24.) Plaintiff does not disagree that the component elements themselves are generic. And Plaintiff's argument that limiting the application of the idea to web-conferencing renders it non-abstract has been resoundingly rejected. *buySAFE*, 765 F.3d at 1355 (collecting Supreme Court cases); *Affinity Labs*, 838 F.3d at 1258-59. The only response left to Plaintiff, then, is to disagree with the conclusion to be drawn from the evidence and legal precedent. But mere disagreement cannot carry the day. *Dropbox*, 815 F. App'x at 538. Plaintiff needed to explain the innovation reflected in the ***claims***. This failure to identify any specific factual allegations evidencing the transformation of an abstract idea into an invention only underscores the ineligibility of the subject matter claimed in the '637 patent.

**II. Plaintiff Failed To Plead Any Infringement Claim Upon Which Relief Can Be Granted**

Plaintiff's FAC suffers from a fundamental problem: establishing infringement under the law generally requires a single party to infringe every element of a claim. Plaintiff's original Complaint premised its case on products that must be separately downloaded, configured, and used by third parties, many of which Google does not even make. In response to Google raising this issue,[8] Plaintiff filed a FAC but did not change its underlying theory, and the window-dressing allegations it added are insufficient to paper over that core deficiency.

**A. Plaintiff Pleaded Infringing "Use," Not Manufacture, Sale, Or Offer To Sell**

Recognizing its failure to adequately plead an infringing "use," Plaintiff's response leads with attempts to recast its infringement theory as manufacture, sale, or offer for sale. But the FAC

---

[7] The generic nature of the claim elements is further evidenced by the '213 patent attached as Exhibit 1 to Google's Motion, but the Court need not look beyond the four corners of the '637 patent to draw this conclusion.

[8] *See* Exhibit Ex. 3 (July 13, 2023 letter to D. Berten).

GOOGLE'S REPLY IN SUPPORT OF RULE 12(b)(6)
MOTION TO DISMISS – 10
(2:23-cv-00592-JHC)

**Appx281**

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| U.S. PATENT NO. 7,679,637 LLC | CASE NO. 2:23-cv-00592-JHC |
| Plaintiff, | NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT |
| v. | |
| GOOGLE, LLC, | |
| Defendant. | |

NOTICE OF APPEAL TO THE UNITED STATES COURT
OF APPEALS FOR THE FEDERAL CIRCUIT
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**Appx285**

Notice is hereby given that Plaintiff U.S. Patent No. 7,679,637 LLC in the above-captioned case, hereby appeal to the United States Court of Appeals for the Federal Circuit from the Judgment entered in this action on January 25, 2024 (D.I. 31) (the "Judgment"); the Order Granting Defendant's Motion to Dismiss on January 25, 2024 (D.I. 30) (the "Order"); the Court's rulings and Orders including the Court's oral orders and the orders on the docket; and any and all of the decisions and findings of this Court underlying and leading to any of the foregoing. This Notice of Appeal is filed within 30 days of the entry of the Judgment and is therefore timely under Federal Rule of Appellate Procedure 4(a).

Enclosed herewith is the $605 fee required by 28 U.S.C. §§ 1913, 1917.

February 22, 2024

Respectfully submitted,

SUMMIT LAW GROUP, PLLC

By *s/ J. Chad Mitchell*
    J. Chad Mitchell, WSBA #39689
    315 5th Ave. S., Ste. 1000
    Seattle, WA 98104-2682
    Telephone: (509) 735-5053
    *chadm@summitlaw.com*

GLOBAL IP LAW GROUP, LLC

By *s/ David Berten*
    David Berten
    (*pro hac vice pending*)
    55 W. Monroe St., Ste. 3400
    Chicago, IL 60603
    Telephone: (312) 241-1502
    *dberten@giplg.com*

*Attorneys for Plaintiff*

NOTICE OF APPEAL TO THE UNITED STATES COURT
OF APPEALS FOR THE FEDERAL CIRCUIT - 1
CASE NO. 2:23-cv-00592-JHC

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Appx286

# JONES DAY

555 CALIFORNIA STREET, 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE: +1.415.626.3939 • JONESDAY.COM

Direct Number: (415) 875-5816
RYOON@JONESDAY.COM

July 13, 2023

VIA EMAIL

David Berten
GLOBAL IP LAW GROUP LLC
55 W. Monroe St., Ste. 3400
Chicago, IL 60603
dberten@giplg.com

Re: *U.S. Patent No. 7,679,637 LLC v. Google LLC*, No. 2:23-cv-00592-JHC (W.D. Wa.)

Dear David:

I write regarding Plaintiff's claims for direct infringement of system claims in the Complaint. Because Plaintiff has affirmatively pleaded that third parties supply an essential component of the claimed system, we ask that you dismiss the Complaint.

In *Centillion* and its progeny, the Federal Circuit made clear that direct infringement of a system claim requires that one entity use each and every element of the claimed system. *See, e.g., Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011); *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1369 (Fed. Cir. 2021).

Here, all asserted claims are system claims that require a "first client application" for the presenter "to share computer screen video"/"computer screen video data". '637 patent, 12:33-34 (claim 2); 13:21-23 (claim 7). For this limitation, the Complaint points to an "encoder" and links to an explanation of encoders from YouTube's Help Center. *See* ECF 1, Ex. 2 at 1, 2, 14, 15, 17.

YouTube's Help Center expressly states that ***none of the encoders are made by YouTube*** and lists two dozen encoders offered by third parties:

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

David Berten
July 13, 2023
Page 2

        "[A] patentee may subject its claims to early dismissal by pleading facts that are inconsistent with the requirements of its claims." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1346 (Fed. Cir. 2021) (affirming Rule 12(b)(6) dismissal because "factual allegations contradicted infringement" in claim charts attached to complaint). That is what Plaintiff has done here.

        Accordingly, please advise by noon Pacific on Monday, July 17, whether Plaintiff agrees to dismiss the Complaint. Refusal to do so can be grounds for recovery of attorney's fees under 35 U.S.C. § 285. *See Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347 (Fed. Cir. 2019). If Plaintiff refuses to do so, please provide Plaintiff's grounds for maintaining the Complaint despite affirmatively alleging that third parties supply the encoders.

                                Sincerely,

                                Rita J. Yoon


cc:       Counsel of Record

**Exhibit 1 to Complaint: Select Evidence of Infringement**

| Claim | Analysis | Select Evidence | | |
|---|---|---|---|---|
| 2. A web conferencing system comprising: | Google has developed and supports web-based live streaming through its "YouTube" line of products.  When used in this manner, YouTube is a web conferencing system.<br><br>"Web conferencing systems can be used to hold meetings and give presentations where participants are in remote locations." '637, 2:37-38. | | | |
| [2](a) a first client application allowing at least one presenting participant to share computer screen video, | At least 3 different Google products allow a presenter to share computer screen video (the "Infringing Google Presenting Participant Applications"):  the YouTube Livestream Website (e.g., | Livestreaming created using the YouTube Website allows sharing computer screen video.  Infringement occurs several ways:<br><br>If YouTube Livestreaming webpage itself is treated as the "first | The YouTube App allows the presenter to share computer screen video | Google Meet allows the presenter to share computer screen video and livestream to YouTube |

Appx290

1

| Claim | Analysis | Select Evidence | |
|---|---|---|---|
| | studio.youtube.com ); the YouTube App running on a smartphone or tablet; and Google Meet. The Infringing Google Input Applications all allow a presenting participant to share computer screen video.[1] | client application," Google's YouTube Website directly infringes this element.  And/or: If a third-party encoder is treated as the "first client application," YouTube directly infringes this element because it directs and controls (and verifies) how the third-party encoders must operate and Google puts the YouTube system into place and benefits from its use. And/Or: If a third-party encoder is treated as the "first client application," and it is determined that YouTube does not direct and control (and verify) how the third-party encoders must operate, then Google is liable for | | |

Appx291

---

[1] Google YouTube system also supports livestreaming initiated from a variety of other devices and platforms including Sony Playstations, Zoom, Bluejeans, and others.  Such alternative systems may support additional variations of infringement by Google.

| Claim | Analysis | Select Evidence | | |
|---|---|---|---|---|
| | | inducing infringement because it is aware of the '637 Patent and how encoder/YouTube infringe the patent and has continued to induce users to use encoders while live streaming to YouTube. | | |
| [2](b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and whiteboarding session, | Each of the three Infringing Google Input Applications allows the presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and whiteboarding session. | Livestreaming created using the YouTube Website has live chat turned on by default

How to use YouTube Live chat
Live chat is turned on by default unless your channel's live stream's audience is set as made for kids. When your live stream ends, it will be archived and viewers can watch the live stream along with the live chat.
The live chat feature is only available on YouTube watch pages, not on embedded players.

https://support.google.com/youtube/answer/2524549 | The YouTube App allows the presenter to "allow chat" | Google Meet allows the presenter to share whiteboarding with a feature called "Jam Board"

Collaborate with a Jamboard in Google Meet
Start or open a Google Jamboard while in a meeting. A Jamboard ⧉ is a virtual dry erase board where you can brainstorm ideas live with others.
Important: You can only start or open a Jamboard during a Meet call if you joined the call on a computer. Meeting participants on a mobile device or tablet will get a link to a Jamboard file and be directed to the Jamboard app.
Start or open a Jamboard in a meeting
Use Jamboard in a meeting
1. Start or Join a meeting.
2. At the bottom right, click Activities ⧉ ▸ Whiteboarding.
3. Select an option:
   • To create a new Jamboard: Click Start a new whiteboard.
   • To open an existing Jamboard from your drive, shared drives, or computer: Click Choose from Drive.

https://support.google.com/meet/answer/10071448 |
| [2](c) storage means for recording said computer screen video and said data stream, and | Regardless of how the YouTube live stream was initiated (through the YouTube Website, | | | |

Appx292

3

| Claim | Analysis | Select Evidence |
|---|---|---|
|  | the YouTube App or Google Meet), Google provides storage means for recording the computer screen data and the data stream. | **Live chat basics**<br><br>Live chat is enabled by default and will appear to the right of the video player when your live stream is active. After your live stream ends, viewers will see a replay of live chat when they watch the stream archive. The Live chat module only exists on the YouTube watch pages — it does not follow embedded players. Watch the video demo ☒ .<br><br>**Note:** Live chat is not available if your channel or live stream's audience is set as made for kids.<br><br>Viewers can choose between two views of Live chat at any time.<br><br>• **Top chat:** This view filters messages such as potential spam to help make chat easier to read and more useful.<br>• **Live chat:** This view is not filtered. It shows all chat messages as they come in.<br><br>Source : https://support.google.com/youtube/answer/2524549<br><br>If your live stream is less than 12 hours, YouTube can automatically archive it for you. This option applies to all types of live streams - including: Stream now, Events, Webcam, and Mobile. YouTube will also automatically archive streams of 1440p and 2160p (4K) video resolution. But, we recommend also recording a local archive as a backup. You can create highlight clips while your stream is still live.<br><br>Source: https://support.google.com/youtube/answer/6247592 |

**Appx293**

4

| Claim | Analysis | Select Evidence |
|---|---|---|
| [2] (d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live, | Google supports many different variations of YouTube to allow an observing participant to watch live-streamed computer screen video and a data stream.  These include the YouTube webpage when viewed on a computer, phone or tablet.[2] | Source: Screenshot of YouTube watch page |
| [2] (e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of | YouTube watch pages allow observing participants to selectively sense a previously presented and recorded part of the | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now**: Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events**: Click **Advanced settings** and check the box for **Enable DVR**.<br><br>Source: https://support.google.com/youtube/answer/9296823?hl=en |

Appx294

---

[2] YouTube also supports being played back on TVs through at least 35 different devices https://support.google.com/youtube/answer/7582560?hl=en#zippy=%2Cgame-consoles%2Csmart-tvs%2Cstreaming-media-devices%2Ccable-and-satellite-providers.  Such alternative systems may support additional variations of infringement by Google of this and other claims.

5

| Claim | Analysis | Select Evidence |
|---|---|---|
| said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream, | computer screen video and data stream while the presenting participant is sharing a current part of the computer screen video and data stream (e.g., "during the event"). | |
| [2] (f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream | YouTube watch pages allow observing participants to selectively sense a previously presented and recorded part of the computer screen video and data stream after the presenting participant has finished sharing the computer screen video and data stream. | If your live stream is less than 12 hours, YouTube can automatically archive it for you. This option applies to all types of live streams - including: Stream now, Events, Webcam, and Mobile. YouTube will also automatically archive streams of 1440p and 2160p (4K) video resolution. But, we recommend also recording a local archive as a backup. You can create highlight clips while your stream is still live.<br><br>Source: https://support.google.com/youtube/answer/6247592 |
| whereby said web conferencing system is able to simultaneously record said computer | YouTube is able to simultaneously record a presenting participant's computer screen | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now:** Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events:** Click **Advanced settings** and check the box for **Enable DVR**. |

Appx295

6

| Claim | Analysis | Select Evidence | | |
|---|---|---|---|---|
| screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream. | video and data stream and allow observing participants to sense current and previously presented parts of the computer screen video and data stream. | Source: https://support.google.com/youtube/answer/9296823?hl=en<br><br>If your live stream is less than 12 hours, YouTube can automatically archive it for you. This option applies to all types of live streams - including: Stream now, Events, Webcam, and Mobile. YouTube will also automatically archive streams of 1440p and 2160p (4K) video resolution. But, we recommend also recording a local archive as a backup. You can create highlight clips while your stream is still live.<br><br>Source: https://support.google.com/youtube/answer/6247592 | | |
| 3. The system of claim 2 wherein:<br><br>(a) said first client application allows said presenting participant to share audio data<br><br>(b) said storage means records said audio data, and<br><br>(c) said second client application allows said observing participant to sense said audio data. | Each of the three Infringing Google Input Applications allows presenting participants to share audio data (e.g., microphone audio data), which can be recorded, and the participants to | Livestreams created at the YouTube Website allow sharing, recording, and sensing audio<br><br>Infringement occurs several ways:<br><br>If YouTube itself is treated as the "first client application," Google's YouTube Website directly infringes this element. And/or: If a third-party encoder is treated as the "first client application," YouTube directly infringes this element because it directs and controls (and verifies) how the | Livestreams initiated with the YouTube App allow sharing, recording, and sensing audio | Livestreams initiated in Google Meet allow sharing, recording, and sensing audio |

Appx296

7

| Claim | Analysis | Select Evidence | | |
|---|---|---|---|---|
| | | third-party encoders must operate and Google puts the YouTube system into place and benefits from it's use. And/Or: If a third-party encoder is treated as the "first client application," and it is determined that YouTube does not direct and control (and verify) how the third-party encoders must operate, then Google is liable for inducing infringement because it is aware of the '637 Patent and how encoder/YouTube infringe the patent and has continued to induce users to use encoders while live streaming to YouTube. | | |
| 4. The system of claim 3 wherein: (a) said web conferencing system | Google supports viewing YouTube livestreams "on TV through many | | | |

8

*Appx297*

| Claim | Analysis | Select Evidence |
|---|---|---|
| includes an audio timescale modification component, | devices available around the world," and Google is "constantly bringing YouTube to new devices."<br><br>In addition to watching YouTube on a computer, phone or tablet (all of which support variable playback speeds), an unknown (but non-zero) number of the more than 35 different devices supporting watching YouTube on TV support variable playback speeds. For example, the "settings" feature in YouTube for TV on LG TVs, Samsung TVs, and Apple TV all allow variation of playback speed. Thus, a live stream initiated by one of the Infringing Google Input | Variable speed playback was launched on the web several years ago and is one of our most highly requested features on mobile. Now, it's here! You can speed up or slow down videos in the YouTube app on iOS and on Android devices running Android 5.0+. Playback speed can be adjusted from 0.25x (quarter speed) to 2x (double speed) in the overflow menu of the player controls.<br><br>The most commonly used speed setting on the web is 1.25x, closely followed by 1.5x. Speed watching is the new speed listening which was the new speed reading, especially when consuming long lectures or interviews. But variable speed isn't just useful for skimming through content to save time, it can also be an important tool for investigating finer details. For example, you might want to slow down a tutorial to learn some new choreography or figure out a guitar strumming pattern.<br><br>To speed up or slow down audio while retaining its comprehensibility, our main challenge was to efficiently change the duration of the audio signal without affecting the pitch or introducing distortion. This process is called time stretching. Without time stretching, an audio signal that was originally at 100 Hz becomes 200 Hz at double speed causing that chipmunk effect. Similarly, slowing down the speed will lower the pitch. Time stretching can be achieved using a phase vocoder, which transforms the signal into its frequency domain representation to make phase adjustments before producing a lengthened or shortened version. Time stretching can also be done in the time domain by carefully selecting windows from the original signal to be assembled into the new one. On Android, we used the Sonic library for our audio manipulation in ExoPlayer. Sonic uses PICOLA, a time domain based algorithm. On iOS, AVplayer has a built in playback rate feature with configurable time stretching. Here, we have chosen to use the spectral (frequency domain) algorithm.<br><br>https://youtube-eng.googleblog.com/2017/09/variable-speed-playback-on-mobile.html<br><br>Source: https://support.google.com/youtube/answer/7582560?hl=en#zippy=%2Cgame-consoles%2Csmart-tvs%2Cstreaming-media-devices%2Ccable-and-satellite-providers |

Appx298

Appx299

| Claim | Analysis | Select Evidence |
|---|---|---|
| | Applications infringes claim 4 if it is accessed on any YouTube viewer that supports variable playback speeds. | |
| [4] (b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed, whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed. | YouTube watch pages allow viewing participants to observe the computer screen video, the data stream, and the audio data at an adjustable rate of speed. YouTube"s variable speed playback component utilizes "time stretching" to maintain substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed. | <br>Source: Screenshot of YouTube watch page |

10

| Claim | Analysis | Select Evidence |
|---|---|---|
| | | To speed up or slow down audio while retaining its comprehensibility, our main challenge was to efficiently change the duration of the audio signal without affecting the pitch or introducing distortion. This process is called time stretching. Without time stretching, an audio signal that was originally at 100 Hz becomes 200 Hz at double speed causing that chipmunk effect. Similarly, slowing down the speed will lower the pitch. Time stretching can be achieved using a phase vocoder, which transforms the signal into its frequency domain representation to make phase adjustments before producing a lengthened or shortened version. Time stretching can also be done in the time domain by carefully selecting windows from the original signal to be assembled into the new one. On Android, we used the Sonic library for our audio manipulation in ExoPlayer. Sonic uses PICOLA, a time domain based algorithm. On iOS, AVplayer has a built in playback rate feature with configurable time stretching. Here, we have chosen to use the spectral (frequency domain) algorithm. Source: https://youtube-eng.googleblog.com/2017/09/variable-speed-playback-on-mobile.html |
| 5. The system of claim 4 wherein said second client application also allows said observing participant to perform timeshifting operations comprising pausing, resuming and seeking. | YouTube watch pages allow observing participants to perform time-shifting operations comprising pausing, resuming, and seeking. | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now:** Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events:** Click **Advanced settings** and check the box for **Enable DVR**.<br><br>Source: https://support.google.com/youtube/answer/9296823?hl=en |

Appx300

11

| Claim | Analysis | Select Evidence |
|---|---|---|
| | | Source: Screenshot of YouTube watch page |
| 7. A web conferencing system comprising: | Google has developed and supports web-based live streaming through its "YouTube" line of products. When used in this manner, YouTube is a web | |

Appx301

12

| Claim | Analysis | Select Evidence | | |
|---|---|---|---|---|
| | conferencing system.<br><br>"Web conferencing systems can be used to hold meetings and give presentations where participants are in remote locations." '637, 2:37-38. | | | |
| [7](a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data | The Infringing Google Input Applications each allow a presenting participant to share audio data and computer screen video data | Livestreaming created using the YouTube Website allows sharing audio data and computer screen video data. Infringement occurs several ways:<br><br>If YouTube Livestreaming webpage itself is treated as the "first client application," Google's YouTube Website directly infringes this element. And/or: If a third-party encoder is treated as the "first client application," YouTube directly infringes this element because it | The YouTube App allows the presenter to share audio data and computer screen video data. | Google Meet allows the presenter to share audio data and computer screen video data and livestream to YouTube. |

Appx302

| Claim | Analysis | Select Evidence | |
|-------|----------|-----------------|---|
| | | directs and controls (and verifies) how the third-party encoders must operate and Google puts the YouTube system into place and benefits from its use. And/Or: If a third-party encoder is treated as the "first client application," and it is determined that YouTube does not direct and control (and verify) how the third-party encoders must operate, then Google is liable for inducing infringement because it is aware of the '637 Patent and how encoder/YouTube infringe the patent and has continued to induce users to use encoders while live streaming to YouTube. |  |

| Claim | Analysis | Select Evidence | | |
|-------|----------|-----------------|---|---|
|       |          |                 |   |   |

Appx304

| [7] (b) a second client application that allows at least one observing participant to sense said data streams | Google supports many different variations of YouTube to allow an observing participant to watch computer screen video and a data stream.  These include the YouTube webpage when viewed on a computer, phone or tablet, and YouTube Apps for TVs (a list of more than 35 devices). | **Where to watch: Supported devices, cable and satellite providers**<br><br>In addition to your computer, phone, or tablet, you can watch YouTube on TV through many devices available around the world.<br><br>We're constantly bringing YouTube to new devices. Let us know which device you want supported in the future.<br><br>**Note:** YouTube may not be available on some device models, even if the device manufacturer is listed below.<br><br>Game consoles<br><br>**Microsoft**<br>• Xbox Series S\|X<br>• Xbox One X<br>• Xbox One S<br>• Xbox One<br>• Xbox 360<br>**Nintendo**<br>• Switch<br>**SONY**<br>• PlayStation 5<br>• PlayStation 4 Pro<br>• PlayStation 4<br>• PlayStation 3<br><br>Smart TVs<br><br>• Amazon Fire TV Editions<br>• Android TVs<br>• Funai<br>• Google TVs<br>• Hisense<br>• LG<br>• Panasonic<br>• Philips<br>• Pioneer<br>• Samsung<br>• Sharp<br>• Skyworth<br>• Sony<br>• TCL<br>• Toshiba<br>• TPV<br>• Vestel<br>• VIZIO<br><br>Streaming media devices<br><br>• Amazon Fire TV<br>• Android TV streaming devices<br>• Apple TV (4th generation or higher)<br>• Chromecast<br>• Google TV streaming devices<br>• Roku<br>• TiVo | |

| Claim | Analysis | Select Evidence |
|---|---|---|
| | | <br>Source: Screenshot of YouTube watch page |
| (c) a server application operatively connected to said first client application and to said second client application, said server application arranged to: | YouTube includes a server application operatively connected to the first client application (e.g., YouTube Mobile application) and to said second client application (e.g., YouTube watch pages). | ## Introduction to live streaming<br><br>YouTube Live is an easy way to reach your audience in real time. Whether you're streaming a video game, hosting a live Q&A, or teaching a class, our tools will help you manage your stream and interact with viewers in real time.<br><br>There are a few ways you can live stream on YouTube. Here's a quick overview:<br><br>**Simple:** These options are great for beginners, or if you want to quickly go live.<br><br>- **Webcam:** Live streaming via webcam is an easy way to go live without the need for an encoder. Start streaming from your laptop/desktop computer using your webcam. Learn more<br>- **Mobile:** Streaming on mobile lets you stream from the YouTube app. Note: to be able to live stream on mobile, you need to have at least 1,000 subscribers. Learn more<br><br>Source: : https://support.google.com/youtube/answer/2474026?hl=en |

| Claim | Analysis | Select Evidence |
|---|---|---|
| i. receive said data streams from said first client application and record it in a storage device | The YouTube server application is arranged to receive the data streams from the YouTube mobile application and record them in a storage device. | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now:** Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events:** Click **Advanced settings** and check the box for **Enable DVR**.<br><br>Source: https://support.google.com/youtube/answer/9296823?hl=en<br><br>## Live chat basics<br><br>Live chat is enabled by default and will appear to the right of the video player when your live stream is active. After your live stream ends, viewers will see a replay of live chat when they watch the stream archive. The Live chat module only exists on the YouTube watch pages — it does not follow embedded players. Watch the video demo ⧉ .<br><br>**Note:** Live chat is not available if your channel or live stream's audience is set as made for kids.<br><br>Viewers can choose between two views of Live chat at any time.<br><br>• **Top chat:** This view filters messages such as potential spam to help make chat easier to read and more useful.<br>• **Live chat:** This view is not filtered. It shows all chat messages as they come in.<br><br>Source : https://support.google.com/youtube/answer/2524549<br><br>If your live stream is less than 12 hours, YouTube can automatically archive it for you. This option applies to all types of live streams - including: Stream now, Events, Webcam, and Mobile. YouTube will also automatically archive streams of 1440p and 2160p (4K) video resolution. But, we recommend also recording a local archive as a backup. You can create highlight clips while your stream is still live.<br><br>Source: https://support.google.com/youtube/answer/6247592 |

Appx307

18

| Claim | Analysis | Select Evidence |
|---|---|---|
| ii. retrieve said data streams from said storage device and send it to said second client application | YouTube server application is arranged to retrieve the data streams from the storage device and send it to the second client application (e.g., YouTube watch pages). | <br><br>Source: Screenshot of YouTube watch page |

Appx308

19

| Claim | Analysis | Select Evidence |
|---|---|---|
| [7] (d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates | YouTube includes a timescale modification component (e.g., time stretching component) operatively connected to the second client application (e.g., YouTube watch pages) that is able to maintain substantially consistent perceived audio quality at a plurality of playback rates. This includes playback on YouTube TV devices. | Variable speed playback was launched on the web several years ago and is one of our most highly requested features on mobile. Now, it's here! You can speed up or slow down videos in the YouTube app on iOS and on Android devices running Android 5.0+. Playback speed can be adjusted from 0.25x (quarter speed) to 2x (double speed) in the overflow menu of the player controls.<br><br>The most commonly used speed setting on the web is 1.25x, closely followed by 1.5x. Speed watching is the new speed listening which was the new speed reading, especially when consuming long lectures or interviews. But variable speed isn't just useful for skimming through content to save time, it can also be an important tool for investigating finer details. For example, you might want to slow down a tutorial to learn some new choreography or figure out a guitar strumming pattern.<br><br>To speed up or slow down audio while retaining its comprehensibility, our main challenge was to efficiently change the duration of the audio signal without affecting the pitch or introducing distortion. This process is called time stretching. Without time stretching, an audio signal that was originally at 100 Hz becomes 200 Hz at double speed causing that chipmunk effect. Similarly, slowing down the speed will lower the pitch. Time stretching can be achieved using a phase vocoder, which transforms the signal into its frequency domain representation to make phase adjustments before producing a lengthened or shortened version. Time stretching can also be done in the time domain by carefully selecting windows from the original signal to be assembled into the new one. On Android, we used the Sonic library for our audio manipulation in ExoPlayer. Sonic uses PICOLA, a time domain based algorithm. On iOS, AVplayer has a built in playback rate feature with configurable time stretching. Here, we have chosen to use the spectral (frequency domain) algorithm.<br><br>Source: https://youtube-eng.googleblog.com/2017/09/variable-speed-playback-on-mobile.html |

Appx309

20

| Claim | Analysis | Select Evidence |
|---|---|---|
| | |  Source: Screenshot of YouTube watch page |
| whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense | YouTube allows data streams to be simultaneously recorded by YouTube's servers and retrieved from the storage device. The YouTube watch pages allow observing participants to sense the data streams in real-time. | **Introduction to live streaming**<br><br>YouTube Live is an easy way to reach your audience in real time. Whether you're streaming a video game, hosti a live Q&A, or teaching a class, our tools will help you manage your stream and interact with viewers in real tim<br><br>Source: https://support.google.com/youtube/answer/2474026?hl=en |

Appx310

| Claim | Analysis | Select Evidence |
|---|---|---|
| said data streams in realtime, | | |
| and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and | The YouTube watch pages allow observing participants to selectively sense a previously presented and recorded part of the data streams at a plurality of playback rates at the same time the presenting participant is sharing a current part of the data streams (e.g., "pause, rewind, and continue during the event"). | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now**: Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events**: Click **Advanced settings** and check the box for **Enable DVR**.<br><br>Source: https://support.google.com/youtube/answer/9296823?hl=en |

Appx311

22

| Claim | Analysis | Select Evidence |
|---|---|---|
| | | Variable speed playback was launched on the web several years ago and is one of our most highly requested features on mobile. Now, it's here! You can speed up or slow down videos in the YouTube app on iOS and on Android devices running Android 5.0+. Playback speed can be adjusted from 0.25x (quarter speed) to 2x (double speed) in the overflow menu of the player controls.<br><br>The most commonly used speed setting on the web is 1.25x, closely followed by 1.5x. Speed watching is the new speed listening which was the new speed reading, especially when consuming long lectures or interviews. But variable speed isn't just useful for skimming through content to save time, it can also be an important tool for investigating finer details. For example, you might want to slow down a tutorial to learn some new choreography or figure out a guitar strumming pattern.<br><br>To speed up or slow down audio while retaining its comprehensibility, our main challenge was to efficiently change the duration of the audio signal without affecting the pitch or introducing distortion. This process is called time stretching. Without time stretching, an audio signal that was originally at 100 Hz becomes 200 Hz at double speed causing that chipmunk effect. Similarly, slowing down the speed will lower the pitch. Time stretching can be achieved using a phase vocoder, which transforms the signal into its frequency domain representation to make phase adjustments before producing a lengthened or shortened version. Time stretching can also be done in the time domain by carefully selecting windows from the original signal to be assembled into the new one. On Android, we used the Sonic library for our audio manipulation in ExoPlayer. Sonic uses PICOLA, a time domain based algorithm. On iOS, AVplayer has a built in playback rate feature with configurable time stretching. Here, we have chosen to use the spectral (frequency domain) algorithm.<br>Source: https://youtube-eng.googleblog.com/2017/09/variable-speed-playback-on-mobile.html |
| after said presenting participant has stopped sharing, and said observing participant will | YouTube automatically archives YouTube Live streams and allows observing | If your live stream is less than 12 hours, YouTube can automatically archive it for you. This option applies to all types of live streams - including: Stream now, Events, Webcam, and Mobile. YouTube will also automatically archive streams of 1440p and 2160p (4K) video resolution. But, we recommend also recording a local archive as a backup. You can create highlight clips while your stream is still live.<br>Source: https://support.google.com/youtube/answer/6247592 |

Appx312

| Claim | Analysis | Select Evidence | | |
|---|---|---|---|---|
| perceive substantially consistent audio quality. | participants to perceive substantially consistent audio quality | To speed up or slow down audio while retaining its comprehensibility, our main challenge was to efficiently change the duration of the audio signal without affecting the pitch or introducing distortion. This process is called time stretching. Without time stretching, an audio signal that was originally at 100 Hz becomes 200 Hz at double speed causing that chipmunk effect. Similarly, slowing down the speed will lower the pitch. Time stretching can be achieved using a phase vocoder, which transforms the signal into its frequency domain representation to make phase adjustments before producing a lengthened or shortened version. Time stretching can also be done in the time domain by carefully selecting windows from the original signal to be assembled into the new one. On Android, we used the Sonic library for our audio manipulation in ExoPlayer. Sonic uses PICOLA, a time domain based algorithm. On iOS, AVplayer has a built in playback rate feature with configurable time stretching. Here, we have chosen to use the spectral (frequency domain) algorithm.<br><br>Source: https://youtube-eng.googleblog.com/2017/09/variable-speed-playback-on-mobile.html | | |
| 8. The system of claim 7 wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and whiteboarding session. | Each of the three Infringing Google Input Applications allows the presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and whiteboarding session. | Livestreaming created using the YouTube Website has live chat turned on by default<br><br>How to use YouTube Live chat<br>Live chat is turned on by default unless your channel's live stream's audience is set as made for kids. When your live stream ends, it will be archived and viewers can watch the live stream along with the live chat.<br>The live chat feature is only available on YouTube watch pages, not on embedded players.<br><br>https://support.google.com/youtube/answer/2524549 | The YouTube App allows the presenter to "allow chat" | Google Meet allows the presenter to share whiteboarding with a feature called "Jam Board"<br><br>Collaborate with a Jamboard in Google Meet<br>Start or open a Google Jamboard while in a meeting. A Jamboard is a virtual dry erase board where you can brainstorm ideas live with others.<br>Important: You can only start or open a Jamboard during a Meet call if you joined the call on a computer. Meeting participants on a mobile device or tablet will get a link to a Jamboard file and be directed to the Jamboard app.<br>Start or open a Jamboard in a meeting<br>Use Jamboard in a meeting<br>1. Start or Join a meeting.<br>2. At the bottom right, click Activities ⚏ ▸ Whiteboarding.<br>3. Select an option:<br>  • To create a new Jamboard: Click Start a new whiteboard.<br>  • To open an existing Jamboard from your drive, shared drives, or computer: Click Choose from Drive.<br><br>https://support.google.com/meet/answer/10071448 |

Appx313

| Claim | Analysis | Select Evidence | |
|---|---|---|---|
| | | | |
| 9. The system of claim 8 wherein said second client application allows said observing participant to perform timeshifting operations comprising pausing, resuming and seeking said data streams. | YouTube watch pages allow observing participants to perform time-shifting operations comprising pausing, resuming, and seeking the data streams. | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now**: Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events**: Click **Advanced settings** and check the box for **Enable DVR**.<br>Source: https://support.google.com/youtube/answer/9296823?hl=en | |

Appx314

| Claim | Analysis | Select Evidence |
|-------|----------|-----------------|
|  |  | <br>Source: Screenshot of YouTube watch page |

Appx315

26

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number**  2024-1520

**Short Case Caption**  US Patent No. 7,679,637 LLC v. Google LLC

---

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

---

I certify that I served a copy of the foregoing filing on 09/27/2024

by  ☐  U.S. Mail  ☐  Hand Delivery  ☑ Email  ☐ Facsimile
    ☐  Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| I. SASHA MAYERGOYZ | smayergoyz@jonesday.com |
| MICHAEL C. HENDERSHOT | mhendershot@jonesday.com |
| JENNIFER L. SWIZE | jswize@jonesday.com |
| JOHN R. BOULÉ III | jboule@jonesday.com |
| DANIELE SAN ROMÁN | dsanroman@jonesday.com |

☑   Additional pages attached.

Date: 09/27/2024

Signature:  /s/David Berten

Name:  David Berten

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| RITA J. YOON | ryoon@jonesday.com |
| T. KAITLIN CROWDER | kcrowder@jonesday.com |