**No. 2024-1520**

# UNITED STATES COURT OF APPEALS FOR THE

# FEDERAL CIRCUIT

US PATENT NO. 7,679,637 LLC

*Plaintiff/Appellant,*

*v.*

GOOGLE LLC

*Defendant/Appellee.*

On Appeal from the United States District Court for the Western District of Washington, No. 2:23-cv-00592-JHC, Judge John H. Chun

**CORRECTED PRINCIPAL BRIEF OF APPELLANT US PATENT NO. 7,679,637 LLC**

DAVID P. BERTEN
ALISON A. RICHARDS
GLOBAL IP LAW GROUP, LLC
55 W. Monroe Street, Suite 3400
Chicago, IL 60603
(312) 241-1500

*Attorneys for Appellant*
*US Patent No. 7,679,637 LLC*

October 4, 2024

**LANGUAGE OF PATENT CLAIMS AT ISSUE U.S. PATENT NO. 7,679,637**

2. A web conferencing system comprising:

(a) a first client application allowing at least one presenting participant to share computer screen video,

(b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session,

(c) storage means for recording said computer screen video and said data stream, and

(d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live,

(e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream,

(f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream

whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream.

i

3. The system of claim 2 wherein:

(a) said first client application allows said presenting participant to share audio data

(b) said storage means records said audio data, and

(c) said second client application allows said observing participant to sense said audio data.

4. The system of claim 3 wherein:

(a) said web conferencing system includes an audio time-scale modification component,

(b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed,

(c) whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed.

5. The system of claim 4 wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking.

7. A web conferencing system comprising:

(a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data

(b) a second client application that allows at least one observing participant to sense said data streams

(c) a server application operatively connected to said first client application and to said second client application, said server application arranged to:

ii

> i.      receive said data streams from said first client application and record it in a storage device
>
> ii.     retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

8. The system of claim 7 wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session.

9. The system of claim 8 wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  2024-1520

**Short Case Caption**  US Patent No. 7,679,637 LLC v. Google LLC

**Filing Party/Entity**  US Patent No. 7,679,637 LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/04/2024

Signature:  /s/David Berten

Name:  David Berten

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| US Patent No. 7,679,637 LLC | Jeffrey Kohler | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| J. Chad Mitchell, SUMMIT LAW GROUP, PLLC | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☑ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

LANGUAGE OF PATENT CLAIMS AT ISSUE U.S. PATENT NO. 7,679,637... i

CERTIFICATE OF INTEREST ................................................................ iv

TABLE OF CONTENTS ...................................................................... vii

TABLE OF AUTHORITIES .................................................................. ix

STATEMENT OF RELATED CASES ................................................... xii

JURISDICTIONAL STATEMENT ..........................................................1

I.    STATEMENT OF THE ISSUES .................................................2

II.   STATEMENT OF THE CASE .....................................................3

     A.    The Invention and Patent...................................................6

     B.    Google's Infringement Demonstrates the Concrete Nature of the Claims...............................................................................11

III.  SUMMARY OF THE ARGUMENT ...........................................15

IV.   ARGUMENT ...........................................................................18

     A.    Standard of Review ..........................................................18

     B.    The District Court Erred When It Failed to Focus on the Claims and Instead Concluded that the '637 *Patent* Is Directed to the Abstract Idea of Playing Back Recorded Content ............................................21

          1.    The Court's First Reason Is Wrong:  The Claims Solve a Particular Problem That Only Arises in the Realm of Computer Networks or Computers, Specifically, Within Web-Based Conferencing ..........................................26

          2.    The Court's Second Reason Is Wrong:  The Claims Are Not "Result-Oriented," and Even if They Are, That Alone Does Not Support the Court's *Alice* Step One Conclusion.......................29

          3.    The Court's Third Reason Is Wrong:  The "Interference with a Primary Activity" Analogy Does Not Apply...........................34

C.    "Playing Back Recorded Content" Is Not an Abstract Idea; It Is Rooted in Technology ...........................................................35

D.    The District Court's *Alice* Step Two Analysis Overlooked the Significant Differences between the Patented Technology and the "Playing Back Recorded Content" Generalization ...........................37

E.    Google's Motion Was Premature, Asked the Court to Make Findings Against the Facts Pled in the Complaint, and Deprived Plaintiff of the Opportunity to Develop and Present Additional Relevant Facts, Resulting in a Flawed Approach to *Alice* Step Two ...........................40

V.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................45

ADDENDUM

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) ................................................................ 40, 41, 44

*ADASA Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 2561, 216 L. Ed. 2d 1181
(2023) ........................................................................................................ 19, 22

*Alice v. CLS Bank*,
573 U.S. 208 (2014) .................................................................................... passim

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018), as amended (Nov. 20, 2018) ...........................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .......................................19

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ................................................................ 20, 21, 40

*Bilski v. Kappos*,
561 U.S. 593 (2010) .................................................................................... passim

*Bot M8 LLC v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed. Cir. 2021) ...........................................................................18

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
15 F.4th 1091 (Fed. Cir. 2021) .................................................................. 17, 19

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) ..........................................................................20

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ........................................................................11

*Enfish LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ........................................................................22

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ........................................................................22

*Interval Licensing LLC v. AOL, Inc.*,
   896 F.3d 1335 (Fed. Cir. 2018) ........................................................ 20, 26, 34, 35

*Knievel v. ESPN,*
   393 F.3d 1068 (9th Cir. 2005) .........................................................................18

*Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*,
   572 F.3d 1039 (9th Cir. 2009) .........................................................................19

*Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP*,
   676 F.3d 1354 (Fed. Cir. 2012). ......................................................................19

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012) ..................... 17, 20, 31, 36

*McRO, Inc. v. Bandai Namco Games America Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016) .......................................................................23

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ..........................................................................................40

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019) .......................................................................22

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020)) .....................................................................26

*Trinity Info Media, LLC v. Covalent, Inc.*,
   72 F.4th 1355 (Fed. Cir. 2023) .......................................................................18

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020) .......................................................................22

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017) .......................................................................21

**Statutes**

28 U.S.C. § 1295(a)(1).........................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 1338(a) .............................................................................................1

35 U.S.C. § 101 ................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ....................................................................... 19

Fed. R. Civ. P. 12(c) ............................................................................ 19

Fed. R. Civ. P. 12(d) ....................................................................... 19, 42

Fed. R. Civ. P. 15(a)(2) ................................................................... 17, 44

Fed. R. Civ. P. 56(d) ............................................................................ 42

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiff-Appellant US Patent No. 7,679,637 LLC certifies that, to its knowledge, no appeal from this civil action was previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

This appeal arises from a final decision of the United States District Court for the Western District of Washington.  The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  The district court granted Defendant-Appellee's motion to dismiss on January 25, 2024. Appx1-26; Appx27 (Final Judgment). Plaintiff-Appellant US Patent No. 7,679,637 LLC appealed on February 22, 2024. Appx285-286.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## I.   STATEMENT OF THE ISSUES

1.      Whether the district court erred in granting Appellee's motion to dismiss under 35 U.S.C. § 101.

2.      Whether the district court erred in finding the '637 patent claims are directed to an abstract idea: "playing back recorded content."

3.      Whether the district court erred in finding the '637 patent contains no patent-eligible inventive concept.

4.      Whether the district court erred in deciding the 101 issue on a motion to dismiss where there were matters outside the pleadings presented, and disputed factual issues required further discovery and the district court denied Patent Owner's request to amend the complaint.

## II.     STATEMENT OF THE CASE

U.S. Patent 7,679,637 is not a patent that claims all of "playing back recorded content."  It does not claim all of "playing back recorded content" in the context of the internet.  Instead, the claims of the '637 patent solve the technical problem that existed in 2006: "current web conferencing systems are unable to enable participants to ***asynchronously*** observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Appx34 (2:51-54) (emphasis added). The specification shows the inventor set out to solve this problem rooted in technology, and the claims reflect his solution rooted in technology.

Jeffrey Kohler, the inventor of the '637 patent and owner of the limited liability company to which it is assigned, developed a set of specific improvements to web-based conferencing back in 2006.  His patent, titled "Time-shifted web conferencing," is summarized in its Abstract as follows:

> A web conferencing system which, in one aspect has time-shifting capabilities. Session content is recorded so that participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at normal, slower, or faster speeds, while maintaining substantially consistent perceived audio quality.

Appx28.

Kohler figured out that instead of being a single stream of information like a television program, a web-based conference could be broken up into a series of

3

discrete data streams.  These could include a presenter speaking live, and a separate data stream (such as on-going chat stream, or a "whiteboard" portion of the presentation) that was discrete from the presenter's video or similar streams. This control would allow, for the first time, review of a live portion of a presentation while simultaneously reviewing a recorded different part of the presentation. No web-conferencing system allowed simultaneous live and recorded review prior to his invention.  Mr. Kohler's invention solved that problem, with a solution that Appellee Google would, years later, copy.

The specific features required to practice the invention are set forth in the claims.  The independent claim considered below, claim 2, requires two different applications, one for the presenter and one for the participants in the web conference.  The presenter's application must allow the recording of discrete data streams: one that is the presenter's computer screen video and the other data stream selected from the group consisting of chat data, documents, web pages and white-boarding session.  The participant's application must allow review control of the two data streams, so that one can be viewed live while the participant is reviewing a recorded part of the presentation. The system solves the problem of the lack of asynchronous participation; it "is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data

4

stream." Appx39.

Despite the claims, the district court found the patent to be directed to the overly generalized abstract idea of "playing back recorded content," and found the patent not subject-matter eligible under *Alice*. The district court made this decision without oral argument, depriving Plaintiff of an opportunity to address the district court's concerns.

This Court should reverse the decision.  First, the Court should correctly determine, under *Alice* step one that claim 2, for example, is not directed to an "abstract idea" of the type of concern to the U.S. Supreme Court in *Alice* and *Bilski*. As explained below, the district court's generalization of the patent as directed to "playing back recorded content" is untied to the specific claims at issue, an oversimplification of the claims, divorced from the problem the inventor set out to solve, and is not an "abstract idea" that should render a patent not subject matter eligible.  Once the Court properly determines that claims 2 and 7 are not directed to any "abstract idea," the claims will properly be determined to be subject matter eligible.

If this Court instead agrees with the district court that claims 2 and 7 are directed to "playing back recorded content" and that playing back recorded content is an abstract idea that requires *Alice* step two analysis, the Court should find that the claims describe an inventive concept in the way they specifically describe

breaking up a web conference into discrete data streams for asynchronous playback

of those streams.  Because *Alice* step two also involves understanding the

differences between the claimed invention and the prior art, differences that the

district court did not allow to be developed prior to issuing its decision, the Court

should, in the alternative, remand the case for further proceedings to allow the

record to be properly developed.

## A.    The Invention and Patent

Inventor Kohler holds a B.S. in Computer Science and Engineering from

Michigan State University and an M.B.A. from Purdue University.  Appx87 ¶ 10.

Mr. Kohler worked for Microsoft for over 15 years, and now works at Meta

(Facebook). *Id*.  Far from a thought exercise or an empty assertion that something

could be done on the internet, Mr. Kohler built a working prototype of the

invention, and his disclosure included a compact disc with over 40 software

subroutines to "illustrate an implementation of the invention."  Appx34 (1:16-

2:27).

> The summary of the '637 patent explains:
>
> According to one aspect, a web conferencing system includes time-shifting capabilities which enable participants to observe a session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at different playback rates while maintaining substantially consistent perceived aspects of audio quality.

Appx35 (3:61-67).

6

The specific problem identified in the background is that "current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Appx34 (2:51-54).  The specification describes several advantages of the invention, "not previously possible" including:

> a participant can enter a meeting after it has begun and either begin observing the live content or rewind and see the content that they missed
>
> a participant can observe a meeting in real-time and be able to pause the content to deal with an interruption
>
> a participant observing a meeting can easily replay an interesting segment
>
> a participant can observe a live meeting at slower than real-time to more easily digest the content
>
> a participant observing on a delay (from joining late, pausing, replaying, etc. . . . ) can observe the content faster than real-time

Appx35 (3:36-50).  Figure 1 is a block diagram that illustrates the general organization and main components of an embodiment of a time-shifted web conferencing system:

7

## FIG. 1



Appx29.

Figure 2 is a block diagram which illustrates the components responsible for time-shifted playback of audio, according to one embodiment. This diagram represents a specific example of stream decompression and display **130** *a*-**130** *n* in FIG. 1.



Appx30.

In Figure 3, the patent disclosed a portion of playback logic used by a client application to determine what presentation time to request from a server, according to one embodiment. This corresponds to playback logic **126** in FIG. 1. In Figure 4, the patent disclosed server logic used to determine what frames to send to a client application based on a presentation time requested, according to one embodiment. This corresponds to server logic **112** in FIG. 1. The patent specification also makes extensive disclosure of the "capture logic" and "server logic." and "playback logic." Appx28-39 (*passim*).

The patent acknowledges that some time-shifting techniques had been developed in other fields, such as using digital video recording technologies like those developed by TiVo for television viewing (Appx35 (3:7-16)). Web-based conferencing systems, however, are different from television viewing in important

ways in at least two important ways. First, unlike a self-contained DVR, web conferencing systems of the kind claimed in the invention involve at least two distinct applications: one used by the presenter and separate applications used by other participants. The '637 patent expressly claims the use of two different applications. *See e.g.*, Appx39 (12:33-44). Second, unlike TV, web conferencing systems of the kind claimed in the invention use more than one data stream. The '637 patent expressly claims the use of distinct data streams. *See e.g.*, Appx39 (12:35-38).

The patent explains how web-based conferencing systems make use of different streams of data:

> In this system, a web conferencing session contains one or more streams. A stream is any type of data that a participant can share or observe. Examples of streams include screen video, camera video, audio (through computers and/or through telephones), documents, collaborative chat, or any other types of data involved in a web conferencing session.

> Streams are comprise[d of] a series of discrete frames. Frames are time dependent data. Examples of frames include a segment of audio, a single video image, etc. In the first embodiment each frame in a stream is given a sequential number. Frames are given a timestamp that identifies when they occurred in the session. Frames are identified either as key frames, which can be interpreted independently of any other frames, or as delta frames which rely on previous frames.

> This key and delta frame scheme is commonly used in the audio visual field, but it can be applied to other types of streams as well. For instance a web page or document shared during a session can be represented as a key frame. Also a white-boarding session (where participants can annotate an image with virtual pens) can be

represented as a sequence of frames (where a pen stroke can be a delta frame, etc.).

Appx36 (5:23-44).  Applying the "key and delta frame scheme" from audio-video streams to other types of data is one way the patent allows discrete parts of a presentation to be reviewed asynchronously.

**B.**    **Google's Infringement Demonstrates the Concrete Nature of the Claims**

After Google requested that the complaint lay out in greater detail all the systems Google sells that infringe the claim, the Plaintiff filed the First Amended Complaint ("FAC").  Appx85-105.  The FAC included paragraphs 16-43 explaining the many products Google makes, uses and sells that infringe the patent. It also included a 25-page detailed claim chart, exhibit 1 to the FAC, including select evidence of Google's infringement.  Appx290-315.  On a motion to dismiss, the district court and this Court must take the factual allegations regarding Google's infringement as true, and they are particularly relevant to addressing the 101 issue because Google's infringement demonstrates how the claims are not abstract but are instead "necessarily rooted in computer technology." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014),

As explained in the FAC and claim chart, multiple, concrete, Google products satisfy the "first client application" for the conference presenter required by claim 2: Google's YouTube website, Google's YouTube App for smartphones, and a Google web-conferencing system, Google Meet.



| [2](a) a first client application allowing at least one presenting participant to share computer screen video, | At least 3 different Google products allow a presenter to share computer screen video (the "Infringing Google Presenting Participant Applications"): the YouTube Livestream Website (e.g., | Livestreaming created using the YouTube Website allows sharing computer screen video. Infringement occurs several ways:<br><br>• If YouTube Livestreaming webpage itself is treated as the "first | The YouTube App allows the presenter to share computer screen video | Google Meet allows the presenter to share computer screen video and livestream to YouTube |
| --- | --- | --- | --- | --- |

Appx290.  The presenter claim element – sharing "computer screen video" – is "necessarily rooted in computer technology," and by itself has nothing to do with playing back recorded content.

Google's products also infringe the next claim element, which requires that the presenter presents not only the computer screen video, but also another, separate, data stream such as chat data or whiteboarding. Once again, three separate Google products (Google's YouTube website, Google's YouTube App for smartphones, and Google Meet) do this:



| [2](b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and whiteboarding session, | Each of the three Infringing Google Input Applications allows the presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and whiteboarding session. | Livestreaming created using the YouTube Website has live chat turned on by default<br><br>How to use YouTube Live chat<br><br>https://support.google.com/youtube/answer/2524549 | The YouTube App allows the presenter to "allow chat" | Google Meet allows the presenter to share whiteboarding with a feature called "Jam Board"<br><br>Collaborate with a Jamboard in Google Meet<br><br>https://support.google.com/meet/answer/10071448 |
| --- | --- | --- | --- | --- |

Appx292.  Like the first element, this element also has nothing to do with playing back recorded content and is also rooted in computer technology.

The claim also requires a second client application for the participants in the conference.  As explained in the claim chart, Google supports many different variations of its YouTube product that include both the computer screen video and the separate data stream.  In the example in the claim chart, the presenter is presenting the computer screen video, and the data stream is a separate chat happening at the same time. The participant can review (the claim says "sense") both parts of the presentation in discrete areas of the client application:



Appx294.  The second client application will ultimately involve playing back part of the presentation, but again, by itself this element has nothing to do with playing back recorded content.

The next claim element is the first part of the claim that relates to playing back recorded content, but it has two important limitations overlooked by the district court: the second client application has to be able to access the two separate data streams (the live computer screen video and chat, for example) and the access

to the recorded content must be available while the presentation is happening.

| [2] (e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of | YouTube watch pages allow observing participants to selectively sense a previously presented and recorded part of the | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br>• **Stream Now:** Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events:** Click **Advanced settings** and check the box for **Enable DVR**.<br>Source: https://support.google.com/youtube/answer/9296823?hl=en |

| said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream, | computer screen video and data stream while the presenting participant is sharing a current part of the computer screen video and data stream (e.g., "during the event"). | |

Appx294-295.

The next claim element requires that the second client application, in addition to being arranged to allow for review of one data stream while the presentation is happening (i.e., live), the second client application also must allow view of the presentation "after said presenting participant has finished sharing" the computer video screen. Appx295.

The final element describes how the system as a whole – the first client application, the second client application, the multiple data streams, and the recording or the multiple data streams – results in a system that "simultaneously" records the computer screen video and the separate data stream and allows the observing participant to observe "current and previously presented parts of said computer screen video and said data stream." Google does this as well:

14

| | | |
|---|---|---|
| whereby said web conferencing system is able to simultaneously record said computer | YouTube is able to simultaneously record a presenting participant's computer screen | Enabling YouTube's DVR feature allows your viewers to pause, rewind, and continue during the event. Once a viewer resumes playing, the event will continue from where they hit pause. To enable DVR, follow these steps:<br><br>• **Stream Now:** Click **Stream Options** and check the box for **Enable DVR**.<br>• **Events:** Click **Advanced settings** and check the box for **Enable DVR**. |

| Claim | Analysis | Select Evidence |
|---|---|---|
| screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream. | video and data stream and allow observing participants to sense current and previously presented parts of the computer screen video and data stream. | Source: https://support.google.com/youtube/answer/9296823?hl=en<br><br>If your live stream is less than 12 hours, YouTube can automatically archive it for you. This option applies to all types of live streams - including: Stream now, Events, Webcam, and Mobile. YouTube will also automatically archive streams of 1440p and 2160p (4K) video resolution. But, we recommend also recording a local archive as a backup. You can create highlight clips while your stream is still live.<br>Source: https://support.google.com/youtube/answer/6247592 |

Appx295-296.  Each of the above elements are rooted in computer technology.

There is nothing abstract about what they cover.

### III.    SUMMARY OF THE ARGUMENT

The district court committed multiple legal errors in its opinion:

*First*, the district court incorrectly applied *Alice* step one by concluding "that the *'637 Patent* is directed to the abstract idea of playing back recorded content." Appx18 (11-12).  *Alice* step one requires analysis of the *claims*, not the patent as a whole.  It was a legal error to conclude the patent was directed to an abstract idea. The elements that the claims recite must be considered.

*Second,* the district court did not properly conduct the analysis required by *Alice* step one.  When the claims are considered (instead of the patent as a whole), they are not directed to any abstract idea and cannot be generalized as directed to "playing back recorded content."  They claim specific web-based conferencing system technology requiring multiple applications relating to multiple different

data streams at least one of which is live, such that the system permits playing back the recorded data streams while simultaneously sensing separate live content.

*Third*, assuming *arguendo* that the claims could have been generalized fairly as "playing back recorded content," even that description is rooted in technology, not an abstraction. Going back to Edison, "playing back recorded content" is literally one of the hallmark technological marvels of the last hundred and fifty years of human ingenuity. The list of technical inventions in this field is both extensive and ongoing:  the phonograph, the moving picture, monotone, stereo, high fidelity (with literally thousands and thousands of improvements in pre-amps, amplifiers, wires, speakers, etc.), myriad recording formats (vinyl, cassettes, CDs, DVDs, MP3s, VCRs, TiVo etc.), scores of playback devices (Walkmans, iPods, computers, TV's).  A large number of these technologies could theoretically be generalized as involving "playing back recorded content," but that does not make them abstract.  Technical innovations in "playing back record content" continue to happen all the time and many are patentable.

*Fourth*, because of the flaws in *Alice* step one, the district court's *Alice* step two analysis was also flawed.  A correct *Alice* step two analysis would have found that the inventive aspects of the patent "'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1095–

16

96 (Fed. Cir. 2021) (quoting *Alice v. CLS Bank*, 573 U.S. 208, 217 (2014)

(alteration in original) (quoting *Mayo*, 566 U.S. at 72–73, 132 S.Ct. 1289)). The

claimed system is "significantly more" than a patent upon "playing back recorded

content" itself.  The claims are confined to a narrow situation that involves playing

back recorded content in a limited way while a live conference is happening.

　　*Fifth*, the district court made these incorrect determinations in a procedurally

flawed manner.  It allowed Google to submit materials outside the pleadings on a

motion to dismiss without converting it to a motion for summary judgment and

decided the disputed *Alice* issues on an undeveloped and incomplete record on the

motion to dismiss without providing the patent owner any opportunity for

discovery and without oral argument. The district court also erred by denying

patent owner's request for an opportunity to amend the complaint to add additional

relevant allegations. Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely

given when justice requires).

　　The Court should correct the district court's errors by: (1) correctly focusing

on the claims and not the patent as a whole; (2) correctly determining that the

claims are not directed to an abstract idea but instead claim a web-based

conferencing system requiring multiple applications and multiple different data

streams at least one of which is live, such that the system permits playing back the

recorded data streams while simultaneously sensing separate live content; (3)

17

conclude that the claims are not directed to an abstract idea under *Alice* step one and thus are subject matter eligible; and (4) reverse the decision dismissing the case and remand to the district court for further proceedings in light of the correct conclusion that the claims are subject matter eligible.   In the alternative, the district court should have concluded that the 101-decision was premature at this stage of the case, declined to engage in the *Alice* analysis at this time, and allowed the Plaintiff to amend its complaint. This Court should reverse the motion to dismiss with prejudice and remand for further proceedings.

## IV.   ARGUMENT

### A.   Standard of Review

As explained in *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360 (Fed. Cir. 2023), the Federal Circuit applies "the law of the regional circuit to review a district court's grant of a motion to dismiss." *See Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021). The Ninth Circuit reviews the grant of a 12(b)(6) motion to dismiss *de novo*, accepting all factual allegations in the complaint as true and construing the pleadings in the light most favorable to the nonmovant. *Id.* (citing *Knievel v. ESPN,* 393 F.3d 1068, 1072 (9th Cir. 2005)).

Google submitted matter outside the pleadings on what it called a "motion to dismiss." Plaintiff did the same in its response.   This matter was not excluded by the district court.   By operation Federal Rule of Civil Procedure 12(d), this

18

converted Google's motion to a motion for summary judgment. Fed. R. Civ. P.

12(d) ("Result of Presenting Matters Outside the Pleadings. If, on a motion under

Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not

excluded by the court, the motion must be treated as one for summary judgment

under Rule 56. All parties must be given a reasonable opportunity to present all the

material that is pertinent to the motion."). If properly treated as a motion for

summary judgment, a similar standard of review applies. As set forth in *Adasa*

*Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 907 (Fed. Cir. 2022), *cert. denied*, 143

S. Ct. 2561, 216 L. Ed. 2d 1181 (2023):

> "We review summary judgment rulings under the law of the regional
> circuit, here the Ninth Circuit. *Landmark Screens, LLC v. Morgan,
> Lewis & Bockius, LLP*, 676 F.3d 1354, 1361 (Fed. Cir. 2012). The
> Ninth Circuit 'review[s] the district court's grant of summary
> judgment de novo, determining whether, viewing all evidence in the
> light most favorable to the nonmoving party, there are any genuine
> issues of material fact and whether the district court correctly applied
> the relevant substantive law.' *Kraus v. Presidio Tr. Facilities
> Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1043–44 (9th Cir.
> 2009). 'The evidence of the non-movant is to be believed, and all
> justifiable inferences are to be drawn in his favor.' *Anderson v.
> Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d
> 202 (1986)."

> As explained in *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15

F.4th 1091, 1095–96 (Fed. Cir. 2021):

> Patent eligibility under § 101 is a question of law that may contain
> underlying questions of fact. *Interval Licensing LLC v. AOL, Inc.*, 896
> F.3d 1335, 1342 (Fed. Cir. 2018) (citing *Berkheimer v. HP Inc.*, 881
> F.3d 1360 (Fed. Cir. 2018)). We review a district court's ultimate

conclusion on patent eligibility de novo. *Id.* We have held that "[p]atent eligibility can be determined on the pleadings under Rule 12(c) when there are no factual allegations that, when taken as true, prevent resolving the eligibility question as a matter of law." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018).

Section 101 defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court established a two-step test for examining patent eligibility under § 101 in *Alice*. First, we "determine whether the claims at issue are directed to a patent-ineligible concept[,]" such as an abstract idea. *Alice*, 573 U.S. at 218, 134 S.Ct. 2347. If so, we proceed to step two and "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012)). Step two is "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217–18, 134 S.Ct. 2347 (alteration in original) (quoting *Mayo*, 566 U.S. at 72–73, 132 S.Ct. 1289).

**B.      The District Court Erred When It Failed to Focus on the Claims and Instead Concluded that the '637 *Patent* Is Directed to the Abstract Idea of Playing Back Recorded Content**

The District Court's errors start with the way it described its *Alice* Step One conclusion: "For three reasons, the Court concludes that the **'637 Patent** is directed to the abstract idea of playing back recorded content." Appx18 (emphasis added). By concluding that the patent, and not its individual claims, is directed to an abstract idea, the court ignored the repeated instructions of *Alice* itself and this Court that *Alice* step one is ***not*** focused on "the patent," it is focused on the ***claims***. As the Supreme Court instructed, in the first step of the *Alice* inquiry the court must "determine whether ***the claims at issue*** are directed to one of those patent-ineligible concepts." *Alice v. CLS Bank*, 573 U.S. 208, 217 (2014). The Federal Circuit's *Berkheimer* decision re-emphasized that the district court must focus its review on the claims, and that resolving whether the claims include an inventive step may rest on underlying, disputed fact issues that preclude summary judgment. *Berkheimer v. HP Inc.*, 882 F.3d 1360, 1370-71 (Fed. Cir. 2018) (concluding claim1 was not subject-matter eligible, but that it was improper to grant summary judgment as to claims 4-7). The court is required to consider the patent eligibility of the specific claims, defining the specific inventions. *E.g., Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017) (reversing decision of patent ineligibility where district court had concluded that the claims were directed to the

21

"abstract idea of categorical data storage" but the Federal Circuit's review of claims themselves "demonstrate[d] that they are directed to an improved computer memory system, not to the abstract idea of categorical data storage.").

This fundamental flaw at *Alice* step one means that the district court never properly applied *Alice* step one. Nowhere does the court determine what "abstract idea," if any, each of the asserted **claims** is "directed to." Had the district court focused on the claims, as it must, it could not have concluded that any claim is directed to the abstract idea that Google advocated. The district court would have concluded that the claims are focused on a specific and concrete technological advance (such as an improvement to a technological process), and this would have ended the inquiry. *ADASA Inc. v. Avery Dennison Corp.,* 55 F.4th 900, 908 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 2561, 216 L. Ed. 2d 1181 (2023) ("If the focus of the claim is a specific and concrete technological advance, for example an improvement to a technological process or in the underlying operation of a machine, our inquiry ends and the claim is eligible. *See, e.g., Enfish [LLC] v. Microsoft Corp.*, 822 F.3d [1327] at 1336 [(Fed. Cir. 2016)]]; *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305–06 (Fed. Cir. 2018); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018), as amended (Nov. 20, 2018)").

22

The importance of properly applying *Alice* step one was also emphasized in a case involving improvements to the way "lip syncing" worked on animated faces. *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). In *McRO*, the Federal Circuit determined that the district court had made the same type of *Alice* step one error the district court made in this case, explaining:

> Claim 1 of the '576 patent is focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type. We disagree with Defendants' arguments that the claims simply use a computer as a tool to automate conventional activity. While the rules are embodied in computer software that is processed by general-purpose computers, Defendants provided no evidence that the process previously used by animators is the same as the process required by the claims.

*McRO,* 837 F.3d at 1314.

Here, Claim 2, for example, is not directed to the abstract idea of "playing back recorded content." Claim 2 is focused on a specific asserted improvement that allows a presentation to be reviewed asynchronously (live and recorded) at the same time. The claimed system requires a myriad of specific components that are not related to playing back recorded content, and ignoring these components oversimplifies the specific requirements of the claim. While Google argued in the district court that the invention was directed to "playing back recorded content," Google would certainly not agree that all playing back of recorded content infringes the claims. Nor would Google agree that all playing back of recorded

23

content on or through the web infringes the claims.

For example, one of the novel features of the claim requires *live* content, i.e., the *opposite* of "playing back recorded content." Claim 2, element (d) requires "a second client application allowing at least one observing participant to sense said computer screen video and said data stream *live*." Appx39 (emphasis added). As further explained in the "whereby" portion of the claim, claim 2 requires *simultaneous* access to both live and recorded content of the same presentation: "whereby said web conferencing system is able to *simultaneously record* said computer screen video and said data stream *and allow said observing participant to sense current* and previously presented *parts* of said computer screen video and said data stream." Appx39 (emphasis added). This can only be accomplished because of another requirement of the claims overlooked by the district court: separate data streams for different aspects of the presentation. This is the only way part of the presentation can be occurring live while an individual user is able to sense a previous, different, part of the web-conference.

Given claim 2's express requirement of live content and the ability to simultaneously review both live and recorded content, the claim cannot be summarized as "directed to playing back recorded content." The district court's *Alice* step one conclusion, again incorrectly focusing on the patent as a whole, cannot be squared with the express "live content" language of the claim 2. Claims

3, 4, and 5 all depend on claim 2, so they also cannot be summarized as only "playing back recorded content."

The same issue arises with the other independent claim, claim 7. The district court did not independently analyze claim 7 (and its dependents) because it found claims 2-5 to be "representative" of the claims. There are both similarities and distinctions between the independent claims (2 and 7), however, and had the district court independently analyzed claims 7, it might have avoided the error of concluding the patent is directed to the abstract idea of playing back recorded content.

For example, claim 7 does not have the word "live" in it. It does, however, require that the system "allows said observing participant to ***sense said data streams in real-time***, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates ***at the same time that said presenting participant is sharing a current part*** of said data streams and after said presenting participant has stopped sharing." Appx40 (emphasis added). As is the case with claim 2, given that claim 7 requires "real-time" sensing and reviewing the data stream "at the same time that said presenting participant is sharing a current part" of a presentation, claim 7 cannot properly be summarized as being "directed to playing back recorded content." Claims 8 and 9 depend on claim 7, so they also

25

cannot be summarized as only "playing back recorded content."

The district court states that it reached its conclusion about the patent for three reasons, but none of the reasons determine that the claims themselves are directed to an abstract idea. The court's stated reasons are:

■ "First, Plaintiff does not say, and the claim language does not illustrate how, the claims focus 'on a solution to a problem specifically arising in the realm of computer networks or computers.'" Appx18 (13-15).

■ "Second, the representative claims of the '637 Patent 'possess the following indicia of abstractness: . . . claim language that is result-oriented[.]'" Appx20 (8-9).

■ "Third, the Federal Circuit previously found that 'patent claims directed to "providing information to a person without interfering with the person's primary activity" to be ineligible under § 101.'" Appx20 (18-20) (citing *Interval Licensing LLC*, 896 F.3d at 1343).

As explained below, each of these stated reasons is incorrect.

**1.    The Court's First Reason Is Wrong:  The Claims Solve a Particular Problem That Only Arises in the Realm of Computer Networks or Computers, Specifically, Within Web-Based Conferencing**

Ignoring the patent's own description of the problem it was solving and the explicit requirements of the claims, the district court erred in concluding that the claims were not addressing "a problem specifically arising in the realm of computer networks or computers." Appx18 (13-15) (citing *TecSec, Inc.*, 978 F.3d at 1293). But the specific problem identified in the patent's background *only* arises in the realm of computer networks and computers: "current web

26

conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Appx34 (2:51-54).  The patent—and its claims— expressly address a problem in the realm of computer networks and computers, specifically web-based conferencing systems (see preambles to claims 2 and 7: "a web conferencing system comprising:").  They are not attempting to address problems in any live in-person meeting, or traditional telephone conference calls, etc.  The claims are focused on solving the computer-related problem the patent identified:  a solution to allow participants to attend a web conference asynchronously such that part of the conference is live while individual participants can review a different portion that has been recorded.

Instead of focusing on what the claims actually say—how they are expressly limited to web conferencing system with discrete data streams—the district court made a statement that cannot be squared with the teachings of the patent:

> But the Court struggles to discern what is the "specific technical problem with web-based video conferencing," as Plaintiff does not elaborate on this. Elsewhere, Plaintiff says that the claims address the issue that "current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Dkt. # 27-2 at 8. If this is the "specific technical problem," it is not an issue unique to the internet or "in the realms of computer networks"—it is an issue in most meetings, whether virtual or in-person.

Appx18-19.

27

First, the patent is nowhere concerned with the addressing problems that arise in any in-person meeting or conference calls.   The district court's failure to recognize the problem as a *technical* one was erroneous. The district court recognized the problem the patent was attempting to solve: "current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." This is inherently a technical issue.  It is discussing "web conferencing systems," which are fundamentally technological and systems that work on the internet.  It is discussing asynchronous observations— observations that are not noncurrent in time—something that can only been done with technology. And it is discussing another technology, recording.

Most importantly, the patent claims enable web-based conference participants to asynchronously observe an in-person meeting, i.e., observe a previously recorded part of the in-person meeting while the in-person meeting is still in progress.  This is not something that could ever be possible in in-person, virtual, or telephonic conference call meetings.  But it is possible using the patent's system for meeting using web-conferencing, which is why the patent claims a technical invention.   Said another way, unlike *Alice* (intermediated risk management) and *Bilski* (hedging), the patents do not claim something that was done in the pre-internet world and claim it within the internet context.  They claim

28

a specific technical solution entirely confined *within* a web-based conferencing system.

> **2.**  **The Court's Second Reason Is Wrong:  The Claims Are Not "Result-Oriented," and Even if They Are, That Alone Does Not Support the Court's *Alice* Step One Conclusion.**

The claimed solution allows web-conferencing systems to operate in a manner that increases their utility.  The claims allow the data streams to be viewed asynchronously, and particularly allow backing up and reviewing one aspect of a multi-media presentation while another aspect is proceeding live. Again ignoring the express language of the claims, the district court concluded in a single paragraph that the claims had was the district court called an "indicia of abstractness" by characterizing the claim language as "result oriented."  Appx20. The claims are not "result oriented"; they expressly explain how the systems need to be set up to accomplish the improvement. If the district court were correct to disparage patent claims under *Alice* just on the basis alone that they evoke certain "results" and allow certain improvements, this would turn the policy behind the patent system on its head. The patent system exists to reward, not condemn, patent claims that empower results.

Using claim 2 as an example, the claim starts by requiring the use of "a first client application," focused on the presenter, that is configured to do two things: "allowing at least one presenting participant to share computer screen video" and

29

to also share "at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session." As explained by the wherein clause, the presenter-focused application must also permit the *simultaneous* recording of both the "computer screen video" and "said data stream." These are concrete, specific requirements that must be carried out by a specific, concrete subsystem, the ***first*** client application. Appx39.

The claims continue to require a ***second*** client application, this one focused on the participant, with similar very specific limitations. Both in real-time while the presentation is happening and after-the fact, the second participant-focused application allows the participant (not the presenter) to review parts of the streams of previous content.

To allow the issue of subject matter eligibility to turn on supposed "functional claiming" is particularly inappropriate in this case. As pointed out by the patentee, but ignored by the district court, ***Google itself*** uses the same sort of claim language in its own patents, including patents that involve video conferencing. The response to Google's motion included U.S. Patent No. 9,549,152 entitled "Application Content Delivery to Multiple Computing Environments Using Existing Video Conferencing Solutions" and which list Google as the assignee, as Exhibit 4 ("Google's '152 patent"). Appx207-248. Google's '152 patent is notable for several reasons. First, Google applied for the

30

patent, on a video conferencing system, eleven years after Mr. Kohler invented the '637 patent. The Supreme Court's *Bilski*, *Alice,* and *Mayo* opinions all issued in the intervening decade, meaning that Mr. Kohler applied for his patent *before* the *Alice*-approach had been announced, the Google's '152 patent was applied for and issued in the years following the *Alice* approach.

A notable aspect of Google's '152 patent for present purposes is that Google opted to use, after *Alice* supposedly disfavored "functional claiming," the same sort of claiming used in the '637 patent. Plaintiff demonstrated this using the same charting presentation style used by Google. *Compare* Appx126-128 *with* Appx177-178 (reproduced below).

| **Google's '152 Patent, Claim 1** | **Results-Based Functional Claiming Without a Specific Way to Achieve the Result (i.e., Applying Google's Argument to Its Patent)** |
|---|---|
| An apparatus comprising at least one processor and at least one memory including computer instructions, when executed by the at least one processor, cause the apparatus to: | |
| *establish*, by an application delivery system in response to an identification of an application from a client device, *a video conferencing session* between a first video conferencing endpoint provided on the application delivery system and a second video conferencing endpoint provided on the client device; | • Does not recite how to "establish" "a video conferencing system," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of establishing a video conference*. |
| *select*, by the application delivery system, *a video capture module* as a video input device for the first video conferencing endpoint; | • Does not recite how to "select" "a video capture module," much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of selecting a video capture module*. |
| *receive*, by the video capture module provided on the application delivery system, *display data* output by the application; | • Does not recite how to "receive" "display data" much less recite a technological improvement or innovative way of doing so.<br>• Instead, merely recites *generic computer function of receiving display data*. |

| | |
|---|---|
| *convert*, by the video capture module, ***the display data to a plurality of video frames***; | • Does not recite how to "convert" "the display data to a plurality of video frames," much less recite a technological improvement or innovative way of doing so.<br><br>• Instead, merely recites ***generic computer function of converting the display data to a plurality of video frames***. |
| ***stream the plurality of video frames*** received via the video capture module from the first video conferencing endpoint to the second video conferencing endpoint via the video conferencing session; and | • Does not recite how to "stream the plurality of video frames" much less recite a technological improvement or innovative way of doing so.<br><br>• Instead, merely recites ***generic computer function of streaming the plurality of video frames.*** |
| *receive*, by the application delivery system from the client device, ***a user input signal*** for the application. | • Does not recite how to "receive" "a user input signal" much less recite a technological improvement or innovative way of doing so.<br><br>• Instead, merely recites ***generic computer function of receiving a user input signal***. |

Appx177-178. Given the duty of candor to the Patent Office and common sense,

Google necessarily believes that "functional claiming," does not result in a video

conferencing patent being subject matter ineligible.  Plaintiff made this argument

to the district court. Appx169; Appx177-178.

The district court dismissed this evidence in a footnote (Appx22 (n.7)),

calling it "immaterial." How Google chose to word the claims in its own patents,

however, is a material admission.  Google necessarily believes that the claims of

Google's '152 patent, despite using what the district court calls an "indicia of

abstractness: . . . claim language that is result-oriented" are subject-matter eligible.

Appx20. Google is asserting inconsistent positions.  Particularly on a motion to

dismiss, the district court should have concluded that Google's own admissions are

contrary to a finding that using language like that used in the '637 patent renders

such a patent ineligible.

### 3.     The Court's Third Reason Is Wrong:  The "Interference with a Primary Activity" Analogy Does Not Apply

The district court's third reason for concluding that the '637 was directed to

an abstract idea – playing back recorded content – was because "the Federal

Circuit previously found that 'patent claims directed to "providing information to a

person without interfering with the person's primary activity" to be ineligible

under § 101.'" Appx20 (quoting and citing *Interval Licensing LLC*, 896 F.3d at

1343.   It is difficult to follow the logic of the point the district court is trying to

make.  If the district court was attempting to explain that the '637 patent claims

share something in common with the claims in *Interval Licensing*, that should have

led to a different conclusion about what the claims of the '637 are directed to.  It

does not make sense to say that because the *Interval Licensing* claims are directed

to "providing information to a person without interfering with the person's primary

activity" then the '637 patent is similarly directed to "playing back recorded

34

content."  The two "abstract ideas" are not at all similar.

The conclusion in *Interval Licensing* that the claims were directed to "providing information to a person without interfering with the person's primary activity," supported a conclusion that the claims at issue in that case were taking a conventional non-computerized activity and moving it to a computer.  This is the same kind of pre-computer activity in *Alice* (intermediated risk) and *Bilski* (hedging) of concern to the Supreme Court. The claims in the case, in contrast, are focused on a specific improvement to activity that occurs only within the realm of computers:  web-based conferencing.  The concerns of *Interval Licensing/Alice/Bilski* nowhere arise, because the '637 patent is not taking pre-computer activity and moving it to a computer.

C.    **"Playing Back Recorded Content" Is Not an Abstract Idea; It Is Rooted in Technology**

The general field of "playing back recorded content" is technological (not abstract) in nature, and improvements within that field can well be inventive.  The district court's decision implied not only that high level claim generalization was allowed, but also that all inventions that can be generalized as "playing back recorded content" satisfy *Alice* step one.  This is a fundamental legal error.

Humanity lacked *any* ability to play back recorded content until Edison invented the phonograph in 1877.  The idea of playing back recorded content was not abstract in 1877, and it is not abstract now.  All ways of playing back recorded

content known to humanity are rooted in technology.  None of them existed prior to 1877, and innovative ways of doing so continue tobe invented now.

What happened in this case is what concerned the Supreme Court in *Alice*: if the "abstract idea" concept is applied too broadly, it will "swallow all of patent law."  *Alice*, 573 U.S. at 217 ("At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law.") (citing *Mayo Collab. Srvs. v. Prometheus Labs., Inc.,* 566 U.S. 66, 71; 132 S.Ct. 1289, 1293 ("The Court has recognized, however, that too broad an interpretation of this exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.").

Reviewing Supreme Court precedent, particularly *Alice* and *Bilski*, makes it clear that the type of "abstract idea" of concern to the Supreme Court was not something technological like specific innovation within the general realm of playing back recorded content. The claims at issue in *Alice* were "drawn to the concept of intermediated settlement, i.e., the use of a third party to mitigate settlement risk. Like the risk hedging in *Bilski*, the concept of intermediated settlement is 'a fundamental economic practice long prevalent in our system of commerce.'"  573 U.S. at 219 (*quoting Bilski v. Kappos*, 561 U.S. 593, 609 (2010)).  "Intermediated settlement" is an abstract idea.  "Risk hedging" is an abstract idea. "Playing back recorded content" is not, and the Supreme Court has

36

never issued an opinion that a claim summary rooted in technology can be considered as an "abstract idea" under *Alice*.

If this Court adopts the district court's *Alice* step one conclusion that "playing back record content" is an abstract idea (or allows it to stand by, for example, a Rule 36 summary affirmance), then *Alice* will have taken another large bite toward swallowing all of patent law.  Defendants will use the opinion to argue that "playing back recorded content" has now been declared an abstract idea, eviscerating tens of thousands of patents in this technological field. Generalizations cannot be substituted for technical claims in *Alice* step one.  For this reason alone, the district court's generalization should not be permitted to satisfy *Alice* step one.

**D.      The District Court's *Alice* Step Two Analysis Overlooked the Significant Differences between the Patented Technology and the "Playing Back Recorded Content" Generalization**

Even if the claim elements could be ignored and the claims could be generalized to playing back recorded content, the claims contain an inventive concept under the second step of the *Alice* test.  These claims are not just "a drafting effort designed to monopolize" the idea of playing back recorded content. Nor do they monopolize all of "playing back recorded content," even within the field of web-conferencing systems.

At *Alice* step 2 the district court again ignored the express language of the claims and these claim requirements.  The district court held:

37

> Assuming the '637 Patent's inventive concept is the enablement of a user to "observe a previously recorded part of the meeting while the meeting is still in progress," Dkt. # 27 at 8, this language does not sufficiently recite an inventive concept. It merely restates the "abstract goals of the invention; [it does] not teach how" a previously recorded part of the meeting can be observed while the meeting is still in progress.

Appx22. Here again the district court is incorrect.

The claims explain in detail how the system must be organized to allow a user to observe a previously recorded part of a web-conference while the meeting is still in progress. The claim further explains that system must be arranged so that both the presenter's client application must create the two distinct data streams and the participant's separate client application must receive them as distinct streams. As explained by the wherein clause, the presenter-focused application must permit the *simultaneous* recording and playing back of both the "computer screen video" and "said data stream." Appx39. This cannot be said to be nothing more than claiming the idea of playing back recorded content in the web-conferencing context.

The claims continue to require a ***second*** client application, this one focused on the participant, with similar very specific limitations. Both in real-time while the presentation is happening and after-the-fact, the second participant-focused application allows the participant (not the presenter) to review parts of the streams of previous content.

38

Claim 4 and claim 7 also require an audio "time-scale modification component" that is able to "maintain(s) substantially consistent perceived (aspects of) audio quality at a plurality of (chosen) playback rates."  The district court refused to hear any argument about, or undertake any claim construction proceedings about, what a "time-scale modification component" is before finding the claims patent ineligible.  Appx13. Remarkably, the district court held that the "representative claims are comprised of 'generic computer functions'" and then identified, without any record cite showing it was generic, the "audio time-scale modification component."  Appx23.  This is a legal error.

The district court also held that the claims "only use[] generic functional language to achieve these purported solutions."  Appx23.  If the Court was referring to the use of the words "first client application allowing"… and being "arranged to…"  this type of claiming is allowed and is not an indicia of patent ineligibility.

Instead, the district court concluded that the claims had what the district court called an "indicia of abstractness" by characterizing the claim language as "result oriented."  Appx20 (8-17).  In support of this conclusion, the district court stated: "Plaintiff fails to explain how the claims do anything more than 'share'; 'store'; enable a user to 'observ[e]' and 'sense' the data; and enable 'time-shifting' capabilities.  Appx20.  But of course, not all inventions that claim sharing, storing,

39

and observing data – and even claims that enable time shifting capabilities – are ineligible.  Taken to its logical extreme no part of any time-shifting system would ever be patentable: an absurd result.

**E.    Google's Motion Was Premature, Asked the Court to Make Findings Against the Facts Pled in the Complaint, and Deprived Plaintiff of the Opportunity to Develop and Present Additional Relevant Facts, Resulting in a Flawed Approach to *Alice* Step Two**

Over Plaintiff's numerous objections, the district court proceeded to consider the eligibility issue on Google's motion to dismiss instead of allowing discovery to develop evidence on key issues.  In response to the motion to dismiss, Plaintiff argued that Google's motion must be treated not as a motion to dismiss but as a motion for summary judgment, and that *Berkheimer* and *Aatrix* required denial of the 101 issue on a motion to dismiss.  Appx170-172.  Both issues relate to an underlying fact issue regarding whether the claims were "well-understood, routine, and conventional."  As the Plaintiff explained and reiterates here:

> The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). *Berkheimer* re-affirmed that any fact that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence. *Id.* (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)). In Berkheimer, the Federal Circuit concluded that "the district court erred in concluding there are no underlying factual questions to the § 101 inquiry." The Federal Circuit has also held that patent eligibility can be determined at the Rule 12(b)(6) stage "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix*, 882 F.3d at 1125.

40

Appx171.

The district court dismissed *Aatrix* in a footnote. Appx22 (n.8). The complaint in *Aatrix*, the court noted, included allegations that the individual elements and combination were not well-understood, routine, or conventional, and noted that "Plaintiff does not point to concrete allegations of this sort." *Id.* But here the district overlooked the express arguments the Plaintiff made and denied the Plaintiff an opportunity to amend the complaint to add them there as well. Chief among the problems was that "Google did not even attempt to argue that the application of 'time-shifting' or 'audio time-scale modification' to web-conferencing systems was known, let alone routine and conventional. Without any evidence, Google's motion must fail." Appx172. Another key problem was that "Google has not and cannot prove by clear and convincing evidence that the claim elements, both individually and collectively, were well-understood, routine, and conventional to a skilled artisan at the time of the invention." Appx171. Patent Owner argued that "the '637 claims change the routine or conventional process of the way otherwise live video conferences can be observed by participants, allowing participants to control different aspects of an otherwise live event." Appx174. The patent was in the record and supported this view. On a motion to dismiss, Appellants arguments should have been accepted as true or the Appellant should have been given an opportunity to amend the complaint to expressly make them.

41

In addition, Google relied on facts outside the complaint (including a prior art reference) to attempt to establish what was known, routine, or conventional. Appx171 (citing Google's reliance on the '213 patent). The district court did not exclude the materials outside the pleadings. Federal Rule of Civil Procedure 12(d) required the district court to treat the motion as one for summary judgment. Summary judgment could not have been granted on this record. Not "relying" on the additional material Google submitted did not cure the error. Appx22 (n.7).

In addition to setting forth these positions in the response, Plaintiff also submitted a declaration consistent with Rule 56(d) of the Federal Rules of Civil Procedure (Appx249-252), that discovery was needed to adequately respond to Google's motion, specifically with regard to *Alice* step two.  The declaration states:

> 5.  For example, fact discovery, including expert reports, documents, and/or depositions (and likely Markman proceedings) will be needed to determine if the asserted claims are well-understood, routine, and conventional, as Google contends. *See e.g.*, Dkt. 26 at 20.

> 6.  Plaintiff should also be allowed to develop the evidence the '637 patent claims an improvement in computer functionality over the state of the art existing at the time.

> 7.  Fact discovery is also needed to determine the facts, if any, supporting or refuting at least the following Google arguments:

> - "The patent specifically acknowledges that each of these components was already well-understood, routine, or conventional."

> - "Nothing in the claims, in view of the specification, requires anything other than off-the-shelf, conventional computer

technology for recording, storing, and playing back content."

- "Because the asserted claims only use admittedly well-understood and conventional computer hardware and software..."

- "The claims use this conventional ordering of steps with admitted conventional technology, including the 'first' and 'second client applications,' 'storage means,' 'application server,' and 'audio time-scale component.'"

- "First, the asserted patent claims are directed to a long-established abstract idea, adding only conventional computing components in functional terms."

- "The patent admits the solution is nothing more than playing back recorded content during and after the live meeting."

- "But the idea of recording a live broadcast and replaying parts of it during the broadcast has been around since at least the 1960s (e.g., instant replay during live sports broadcasts)."

- "the '637 patent acknowledges that all of these components merely perform generic functions of a computer and already existed before the claimed invention."

- The claims recite "functions [that] are generic time-shifting and audio time-scale modification technologies present in conventional VCRs, DVRs, voicemail, and open source software."

- "The very idea to which the '637 patent is directed—time-shifting a live presentation—and the purported problems it addressed were already understood over a decade before with pre-web technology."

8.  The facts above are disputed and resolution of these fact

43

disputes related to § 101 patent-eligibility cannot be reached without allowing Plaintiff an opportunity to obtain fact discovery (and likely expert discovery) regarding the above factual contentions.

Having set forth these positions, Plaintiff asked the district court for an opportunity to amend the complaint if the court identified any shortcomings in the complaint. Appx184 ("to the extent the Court finds any defects in the FAC, Plaintiff request[s] an opportunity to amend the complaint to address any such defects."). The district court identified just such a defect in its *Aatrix* footnote—"Plaintiff does not point to concrete allegations of this sort"—the Court nonetheless dismissed the case with prejudice opining that any such amendment based on futility. Appx22; Appx24; Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given). It defies logic that the court can dismiss *Aatrix* concerns solely based on a lack of allegations in the complaint and also conclude that amending the complaint would be futile.

## V.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Neither the Supreme Court in *Alice*, nor this Court in any of its following decisions, contemplated pleading-stage dismissals of patents whose claims embody technical solutions to technical problems. When an inventor sets out to solve a technical problem (here, lack of asynchronous web conferencing capabilities) with technical solutions, the "abstract" label should never be available to diminish the inventor's accomplishments.

The Court should reverse the finding of the District Court and find that claims 2, 3, 4, 5, 7, 8, and 9 of the '637 Patent are subject matter eligible. In the alternative, this Court should reverse the finding of the District Court as premature and order that the subject matter eligibility determination be made only after a reasonable time for discovery allows for consideration of a more complete record.

Dated: October 4, 2024                          Respectfully submitted,

                                                /s/ *David P. Berten*

                                                David Berten
                                                Alison Aubry Richards
                                                GLOBAL IP LAW GROUP LLC
                                                55 West Monroe Street, Suite 3400
                                                Chicago, IL 60603
                                                (312) 241-1500

                                                *Attorneys for Appellant*
                                                *US PATENT NO. 7,679,637 LLC*

45

# ADDENDUM

## TABLE OF CONTENTS

**Page(s)**

**DECISIONS APPEALED**

Order granting Defendant's Motion to Dismiss with            Appx1-26
prejudice, D.I. 30 (January 25, 2024)

Judgment By Court, D.I. 31 (January 25, 2024)               Appx27

**PATENT-IN-SUIT**

U.S. Patent No. 7,679,637 (D.I. 1- Ex. 1)                   Appx28-40

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

US PATENT NO. 7,679,637 LLC,

               Plaintiff,

     v.

GOOGLE LLC,

               Defendant.

CASE NO. 2:23-cv-00592-JHC

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

## I

### INTRODUCTION

This patent matter comes before the Court on Google's Rule 12(b)(6) Motion to Dismiss the First Amended Complaint. Dkt. # 26. Plaintiff claims infringement of its patent. Google seeks dismissal, arguing ineligibility under Section 101 of the Patent Act. Applying the two-step test of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), for the reasons discussed below, the Court finds that (1) the representative claims of the patent are directed to an abstract idea; and (2) such claims do not contain an inventive concept sufficient for patent eligibility. Further, the Court concludes that amendment of the operative pleading would be futile. Accordingly, the Court GRANTS Defendant's motion and DISMISSES this matter with prejudice.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 1

**Appx1**

## II

### BACKGROUND

On March 16, 2010, the United States Patent and Trademark Office issued U.S. Patent No. 7,679,637 ('637 Patent). Dkt. # 25 at 3. Plaintiff U.S Patent No. 7,679,637 LLC owns the '637 Patent. *Id.* Plaintiff filed its complaint on April 18, 2023, Dkt. # 1, and its First Amended Complaint (FAC) on July 31, 2021, Dkt. # 25. Plaintiff claims that Google's YouTube Service directly infringes Claims 2, 3, 4, 5, 7, 8, and 9 of the '637 Patent; and, in the alternative, that Google induces infringement of Claims 2,3, 4, and 5 of the '637 Patent. *Id.* at 3–4.

Defendant moves to dismiss Plaintiff's infringement claim under Rule 12(b)(6), arguing that the '637 Claims are not directed to patent-eligible subject matter required by § 101 of the Patent Act. 35 U.S.C. § 101. Dkt. # 26.[1]

## III

### PROCEDURAL & SUBSTANTIVE STANDARDS

A.    Motion to Dismiss

A defendant may move to dismiss a claim under Rule 12(b)(6) when a pleading "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), courts construe the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Courts must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). But courts are not required "to accept as true allegations that are

---

[1] In the alternative, Defendant argues for dismissal on the ground that the FAC "fails to plausibly allege that Google 'benefits' or 'uses' the entire claimed system." Dkt. # 26 at 30. Because the Court finds the '637 Patent ineligible under § 101, it need not address this argument in the alternative.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 2

**Appx2**

merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

B.      Section 101 Standards

Federal Circuit law applies to "substantive and procedural issues unique to and intimately involved in federal patent law." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 830 F.3d 1335, 1338 (Fed. Cir. 2016).

Patent eligibility may be resolved on a motion to dismiss so long as there "are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022); *see also ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019).

Section 101 of the Patent Act authorizes protection for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof[.]" 35 U.S.C. § 101.  The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (quotation marks omitted).

In *Alice Corp. Pty. Ltd.*, the Supreme Court outlined a two-step process for courts to use when assessing whether a claimed invention is an unpatentable abstract idea: first, the court asks

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 3

**Appx3**

whether the patent claims are directed to unpatentable subject matter, and second, if so, the court asks whether the patent includes an "inventive concept" implementing the abstract idea. 573 U.S. 208.

When conducting an *Alice* analysis, the court must consider the "representative" claims of a patent. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). "Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Id.*; *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016) (affirming district court's finding of representativeness when patentee did not "present[] any meaningful argument for the distinctive significance of any claim limitations other than those included in" the representative claim). "A claim is not representative simply because it is an independent claim." *Berkheimer*, 881 F.3d at 1365.

As touched on above, *Alice* step one requires the court to determine whether the representative claims are "directed to" one of the patent-ineligible concepts: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd.*, 573 U.S. at 217. If the representative claims are not directed to any of these concepts, the court must find the claims are patent eligible under § 101. When conducting this analysis, courts may "compare [the] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). And the Federal Circuit has approached this inquiry by asking "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (internal quotation marks and citations omitted). The court "must focus on the language of the Asserted

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 4

**Appx4**

Claims themselves . . . considered in light of the specification." *Id.* (internal quotation marks and citation omitted). The court must "look to whether the [representative] claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).

"In cases involving software innovations, this inquiry often turns on whether the [representative] claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *TecSec, Inc.*, 978 F.3d at 1293 (internal quotation marks and citation omitted). "[S]oftware can make patent-eligible improvements to computer technology, and related claims are eligible as long as they are directed to non-abstract improvements to the functionality of a computer or network platform itself." *Id.* (internal quotation marks and citation omitted). The Federal Circuit has held software-related claims patent eligible when (1) "the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014)[,]" and (2) the claim identifies "a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function, *Uniloc [USA, Inc. v. LG Elecs. USA, Inc.]*, 957 F.3d [1303,] 1306, 1308–09 [(Fed. Cir. 2020)]." *Id.*

A claim is patent ineligible when it "applies a well-known idea using generic computers 'to the particular technological environment of the Internet.'" *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) (quoting *DDR Holdings, LLC*, 773 F.3d at 1259); *see also Two-Way Media Ltd.*, 874 F.3d at 1337 ("Claims directed to generalized steps to be performed on a computer using conventional computer activity are not patent eligible."); *see also*

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 5

**Appx5**

*Affinity Labs of Texas LLC v. DIRECTV LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016) ("The Supreme Court and [the Federal Circuit] have repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract."). Finally, "a claim that merely describes an effect or result dissociated from any method by which it is accomplished is usually not directed to patent-eligible subject matter." *Int'l Bus. Machs. Corp. v. Zillow Grp. Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (internal quotation marks and citation omitted).

If the court determines the representative claims are directed to one of the patent-ineligible concepts, the court proceeds to *Alice* step two and determines whether the patent claims include an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice Corp. Pty. Ltd.*, 573 U.S. at 217 (internal quotation marks and citation omitted) (alteration in original). To become patent-eligible, a claim directed to a patent-ineligible concept "requires more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *ChargePoint, Inc.*, 920 F.3d at 773. When a claim "amount[s] to nothing significantly more than an instruction to apply [an] abstract idea … using some unspecified, generic computer and in which each step does no more than require a generic computer to perform generic computer functions" the abstract idea does not become patent-eligible "because claiming the improved speed or efficiency inherent with applying the abstract idea on a computer does not provide a sufficient inventive concept." *Intell. Ventures I LLC*, 838 F.3d at 1316 (internal quotation marks and citations omitted).

Finally, a court may conduct a § 101 analysis before formal claim construction if the patentee does not "explain how any proposed construction would change the § 101 analysis."

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 6

**Appx6**

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x 520, 525 (Fed. Cir. 2021) (affirming § 101 determination on a motion to dismiss before claim construction because plaintiff proposed no construction that would have changed the § 101 analysis).  A § 101 analysis may be conducted before formal claim construction "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).  But when a party does not identify any claim construction issues that need to be resolved or any factual disputes that would affect a § 101 analysis, the Federal Circuit has dismissed without conducting claim construction.  *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, No. 2022-1861, 2024 WL 89642, at *6 (Fed. Cir. Jan 9, 2024).

## IV
### DISCUSSION

A.      The '637 Patent

According to the '637 Patent abstract, it is,

> [a] web conferencing system which, in one aspect has time-shifting capabilities. Session content is recorded so that participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at normal, slower, or faster speeds, while maintaining substantially consistent perceived audio quality.

Dkt. # 27-2 at 2.  The '637 Patent specification[2] describes the system as a "multi-part software program comprised of a server application **110** running on a computer connected through a

---

[2] The specification "'includes both the written description and the claims' of the patent." *Cisco Sys. v. TQ Delta, LLC*, 928 F.3d 1359, 1362 (Fed. Cir. 2019) (quoting *In re Packard*, 751 F.3d 1307, 1320 n.11 (Fed. Cir. 2014)).

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 7

network **118** to multiple client applications **120***a*-**120***n*, each running on a computer." *Id.* at 9 (see FIG. 1 below).[3]

# FIG. 1



And the specification explains several advantages of the '637 Patent:

A participant can enter a meeting after it has begun and either begin observing the live content or rewind and see the content that they missed

A participant can observe a meeting in real-time and be able to pause the content to deal with an interruption

A participant observing a meeting can easily replay an interesting segment

---

[3] Dkt. # 27-2 at 3. Figure 1 "is a block diagram which illustrates the general organization and main components of an embodiment of a time-shifted web conferencing system." Dkt. # 27-2 at 9.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 8

A participant can observe a live meeting at slower than real-time to more easily digest the content

A participant observing on a delay (from joining late, pausing, replaying, etc. . . .) can observe the content faster than real-time[.]

*Id.*

*Language of the Claims allegedly infringed—i.e., Claims 2–5 and 7–9*

Claim 2 of the '637 Patent provides:

A web conference system comprising:

(a) A first client application allowing at least one presenting participant to share computer screen video,

(b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session,

(c) storage means for recording said computer screen video and said data stream, and

(d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live,

(e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream,

(f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream

whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream.

*Id.* at 13.

Claim 3 of the '637 Patent provides:

The system of claim 2 wherein:

(a) said first client application allows said presenting participant to share audio data

(b) said storage means records said audio data, and

(c) said second client application allows said observing participant to sense said audio data.

*Id.* at 13.  Claim 3 depends on Claim 2.  Dkt. # 25 at 13.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 9

Claim 4 of the '637 Patent provides:

The system of claim 3 wherein:

(a) said web conferencing system includes an audio time-scale modification component,

(b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed,

(c) whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed.

Dkt. # 27-2 at 14. Claim 4 depends on Claim 3. Dkt. # 25 at 14.

Claim 5 of the '637 Patent provides:

The system of claim 4 wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking.

Dkt. # 27-2 at 14. Claim 5 depends on Claim 4. Dkt. # 25 at 15.

Claim 7 of the '637 Patent provides:

A web conferencing system comprising:

(a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data

(b) a second client application that allows at least one observing participant to sense said data streams

(c) a server application operatively connected to said first client application and to said second client application, said server application arranged to: i. receive said data streams from said first client application and record it in a storage device ii. retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

Dkt. # 27-2 at 14.

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS - 10

**Appx10**

Claim 8 of the '637 Patent provides:

> The system of claim 7 wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session.

*Id.*

Claim 9 of the '637 Patent provides:

> The system of claim 8 wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams.

*Id.* Claim 9 depends on Claim 8. Dkt. # 25 at 19

B.     The Representative Claims

Defendant argues that Claims 2–5 are representative "because they recite substantially similar limitations and are drawn to the same abstract idea as [C]laims 7-9 with [C]laims 7-9 reciting a 'server application.'"[4] Dkt. # 26 at 12, 27. The Court agrees.

In sum, Claim 2 focuses on the sharing of computer screen video; data stream information including "chat data, documents, web pages, and white-boarding session"; storing of such data; and a second client application enabling another user to observe such data, both live and previously recorded. Dkt. # 27-2 at 13. Claim 3 focuses on the sharing, storing, and observation of audio data between first and second client applications. *Id.* Claim 4 focuses on the time-scale modification component enabling the second client application to perceive aspects of the audio data at various rates of playback speed. *Id.* at 14. And Claim 5 focuses on the second client application's time-shifting operations of pausing, resuming, and seeking. *Id.*

---

[4] Defendant also contends that because the '637 Patent "acknowledges that 'the server application' performs generis functions, this limitation does not substantially change the character of [C]laims 7–9 under *Alice*." Dkt. # 26 at 27. The Court agrees.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 11

**Appx11**

In sum, Claim 7 focuses on the sharing of computer screen video and audio data; the recording and retrieval of such data from a server application; a time-scale modification component enabling the second client application to perceive audio data at various playback rates; and the selective observation and sensing of data streams, both live and previously recorded. Dkt. #27-2 at 14. Thus, Claim 7 is represented by Claims 2, 3, and 4. *Id.* Claim 8 focuses on data stream information including "chat data, documents, web pages and white-boarding session[s]" and is, therefore, represented by claim 2. *Id.* Finally, Claim 9 focuses on the second client applications time-shifting operations of pausing, resuming, and seeking and is represented by Claim 5. *Id.*

Plaintiff responds that Defendant's argument is "conclusory" and that Google has not addressed the question "whether each claim has distinctive claim limitations (*e.g.*, limitations not common to the other claims)." Dkt. # 27 at 11. But the Federal Circuit has explained that claims are representative when "the *patentee* does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim." *Berkheimer*, 881 F.3d at 1365 (emphasis added). And Plaintiff has not done so here. Dkt. # 27 at 11–12. Thus, the Court finds Claims 2–5 representative for purposes of its § 101 analysis.

C.     Claim Construction

Plaintiff says that it would be premature for the Court to determine patent-eligibility at the motion to dismiss stage, and that the Court must conduct a claim construction hearing beforehand. Dkt. # 27 at 18. To support this assertion, Plaintiff says that two terms may be

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 12

**Appx12**

"functional" under § 112(6):[5] "time-scale modification component" and "storage means." *Id.* But Plaintiff merely contends that *Google* may make certain arguments about the functionality of these terms in a claim construction hearing—Plaintiff neither proposes constructions of these terms nor explain "how any proposed construction would change the § 101 analysis." *Mortg. Application Techs., LLC*, 839 F. App'x at 525. Therefore, the Court may proceed with a § 101 analysis without conducting claim construction.

D.      The Federal Circuit's application of the *Alice* Two-Step Framework

District courts may "compare [the] claims at issue to those claims already found to be directed to an abstract idea in previous cases[]" when considering a motion to dismiss under § 101. *Enfish, LLC*, 822 F.3d at 1335. Below the Court summarizes instructive cases and then compares the representative claims of the '637 Patent in its eligibility analysis.

1.      Cases involving claims directed to ineligible subject matter under § 101

In *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, the Federal Circuit found patent claims "directed to a method of receiving, displaying, converting, storing and transmitting digital video 'using result-based functional language'" to be ineligible under § 101. 60 F.4th 1349, 1357 (Fed. Cir. 2023) (quoting *Two-Way Media Ltd.*, 874 F.3d at 1337). At *Alice* step one, the Federal Circuit agreed with the district court's conclusion that the claims were "directed to the abstract idea of 'storing and displaying video.'" *Id.* at 1356 (internal citations omitted). At *Alice* step 2, the Federal Circuit held that the claims "'read in light of the specification, do not show a technological improvement in video storage and display because the limitations can be

---

[5] Section 112(6) states that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(6).

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 13

**Appx13**

implemented using generic computer elements,' and the 'specification and claims do not explain or show how the monitoring and storage is improved, except by using already existing computer and camera technology.'" *Id.* at 1358. And even if the claims attained the patent-holder's purported solution of achieving the "benefit of transmitting the same digital image to different devices for different and perhaps divergent purposes, while using the same bandwith," the Federal Circuit explained the claims use only "generic functional language" to do so and only require "conventional computer and network components operating according to their ordinary functions[.]" *Id.* at 1358 (internal quotation marks omitted) (citing *Two-Way Media*, 874 F.3d at 1339).

In *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, the Federal Circuit found a claim ineligible under § 101. 874 F.3d 1329. The claim recited "a method for routing information using result-based functional language." *Id.* at 1337. The court found that the claim required "the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but [did] not sufficiently describe how to achieve these results in a non-abstract way." *Id.* at 1337 (quoting *Affinity Labs of Tex.*, 838 F.3d at 1258–59). At *Alice* step 2, the Federal Circuit held that "[m]erely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 1338. The court held that the main problem with the claim was that it "—as opposed to something purportedly described in the specification—is missing an inventive concept." *Id.* at 1339. And while the plaintiff said that "the claim solves various technical problems, including excessive loads on a source server, network congestion, unwelcome variations in delivery times, scalability of networks, and lack of precise recordkeeping . . . [the claim] here only uses generic functional language to achieve these purported solutions." *Id.* at

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 14

**Appx14**

1339. The court also saw "no inventive concept in the ordered combination of these limitations." *Id.* at 1339.

In *Interval Licensing LLC v. AOL Inc.*, the Federal Circuit found patent claims directed to "providing information to a person without interfering with the person's primary activity" to be ineligible under § 101. 896 F.3d 1335, 1343 (Fed. Cir. 2018) (internal quotation marks and citation omitted).[6] The court determined that "[s]tanding alone, the act of providing someone an additional set of information without disrupting the ongoing provision of an initial set of information is an abstract idea" and "the collection, organization, and display of two sets of information on a generic display device is abstract[.]" *Id.* at 1344–45. At *Alice* step two, the Federal Circuit began its analysis by stating "[i]t is well-settled that placing an abstract idea in the context of a computer does not 'improve' the computer or convert the idea into a patent-eligible application of that idea." *Id.* at 1346. And the court held that the claims at issue did not include the "kinds of limitations we have held to 'solve a technology-based problem, even with conventional, generic components, combined in an unconventional manner.'" *Id.* at 1347 (quoting *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016), *cert. denied*, ___ U.S. ___, 138 S.Ct. 469, 199 L.Ed.2d 356 (2017)). The Federal Circuit held that "the claims here do not offer a particular solution to a problem that, in [other cases], was unique to the internet." *Id.* at 1347.

___

[6] Plaintiff says that *Interval Licensing LLC* is distinguishable because the parties there "**agreed** that the claims in the patent . . . were directed to an 'attention manager'; and the district court determined that the abstract idea was 'providing information to a person without interfering with that person's primary activity.'" Dkt. # 27 at 17 (citing *Interval Licensing LLC*, 896 F.3d at 1341). But the district court's order highlighted differences between the plaintiff's and the defendants' positions on the claims: "Defendants argue the asserted claims are directed at the abstract idea of providing information to a person without interfering with the person's primary activity[]" and "[Plaintiff] argues that the claims are 'directed to the operation of an attention manager system[.]" *Interval Licensing LLC v. AOL Inc.*, 193 F. Supp. 3d 1184, 1187 (W.D. Wash. 2016). Thus, the Court does not see the case as meaningfully distinct.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 15

**Appx15**

Finally, in *International Business Machines Corporation*, the Federal Circuit found two patents ineligible for patent protection under § 101. 2024 WL 89642, at *1. The district court found the claims of the first patent "'possess[ed] the following indicia of abstractness: (1) describing processes that can be performed with a pen and paper; (ii) using claim language that is result-oriented; and (iii) focusing on an intangible, namely information.'" *Id.* at *4 (quoting J.A. [Joint Appendix] 18). The district court concluded that the patent "'merely mimics what humans do to search for information, with the added feature of conducting the entire exercise on a computer.'" *Id.* (quoting J.A. 18). The Federal Circuit agreed and held that the patent claims "do nothing more than improve a user's experience while using a computer application and are precisely the types of claims that we have held are abstract at step one" in previous cases. *Id.* The Federal Circuit held that plaintiff "fails to explain how the claims do anything more than '[i]dentify[], analyz[e], and present[] certain data to a user,' which we explained in [a prior case] is 'not an improvement specific to computing.'" *Id.* (quoting *Int'l Bus. Machs. Corp.*, 50 F.4th at 1378). Because the claims "do not disclose any technical improvement to how computer applications are used[,]" the Federal Circuit agreed that the first patent is directed to an abstract idea. *Id.* As for the second patent, the Federal Circuit agreed with the district court that it was directed to an abstract idea because,

> the claims are directed to improving a user's experience when viewing search results but do not contain any specific mechanism for doing so. For example, representative claim 14 uses results-oriented language, such as "receiving a resource response set of results," "receiving a user context vector," "mapping the user context vector," and "controlling the presentation of the resource response set," without any explanation for how these steps are carried out.

*Id.* at *5. At *Alice* step two, the Federal Circuit agreed with the district court's determination that "IBM's allegations of inventiveness 'do[] not … concern the computer's or graphical user interface's capability or functionality, [but] relate[] merely to the user's experience and

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 16

**Appx16**

satisfaction with the search process and results.'" *Id.* at *4 (quoting J.A. 22). When the Federal Circuit recently found inventiveness, it highlighted that "the specification for those patents included a 'specific implementation' of improving search results, rather than a simple conceptual description of an improvement." *Id.* (quoting *Weisner v. Google LLC*, 51 F.4th 1073, 1086 (Fed. Cir. 2022). Thus, the first patent was not patent-eligible. Similarly, the Federal Circuit found the second patent was not inventive because the plaintiff's claims of inventiveness were not "in the specification or the claims." *Id.*

2.     Cases involving claims directed to eligible subject matter under § 101

According to Plaintiff, *DDR Holdings, LLC v. Hotels.com, L.P.*, controls the outcome here. 773 F.3d at 1257. There, the Federal Circuit found the patented claims eligible under a § 101 analysis because "the claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* While the Federal Circuit cautioned that "not all claims purporting to address Internet-centric challenges are eligible for patent," it found that the patent's claims at issue did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice" and the claims "specif[ied] how interactions with the internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258.

Plaintiff also cites *Visual Memory LLC v. NVIDIA Corp.*, in which the Federal Circuit found patented claims eligible under a §101 analysis. 867 F.3d 1253 (Fed. Cir. 2017). The Federal Circuit found the patents at issue to be "directed to a technological improvement: an enhanced computer memory system." *Id.* at 1258–59. According to the Federal Circuit, the patent's claims "focus on a 'specific asserted improvement in computer capabilities'—the use of

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 17

**Appx17**

programmable operational characteristics that are configurable based on the type of processor—instead of 'on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Id.* at 1260 (quoting *Enfish, LLC*, 822 F.3d at 1336). The Federal Circuit also stated that the patent's specification "discusses the advantages offered by the technological improvement." *Id.* at 1260. Therefore, the court found that "this is not a case where the claims recite . . .generalized steps to be performed on a computer using conventional computer activity.'" *Id.* at 1260 (quoting *Enfish, LLC*, 822 F.3d at 1338).

E.      The Eligibility of the '637 Patent's Representative Claims Under § 101

        1.      *Alice* Step One

For three reasons, the Court concludes that the '637 Patent is directed to the abstract idea of playing back recorded content.

First, Plaintiff does not say, and the claim language does not illustrate how, the claims focus "on a solution to a problem specifically arising in the realm of computer networks or computers." *TecSec, Inc.*, 978 F.3d at 1293 (internal quotation marks and citation omitted). Nor do the claims identify "a specific improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function[.]" *Id.* (internal quotation marks and citation omitted).

Plaintiff says that "the patent claims an invention that is specifically addressed to a specific technical problem with web-based video conferencing, itself a highly technical field that requires all manner of technologies just to establish the conference, let alone have in operate in a manner consistent with the claims." Dkt. # 27 at 17. But the Court struggles to discern what is the "specific technical problem with web-based video conferencing," as Plaintiff does not

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 18

**Appx18**

elaborate on this. Elsewhere, Plaintiff says that the claims address the issue that "current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Dkt. # 27-2 at 8. If this is the "specific technical problem," it is not an issue unique to the internet or "in the realms of computer networks"—it is an issue in most meetings, whether virtual or in-person.

Plaintiff highlights that "playing back of some recorded media was known in other technical fields prior to the invention, e.g., digital video recorders (DVRs) like TiVo, which the patent correctly explains is in 'a separate field' of 'television viewing[.]'" Dkt. # 27 at 7. The '637 Patent states,

> Web conferencing systems, however, presented technical challenges that are different from television viewing, and [Plaintiff's] invention solved some of those technical issues, overcoming technological problems specifically arising in the realm of these web conferencing systems. For example, unlike a self-contained DVR, web conferencing systems of the kind claimed in the invention involved at least two distinct applications: one used by the presenter and separate applications used by other participants. The '637 patent expressly claims the use of two different applications. . . . Second, unlike TV, web conferencing systems of the kind claimed in the invention use more than one data stream. The '637 patent expressly claims the use of distinct data streams.

*Id.* at 8. But this merely summarizes the content of the claims, not any specific improvements. And while there very well may be different technological issues between web conferencing systems and "a self-contained DVR," the Federal Circuit explained that "merely limiting the field of use of the abstract idea to a particular existing technological environment [i.e., web conferencing systems] does not render the claims any less abstract." *Affinity Labs of Texas LLC*, 838 F.3d at 1259.

More to the point, Plaintiff says that the invention "solved some of those technical issues" but does not specify how the claims make the alleged improvements. Nor does the claim

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 19

**Appx19**

language identify the alleged improvements. Thus, the Court finds that the representative claims do not include a "specific implementation" of improving web-based conferencing. While "[t]he '637 [Patent] explains that, unlike DVRs/TiVo with televisions, 'current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress[,]'" Dkt. # 27 at 8, this is merely a "simple conceptual description of an improvement." *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at *4.

Second, the representative claims of the '637 Patent "possess the following indicia of abstractness: . . . claim language that is result-oriented[.]" *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at *4. Plaintiff fails to explain how the claims do anything more than "share"; "store"; enable a user to "observ[e]" and "sense" the data; and enable "time-shifting" capabilities. Dkt. # 27-2 at 13–14; *see Two-Way Media Ltd.*, 874 F.3d at 1337 ("the claim require[d] the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but [did] not sufficiently describe how to achieve these results in a non-abstract way."). As the Federal Circuit has explained, "a claim that merely describes an effect or result dissociated from any method by which it is accomplished is usually not directed to patent-eligible subject matter." *Int'l Bus. Machs. Corp*, 50 F.4th at 1378.

Third, the Federal Circuit previously found that "patent claims directed to 'providing information to a person without interfering with the person's primary activity' to be ineligible under § 101." *Interval Licensing LLC*, 896 F.3d at 1343. As in *Interval Licensing LLC*, the representative '637 Patent claims merely provide the abstract idea of "collect[ing], organiz[ing], and display[ing] . . . two sets of information on a generic display device." *Id.* at 1344–45. Moreover, the '637 Patent describes its functions as the recording of session content "so that

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 20

**Appx20**

participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed." Dkt. # 27-2 at 2. And unlike in *DDR Holdings*, the claims here do not offer a solution to an issue unique to the internet. 773 F.3d at 1257.

Finally, in *Hawk Technology Systems*, the Federal Circuit found patent claims "directed to a method of receiving, displaying, converting, storing and transmitting digital video 'using result-based functional language[,]'" ineligible under § 101. 60 F.4th at 1357. The representative claims of the '637 Patent are similarly directed. Claim 2 outlines a "web conference system" allowing for an application to "share computer screen video" and other data; enabling "storage means for recording" said video and data; and a "second client application" enabling another participant to sense said live and previously recorded data. Dkt. # 27-2 at 13. Claim 3 builds on Claim 2 and provides for the "shar[ing]," "stor[ing], and "observing" of audio data. *Id.* Claim 4 builds on Claim 3 and allows for "time-scale modification" of shared screen data, audio data, and the data stream. *Id.* at 14. Finally, Claim 5 enables the observing client application to pause, resume, and seek shared data. *Id.*

For these reasons, the Court finds the representative claims of the '637 Patent to be directed to an abstract idea.

2.      *Alice* Step Two

Because the Court finds the representative claims of '637 Patent to be directed to an abstract idea, it must proceed to step two of the *Alice* framework. Defendant argues that the "[i]ndividual [e]lements and [o]rdered [c]ombination" of the representative claims of the '637

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 21

**Appx21**

Patent "[f]unction in a [c]onventional [w]ay and [d]o [n]ot [s]upply an [i]nventive [c]oncept." Dkt. # 26 at 26 (in heading).  The Court agrees.[7]

Plaintiff states that "[t]he asserted claims recite inventive concepts sufficient to render them patent-eligible."  Dkt. # 27 at 18.  But Plaintiff does not explicitly identify these "inventive concepts" and neither the claim language nor the specification outlines these concepts.  "Merely alleging inventiveness without tying those allegations to the patent is insufficient to survive a Rule 12 motion." *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at *5.[8]

Assuming the '637 Patent's inventive concept is the enablement of a user to "observe a previously recorded part of the meeting while the meeting is still in progress," Dkt. # 27 at 8, this language does not sufficiently recite an inventive concept.  It merely restates the "abstract goals of the invention; [it does] not teach how" a previously recorded part of the meeting can be observed while the meeting is still in progress.  *IBM v. Zillow*, 549 F. Supp. 3d 1247, 1268 (W.D. Wash. 2021), aff'd, *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371 (Fed. Cir. 2022); *see also Dropbox Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (finding that the plaintiff's claims that each patent solves "given technological problems, but

---

[7] In the opposition brief, in the section addressing *Alice* step 2, Plaintiff cites a prior Google patent arguing that "Google *itself* makes extensive use of 'functional claiming' on its own patents."  Dkt. # 27 at 20–21.  This prior patent is immaterial.  The focus of the § 101 analysis is on the claim language of the '637 Patent.  Therefore, this Court must consider the claims of the '637 Patent for the § 101 analysis.  Whether Defendant has prior patents that also employ "functional claiming" does not affect this analysis.
Also, Plaintiff says that Defendant's 12(b)(6) motion has transformed into a motion for summary judgment because Defendant introduced a patent not on the face of Plaintiff's complaint, Dkt. # 27 at 13–14 (citing Dkt. # 26 at 14).  But the Court does not rely on that patent in its § 101 analysis and need not address this argument.
[8] Plaintiff says that the *Aatrix* decision precludes dismissal based on Rule 12(b)(6), Dkt. # 27 at 14–15, but the Court disagrees.  In *Aatrix*, the patentee pointed to "concrete allegations in the [] complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity [and] [t]here are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer."  882 F.3d at 1128.  Plaintiff does not point to concrete allegations of this sort.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 22

never provide more support than a conclusory statement that 'the inventions described and claimed ... solved these problems,' improved the art, 'represented a significant advance over existing approaches[,] and were not well-known, routine, or conventional in the field' at the time of patenting" were no more than a "series of legal conclusions" and "insufficient to survive a motion to dismiss.").

Moreover, despite Plaintiff's assertion that the '637 Patent provides inventive concepts, the representative claims "only use[] generic functional language to achieve these purported solutions." *Two-Way Media Ltd.*, 874 F.3d at 1339; *see also BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018) ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application."). The representative claims are comprised of "generic computer functions." *Intell. Ventures I LLC*, 838 F.3d at 1318. Claim 2 provides for the "shar[ing] of computer screen video[,]" "storage means for recording[,]" and receiving recorded content. Dkt. # 27-2 at 13. Claim 3 provides for "audio time-scale modification component." *Id.* at 14. Claims 2 and 3 provide for recording computer screen video, data streams, and audio data. *Id.* at 13–14. Claims 2, 3, and 4 provide for sharing and sensing data streams, audio data, and computer screen video data. *Id.* And Claim 5 provides for time-shifting operations including pausing, resuming, and seeking. *Id.* at 14. The Federal Circuit held in *Two-Way Media Ltd.*, that claims requiring the "processing of data streams, [and] transmi[ssion] . . . from an intermediate computer" as well as claims "receiving and transmitting a real-time media stream from an intermediate server, . . . and recording certain information about the steam" require nothing more "than conventional computer and network components

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 23

operating according to their ordinary functions." 874 F.3d at 1340–41 (internal quotation marks and citation omitted).

Finally, recent Federal Circuit cases determining § 101 patent eligibility are instructive. As in *Hawk Technology Systems*, the representative claims of the '637 Patent, read in light of the specification, "do not show a technological improvement in video storage and display because the limitations can be implemented using generic computer elements[.]" 60 F.4th at 1358. Nor do the claims "explain or show how the monitoring and storage is improved, except by using already existing computer and camera technology." 60 F.4th at 1358. And compared to *Visual Memory LLC*, while the '637 Patent's specification "discusses the advantages offered by" their patent claims, Dkt. # 27-2 at 9, it does not specify the technological improvement. 867 F.3d at 1260.

For these reasons, the Court finds that the representative claims of the '637 Patent do not contain an inventive concept sufficient for patent eligibility under § 101.

F.      Dismissal With Prejudice

Plaintiff requests an opportunity to amend if this Court finds any defect in their FAC. Dkt. # 27 at 27. A district court must grant leave to amend unless one or more of these factors are present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Courts in this district have dismissed without leave to amend when amendment would be futile after determination of ineligibility under §101. *See e.g.*, *PTP OneClick, LLC v. Avalara, Inc.*, 413 F. Supp. 3d 1050, 1065 at n.11 (W.D. Wash., 2019) ("Dismissal without leave to amend is appropriate only when the court is satisfied that the

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 24

**Appx24**

deficiencies in the complaint could not possibly be cured by amendment. . . . Here, no amendment can revive the eligibility of the '915 Patent. . . . Accordingly, the court dismisses PTP's patent infringement claim without leave to amend."); *Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176, 1184 (W.D. Wash., 2016) (dismissal of complaint with prejudice where the court found the patents in question cover ineligible subject matter).

Also, based on futility, the Federal Circuit has affirmed district court dismissals without leave to amend under Ninth Circuit law. For example, in *Sanderling Mgmt. v. Snap Inc.,* the Central District of California's dismissal of an infringement suit for lack of patent-eligible subject matter under 35 U.S.C. § 101 and denial of plaintiff's motion for leave to amend complaint was appealed. 65 F.4th 698 (Fed. Cir. 2023). The Federal Circuit held,

> [n]o amendment to a complaint can alter what a patent itself states. In this case, then, our agreement with the district court as to what the patent discloses, and our agreement with the court's application of the *Alice* test, leads inexorably to the conclusion that amendment of the complaint would have been futile. Sanderling's proposed amendment merely sought to add conclusory statements that the claimed steps were not well-known, routine, and conventional.

*Id.* at 706.

The Court finds that granting leave to amend would be futile. The claim language of '637 Patent dictates the result of § 101 ineligibility and amendment cannot rectify that. *See Sanderling Mgmt.*, 65 F.4th at 706 ("[n]o amendment to a complaint can alter what a patent itself states.").

## V

### CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion to Dismiss and DISMISSES the FAC with prejudice.

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 25

**Appx25**

Dated this 25th day of January, 2024.

John H. Chun
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS - 26

# UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| US PATENT NO 7,679,637 LLC<br><br>               Plaintiff,<br>   v.<br><br>GOOGLE LLC<br><br>               Defendant | **JUDGMENT IN A CIVIL CASE**<br><br>CASE NUMBER 2:23-cv-00592-JHC |

☐    **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒    **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT

Defendant's Rule 12(b)(6) Motion to Dismiss the First Amended Complaint, Dkt. # 26, is

GRANTED.  Plaintiff's First Amended Complaint is dismissed with prejudice.

Dated January 25, 2024.

Ravi Subramanian_____
Clerk of Court


/s/Ashleigh Drecktrah_____
Deputy Clerk

**Appx27**

US007679637B1

## (12) United States Patent
### Kohler

(10) **Patent No.:** **US 7,679,637 B1**
(45) **Date of Patent:** **Mar. 16, 2010**

(54) **TIME-SHIFTED WEB CONFERENCING**

(76) Inventor: **Jeffrey Alan Kohler**, 6880 156th Pl., NE., Redmond, WA (US) 98052

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 82 days.

(21) Appl. No.: **11/973,219**

(22) Filed: **Oct. 5, 2007**

### Related U.S. Application Data

(60) Provisional application No. 60/855,076, filed on Oct. 28, 2006.

(51) **Int. Cl.**
*H04N 7/14* (2006.01)
(52) **U.S. Cl.** ............................... **348/14.01**; 379/202.01
(58) **Field of Classification Search** ... 348/14.01–14.08; 379/202.01; 341/61; 370/260; 704/503
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,278,387 B1 * 8/2001 Rayskiy ...................... 370/260

| | | | | |
|---|---|---|---|---|
| 6,298,129 | B1 * | 10/2001 | Culver et al. ........... | 379/202.01 |
| 6,847,778 | B1 * | 1/2005 | Vallone et al. ................. | 386/68 |
| 6,906,741 | B2 * | 6/2005 | Canova et al. ........... | 348/14.08 |
| 6,967,599 | B2 * | 11/2005 | Choi et al. ..................... | 341/61 |
| 7,466,334 | B1 * | 12/2008 | Baba ........................ | 348/14.06 |
| 2002/0165721 | A1 * | 11/2002 | Chang ......................... | 704/503 |
| 2006/0146124 | A1 * | 7/2006 | Pepperell et al. ......... | 348/14.08 |
| 2008/0247730 | A1 * | 10/2008 | Barton et al. ................. | 386/83 |

* cited by examiner

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Maria El-Zoobi

(57) **ABSTRACT**

A web conferencing system which, in one aspect has time-shifting capabilities. Session content is recorded so that participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at normal, slower, or faster speeds, while maintaining substantially consistent perceived audio quality.

**9 Claims, 5 Drawing Sheets**



**Appx28**

Case 2:24-cv-02092-JDC-CBW Document 1 Filed 04/15/23 Page 89 of 101 PageID #: 51

# FIG. 1



Case 2:24-cv-02092-JbC Document 24-1 Page 90 4/15/23 Page 10/04/2024 51

# FIG. 2



3/31/2023 13:04:01

**Appx30**

# FIG. 3

<u>Variables</u>

```
m_fPaused           //indicates if playback is paused
                    // (true) or resumed (false)
m_dwTickStart       //indicates system time when current
                    //  playback began
m_dwStartOffset     //indicates presentation time when
                    //  current playback began
m_flRate            //indicates playback rate (1.0 for
                    //  real-time, 2.0 for double...)
```

<u>Functions</u>

```
Pause
    Set m_dwStartOffset to the current presentation time
    Set m_fPaused to true

Resume
    Set m_dwTickStart to the current system time
    Set m_fPaused to false

Seek
    Set m_dwTickStart to the current system time
    Set m_dwStartOffset to the desired seek position

Change Playback Rate
    Set m_dwTickStart to the current system time
    Set m_dwStartOffset to the current presentation time
    Set m_flRate to the desired playback rate

Get Current Presentation Time
    if( m_fPaused )
        return m_dwStartOffset
    else
        return ( (current system time - m_dwTickStart)
            * m_flRate ) + m_dwStartOffset
```

**Appx31**

# FIG.4

```
RetrieveFrames( DWORD dwPresentationTimeRequested,
                UINT  nLastFrameNumberReceived,
                bool  fReceiveAllFrames )
{
      if( nLastFrameNumberReceived == -1 )
      // this would indicate no frames previously received
            fReceiveAllFrames = false;

      CAtlArray<SFrameInfo> framesToRetrieve;
      for( size_t i = 0; i < m_receivedFrames.GetCount(); i++ )
      {
            if( m_receivedFrames[i].nFrameNumber > nLastFrameNumberReceived ||
                nLastFrameNumberReceived == -1 )
            {
                  if( m_receivedFrames[i].dwPresentationTime >
                      dwPresentationTimeRequested )
                  {
                        break;
                  }

                  if( m_receivedFrames[i].fKeyFrame && !fReceiveAllFrames )
                  {
                        framesToRetrieve.RemoveAll();
                  }

                  framesToRetrieve.Add( m_receivedFrames[i] );
            }
      }

      return framesToRetrieve;
}
```

**Appx32**

Case 2:24-cv-00092-JRG Document 24 Page 934/15/23 Filed: 10/04/2024 51

# FIG. 5



US 7,679,637 B1

## TIME-SHIFTED WEB CONFERENCING

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of provisional patent application Ser. No. 60/855,076, filed 2006 Oct. 28 by the present inventor.

### FEDERALLY SPONSORED RESEARCH

Not applicable

### COMPUTER PROGRAM LISTING

A computer program listing appendix is stored on each of two identical compact disks labeled "Copy 1" and "Copy 2" which accompany this specification. Each disk contains computer program listings that illustrate an implementation of the invention. The listings are recorded as IBM-PC MS-Windows compatible files which have the creation dates, sizes (in bytes) and names listed below:

| | | \ |
|---|---|---|
| 10/22/2006 03:58 PM | 2,817 | ReadMe.txt |
| | | \MeetingDemand |
| 07/29/2006 12:19 PM | 1,372 | MeetingDemand.sln |
| | | \MeetingDemand\Common |
| 10/18/2006 09:36 PM | 769 | debughelpers.h |
| | | \MeetingDemand\MDClientApp |
| 10/16/2006 08:39 PM | 9,058 | CameraInput.cpp |
| 10/16/2006 08:39 PM | 1,885 | CameraInput.h |
| 10/16/2006 08:34 PM | 3,211 | ClockCapture.cpp |
| 10/16/2006 08:31 PM | 408 | ClockCapture.h |
| 10/16/2006 08:34 PM | 2,219 | ClockOverlay.cpp |
| 10/16/2006 08:34 PM | 311 | ClockOverlay.h |
| 10/18/2006 10:04 PM | 6,925 | CommunicationMgr.cpp |
| 10/17/2006 10:29 PM | 2,462 | CommunicationMgr.h |
| 10/16/2006 08:50 PM | 1,722 | ConnectDlg.cpp |
| 10/16/2006 08:50 PM | 553 | ConnectDlg.h |
| 10/18/2006 10:08 PM | 13,252 | MDClientApp.cpp |
| 10/18/2006 08:41 PM | 3,021 | MDClientApp.h |
| 10/22/2006 08:24 PM | 7,418 | MDClientApp.rc |
| 10/22/2006 08:25 PM | 8,960 | MDClientApp.vcproj |
| 10/18/2006 10:06 PM | 17,045 | MDClientAppDlg.cpp |
| 10/18/2006 10:06 PM | 2,258 | MDClientAppDlg.h |
| 10/22/2006 08:25 PM | 1,973 | resource.h |
| 10/18/2006 09:33 PM | 3,247 | ScreenCapture.cpp |
| 10/18/2006 09:33 PM | 296 | ScreenCapture.h |
| 10/18/2006 09:58 PM | 1,919 | ScreenDecoder.cpp |
| 10/18/2006 09:58 PM | 1,429 | ScreenDecoder.h |
| 10/18/2006 09:59 PM | 3,136 | ScreenEncoder.cpp |
| 10/18/2006 09:58 PM | 862 | ScreenEncoder.h |
| 10/02/2006 06:10 PM | 211 | stdafx.cpp |
| 10/02/2006 06:10 PM | 3,008 | stdafx.h |
| 10/17/2006 10:33 PM | 4,073 | TSPlaybackMgr.cpp |
| 10/17/2006 10:33 PM | 1,089 | TSPlaybackMgr.h |
| 10/17/2006 08:20 PM | 1,648 | VideoDecoder.cpp |
| 10/16/2006 09:28 PM | 729 | VideoDecoder.h |
| 10/16/2006 09:28 PM | 381 | VideoDecoderBase.h |
| 10/16/2006 09:28 PM | 1,439 | VideoDisplay.cpp |
| 10/16/2006 09:28 PM | 483 | VideoDisplay.h |
| 10/17/2006 10:07 PM | 3,045 | VideoEncoder.cpp |
| 10/16/2006 09:28 PM | 840 | VideoEncoder.h |
| 10/16/2006 09:28 PM | 27 | WebService.h |
| | | \MeetingDemand\MDClientApp\AudioInput |
| 10/16/2006 08:26 PM | 2,272 | sync_simple.h |
| 10/16/2006 08:26 PM | 18,274 | waveIN_simple.cpp |
| 10/16/2006 08:26 PM | 8,004 | waveIN_simple.h |

-continued

| | | |
|---|---|---|
| | | \MeetingDemand\MDClientApp\AudioOutput |
| 10/18/2006 08:48 PM | 3,647 | AudioOutput.cpp |
| 10/18/2006 08:48 PM | 1,064 | AudioOutput.h |
| 10/18/2006 08:33 PM | 2,288 | DataBuffer.cpp |
| 10/18/2006 08:40 PM | 634 | DataBuffer.h |
| 10/18/2006 08:34 PM | 3,423 | TempoChangingAudioBuffer.cpp |
| 10/18/2006 08:34 PM | 791 | TempoChangingAudioBuffer.h |
| | | \MeetingDemand\MDClientApp\MDWebService |
| 10/05/2006 02:49 PM | 398 | MDWebService.disco |
| 10/17/2006 10:15 PM | 20,636 | MDWebService.wsdl |
| 10/05/2006 02:49 PM | 614 | results.discomap |
| | | \MeetingDemand\MDClientApp\res |
| 07/29/2006 12:19 PM | 402 | MDClientApp.rc2 |
| | | \MeetingDemand\MDWebService |
| 10/17/2006 10:36 PM | 6,992 | index.cpp |
| 10/17/2006 10:14 PM | 2,691 | Index.h |
| 10/17/2006 10:14 PM | 8,176 | MDWebService.cpp |
| 07/29/2006 12:18 PM | 171 | MDWebService.def |
| 10/05/2006 09:36 AM | 281 | MDWebService.disco |
| 10/17/2006 10:14 PM | 7,204 | MDWebService.h |
| 10/17/2006 08:06 PM | 2,038 | MDWebService.htm |
| 07/29/2006 12:18 PM | 2,577 | MDWebService.rc |
| 09/10/2006 02:11 PM | 6,039 | MDWebService.vcproj |
| 07/29/2006 12:18 PM | 439 | resource.h |
| 07/29/2006 12:18 PM | 299 | StdAfx.cpp |
| 07/29/2006 04:40 PM | 1,146 | StdAfx.h |

### BACKGROUND

1. Field

The field is web conferencing, specifically the application of time-shifting presentation techniques to the field of web conferencing.

2. Prior Art

Web conferencing systems can be used hold meetings and give presentations where participants are in remote locations. Web conferencing systems allow participants to share content with and observe content from other participants. Typical types of content include screen video data, camera video data, audio data (through computers and through telephones), chat data, documents, and the like

The current generation of web conferencing systems is focused primarily on real-time interaction. That is, participants join a virtual meeting at a designated time and are able to present and observe in real time (hereafter synchronously). Secondarily, many web conferencing systems can record the meeting. This allows a participant to observe the content of the meeting after the meeting has concluded.

However current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress. This is undesirable for several reasons. First, if a participant joins a meeting five minutes late, their only choices are to either observe real-time and simply miss the first five minutes, or wait until the entire meeting has concluded to watch the entire recorded content or a selected part of it. Second, if a participant is observing real-time there is no way for them to pause the content to deal with an interruption, or to easily replay a portion of the content to repeat something they missed. Third, if a participant is observing in real-time and the presenter is moving too quickly, there is no way for the participant to slow the presentation.

A key struggle with using existing web conferencing systems is the organization and scheduling required to ensure

US 7,679,637 B1

**3**

that all participants are available and connected before the presentation begins. This leads to great inefficiencies, because some participants will simply have to wait for the rest of the participants to join, and some participants may miss part of the presentation or have to wait until the presentation has completed to observe it in its entirety.

In a separate field, commercial digital video recording services and associated equipment, such as one sold under the trademark TiVo by TiVo, Inc, Alviso, Calif., have paved the way in providing live time-shifting capabilities for television viewing and have begun to affect consumers' expectations. Prior to digital video recorders (DVRs), consumers had limited control over their viewing experience. Consumers could either watch a television show in real-time, or with devices like video cassette recorders they could watch a recorded version of the show after the whole show had finished.

DVRs have empowered consumers by allowing them to time-shift real-time television content.

In yet another field, algorithms have been devised to time-scale manipulate audio content with high fidelity reproduction. These algorithms allow an audio stream to be played back at a faster or slower rate while maintaining other perceived aspects of the audio, such as timbre, voice quality, and pitch.

Audio time-scale modification techniques have been applied to applications such as voice-mail and dictation tape playback, post synchronization of film and video, and playback of recorded content. These techniques have also been employed in adaptive buffering schemes for streaming audio (to speed up or slow down audio playback to maintain an optimal buffer length).

### ADVANTAGES

Accordingly several advantages of one or more aspects are to enable several advantageous web conferencing scenarios not previously possible:

- a participant can enter a meeting after it has begun and either begin observing the live content or rewind and see the content that they missed
- a participant can observe a meeting in real-time and be able to pause the content to deal with an interruption
- a participant observing a meeting can easily replay an interesting segment
- a participant can observe a live meeting at slower than real-time to more easily digest the content
- a participant observing on a delay (from joining late, pausing, replaying, etc. . . . ) can observe the content faster than real-time

Another advantage of one or more aspects is the mitigation of scheduling problems. A meeting organizer can begin the presentation whenever they are ready. The participants who are available at the time can begin observing immediately in real-time. Participants who join later can immediately begin observing what they missed.

### SUMMARY

According to one aspect, a web conferencing system includes time-shifting capabilities which enable participants to observe a session in real-time, delayed while the session is still in progress, or after the session has completed. Participants are also able to observe the session at different playback rates while maintaining substantially consistent perceived aspects of audio quality.

**4**

### DRAWINGS

#### Figures

FIG. **1** is a block diagram which illustrates the general organization and main components of an embodiment of a time-shifted web conferencing system.

FIG. **2** is a block diagram which illustrates the components responsible for time-shifted playback of audio, according to one embodiment. This diagram represents a specific example of stream decompression and display **130a-130n** in FIG. **1**.

FIG. **3** is a pseudo-code listing of a portion of playback logic used by a client application to determine what presentation time to request from a server, according to one embodiment. This corresponds to playback logic **126** in FIG. **1**.

FIG. **4** is a pseudo-code listing of a portion of server logic used to determine what frames to send to a client application based on a presentation time requested, according to one embodiment. This corresponds to server logic **112** in FIG. **1**.

FIG. **5** is a block diagram which illustrates an alternate embodiment of a time-shifted web conferencing system incorporating telephony.

#### DRAWINGS

#### Reference Numerals

| | |
|---|---|
| 110 | server |
| 112 | server logic |
| 114 | storage |
| 116 | server-side communication |
| 118 | network |
| 120a-120n | client |
| 122 | capture logic |
| 124 | client-side communication |
| 126 | playback logic |
| 128a-128n | stream capture and compression |
| 130a-130n | stream decompression and display |
| 130aud | audio stream decompression and display |
| 210 | audio decompression |
| 212 | audio time-scale modification |
| 214 | audio buffer |
| 216 | audio output |
| 510 | telephony network |
| 520a-520n | telephone |
| 530a-530n | participant |
| 540 | telephony device |

### DETAILED DESCRIPTION

#### First Embodiment—FIGS. **1** and **2**

Overview

The general organization and main components of the first time-shifted web conferencing system embodiment are illustrated in FIG. **1**. The system is a multi-part software program comprised of a server application **110** running on a computer connected through a network **118** to multiple client applications **120a-120n**, each running on a computer.

Server

Server **110** is responsible for handling and setting up a web conferencing session, receiving and storing streams of data being shared by the client applications **120a-120n**, and sending streams of data to the client applications.

**Appx35**

US 7,679,637 B1

5

**Network**

Network **118** is a communications link that facilitates the transfer of content between, for example, the server and client applications. In the first embodiment, the network includes the Internet. It may also include one or more other types of networks, such as a local-area-network, a wide-area-network, a point-to-point dial-up connection, a cell-phone network, and the like.

**Client**

Client applications **120a-120n** run on participants' computers. The client application captures the streams that the participant chooses to share (if any). The client application sends these streams to server **110**. The client application also receives the streams from the server that the participant chooses to observe (if any) and displays them. The client application includes a user interface that allows participants to select what streams to share and receive as well as to pause, resume, seek, and adjust the playback rate while observing. In this way a participant can use the client application to share and/or receive.

**Streams**

In this system, a web conferencing session contains one or more streams. A stream is any type of data that a participant can share or observe. Examples of streams include screen video, camera video, audio (through computers and/or through telephones), documents, collaborative chat, or any other types of data involved in a web conferencing session.

Streams are comprise a series of discrete frames. Frames are time dependent data. Examples of frames include a segment of audio, a single video image, etc. In the first embodiment each frame in a stream is given a sequential number. Frames are given a timestamp that identifies when they occurred in the session. Frames are identified either as key frames, which can be interpreted independently of any other frames, or as delta frames which rely on previous frames.

This key and delta frame scheme is commonly used in the audio visual field, but it can be applied to other types of streams as well. For instance a web page or document shared during a session can be represented as a key frame. Also a white-boarding session (where participants can annotate an image with virtual pens) can be represented as a sequence of frames (where a pen stroke can be a delta frame, etc.).

**Sharing Process**

The process involved in sharing content in the first embodiment is as follows: Client applications **120a-120n** contain two key components for sharing: a capture logic software module **122** and a collection of stream capture and compression components **128a-128n**. The capture logic contains information relating to each stream that can be shared. There are different types of stream capture and compression components for each type of data that can be shared. For instance, there is a component type for dealing with screen video, for dealing with camera video, for dealing with audio, etc. Thus the stream capture and compression components constitute a means for sharing data.

In the first embodiment when (if) a participant chooses to share a stream, a capture logic module **122** initializes the appropriate stream capture and compression component **128a-128n**. The stream capture and compression component provides stream format information. This information can include the type of stream as well as stream specific format information such as the codec (compression scheme) used, image dimensions, sampling rate, etc. . . . . The client application then needs to notify the server about this new stream. This is accomplished by sending the information to a client-

6

side communication component **124** which passes the information through network **118** to server **110**.

The server receives information through a server-side communication component **116**. A server logic software module **112** acknowledges the new stream and assigns a unique number to identify the stream. This acknowledgement is passed back to the client through the server-side communication component, network, and client-side communication component.

This arrangement of client-side communication, network, and server-side communication is also used to pass other types of data between the server and the client applications.

During the session, if the participant chose to share streams, frames are captured and compressed by a corresponding component **128a-128n**. Capture logic module **122** assigns the frames sequence numbers and time stamps. The frames are then passed to the server.

When the frames reach the server, server logic module **112** puts meta-information about the frame in an index and then records the frame data with storage component **114**. In the first embodiment the server logic maintains an index for each stream, and the storage component maintains a file containing the actual frame data for the stream. The index contains an entry for each frame that was received. Each entry contains the meta-information for the frame: frame number, the timestamp of the frame, whether the frame was marked as a key frame or a delta frame, and an offset into the storage file where the data from the frame was stored.

**Observing Process**

The process involved in observing content in the first embodiment is as follows: Clients **120a-120n** receive a list of streams that have been shared through server **110**. A participant can then select which of these streams (if any) they would like to observe. When a stream is chosen, an appropriate stream decompression and display component **130a-130n** is initialized with format information received from the server. Similar to the stream capture and compression components **128a-128n**, there are different types of stream decompression and display components for each type of stream that can be observed.

While a session is being observed, information about what to observe is provided by the playback logic module **126**. This information is sent to the server **110**. Based on this information, server logic module **112** determines what frames should be returned. The appropriate frames are retrieved from storage unit **114** and returned to the client. The frames are then provided to the appropriate stream decompression and display components **130a-130n** which handle decompressing and displaying them. Thus the stream decompression and display components constitute a means for observing data streams.

This process of the client sending information to the server, the server responding with frames, and the client displaying those frames occurs repeatedly as the session is observed.

**Capture Logic**

With a general overview of the process provided, we can begin to explore individual aspects of the process in more depth.

In the first embodiment capture logic component **122** is responsible for providing sequence numbers and timestamps for each frame that is captured and sent to server **110**.

The timestamps given to each frame are relative to the start of the session. For example, a timestamp could indicate that a frame corresponds to a point in time five minutes into the session. Time relative to the start of the session is referred to as presentation time.

**Appx36**

US 7,679,637 B1

**7**

Another important time concept is that of local system time. Each of client applications **120a-120n** is run on a computer. The client application is able to query the computer's operating system to determine the local time on that computer. This local system time is useful in much of the capture and playback logic.

As part of its responsibilities, capture logic module **122** maintains the following information for each stream that is being shared: the local system time when the stream first started to be shared, the presentation time when the stream first started to be shared, and a count of how many frames have been captured.

When a frame is captured, the capture logic gives it a timestamp (current system time–system time when the stream started to be shared+presentation time when the stream started to be shared). The capture logic also numbers the frame based on how many frames have been captured.

Server Logic

When server **110** receives a frame, it simply stores the frame and its accompanying information. In one embodiment an index is kept by server logic module **112** and the frame data is kept in storage component **114**. Thus the server logic module and storage component constitute a means for recording data streams.

The process is slightly more involved when the server receives a request for frames from a client that is requesting to observe streams. When the client requests frames, it sends along the presentation time requested and the streams that it is interested in receiving. Additionally, for each stream requested, the client also sends along the number of the last frame (if any) from that stream that the client received.

Server logic module **112** will determine the appropriate frames to send for each stream. A listing of a program for implementing this logic is illustrated in FIG. **4** in the C++ programming language. If the client indicated that they had not received any previous frames for a stream (either because they just started observing, or because of a discontinuity like a seek operation), the server logic will find the key frame with the latest presentation time whose presentation time is less than or equal to the requested presentation time. The server logic will then return that frame and any subsequently numbered frames whose presentation times are less than or equal to the requested presentation time.

In the simplest embodiment, if a client provided the number of the last received frame, the server logic would return any frames with a higher number and a presentation time less than or equal to the requested presentation time.

However, there are advantages to having the server logic be smarter than this. In some cases, having a client receive every single frame is important. This could be the case for an audio stream to prevent audio distortion, for a video stream to provide smoother playback and prevent the appearance of jitter, etc. However, in cases where receiving every single frame is not as important, the ability to skip frames can lead to significant bandwidth savings. The decision to allow frames to be skipped can be made on a stream-by-stream basis (e.g., to prevent audio skipping) or on a request by request basis (e.g., if bandwidth becomes restrained a client could chose to sacrifice smoother playback).

Therefore a more advanced embodiment would allow the client to select between receiving all frames or just those frames necessary to display the stream correctly. If the client chose not to receive all frames and there were no key frames between the last received frame and the requested presentation time, the result will be the same as with the simplest embodiment. If there were one or more key frames, the server

**8**

would return the key frame with the latest presentation time less than or equal to the requested presentation time and any subsequently numbered frames whose presentation times are less than or equal to the requested presentation time.

Playback Logic

Another point of interest is playback logic module **126**, which in the first embodiment is responsible for determining what presentation time to request from server **110** if a participant chose to observe. The playback logic module supports the ability to have the participant perform time-shifting actions such as pausing, resuming, and seeking backward or forward. The playback logic module also supports changing the rate at which content is displayed; i.e., allow the participant to observe at slower than or faster than real-time.

The playback logic module is connected to the client application's user interface. Thus the playback logic module and the client application's user interface constitute an interface means allowing participants to pause, resume, seek, and to adjust the playback rate of streams.

A pseudo-code listing of a program for implementing the playback logic module is displayed in FIG. **3**.

In addition to what is shown in the figure, the playback logic is also responsible for remembering the last frame number received for each stream. The last received frame numbers are all initialized to indicate that no frame has been received (in the first embodiment the invalid frame number, −1, is used). The last received frame numbers are updated every time frames are received from the server. In the case of a discontinuity such as seeking (jumping to another point in time), the last received frame numbers would be reset to −1.

Stream Decompression and Display

After frames are received by client **120a-120n**, they are sent to one of the stream decompression and display components **130a-130n**. For the most part, the workings of these components resemble those of similar components in existing web conferencing or audio video display applications. One aspect worth mentioning is how these components deal with playback rate.

In its simplest embodiment, if a stream decompression and display component received a collection of frames from the server, it could decompress the frames in order and then simply display the last frame.

However, for an increased level of fidelity an improved embodiment would display each frame with the appropriate amount of time between each frame. For example, if an improved stream decompression and display component received two frames whose presentation times differed by one second, the component could decompress both frames, display the first frame, wait one second and then display the second frame. A more advanced embodiment would have the components coordinate with each other and the playback logic to improve synchronization between the streams.

If a participant manipulated the playback rate, the components would simply need to adjust the time between frames accordingly.

Audio Stream Decompression and Display

Certain stream types need a more sophisticate treatment. For instance, without additional care, if the playback rate of an audio stream was adjusted, the pitch would change and the audio would seem distorted. It would be advantageous to be able to adjust the playback rate of the audio stream while maintaining the perceived aspects such as pitch.

FIG. **2** illustrates an embodiment of an audio stream decompression and display component **130aud** which addresses the above concerns. It contains an audio decom-

**Appx37**

US 7,679,637 B1

9                                                                10

pression component **210**, an audio buffer **214** that stores the decompressed audio, and an audio output component **216** responsible for playing the audio.

A point of interest is the audio time-scale modification component **212**. This component includes logic for manipulating the time-scale of a stream of audio while maintaining the perceived aspects of audio quality. Example algorithms include the WSOLA algorithm introduced by Verhelst and Roelands, and available at http://ieeexplore.ieee.org/xpl/free-abs_all.jsp?arnumber=319366, or related algorithms. The first embodiment uses Olli Parviainen's open-source Sound-Touch library, available at http://www.surina.net/sound-touch/.

As audio is received it is decompressed and placed into buffer **214**. As audio is played back, a segment of audio of a certain length is retrieved from the buffer and fed into time-scale modification component **212**. This produces a resultant segment of audio of the same or different length which is then consumed by audio output **216**.

The lengths of the audio segments and the behavior of the time-scale modification component are controlled by the playback rate. For example, in the first embodiment, if the audio output required audio segments 250 milliseconds long and the playback rate was 1.0 (real-time) an audio segment of 250 milliseconds would be retrieved from the buffer. This segment would be fed into the time-scale modification component which would leave it unchanged and return an identical 250 millisecond audio buffer to be output.

Similarly, if the playback rate was 2.0 (twice as fast as real-time), an audio segment 500 milliseconds long would be retrieved from the buffer and fed into the time-scale modification component. The time-scale modification component would adjust the audio and return a 250 millisecond segment to be output.

Physical Configuration

In a typical scenario, the participants **530a-530n** who are presenting and observing would be in remote locations. Client applications **120a-120n** with which the participants are interacting would be running on personal computers. In the first embodiment, the participants would each be running copies of the same client software application. The client application would have the ability to share (present) data streams as well as observe (view) data streams. In other embodiments, multiple client software applications could be provided that support differing capabilities (e.g., first client application for presenting and second client application for observing).

Server application **110** would be running on server class computer. This computer could be hosted and maintained by a company running the web conferencing system. Alternatively, it could be hosted by a company or organization that one or more of the participants are affiliated with.

In the first embodiment, the client application and server application are implemented in C++.

Additional Embodiments

Additional embodiments incorporating different designs and providing different functions can be provided.

Server Architecture

FIG. **1** shows a single server. However, it is possible and advantageous to have the duties split among a plurality of physical computers and software components. This division would afford scalability, redundancy, and performance advantages.

Multiple servers could be implemented by separating the storage unit **114** from the server logic component **112** and server-side communication component **116** and placing them on separate physical machines. Additionally, multiple physical machines with the same software components could be used. For example, multiple servers could sit behind a load-balancer. As requests came in, the load-balancer could direct the requests to an appropriate server.

Storage

The way that frame data and associated information is stored and retrieved is open to alternatives. In one example the frame meta-information is stored in a relational database. Relational databases can provide performance, scalability, and persistence advantages over storing the meta-information in an in-memory structure or in a file. The frame data could also be stored in a database, on a network attached storage device, or the like.

Client Architecture

In the first embodiment, a single client application is provided for participants to share and/or observe content. In an alternative embodiment, multiple client applications could be provided. Motivations for this could include simplifying or limiting the application used for observation. Also, applications could be provided for different operating systems or platforms. For example, in a Microsoft Windows environment a native application might be required for full capabilities, such as sharing screen data, but an Adobe Flash application might be able to observe and share some types of data.

Communication

In the first embodiment, the client application observes a session by repeatedly making requests to the server for frames. Each request contains the streams requested, and the last frame numbers received for each stream. While this provides an easier implementation, it is not the most high-performing.

A more optimized embodiment could have the server remember the streams that each client is interested in, the playback rate for the client and the last frame numbers sent for each stream to each client. In this embodiment, clients would only need to update the server if something changed; e.g., if different streams are selected, a discontinuity occurred, etc.

Additionally, there are existing advanced audio video broadcasting mechanisms that do not rely on this request/response mechanism. For example, with protocols like the real-time transport protocol (http://tools.ietf.org/html/rfc1889), the server simply continues to send frames to clients and some separate quality of service mechanism informs the server if the frames are reaching their destination. This can lead to performance improvements, including lowered latency. An embodiment could embrace this strategy.

Also, in the first embodiment, the clients all communicate with the server. However, it is conceivable that under certain circumstances it would be advantageous for some of the clients to communicate directly with each other. For example, a client sharing stream data would send the data to the server to be stored. If there was another nearby client attempting to observe this stream data, the second client might be able to receive the data directly from the first client instead of through the server. Other network topologies could be imagined that would have further advantages.

Other Communications Media

In the first embodiment, all stream data is shared and received through a network connection between the client applications and the server. However, there are examples

**Appx38**

US 7,679,637 B1

**11**

where this could be expanded. For instance, for sharing or receiving audio, a telephone may be a more suitable device than a computer.

FIG. **5** shows an embodiment that allows participants to share or receive audio through a telephone or through their computer. This embodiment features the addition of a telephony device **540**. This device could be a teleconferencing bridge, an Asterisk server (Asterisk is an open source telephony software program capable of interfacing with telephony networks), a computer running a session initiation protocol (SIP) application (SIP is a protocol commonly used to communicate with telephony networks), or the like. The telephony device communicates through network **118** to server **110**. The telephony device sends audio data to the server to be stored and retrieves audio data from the server to be sent to participants. The server and telephony device contain logic for compressing and decompressing the audio data. The telephony device is connected to a telephony network **510**. This telephony network, which could include the public switched telephone network (PSTN), a private telephone network or the like, connects to telephones **520a-520n**. Participants **530a-530n** connect to the session using client applications **120a-120n**. As in the first embodiment, participants can input and output audio through the client application on their computer. In this embodiment participants also have the option to input and output audio data through their telephone.

In order to support variable speed playback of audio through telephones, some of the logical components introduced with the first embodiment would need to be included in the server application. Before sending audio data to the telephony device, the server would need to decompress it with audio decompression **210**, and manipulate it with audio time-scale modification **212**.

### CONCLUSIONS, RAMIFICATIONS, AND SCOPE

Accordingly, the reader will see that one or more embodiments of time-shifted web conferencing provide several advantageous features. Participants are able to observe content live, delayed while the session is still in progress, or after the session has completed. Additionally, participants are able observe at normal, slower or faster speeds while maintaining substantially consistent perceived aspects of audio quality.

Although the description above contains many specificities, these should not be construed as limiting the scope of any aspect but as merely providing illustrations of some of the presently preferred embodiments. Many other variations are possible and should be considered in the scope. For example the client and server components could run on devices other than computers, clients could maintain a separate local storage of session data, different types of stream data or communication networks could be used, the applications could be organized differently, etc.

Accordingly, the scope should be determined not by the embodiments illustrated, but by the appended claims and their legal equivalents.

I claim:

1. A method of presenting audio data in a web conference comprising:
(a) providing an input means which allows at least one presenting participant to share audio data,
(b) providing a storage means which is able to record said audio data and is operatively connected to said input means,
(c) recording said audio data with said storage means,

**12**

(d) providing an output means which is operatively connected to said storage means and allows at least one observing participant to listen to said audio data,
(e) providing an interface means which can receive instructions and which allows said observing participant to:
i. pause, resume, and seek said audio data, and
ii. adjust the playback rate of said audio data,
(f) providing a time-scale modification means which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates,
(g) retrieving said audio data from said storage means in accordance with said instructions given to said interface means,
(h) manipulating said audio data with said time-scale modification means in accordance with said instructions given to said interface means,
(i) providing said audio data to said observing participant with said output means,
whereby said observing participant can provide said instructions to said interface means at the same time that said presenting participant is sharing said audio data, and said audio data from said presenting participant can be simultaneously recorded by and retrieved from said storage means, allowing said observing participant to selectively listen to said audio data live and allowing said observing participant to selectively listen to a previously presented and recorded part of said audio data at a plurality of playback rates at the same time that said presenting participant is sharing said audio data, and said observing participant will perceive substantially consistent audio quality.

2. A web conferencing system comprising:
(a) a first client application allowing at least one presenting participant to share computer screen video,
(b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group consisting of chat data, documents, web pages and white-boarding session,
(c) storage means for recording said computer screen video and said data stream, and
(d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live,
(e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream,
(f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream
whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream.

3. The system of claim **2** wherein:
(a) said first client application allows said presenting participant to share audio data
(b) said storage means records said audio data, and
(c) said second client application allows said observing participant to sense said audio data.

**Appx39**

US 7,679,637 B1

13

4. The system of claim 3 wherein:

(a) said web conferencing system includes an audio time-scale modification component,

(b) said second client application also allows said participant to observe said computer screen video, said data stream, and said audio data at an adjustable rate of speed,

whereby said audio time-scale modification component maintains substantially consistent perceived aspects of audio quality at a plurality of chosen playback rates of speed.

5. The system of claim 4 wherein said second client application also allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking.

6. The method of claim 1 wherein said audio data is provided to said observing participant in such a way that said observing participant can also provide said instructions to said interface means and listen to said audio data after said presenting participant has finished sharing said audio data.

7. A web conferencing system comprising:

(a) a first client application that allows at least one presenting participant to share data streams comprised of audio data and computer screen video data

(b) a second client application that allows at least one observing participant to sense said data streams

(c) a server application operatively connected to said first client application and to said second client application, said server application arranged to:

14

i. receive said data streams from said first client application and record it in a storage device

ii. retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

8. The system of claim 7 wherein said data streams also include data selected from the group consisting of chat data, documents, web pages and white-boarding session.

9. The system of claim 8 wherein said second client application allows said observing participant to perform time-shifting operations comprising pausing, resuming and seeking said data streams.

\* \* \* \* \*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules.

1. The brief complies with Fed. Cir. R. 32(b). It has been prepared using Microsoft® Word 2013 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of Microsoft® Word in preparing this certificate. That program reports the total word count of the document, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), as 9,694 words. If the words used in the claim elements depicted on pages 12 to 15 should also be counted, they contain 464 words counted by hand count, for a total of 10,158 words.

Dated: October 4, 2024                    /s/ *David P. Berten*

                                          David Berten
                                          GLOBAL IP LAW GROUP LLC
                                          55 West Monroe Street, Suite 3400
                                          Chicago, IL 60603
                                          (312) 241-1500