**No. 2024-1520**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

US PATENT NO. 7,679,637 LLC

*Plaintiff/Appellant,*

*v.*

GOOGLE LLC

*Defendant/Appellee.*

On Appeal from the United States District Court for the Western District of Washington, No. 2:23-cv-00592-JHC, Judge John H. Chun

**APPELLANT US PATENT NO. 7,679,637 LLC'S COMBINED PETITION FOR PANEL REHEARING AND REHEARING *EN BANC***

DAVID P. BERTEN
ALISON A. RICHARDS
GLOBAL IP LAW GROUP, LLC
55 W. Monroe Street, Suite 3400
Chicago, IL 60603
(312) 241-1500

*Attorneys for Appellant*
*US Patent No. 7,679,637 LLC*

February 23, 2026

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  2024-1520

**Short Case Caption**  US Patent No. 7,679,637 LLC v. Google LLC

**Filing Party/Entity**  US Patent No. 7,679,637 LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/23/2026

Signature:  /s/David Berten

Name:  David Berten

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| US Patent No. 7,679,637 LLC | Jeffrey Kohler | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| J. Chad Mitchell, SUMMIT LAW GROUP, PLLC | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☑ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

STATEMENT OF COUNSEL ...............................................................................vi

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................2

    I.    A Fair Characterization of the Claims Requires Acknowledgment that "Playing Back Recorded Content" or "Asynchronous Review of Presentations" Occur (1) in a Web-Conferencing System; and (2) While the Presentation is Happening (e.g., While it is Live)..........................................2

    II.    The Patent Teaches How to Achieve Simultaneous Recording and Playback of a Live Web Conference, Rendering Them Non-Abstract...........................4

    III.  *En Banc* Review Should Resolve the Disparate Approaches to *Alice* Step One in *Contour IP* and This Case.................................................11

# TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ............................................................... passim

*Contour IP Holding LLC v. GoPro, Inc.*,
113 F.4th 1373 (Fed. Cir. 2024) ....................................... 1, 3, 12, 13

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ................................................. 2, 5, 6

**Rules**

Fed. R. App. P. 40(b)(1) .........................................................................1

Fed. R. App. P. 40(b)(2) .........................................................................1

MPEP § 608.05(a).................................................................................12

# STATEMENT OF COUNSEL

Pursuant to Federal Rule of Appellate Procedure 40(b) and Federal Circuit Rules 40(b) and (c), counsel for Appellant states that, in counsel's judgment:

(1) Panel rehearing is warranted because the panel decision misapprehended aspects of the claims and overlooked the extensive computer code that is part of the specification, both of which explain "how" the goal of asynchronous review of a presentation is achieved.  Fed. R. App. P. 40(b)(1).

(2) *En banc* review is warranted to resolve the inconsistent approaches and outcomes of this case and a separate panel's holding in *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373 (Fed. Cir. 2024).  Fed. R. App. P. 40(b)(2).  *En banc* consideration is necessary to secure and maintain uniformity of this Court's decisions regarding the application of *Alice* step one to claims reciting specific technological means for achieving technological results, particularly in cases involving the manipulation of multiple data streams.

/s/ *David P. Berten*

David Berten
Alison Aubry Richards
GLOBAL IP LAW GROUP LLC
55 West Monroe Street, Suite 3400
Chicago, IL 60603
(312) 241-1500

*Attorneys for Appellant*
*US Patent No. 7,679,637 LLC*

vi

**INTRODUCTION**

The panel determined at *Alice* step one that the claims could be characterized as "directed to the patent-ineligible abstract idea of asynchronous review of presentations," not because that idea is ineligible per se, but "because they do not 'describe *how* the alleged goal of [asynchronous review] is achieved.'" Op. 6 (*quoting Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (emphasis added by panel).

Respectfully, the panel is wrong in two respects. First, the panel's abstract idea "asynchronous review of presentations," overlooks the key innovation and limitation of the claim: the asynchronous review of presentations occurs *while the presentation is live.* This was the problem the invention sought to solve: "However current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress." Appx34. And the innovation was the creation of a web conferencing system that can *simultaneously* record and playback content as the presentation is taking place. Disregarding that element is error.

Second, contrary to the panel's conclusion, the specification explains *how* the innovation of simultaneous recording and retrieval is accomplished. This is explained in detail by (1) how streams are captured (the capture logic); (2) how

1

incoming frames are entered into an index on the server (the server logic); (3) how an observer interacts with the server (the observer logic); and (4) how playback requests to the server results in simultaneous recording and playback of a live web conference (the playback logic).  All of this explanation is not only in the specification in English, but also in the computer code that was submitted with the application.  The panel nowhere mentions the code nor explains why it can conclude that a patent that includes such code can nonetheless fail to explain how the invention operates.

As for *en banc* consideration, while the panel distinguishes *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373 (Fed. Cir. 2024), in a single sentence, Appellant respectfully submits that the approach of the *Contour IP* panel and the approach of this panel with regard to *Alice* step one are inconsistent and the full Court should review and harmonize the approaches.

## ARGUMENT

**I.    A Fair Characterization of the Claims Requires Acknowledgment that "Playing Back Recorded Content" or "Asynchronous Review of Presentations" Occur (1) in a Web-Conferencing System; and (2) While the Presentation is Happening (e.g., While it is Live)**

The district court's opinion concluded that the claims were directed to the abstract idea of "playing back recorded content."  Appellant challenged this characterization in part because the district court's summary did not acknowledge or address key limitations of the claims or the problem the inventor was trying to

2

solve.  The inventor identified a specific problem with then current web conferencing systems: "Current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress."  Appx34.  As explained in the abstract, the invention solved this problem: "Session content is recorded so that participants are able to observe the session in real-time, delayed while the session is still in progress, or after the session has completed."  Appx28.  This aspect of the inventions is expressly set forth in the claims:

- "whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream." (claim 2).  Appx39.

- "whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams" (claim 7).  Appx40.

The panel opinion does not opine on whether the district court's characterization is overly general, but states that even if was narrowed to "asynchronous review of presentations," the claims remain directed to an abstract idea.  The core passage reads:

> Regarding *Alice* Step One, Appellant argues the district court erred in determining the asserted claims are directed to the abstract

3

idea of "playing back recorded content." Appellant Br. 21 (citing J.A. 18). According to Appellant, this is an over-generalization of the claims, which are directed to a "specific asserted improvement that allows a presentation to be reviewed asynchronously . . . at the same time." *Id*. at 23–26. Even if we were to narrow the district court's characterization of the claims, however, we would still conclude the claims are directed to the patent-ineligible abstract idea of allowing asynchronous review of presentations, rather than any specific technological improvement, because they do not "describe *how* the alleged goal of [asynchronous review] is achieved." *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (emphasis added).

Op. 6.

Despite the central importance of improving a web conferencing system to allow simultaneous recording and playback of a live web conference, neither the district court's nor the panel's characterization of the claim includes this fundamental innovation for which the patentee was awarded the patent. For the reasons set forth in Section III below, the panel should correct the error. In doing so, the panel should also recognize that the patent explains how to achieve simultaneous recording and playback of a live web conference, as explained in Section II.

## II. The Patent Teaches How to Achieve Simultaneous Recording and Playback of a Live Web Conference, Rendering Them Non-Abstract

The panel's *Alice* step one determination appears to find claims 2 and 7 directed to an abstract idea because the panel determined the claims do not "describe *how* the alleged goal of [asynchronous review] is achieved." Op. 6

4

(*quoting Hawk Tech. Sys.*, 60 F.4th at 1357) (emphasis added by panel).

First, as explained above, the goal was not "asynchronous review" in general, as in after a web conference was over and a recording of it was being accessed. The goal was "simultaneous recording and playback of a live web conference." Second, to the extent the claims do not claim a specific manner of achieving that goal, the patent specification does, and it appears the panel misapprehended these teachings.

To achieve the goal of simultaneous recording and playback of a live web conference, the patent explains (1) how streams are captured (the capture logic); (2) how incoming frames are entered into an index on the server (the server logic); (3) how an observer interacts with the server (the observer logic); and (4) how playback requests to the server results in simultaneous recording and playback of a live web conference (the playback logic).

With regard to **capture logic**, the patent teaches:

Client applications **120a-120n** contain two key components for sharing: a capture logic software module **122** and a collection of stream capture and compression components **128a-128n**. The capture logic contains information relating to each stream that can be shared. There are different types of stream capture and compression components for each type of data that can be shared. For instance, there is a component type for dealing with screen video, for dealing with camera video, for dealing with audio, etc. (5:46-55).

During the session, if the participant chose to share streams, frames are captured and compressed by a corresponding component **128a-128n**. Capture logic module **122** assigns the frames sequence numbers

5

and time stamps. The frames are then passed to the server. (6:13-18).

The timestamps given to each frame are relative to the start of the session. For example, a timestamp could indicate that a frame corresponds to a point in time five minutes into the session. Time relative to the start of the session is referred to as presentation time. (6:63-67).

Another important time concept is that of local system time. Each of client applications **120**a-**120**n is run on a computer. The client application is able to query the computer's operating system to determine the local time on that computer. This local system time is useful in much of the capture and playback logic. (7:1-6).

As part of its responsibilities, capture logic module **122** maintains the following information for each stream that is being shared: the local system time when the stream first started to be shared, the presentation time when the stream first started to be shared, and a count of how many frames have been captured. (7:7-12).

When a frame is captured, the capture logic gives it a timestamp (current system time−system time when the stream started to be shared+presentation time when the stream started to be shared). The capture logic also numbers the frame based on how many frames have been captured. (7:13-17).

Appx36-37. This specific capture logic is further detailed in the computer code

included with the specification (and overlooked completely by the panel).

With regard to **server logic**, the patent teaches:

When the frames reach the server, server logic module **112** puts meta-information about the frame in an index and then records the frame data with storage component **114**. In the first embodiment the server logic maintains an index for each stream, and the storage component maintains a file containing the actual frame data for the stream. The index contains an entry for each frame that was received. Each entry contains the meta-information for the frame: frame number, the timestamp of the frame, whether the frame was marked as a key frame or a delta frame, and an offset into the storage file where the data from

6

the frame was stored.  (6:18-28).

Appx36.  The use of an index on the server for each frame received when the frames reach the server is what will ultimately allow simultaneous recording and playback of a live web conference.  This is a "specific technical improvement" over prior art systems that allowed the simultaneous recording and playback of a web conference.  This specific server logic is further detailed in the computer code included with the specification (and overlooked completely by the panel).

With regard to **observer logic**, the patent teaches:

The process involved in observing content in the first embodiment is as follows: Clients **120**a-**120**n receive a list of streams that have been shared through server **110**. A participant can then select which of these streams (if any) they would like to observe. When a stream is chosen, an appropriate stream decompression and display component **130**a-**130**n is initialized with format information received from the server. Similar to the stream capture and compression components **128**a-**128**n, there are different types of stream decompression and display components for each type of stream that can be observed. (6:31-41).

While a session is being observed, information about what to observe is provided by the playback logic module **126**. This information is sent to the server **110**. Based on this information, server logic module **112** determines what frames should be returned. The appropriate frames are retrieved from storage unit **114** and returned to the client. The frames are then provided to the appropriate stream decompression and display components **130**a-**130**n which handle decompressing and displaying them.  (6:42-49).

The process is slightly more involved when the server receives a request for frames from a client that is requesting to observe streams. When the client requests frames, it sends along the presentation time requested and the streams that it is interested in receiving. Additionally for each stream requested, the client also sends along the

number of the last frame (if any) from that stream that the client received.  (7:26-32).

Server logic module **112** will determine the appropriate frames to send for each stream. A listing of a program for implementing this logic is illustrated in FIG. **4** in the C++ programming language. If the client indicated that they had not received any previous frames for a stream (either because they just started observing, or because of a discontinuity like a seek operation), the server logic will find the key frame with the latest presentation time whose presentation time is less than or equal to the requested presentation time. The server logic will then return that frame and any subsequently numbered frames whose presentation times are less than or equal to the requested presentation time.  (7:32-44).

Appx36-37.  This specific observer logic is further detailed in the computer code included with the specification (and overlooked completely by the panel).

With regard to **playback logic**, the patent teaches:

Another point of interest is playback logic module **126**, which in the first embodiment is responsible for determining what presentation time to request from server **110** if a participant chose to observe. The playback logic module supports the ability to have the participant perform time-shifting actions such as pausing, resuming, and seeking backward or forward. The playback logic module also supports changing the rate at which content is displayed; i.e., allow the participant to observe at slower than or faster than real-time.  (8:7-15)

A pseudo-code listing of a program for implementing the playback logic module is displayed in FIG. **3**. In addition to what is shown in the figure, the playback logic is also responsible for remembering the last frame number received for each stream. The last received frame numbers are all initialized to indicate that no frame has been received (in the first embodiment the invalid frame number, −1, is used). The last received frame numbers are updated every time frames are received from the server. In the case of a discontinuity such as seeking (jumping to another point in time), the last received frame numbers would be reset to −1.  (8:21-31).

8

Appx37. This specific playback logic is further detailed in the computer code

included with the specification (and overlooked completely by the panel).

With regard to the computer code that further explains how each of these

aspects of the invention are carried out, column 1 the patent explains that:

> A computer program listing appendix is stored on each of two identical compact disks labeled 'Copy 1' and 'Copy 2' which accompany this specification. Each disk contains computer program listings that illustrate an implementation of the invention. The listings are recorded as IBM-PC MS-Windows compatible files which have the creation dates, sizes (in bytes) and names listed below:  (1:16-23)

Appx34. This is followed by a list of dozens of computer files the inventor

programmed as a demonstration of how one embodiment of the invention worked:

US 7,679,637 B1

**1**

## TIME-SHIFTED WEB CONFERENCING

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of provisional patent application Ser. No. 60/855,076, filed 2006 Oct. 28 by the present inventor.

### FEDERALLY SPONSORED RESEARCH

Not applicable

### COMPUTER PROGRAM LISTING

A computer program listing appendix is stored on each of two identical compact disks labeled "Copy 1" and "Copy 2" which accompany this specification. Each disk contains computer program listings that illustrate an implementation of the invention. The listings are recorded as IBM-PC MS-Windows compatible files which have the creation dates, sizes (in bytes) and names listed below:

| | | |
|---|---|---|
| | | \ |
| 10/22/2006 03:58 PM | 2,817 | ReadMe.txt |
| | | \MeetingDemand |
| 07/29/2006 12:19 PM | 1,372 | MeetingDemand.sln |
| | | \MeetingDemand\Common |
| 10/18/2006 09:36 PM | 769 | debughelpers.h |
| | | \MeetingDemand\MDClientApp |
| 10/16/2006 08:39 PM | 9,058 | CameraInput.cpp |
| 10/16/2006 08:39 PM | 1,885 | CameraInput.h |
| 10/16/2006 08:34 PM | 3,211 | ClockCapture.cpp |
| 10/16/2006 08:31 PM | 408 | ClockCapture.h |
| 10/16/2006 08:34 PM | 2,219 | ClockOverlay.cpp |
| 10/16/2006 08:34 PM | 311 | ClockOverlay.h |
| 10/18/2006 10:04 PM | 6,925 | CommunicationMgr.cpp |
| 10/17/2006 10:29 PM | 2,462 | CommunicationMgr.h |
| 10/16/2006 08:50 PM | 1,722 | ConnectDlg.cpp |
| 10/16/2006 08:50 PM | 553 | ConnectDlg.h |
| 10/18/2006 10:08 PM | 13,252 | MDClientApp.cpp |
| 10/18/2006 08:41 PM | 3,021 | MDClientApp.h |
| 10/22/2006 08:24 PM | 7,418 | MDClientApp.rc |
| 10/22/2006 08:25 PM | 8,960 | MDClientApp.vcproj |
| 10/18/2006 10:06 PM | 17,045 | MDClientAppDlg.cpp |
| 10/18/2006 10:06 PM | 2,258 | MDClientAppDlg.h |
| 10/22/2006 08:25 PM | 1,973 | resource.h |
| 10/18/2006 09:33 PM | 3,247 | ScreenCapture.cpp |
| 10/18/2006 09:33 PM | 296 | ScreenCapture.h |
| 10/18/2006 09:58 PM | 1,919 | ScreenDecoder.cpp |
| 10/18/2006 09:58 PM | 1,429 | ScreenDecoder.h |
| 10/18/2006 09:59 PM | 3,136 | ScreenEncoder.cpp |
| 10/18/2006 09:58 PM | 862 | ScreenEncoder.h |
| 10/02/2006 06:10 PM | 211 | stdafx.cpp |
| 10/02/2006 06:10 PM | 3,008 | stdafx.h |
| 10/17/2006 10:33 PM | 4,073 | TSPlaybackMgr.cpp |
| 10/17/2006 10:33 PM | 1,089 | TSPlaybackMgr.h |
| 10/17/2006 08:20 PM | 1,648 | VideoDecoder.cpp |
| 10/16/2006 09:28 PM | 729 | VideoDecoder.h |
| 10/16/2006 09:28 PM | 381 | VideoDecoderBase.h |
| 10/16/2006 09:28 PM | 1,439 | VideoDisplay.cpp |
| 10/16/2006 09:28 PM | 483 | VideoDisplay.h |
| 10/17/2006 10:07 PM | 3,045 | VideoEncoder.cpp |
| 10/16/2006 09:28 PM | 840 | VideoEncoder.h |
| 10/16/2006 09:28 PM | 27 | WebService.h |
| | | \MeetingDemand\MDClientApp\AudioInput |
| 10/16/2006 08:26 PM | 2,272 | sync__simple.h |
| 10/16/2006 08:26 PM | 18,274 | waveIN__simple.cpp |
| 10/16/2006 08:26 PM | 8,004 | waveIN__simple.h |

**2**

| | | |
|---|---|---|
| | | -continued |
| | | \MeetingDemand\MDClientApp\AudioOutput |
| 10/18/2006 08:48 PM | 3,647 | AudioOutput.cpp |
| 10/18/2006 08:48 PM | 1,064 | AudioOutput.h |
| 10/18/2006 08:33 PM | 2,288 | DataBuffer.cpp |
| 10/18/2006 08:40 PM | 634 | DataBuffer.h |
| 10/18/2006 08:34 PM | 3,423 | TempoChangingAudioBuffer.cpp |
| 10/18/2006 08:34 PM | 791 | TempoChangingAudioBuffer.h |
| | | \MeetingDemand\MDClientApp\MDWebService |
| 10/05/2006 02:49 PM | 398 | MDWebService.disco |
| 10/17/2006 10:15 PM | 20,636 | MDWebService.wsdl |
| 10/05/2006 02:49 PM | 614 | results.discomap |
| | | \MeetingDemand\MDClientApp\res |
| 07/29/2006 12:19 PM | 402 | MDClientApp.rc2 |
| | | \MeetingDemand\MDWebService |
| 10/17/2006 10:36 PM | 6,992 | index.cpp |
| 10/17/2006 10:14 PM | 2,691 | Index.h |
| 10/17/2006 10:14 PM | 8,176 | MDWebService.cpp |
| 07/29/2006 12:18 PM | 171 | MDWebService.def |
| 10/05/2006 09:36 AM | 281 | MDWebService.disco |
| 10/17/2006 10:14 PM | 7,204 | MDWebService.h |
| 10/17/2006 08:06 PM | 2,038 | MDWebService.htm |
| 07/29/2006 12:18 PM | 2,577 | MDWebService.rc |
| 09/10/2006 02:11 PM | 6,039 | MDWebService.vcproj |
| 07/29/2006 12:18 PM | 439 | resource.h |
| 07/29/2006 12:18 PM | 299 | StdAfx.cpp |
| 07/29/2006 04:40 PM | 1,146 | StdAfx.h |

### BACKGROUND

1. Field

The field is web conferencing, specifically the application of time-shifting presentation techniques to the field of web conferencing.

2. Prior Art

Web conferencing systems can be used hold meetings and give presentations where participants are in remote locations. Web conferencing systems allow participants to share content with and observe content from other participants. Typical types of content include screen video data, camera video data, audio data (through computers and through telephones), chat data, documents, and the like

The current generation of web conferencing systems is focused primarily on real-time interaction. That is, participants join a virtual meeting at a designated time and are able to present and observe in real time (hereafter synchronously). Secondarily, many web conferencing systems can record the meeting. This allows a participant to observe the content of the meeting after the meeting has concluded.

However current web conferencing systems are unable to enable participants to asynchronously observe a live meeting, i.e., observe a previously recorded part of the meeting while the meeting is still in progress. This is undesirable for several reasons. First, if a participant joins a meeting five minutes late, their only choices are to either observe real-time and simply miss the first five minutes, or wait until the entire meeting has concluded to watch the entire recorded content or a selected part of it. Second, if a participant is observing real-time there is no way for them to pause the content to deal with an interruption, or to easily replay a portion of the content to repeat something they missed. Third, if a participant is observing in real-time and the presenter is moving too quickly, there is no way for the participant to slow the presentation.

A key struggle with using existing web conferencing systems is the organization and scheduling required to ensure

Appx34. Submission of the code in this manner as part of the specification is

consistent with MPEP § 608.05(a).

Despite this explanation of how to simultaneously record and playback a live web conference, the panel concludes that patent lacks such explanation. This was a misapprehension of the patent and should be corrected.

III.    *En Banc* **Review Should Resolve the Disparate Approaches to** *Alice* **Step One in** *Contour IP* **and This Case.**

Between the filing of the opening brief and the reply, a different panel of this Court issued the opinion in *Contour IP*. The reply relies heavily on *Contour IP* for multiple reasons, including the opinion's admonitions that overly general "abstract ideas" risk swallowing all of patent law. There were striking similarities between this case and *Contour IP* and one significant difference.

The significant difference was how the district court in each case characterized the abstract idea. In *Contour IP*, the district court determined that the abstract idea was: "creating and transmitting video (at two different resolutions) and adjusting the video's settings remotely." In this case, the district court's abstract idea was: "playing back recorded content." In other words, the "abstract idea" in *Contour IP* was much more specific—and much more tethered to the claims—than the district court's abstract idea in this case.

Despite being much more specific than the abstract idea in this case, a different panel of this Court determined that the district court's abstract idea was done at too high a level of abstraction and too untethered from the claims:

11

> The district court's decision characterizes the claims at an impermissibly high level of generality. As we have noted, the practice of "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337 (citations omitted). For example, in this case, the district court's conclusion that the claims were "directed to a result or effect that itself is the abstract idea" disregards the disclosed technological means for obtaining a technological result. *Decision*, 2022 WL 658553, at \*4 (internal quotations and citation omitted). The district court erred in its generalized articulation of the claimed advance of the claims, which all but ensured the incorrect conclusion that the claims were drawn to an abstract idea. *Enfish*, 822 F.3d at 1337.

*Contour IP*, 113 F.4th at 1379-80.

In this case, the panel did not criticize the district court's much more overly general "abstract idea" at all.  It now stands as "affirmed," despite violating all of the canons set forth in *Contour IP* and the cases it cites.   Unless corrected, all patents that can be characterized as "playing back recorded content" will face arguments that they are directed to patent ineligible subject matter under *Alice* step one.  The panel let that characterization stand, with no comment on whether it constitutes an impermissibly high level of generality.

The Court should grant *en banc* review to set forth one set of guidelines for *Alice* step one and specifically to hold that the district court's "abstract idea" in this case characterized "the claims at an impermissibly high level of generality."  It should correct the panel's "abstract idea" for the same reason and conclude that the claims at issue, like the claims in *Contour IP* are not directed to an abstract idea.

12

13

Dated: February 23, 2026

Respectfully submitted,

/s/ *David P. Berten*

David Berten
Alison Aubry Richards
GLOBAL IP LAW GROUP LLC
55 West Monroe Street, Suite 3400
Chicago, IL 60603
(312) 241-1500

*Attorneys for Appellant*
*US Patent No. 7,679,637 LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules.

1. The brief complies with Fed. R. App. P. 40(d)(3). It has been prepared using Microsoft® Word 2013 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of Microsoft® Word in preparing this certificate. That program reports the total word count of the document as 2,968 words.

Dated: February 23, 2026                    /s/ *David P. Berten*

David Berten
GLOBAL IP LAW GROUP LLC
55 West Monroe Street, Suite 3400
Chicago, IL 60603
(312) 241-1500

14

# ADDENDUM

# United States Court of Appeals
# for the Federal Circuit

———————————

**US PATENT NO. 7,679,637 LLC,**
*Plaintiff-Appellant*

**v.**

**GOOGLE LLC,**
*Defendant-Appellee*

———————————

2024-1520

———————————

Appeal from the United States District Court for the Western District of Washington in No. 2:23-cv-00592-JHC, Judge John H. Chun.

———————————

Decided: January 22, 2026

———————————

DAVID P. BERTEN, Global IP Law Group, Chicago, IL, argued for plaintiff-appellant. Also represented by ALISON AUBREY RICHARDS.

JOHN R. BOULE, III, Jones Day, Los Angeles, CA, argued for defendant-appellee. Also represented by T. KAITLIN CROWDER, Cleveland, OH; MICHAEL C. HENDERSHOT, Palo Alto, CA; ISRAEL SASHA MAYERGOYZ, Chicago, IL; JENNIFER L. SWIZE, Washington, DC; RITA J. YOON, San Francisco, CA.

———————————

Before MOORE, *Chief Judge*, HUGHES and STOLL, *Circuit Judges*.

MOORE, *Chief Judge*.

US Patent No. 7,679,637 LLC appeals an order of the United States District Court for the Western District of Washington granting Google LLC's (Google) motion to dismiss for failure to state a claim upon which relief can be granted. For the following reasons, we affirm.

## BACKGROUND

Appellant owns U.S. Patent No. 7,679,637, which relates to web conferencing systems that include "time-shifting capabilities" enabling participants "to observe [a] session in real-time, delayed while the session is still in progress, or after the session has completed." '637 patent at abstract, 3:61–64; *see also id.* at 2:33–43. Participants can also observe the session at different playback rates while maintaining substantially consistent perceived audio quality. *Id.* at 3:64–67. According to Appellant, and undisputed by Google on appeal, the claims allow data streams (e.g., video, chat data, documents, web pages, and whiteboarding sessions) to be viewed asynchronously, for example, to go back and review one aspect of a multimedia presentation while another aspect is proceeding live. Appellant Br. 29–30; *see also* Google Br. 3–4.

Independent claims 2 and 7 of the '637 patent are representative. Claim 2 reads:

2. A web conferencing system comprising:

(a) a first client application allowing at least one presenting participant to share computer screen video,

(b) said first client application also being arranged to allow said presenting participant to share at least one data stream selected from the group

consisting of chat data, documents, web pages and white-boarding session,

(c) storage means for recording said computer screen video and said data stream, and

(d) a second client application allowing at least one observing participant to sense said computer screen video and said data stream live,

(e) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream while said presenting participant is sharing a current part of said computer screen video and said data stream,

(f) said second client application also being arranged to allow said observing participant to selectively sense a previously presented and recorded part of said computer screen video and said data stream after said presenting participant has finished sharing a said computer screen video and, said data stream

whereby said web conferencing system is able to simultaneously record said computer screen video and said data stream and allow said observing participant to sense current and previously presented parts of said computer screen video and said data stream.

'637 patent at 12:32–61.

Claim 7 reads:

7. A web conferencing system comprising:

(a) a first client application that allows at least one presenting participant to share data streams

comprised of audio data and computer screen video data

(b) a second client application that allows at least one observing participant to sense said data streams

(c) a server application operatively connected to said first client application and to said second client application, said server application arranged to:

i. receive said data streams from said first client application and record it in a storage device

ii. retrieve said data streams from said storage device and send it to said second client application

(d) a time-scale modification component operatively connected to said second client application which is able to maintain substantially consistent perceived audio quality at a plurality of playback rates

whereby said data streams from said first client application can be simultaneously recorded by and retrieved from said storage device, and said second client application allows said observing participant to sense said data streams in real-time, and said second client application also allows said observing participant to selectively sense a previously presented and recorded part of said data streams at a plurality of playback rates at the same time that said presenting participant is sharing a current part of said data streams and after said presenting participant has stopped sharing, and said observing participant will perceive substantially consistent audio quality.

*Id.* at 13:20–14:19.

Appellant sued Google for infringing claims 2–5 and 7–9 of the '637 patent. J.A. 87–88. Google moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing the asserted claims are patent-ineligible under 35 U.S.C. § 101.[1] J.A. 121–36. The district court granted Google's motion to dismiss and denied Appellant leave to amend its complaint based on futility. J.A. 1–25. US Patent No. 7,679,637 LLC appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review a district court's Rule 12(b)(6) dismissal under the law of the regional circuit, here the Ninth Circuit. *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021). The Ninth Circuit reviews Rule 12(b)(6) dismissals de novo, accepting all factual allegations in the complaint as true and construing the pleadings in the light most favorable to the nonmoving party. *Id.* (citing *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)).

## I.    Patent Eligibility

Patent eligibility under 35 U.S.C. § 101 is a question of law that may contain underlying factual issues. *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1342 (Fed. Cir. 2018). We review the district court's ultimate conclusion on patent eligibility de novo. *Id.* We assess patent eligibility using a two-part test. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). First, "[w]e must . . . determine whether the claims at issue are directed to a patent-

---

[1]    Google also argued Appellant failed to plausibly allege that Google "benefits" from or "uses" the entire claimed system. J.A. 136. The district court did not reach this alternative argument, J.A. 2 n.1, and we do not reach it on appeal.

ineligible concept," such as an abstract idea (i.e., *Alice* Step One). *Id.* at 218. If so, we must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application" (i.e., *Alice* Step Two). *Id.* at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78–79 (2012)). The Supreme Court has described *Alice* Step Two as "a search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Id.* at 217–18 (citation modified) (quoting *Mayo*, 566 U.S. at 72–73).

Applying the *Alice* test, the district court determined the asserted claims are patent-ineligible because they are directed to an abstract idea and do not include an inventive concept that makes the claims patent-eligible. J.A. 1–24. We agree the asserted claims are not eligible.

## A. *Alice* Step One

Regarding *Alice* Step One, Appellant argues the district court erred in determining the asserted claims are directed to the abstract idea of "playing back recorded content." Appellant Br. 21 (citing J.A. 18). According to Appellant, this is an over-generalization of the claims, which are directed to a "specific asserted improvement that allows a presentation to be reviewed asynchronously . . . at the same time." *Id.* at 23–26. Even if we were to narrow the district court's characterization of the claims, however, we would still conclude the claims are directed to the patent-ineligible abstract idea of allowing asynchronous review of presentations, rather than any specific technological improvement, because they do not "describe *how* the alleged goal of [asynchronous review] is achieved." *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (emphasis added).

"In cases involving software innovations, [the step-one] inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea . . . ." *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022) (alterations in original). "While the § 101 inquiry must focus on the language of the asserted claims themselves," *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (citation modified), the claim itself need not explicitly recite the improvement. Rather, our precedent supports a variety of analytical approaches including, for example, (1) looking to the written description to understand the problem facing the inventor and what the patent describes as the invention, *id.* at 767–68; (2) considering whether any technological improvement is "embodied in the claims," *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017); and (3) analyzing whether the claims and written description "describe how [the] improvement was accomplished." *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1213 (Fed. Cir. 2025) (collecting cases), *cert. denied*, __ S. Ct. __, 2025 WL 3507020 (Dec. 8, 2025).

We start our analysis with the claim language. Here, independent claim 2 recites that the first and second client applications are "arranged to allow" certain results and that the web conferencing system is "able to" achieve simultaneous recording and observing of current and previously presented parts of a computer screen video and data stream. '637 patent at 12:32–61 (claim 2). Similarly, independent claim 7 recites that "a first client application . . . *allows* at least one presenting participant to share data streams comprised of audio data and computer screen video data" and "a second client application . . . *allows* at least one observing participant to sense said data streams" in real time and asynchronously. *Id.* at 13:20–14:19 (claim 7) (emphases added). Neither these claims nor their dependent claims, however, disclose *how* the claimed

8                    US PATENT NO. 7,679,637 LLC v. GOOGLE LLC

results are achieved or embody any specific technological improvement discernible to a skilled artisan from the patent or the prosecution history. Accordingly, we agree with the district court that the asserted claims of the '637 patent are directed to a patent-ineligible abstract idea. *See Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1356 (Fed. Cir. 2024) ("[C]laims . . . drafted using largely (if not entirely) result-focused functional language, containing no specificity about how the purported invention achieves those results . . . are almost always found to be ineligible for patenting under Section 101.").

Appellant argues the asserted claims are not result-oriented because they recite two client applications enabling the manipulation (e.g., the sharing, recording, reviewing, and sensing) of multiple data streams, and thus "expressly explain how the systems need to be set up to accomplish the improvement" of asynchronous presentation review. Appellant Br. 29–30; *see* Oral Arg. at 5:07–7:32. We do not agree. The claims are result-oriented because they do not explain how the client applications achieve the recited manipulation of the data streams to enable asynchronous review. '637 patent at 12:32–61 (claim 2), 13:20–14:19 (claim 7). Moreover, the written description does not disclose any improvement to the underlying components to enable asynchronous review. *See id.* at 10:26–29 (disclosing known client applications); *id.* at 5:37–38 (acknowledging data streams were "commonly used in the audio visual field"); *id.* at 8:33–39 (stating "the workings of [the stream decompression and display] components resemble those of similar components in existing web conferencing . . . applications"). The written description does not suggest the use of two client applications and multiple data streams was a technical solution to any problem facing the inventor. *See id.* at 2:66–3:6, 3:61–64 (describing problem and invention). Instead, the written description suggests the invention is nothing more than the abstract idea of applying known time-shifting functions to web-conferencing

systems to solve "great inefficiencies" resulting from participants waiting for others to join a presentation or from participants missing part of a presentation. *Id.* at 3:2–6.

For these reasons, this case is not like *Contour IP Holding LLC v. GoPro, Inc.*, where the patent disclosed (and the claims reflected) "improving POV camera technology through specific means of generating high- and low-quality video streams in parallel and transferring a low-quality video stream to a remote device." 113 F.4th 1373, 1380 (Fed. Cir. 2024). Instead, this case is like *Hawk Technology Systems*, where the claims at issue also involved the manipulation of multiple data streams but "fail[ed] to recite a specific solution to make the alleged improvement—conserving bandwidth while preserving quality—'concrete'" and were "recited at such a level of result-oriented generality that those claims amount[ed] to a mere implementation of an abstract idea." 60 F.4th at 1358 (quoting *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1152 (Fed. Cir. 2019)).

Appellant additionally argues that, even if the asserted claims are result-oriented, Google similarly uses "functional claiming" in its own video conferencing patents and thus necessarily believes this approach to claim drafting does not result in subject matter ineligible claims. Appellant Br. 30–34. The subject matter eligibility of Google's patent claims is not before us and has no bearing on our analysis of the '637 patent. Moreover, we reject the notion that the mere existence of factually distinguishable Google-owned patents somehow amounts to a sweeping concession by Google that *all* patents involving functional claiming approaches are necessarily patent-eligible.

Because we conclude the asserted claims of the '637 patent are directed to a patent-ineligible abstract idea, we proceed to Step Two of the *Alice* test.

10                    US PATENT NO. 7,679,637 LLC v. GOOGLE LLC

### B.  *Alice* Step Two

Appellant argues the district court erred in its application of *Alice* Step Two by overlooking two inventive concepts recited in the asserted claims that allegedly make them patent-eligible: (1) a two client application system allowing for the manipulation of multiple data streams and (2) a "time-scale modification component."  Appellant Br. 37–40.  We do not agree either "transforms the nature of the claims into a patent-eligible application."  *Alice*, 573 U.S. at 217 (citation modified).

First, Appellant largely repeats its *Alice* Step One arguments in pointing out the claims recite two client applications enabling the manipulation of distinct data streams. Appellant Br. 38.  As explained above,  the claims use result-oriented language with no specific implementation illustrating how to achieve the claimed results.  "Merely describing the functions of the abstract idea itself, without particularity, . . . is simply not enough under step two." *Int'l Bus. Machs.*, 50 F.4th at 1382  (citation  modified). Moreover, as the specification makes clear, the claimed client applications are conventional, well-known components, operating according to their ordinary functions to manipulate conventional data streams.  *See* '637 patent at 5:10–20, 5:23–39, 8:33–39, 10:20–29.  This cannot amount to an inventive concept, which must "reflect[] something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'"  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018)); *see also Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (no inventive concept in system claims that "only contain generalized software components arranged to implement an abstract concept on a computer").  Nor can conclusory allegations to the contrary "alter what [the]

patent itself states." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023).

Second, Appellant points to claims 4 and 7 of the '637 patent as allegedly supplying an inventive concept because they require an audio "time-scale modification component" able to maintain substantially consistent perceived audio quality (or aspects of audio quality) at a plurality of playback rates. Appellant Br. 39; '637 patent at 13:1–10 (claim 4), 13:20–14:19 (claim 7). Again, there is no disclosed inventive concept used to accomplish the claimed result, and the specification confirms the time-scale modification component was a conventional component implemented using off-the-shelf algorithms from related audio contexts including the "playback of recorded content." '637 patent at 3:19–32, 9:4–13. Under these circumstances, the time-scale modification component cannot, as a matter of law, constitute an inventive concept, which "must be more than well-understood, routine, conventional activity." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) (citation modified).

We see no error in the district court's conclusion that claims 2–5 and 7–9 of the '637 patent are patent-ineligible and affirm the dismissal.

## II. Premature Dismissal

Appellant next argues that, as a procedural matter, the district court erred by deciding patent-eligibility at the motion to dismiss stage and should have granted Appellant leave to amend its complaint. Appellant Br. 40–44. We do not agree.

"A patent may be determined ineligible at the Rule 12(b)(6) stage 'when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (quoting *Aatrix*,

882 F.3d at 1125).  And while "[t]he Ninth Circuit reviews a district court's denial of leave to amend a complaint for abuse of discretion," "[t]he question of futility of amendment . . . is reviewed *de novo*."  *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1288 (Fed. Cir. 2024) (citation omitted).

The Appellant has made no factual allegations that would preclude dismissal in this case.  The abstract idea involves allowing asynchronous review of web conferencing presentations, and an inventive concept "must be significantly more than the abstract idea itself."  *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).  No amendment to the complaint can alter what the '637 patent itself states regarding the conventionality of the client applications, data streams, and time-scale modification components discussed in the eligibility analysis detailed above.  *See supra* Discussion § I; *Sanderling*, 65 F.4th at 706.  Accordingly, we see no error in the district court's conclusion that granting leave to amend here would be futile.  J.A. 25.

Appellant additionally argues the district court should have (1) treated Google's motion to dismiss as a motion for summary judgment because Google improperly relied on facts outside the complaint to attempt to establish what was known, routine, or conventional, and (2) conducted claim construction before dismissal.  Both arguments are unavailing.  The district court was not obligated to treat Google's motion as a summary judgment motion because the court was clear it did not rely on any extra-pleading materials.  *See* J.A. 22 n.7; *Swedberg v. Marotzke*, 339 F.3d 1139, 1146 (9th Cir. 2003) ("A Rule 12(b)(6) motion to dismiss supported by extraneous materials *cannot* be regarded as one for summary judgment until the district court acts to convert the motion by indicating . . . that it will *not* exclude those materials from its consideration." (emphases added)).  Nor was claim construction necessary because Appellant never proposed any constructions or

explained how a proposed construction would change the patent-eligibility analysis. *Mobile Acuity*, 110 F.4th at 1293 ("To defeat a motion to dismiss based on the purported need for claim construction, a patentee must propose a specific claim construction . . . and explain why any dispute . . . must be resolved before the scope of the claims can be understood for § 101 purposes." (citation modified)).

## CONCLUSION

We have considered Appellant's remaining arguments and find them unpersuasive. Because claims 2–5 and 7–9 of the '637 patent are patent-ineligible and dismissal under Rule 12(b)(6) was appropriate, we affirm.

## **AFFIRMED**

### COSTS

Costs to Google.